**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Gordon College<br>    255 Grapevine Road<br>    Wenham, MA 01984-1899<br><br>            *Petitioners / Plaintiffs,*<br><br>    v.<br><br>UNITED STATES SMALL BUSINESS<br>ADMINISTRATION; ISABELLA CASILLAS<br>GUZMAN, *in her Official Capacity as*<br>*Administrator of the Small Business Administration*;<br>*and* THE UNITED STATES OF AMERICA,<br><br>        *Respondents / Defendants.* | Case No. <u>23-614</u><br><br>**PETITION FOR JUDICIAL**<br>**REVIEW AND**<br>**COMPLAINT FOR**<br>**DECLARATORY RELIEF** |

## COMPLAINT

COMES NOW the Plaintiff-Petitioner, GORDON COLLEGE, by counsel, and for its petition for judicial review and causes of action against Defendants UNITED STATES SMALL BUSINESS ADMINISTRATION; ISABELLA CASILLAS GUZMAN, *in her Official Capacity as Administrator of the Small Business Administration*; *and* THE UNITED STATES OF AMERICA, and alleges and states the following:

## INTRODUCTION

1.      Gordon College, a religious nonprofit higher educational institution respectfully submits this *Petition for Judicial Review and Complaint for Declaratory Relief* (the "Petition/Complaint").

1

2.      Gordon College's *Petition/Complaint* seeks review and reversal of the Decision of Administrative Law Judge ("ALJ") Gary D. Smith of the United States Small Business Administration ("SBA") Office of Hearings and Appeals ("OHA") issued on January 5, 2023 (the "Final Decision"). That Final Decision denied Gordon College's *Petition for Reconsideration* of ALJ Smith's initial decision issued November 21, 2022 (the "Initial Decision") denying Gordon College's application for forgiveness of Paycheck Protection Program ("PPP") loan number # 8289087101.

3.      Gordon College's Paycheck Protection Program loan # 8289087101 was obtained pursuant to the Coronavirus Aid, Relief and Economic Security Act (the "CARES Act"), Pub. L. No.116-136, 134 Stat. 281 (2020).

4.      Judicial review of the legally erroneous and arbitrary and capricious decision by Defendants SBA and its Administrator to deny forgiveness to Gordon College of a Paycheck Protection Program ("PPP") requires reversal of the SBA's Final Decision and Initial Decision issued by the ALJ and granting of Gordon College's PPP loan forgiveness.

5.      Both the Final Decision and the Initial Decision are legally erroneous and arbitrary and capricious on the merits. The ALJ applied incorrect legal standards, failed to address the College's legal authorities and arguments regarding the correct legal standards and analysis, and refused to consider undisputed evidence that SBA had granted PPP loan forgiveness to more than twenty-five similarly situated private colleges that had also used the same FTE employee method in their PPP loan applications that Gordon College had used.

6.      Moreover, in deciding and denying Gordon College's appeal, the ALJ and SBA committed multiple violations of applicable regulations governing the PPP appeal process. Those violations include (but are not limited to) failing to close the Administrative Record at any point

in the OHA appeal, failing to rule on Gordon College's *Objections to Administrative Record* prior to issuing the Initial Ruling, and admitting into to the Administrative Record of the SBA loan forgiveness decision SBA documents that did not exist at the time of the SBA decision – nor at any time until after all briefing on the appeal of that decision had concluded.

7.      The ALJ's Final Decision was thus based upon an incomplete and fundamentally flawed Administrative Record and other improper, arbitrary, and capricious actions.

8.      Gordon College's *Petition for Judicial Review and Complaint for Declaratory Relief* also requests a Declaratory Judgment that the actions of the Defendants herein violate Gordon College's constitutional and statutory rights under the First and Fifth Amendments to the United States Constitution and under federal statutes and regulations, including without limitation the federal Religious Freedom Restoration Act of 1993, 42 U.S.C. 2000bb *et seq*.

## THE PARTIES

**Plaintiff-Petitioner Gordon College**

9.      Plaintiff-Petitioner Gordon College is a private nonprofit Christian institution of higher education located in Wenham, Massachusetts. Gordon College's principal office is located at 255 Grapevine Road, Wenham, Massachusetts, 01984-1899.

10.     Gordon College was chartered by the Commonwealth of Massachusetts for the purpose of carrying on the religious educational work begun in 1889 by the Reverend Adoniram Judson Gordon and continued without interruption to the present time.

11.     Gordon College is an expressly and devotedly Christian organization. Gordon College was formed to provide instruction in the Bible and other subjects while preparing students for Christian ministry and other forms of Christian work.

12.     Gordon has maintained its dedication to the historic, evangelical, biblical faith. Should the College ever stray from its core religious mission, its governing charter requires the transfer of all its assets to another evangelical institution.

13.     Gordon College's Restated Articles of Organization state that Gordon was formed "to provide instruction in the Bible and other subjects; to prepare men and women for the work of foreign and home missions, for the duties of the Christian ministry and other special forms of Christian work."

14.     In furtherance of that purpose, the Board of Trustees of the College has approved the following Mission Statement: Gordon College strives to graduate men and women distinguished by intellectual maturity and Christian character, committed to lives of service and prepared for leadership worldwide. To that end, Gordon College, a Christian community of the liberal arts and sciences, is dedicated to:

- The historic, evangelical, biblical faith;
- Education, not indoctrination;
- Scholarship that is integrally Christian;
- People and programs that reflect the rich mosaic of the Body of Christ;
- Life guided by the teaching of Christ and the empowerment of the Holy Spirit;
- The maturation of students in all dimensions of life: body, mind and spirit;
- The application of biblical principles to transform society and culture.

15.     As the College explains on its website, "We deepen the faith by integrating Christian beliefs and practice into all aspects of our educational experience."[1]

**Respondents/Defendants**

16.     Respondent/Defendant United States Small Business Administration ("SBA") is an independent federal agency created and authorized pursuant to 15 U.S.C. § 633 *et seq*. Under the CARES Act, the SBA administers the PPP.

---

[1] https://perma.cc/7W73-VSUE

17.     Defendant Isabella Casillas Guzman (the "Administrator") is the Administrator of the SBA and is sued in her official capacity only, as the Administrator of the SBA. Authority to sue the Administrator is granted by 15 U.S.C. § 634(b).

18.     Defendant United States of America ("United States") is named as a party pursuant to 5 U.S.C. §§ 702, 703. The actions complained of were taken by the United States through its officials or agencies, including the SBA and the Administrator.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction of Petitioner Gordon College's *Petition/Complaint* under 28 U.S.C. §§ 1331,1346(a)(2), 1361, and/or 2201.

20.     Authority for judicial review of agency action is further provided by 5 U.S.C. §§ 702, 703, and 704.

21.     Plaintiff's *Petition/Complaint* also arises under the United States Constitution, including without limitation the First and Fifth Amendments, and certain other federal laws, including without limitation RFRA, 42 U.S.C. §§1983 and 1988.

22.     This Court is vested with original jurisdiction over the declaratory judgment claims under 28 U.S.C. §§1331 and 1343.

23.     This Court is vested with authority to grant the requested declaratory judgment under 28 U.S.C. §2201 *et seq*.

24.     This Court has jurisdiction to award the requested injunctive relief under 28 U.S.C. §1343.

25.      This Court has jurisdiction to award reasonable costs and attorneys' fees under 42 U.S.C. §1988 and 42 U.S. Code § 2000bb–1(c).

26.     Venue is proper in United States District Court for the District of Columbia pursuant to 28 U.S.C. §1391(b) and (e) and 5 U.S.C § 703 because Defendants reside in the District of Columbia and because events giving rise to the claim occurred within the District of Columbia.

27.     The SBA's review and denial of Gordon College's appeal through the SBA's Office of Hearings and Appeal ("OHA") became final by Monday, February 6, the first business day immediately following thirty calendar days after service of the ALJ's Final Decision. *See* 13 C.F.R. § 134.1211(c) and (d).

28.     Plaintiff-Petitioner Gordon College is entitled to judicial review of the SBA Final Decision and Initial Decision. 13 C.F.R. § 134.1201(d) ("An appeal to OHA is an administrative remedy that must be exhausted before judicial review of a final SBA loan review decision may be sought in a Federal district court."); § 134.1211(g) ("***Appeal to Federal district court.*** Final decisions may be appealed to the appropriate Federal district court only.") (emphasis in original).

## FACTUAL BACKGROUND

29.     Petitioner Gordon College seeks judicial review of the erroneous and improper handling of the College's PPP loan application and forgiveness application by Defendant SBA and its Office of Hearing and Appeals ("OHA").

30.     Gordon College accurately completed and submitted to SBA via the College's PPP lender Citizens Bank a PPP Borrower Application on the Form 2483 as promulgated by SBA in March 202 for that specific purpose.

31.     As required on the face of the SBA Form 2483, Gordon College accurately reported the number of employees that it had during the relevant time-period. The College's

answer of "495.67" employees clearly indicated that it was using a full-time equivalent ("FTE") employee methodology to determine the number of employees.

32.     Gordon College's use of the FTE method to determine its number of employees for purposes of PPP loan eligibility also reflected the SBA requirement that a borrower certify (as Gordon College truthfully certified) on page 2 of its SBA Form 2483 (04/20) that "The Applicant will provide to the Lender documentation *verifying the number of full-time equivalent employees on the Applicant's payroll* as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities for the eight-week period following this loan." (emphasis added)

33.     At the time that Gordon College signed, certified, and submitted its PPP Loan Application using SBA Form 2483 (04/20), there was widespread confusion about what method to determine the number of employees should be used.

34.     On April 6, 2018, Defendant SBA and Treasury promulgated FAQ #17 making clear that PPP loan applicants could rely upon the guidance that was available at the time of loan application regarding eligibility and their loan eligibility and forgiveness would be evaluated based upon that available guidance even if guidance issued at a later point provided otherwise. FAQ #17 provided in full:

> 17. **Question:** I filed or approved a loan application based on the version of the PPP Interim Final Rule published on April 2, 2020. Do I need to take any action based on the updated guidance in these FAQs?
>
> **Answer:** No. Borrowers and lenders may rely on the laws, rules, and guidance available at the time of the relevant application. However, borrowers whose previously submitted loan applications have not yet been processed may revise their applications based on clarifications reflected in these FAQs.

35.     Many PPP loan applicants, including more than twenty-five (25) other colleges similarly situated to Gordon College, in good faith used an FTE method to determine the number

of employees for purposes of completing SBA Form 2483 and of determining PPP loan eligibility.

36.     Gordon College's PPP loan application was quickly approved by its lender Citizens Bank and the SBA, the loan funded, and the loan proceeds applied by Gordon College for the exact purposes set forth in the CARES Act and in the existing PPP Interim Final Rules and FAQs.

37.     Gordon College expended all the PPP loan funds that it received entirely to keep employees employed by Gordon College during the COVID-19 lockdown in 2020.

38.     Only after Gordon College had applied for, been approved for, and received the PPP loan funds did Defendant SBA and the Department of Treasury decide that they should provide guidance to PPP loan applicants about SBA's preferred method to determine number of employees. Consequently, for the first time on April 26, 2020, SBA and Treasury issued written guidance in the form of FAQ #36 indicating that a headcount method rather than an FTE method should be used to determine the number of employees for purposes of PPP loan eligibility.

39.     Defendants have misunderstood and misapplied the relevant regulations and guidance (including both "Interim Final Rules" and Frequently Asked Questions ("FAQs")) promulgated by SBA and the Department of Treasury during the extremely hectic first several weeks of initial PPP loan applications as applicants rushed to complete and submit their applications before the loan funds appropriate by Congress were exhausted.

**Congress Enacts the CARES ACT in Response to the Urgent COVID-19 Lockdowns.**

40.     In March 2020, in response to the escalating global pandemic caused by the COVID-19 virus, the federal government ordered an unprecedented lockdown of the U.S. economy. On March 11, 2020, the World Health Organization, after more than 118,000 cases in

114 countries and 4,291 deaths, declared COVID-19 a pandemic. On March 13, 2020, the President declared a nationwide emergency. In response, by March 15, most states began to implement mandated shutdowns of businesses, schools, and other public gatherings in order to prevent the spread of COVID-19. *See* https://www.cdc.gov/museum/timeline/covid19.htm.

41.     Beginning on March 10, 2020, the Governor of Massachusetts declared a state of emergency in Massachusetts due to the COVID-19 pandemic and began issuing a series of COVID-19 Executive Orders that, among other things, prohibited gatherings of more than 25 people and led to the shutting down of operations of public and private schools and colleges and universities in the state.

42.     These shutdowns occurred while Gordon College students were on their Spring Break. Gordon College leadership ultimately decided that to comply with the lockdowns and other legal restrictions it would be necessary to shut down on-campus classes and residential attendance and to shift entirely to online classes and education.

43.     These unprecedented shutdowns of the U.S. economy and educational systems had extremely serious effects upon nonprofits, businesses, and individuals, and particularly on small colleges and universities such as Gordon College. The lockdowns created serious practical, financial, and existential issues for colleges, particularly those focused on residential undergraduate education, like Gordon College.

44.     In response to these unprecedent shutdown of the U.S. economy and the profound impact on business and nonprofits, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") was enacted by Congress and signed by the President on March 27, 2020.

45.     The CARES Act provided a number of measures designed to enable and encourage employers to keep their employees employed during the economic shutdowns. One

such measure was the Paycheck Protection Program, which appropriated federal funds to be used to provide loan interest loans to employers to be used to support ongoing operations to keep employees employed. Under the CARES Act, the loans could be forgiven if certain conditions related to keeping employees employed were satisfied.

**The Paycheck Protection Program and Its Implementation.**

46.     Because there was no existing federal agency or institution that was capable of implementing the PPP loan program under the CARES Act, Congress selected the United States Small Business Administration ("SBA") to implement and administer the PPP loan application and forgiveness process.

47.     The CARES Act gave the SBA an almost impossible task – to administer a brand new massive and unprecedented Paycheck Protection Program loan program urgently authorized by Congress in a time of national crisis, a worldwide pandemic, and national and state ordered shelter-in-place orders.

48.     Existing SBA regulations and guidance were not sufficient to address the requirements of implementing the PPP program.

49.     The duty of establishing rules and guidance to clarify uncertainty and confusion in the loan application and forgiveness process fell to the Treasury and the SBA. SBA and Treasury rolled out new rules, guidance, and clarifications every few days that were eagerly anticipated and devoured by borrowers and their attorneys and CPAs to understand such critical issues as loan eligibility and loan application procedures.

50.     Most important for present purposes, with only a few very limited exceptions, the SBA had not previously implemented, overseen, or administered laws, regulations, and programs that made loans to religious and other nonprofit organizations such as Gordon College.

51.     Many faith-based organizations such as Gordon College delayed applying for PPP loans due to needing clarification of their eligibility and the impact on their organizations of receiving federal PPP loans. Other organizations, including Gordon College, were held up by the inability of larger banks to develop the technology and systems to receive and process loan applications.

52.     When the PPP program was announced, the federal government stated frankly and frequently that funds were limited and the program would operate on a first come, first serve basis until the appropriated funds ran out or the program terminated on June 30, 2020. News media reinforced this urgency.

53.     There was a rush to apply for this limited pool of funds for which applications would open on April 3, 2020, which ran headlong into the need for rules and guidance that was yet to be forthcoming.

54.     In late March and early April 2020, both the Treasury Department and Defendant SBA were issuing rules and guidance at the same time that PPP applications were flooding in from PPP loan applicants. Interim Final Rules, SBA/Treasury instructions and guidance, and an evolving list of Frequently Asked Questions ("FAQs") were cumulative and ongoing throughout the PPP loan application process. Different rules were available and applicable to applicants depending on when the applicant applied for the PPP loan.

55.     Lenders – both national and community banks – were overwhelmed as they were enlisted into the loan evaluation and approval process as well. Some banks halted intake of loan applications due to technological issues of syncing up with the SBA portals. At the same time government representatives and media were touting the limited funds and the need to hurry up and apply before the PPP funds ran out.

56.     Gordon College signed its application on April 6, 2020, yet its PPP lender Citizens Bank had to pause its intake of PPP loan applications due to technical issues. It was a week until Citizens Bank submitted the Gordon College PPP loan application to SBA on April 13, 2020.

57.     In fact, early in the PPP program, some lenders had virtually no guidance even as to what documents the applicants were to submit. Additionally, it was unclear whether nonprofit organizations would be eligible as a "small business", what size standards would be applied, and if so what did faith-based nonprofit organizations give up in ways of autonomy or other concerns by applying for a PPP loan.

58.     Thus began a series of Interim Final Rules and sequentially numbered Frequently Asked Questions (FAQs) posted on the PPP Loan website issued by SBA and Treasury. These were cumulative and rolling in nature and the applicant only had available to it the relevant laws, rules and guidance at the time of completing and filing its application for the PPP loan.

**The CARES Act (March 27, 2022) and Determining "Employees" for PPP Purposes.**

59.     The CARES Act became law on March 27, 2020.

60.     The CARES ACT provided the definition of "employee" for purposes of Paycheck Protection Program loan program:

> (v) EMPLOYEE. — For purposes of determining whether a business concern, non-profit organization, veterans organization, or Tribal business concern described in section 31(b)(2)(C) employs not more than 500 employees under clause (i)(I), **the term 'employee' includes individuals employed on a full-time, part-time, or other basis**. [emphasis added]

61.     There are only three uses of the term "part-time employee" in the CARES Act and none define the term. The term "headcount" is not used in the CARES Act. There is no formula for counting employees provided in the CARES Act. The Act made it clear that part-time

employees were "included" in the <u>definition</u> of employee but did not address how to calculate the sum of these full-time and part-time employees into a total number.

62.     At least until the issuance of FAQ #36 on April 26, 2020, it was unclear for purposes of determining the 500 maximum number of employees for PPP loan eligibility whether such part-time employees are each counted as one employee (regardless of any specific part-time threshold hours standard) – a "headcount" formula – or whether the full-time equivalent (FTE) calculation was appropriate.

**SBA/Treasury PPP Loan Application Guidance.**

63.     Although the CARES Act did not address the formula for calculation of 500 employee threshold, SBA and Treasury announced that SBA would begin taking applications for PPP loans on April 3, 2020.

64.     On or about March 31, 2020, the Treasury Department publicly posted new guidance about the PPP loan application process,  including the following:

65.     **Paycheck Protection Program Application Form**. The PPP Application Form, SBA Form 2483 (04/20), itself stated that the Borrower should provide the Lender documentation verifying the number of full-time equivalent employees. The PPP Application Form available in April 2020 and that Gordon used did not state that this was for forgiveness only; it did not even state that it was for forgiveness or any other specific purposes at all.

66.     Page two of that Form requires the Borrower to make certifications that include:

The applicant will provide to the Lender documentation *verifying the number of* ***full-time equivalent employees*** *on the Applicant's payroll* as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities for the eight-week period following this loan. [emphasis added]

67.     Pages three and four of the form provided "Instructions for completing this form". These instructions did not address any formula for how to count the number of employees, nor undermine the emphasis in the certification on verifying the number of *full-time equivalent employees* on the Applicant's payroll as only for the forgiveness application purposes. At the time of the initial PPP Application Form, the form was stylized for businesses, and not for nonprofits.[2]

68.     **Small Business Paycheck Protection Program.** The only reference to employee numbers or size standards in this one-page memo was the following:

> All Small Businesses Eligible. Small businesses with 500 or fewer employees— including nonprofits, veterans organizations, tribal concerns, self-employed individuals, sole proprietorships, and independent contractors— are eligible. Businesses with more than 500 employees are eligible in certain industries.

69.     **Paycheck Protection Program (PPP) Information Sheet: Borrowers**. Relevant information is found on page 1 and page 3. It answers the question "Who can apply?" by stating:

> All businesses – including nonprofits . . . with 500 or fewer employees can apply. Businesses in certain industries can have more than 500 employees if they meet applicable SBA employee-based size standards for those industries.

70.     The question "How can I request loan forgiveness?" receives the following answer:

> You can submit a request to the lender that is servicing the loan. The request will include documents that verify ***the number of full-time equivalent employees***.... [emphasis added]

_____

[2] For example, it asked for Applicant Ownership and required the applicant to "list all owners of Applicant with greater than 20% ownership stakes." Federally tax-exempt organizations such as Gordon College are not owned by any individuals or companies. Many of the questions required to have a yes or no answer also applied to businesses and not nonprofit organizations. This Form is available at https://home.treasury.gov/system/files/136/PPP-Borrower-Application-Form-Fillable.pdf

71.     On pages 3-4, the document repeats the certifications and informs a borrower applying for forgiveness of a PPP loan that "as part of your application, you will need to certify in good faith. . ." and again references the full-time equivalent documentation that the applicant will provide to the lender for the eight-week period of the loan:

> You will provide to the lender documentation that verifies **the number of full-time equivalent employees** on payroll and the dollar amounts of payroll costs. [emphasis added]

72.     It was not until April 26, 2020 that SBA clarified that the full-time equivalent employees analysis was *not* to be the standard for PPP loan *eligibility* when counting to 500 employees, but only the standard for *forgiveness* of PPP loans. Prior to April 26, 2020, nothing in these documents or the CARES Act and related FAQs and Interim Final Rules provided by SBA or Treasury stated that the full-time equivalent employee standard would not apply for *eligibility*. To the contrary, the references to full-time equivalent employees and documentation that the applicant had to provide to the lender strongly indicated that full-time equivalent employees were an acceptable form of "counting" to get to 500 employees.

**Interim Final Rule Issued April 2, 2020.**

73.     The Department of Treasury issued a 31-page Interim Final Rule ("IFR") to provide further PPP guidance, first posted on April 2, 2020 and published April 15, 2020.[3] Its stated purpose was to outline "the key provisions of SBA's implementation of sections 1102 and 1106 of the [CARES] Act in formal guidance". It provides (in pertinent part):

> 2. What Do borrowers Need to Know and Do?
> a. Am I eligible?
> You are eligible for a PPP loan if you have 500 or fewer employees whose principal place of residence is in the United States, or are a business that operates

---

[3] 85 F.R. 20811 (Apr. 15, 2020), available at: https://home.treasury.gov/system/files/136/PPP--IFRN%20FINAL.pdf

in a certain industry and meet the applicable SBA employee-based size standards
for that industry, and:
i. You are: …….
       B. A tax-exempt nonprofit organization described in section 501(c)(3) of
       the Internal Revenue Code (IRC) . . .

74.     There is no guidance regarding calculation of number of employees and no
reference to a definition of employee or "part-time" employee included. There is, however, a
reference to "full-time equivalent employees" at section 2(t)(iv), where it again repeats the
required certification that the borrower will provide " [d]ocumentation verifying the number of
*full-time equivalent employees on payroll*...." [emphasis added]

**Frequently Asked Questions Regarding Participation of Faith-Based Organizations in the
Paycheck Protection Program (PPP) and the Economic Injury Disaster Loan Program
(EIDL)– issued April 3, 2020.**

75.     On April 3, 2020, the SBA issued specific guidance as to whether nonprofits and
faith-based organizations such as Gordon College could apply for the PPP loan without impunity
or impact on its tax-exempt status, in its *Frequently Asked Questions Regarding Participation Of
Faith-Based Organizations In The Paycheck Protection Program (PPP) and the Economic
Injury Disaster Loan Program (EIDL)* and provided FAQs #1 –8. Information on size standards
for nonprofits was provided at Question 8:

8. How do I know where my organization fits in SBA's size standards table?
Should I use the table to determine whether my organization is a small business
that is eligible to participate in the PPP program?

SBA's size standards can be found at 13 CFR § 121.201. Under the CARES Act,
a non-profit organization qualifies as small, and is eligible for assistance, if (1) it
has no more than 500 employees or (2) the NAICS code associated with its
primary industry has a higher employee-based size standard. Some industries—
including "religious organizations"—are currently listed in the size standards
table with a monetary cap on annual receipts rather than an employee-based size
standards cap. For nonprofit organizations whose primary industry is listed with a
monetary cap on annual receipts, the size standards table therefore cannot be used
to determine eligibility for the PPP program. Faith-based nonprofit organizations

that do not fall under a primary industry that is listed with an employee-based size standard must have 500 employees or fewer to be considered small.[4]

**Interim Final Rule on Affiliations Issued April 3, 2020; Effective April 15, 2020.**

76.     The stated purpose of this IRF on Affiliations ("IFR-AFF") was to supplement the "Initial Rule" (see 7.3 above) "with additional guidance regarding the application of certain affiliate rules applicable to SBA's implementation of sections 1102 and 1106 of the [CARES] Act". [5]

77.     This IFR-AFF was a significant determination for Faith Based Organizations (FBOs) as it exempted FBOs from the SBA affiliation rules "where the application of the affiliation rules would substantially burden those organizations' religious exercise." Generally, a borrower was considered together with its affiliates for purposes of determining eligibility for the PPP. Affiliates were generally identified by having such factors as stock ownership, overlapping management, and identity of interest. Of particular interest is how the IFR-AFF addressed the conflict between the SBA's existing affiliation rules for small businesses and the application of those rules to FBOs.

78.     Prior to the CARES Act, nonprofits were not eligible for SBA Business Loan Programs under section 7(a) of the Small Business Act. The CARES Act not only made

---

[4] The SBA Loan Decision similarly stated that SBA industry size standards do not apply to Appellant.

[5] This IFR-AFF was published at 85 F.R. 20817 (Apr. 15, 2020) and is also available at:

https://www.federalregister.gov/documents/2020/04/15/2020-07673/business-loan-program-temporary-changes-paycheck-protection-program

https://www.govinfo.gov/content/pkg/FR-2020-04-15/pdf/2020-07673.pdf

*See also Affiliations Rules Applicable to U.S. Small Business Administration Paycheck Protection Program* outlining tests for affiliation posted on treasury.gov on April 3, 2020 at Borrower Information at:

https://home.treasury.gov/system/files/136/Affiliation%20rules%20overview%20%28for%20public%29.pdf

nonprofits eligible for the PPP but subjected them to the SBA affiliation rules (Section 1102 of the Act stated this explicitly). The IFR-AFF exempts FBOs from these SBA affiliation rules listed in 13 CFR part 121 because application of those rules to FBOs would impose a substantial burden on their free exercise of religion. The IFR-AFF further revised Section 121.103(b) by adding subsection (b)(10) addressing those free exercise considerations and explaining both the process for a Faith Based Organization to acknowledge that the FBO would have been an eligible borrower but for the application of the SBA rules and how the FBO can assert that exemption on its loan application.

79.     In this IFR-AFF, SBA/Treasury acknowledged that nonprofits were not eligible for the previously existing SBA Business Loan section 7(a) and that some long-established rules provided for that regular SBA program not open to nonprofits would work to the detriment of the faith-based nonprofit securing the desperately needed PPP loan funds.

**Treasury FAQs Posted as of April 13, 2020 – date of Gordon College PPP Application Submission to SBA.**

80.     To assist borrowers, Treasury posted on its website Frequently Asked Questions (FAQs) and the answers on a continually updated basis. There were 25 FAQs issued as of the date of the filing of the Gordon College loan application with SBA on April 13, 2020. Of these first 25 FAQs publicly available to Gordon at the time of its certifications and submission of its PPP loan application, only two FAQs tangentially reference number of employees:

81.     **FAQ #3** clarified that PPP loans "are also available for qualifying tax-exempt nonprofit organizations described in Section 501(c)(3) of the Internal Revenue Code (IRC). . . *that have 500 or fewer employees whose principal place of residence is in the United States, or meets the SBA employee-based or revenue-based size standards for the industry corresponding to its primary industry*." [emphasis added] There are no SBA employee-based standards for

Gordon's industry of higher education (NAICS 611310 Colleges, Universities and Professional Schools).[6] For those industries with only a compensation standard and not a size standard, the size standards table cannot be used. Additionally, "Faith-based nonprofit organizations that do not fall under a primary industry that is listed with an employee-based size standard must have 500 employees or fewer to be considered small."

82.     As originally posted by SBA/Treasury,[7] **FAQ #14** provided:

**Question**: What time period should borrowers use to determine their number of employees and payroll costs to calculate their maximum loan amounts?

**Answer**: In general, borrowers can calculate their aggregate payroll costs using data either from the previous 12 months or from calendar year 2019. . . Borrowers may use their *average employment over the same time periods to determine their number of employees*, for the purposes of applying an employee-based size standard. [emphasis added]

83.     The answer addressed which time periods to use when calculating number of employees for purposes of applying an employee-based size standard. However, Gordon College had no such employee-based size standard available to it as a faith-based nonprofit organization.

84.     The most critical of these FAQs to the argument that the SBA decision below failed to take into consideration is the ability of an applicant to rely on the laws, rules, and guidance provided as of the date the employer applies for the PPP loan. **FAQ #17** issued April 06, 2020 provided:

**Question**: I filed or approved a loan application based on the version of the PPP Interim Final Rule published on April 2, 2020. Do I need to take any action based on the updated guidance in these FAQs?

---

[6] *See* Size Standards Table, *U. S. Small Business Administration Table of Small Business Size Standards Matched to North American Industry Classification System Codes*, available at: https://www.sba.gov/sites/default/files/2022-05/Table%20of%20Size%20Standards_Effective%20May%202%202022_Final.pdf

[7] The original version of FAQ #14 is no longer posted on the SBA site. Footnote 17 to the version of FAQ #14 currently posted at www.SBA.gov explains the edits to the text.

**Answer**: No. *Borrowers and lenders may rely on the laws, rules, and guidance available at the time of the relevant application.* However, borrowers whose previously submitted loan applications have not yet been processed may revise their applications based on clarifications reflected in these FAQs. [emphasis added]

**Gordon College PPP Loan Application Submitted April 13, 2020.**

85.     Gordon College's completed SBA Form 2483 (04/20) Borrower Application was completed and submitted to the SBA Portal by Gordon's lender Citizen's Bank by no later than April 13, 2020.

86.     Gordon's Borrower Application clearly stated in at least three different places that Gordon College was a 501(c)(3) nonprofit organization.

87.     Gordon's Borrower Application requested a loan in the amount of $7,046,037.

88.     In good faith reliance upon the then-existing SBA/Treasury guidance, Gordon's Borrower Application listed in the designated box on page 1 of the form the number of employees as "495.67". The percentage ".67" clearly indicated that Gordon was using an FTE method to calculate the number of employees.

89.     The fourth certification on page 2 of the SBA Form 2483 Borrower Application Form required that the applicant certify under penalty of perjury that:

The applicant will provide to the Lender documentation *verifying the number of full-time equivalent employees on the Applicant's payroll* as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities for the eight-week period following this loan. [emphasis added]

90.     Gordon College made this certification on its Borrower Application Form submitted April 13, 2020.

91.     The "Instructions for completing this form" on pages 3-4 of SBA Form 2483 (04/20) in April 2020 did not address the formula for how to count number of employees nor in

any way suggest that the certification's requirement to verify *full-time equivalent employees* was only for forgiveness and not eligibility purposes.

92.     The Borrower Application thus was beyond Gordon's control by April 13, 2020.

93.     Gordon College was entitled to rely on the laws, rules and guidance available at the time of its application that was submitted to SBA on April 13, 2020.

94.     Gordon College's Loan Application was approved on April 15, 2020 in the requested amount of $7,046,037.00.

95.     The Loan Agreement and all related documentation were executed by both parties on or before April 23, 2020.

96.     Gordon College relied on FAQ #17 and expended the entire PPP loan proceeds of $7,046,037 entirely on payroll and related permissible costs to keep its employees employed – the quintessential reason for the Paycheck Protection Program as designed by Congress.

**Treasury FAQ #36 – Issued April 26, 2020 -- Clarification on 500 Employee Calculation.**

97.     Only *after* Gordon College's PPP Loan Application was submitted to SBA on April 13, 2020, approved by SBA on April 15, 2020, and all loan documents executed by April 23, 2020, Treasury/SBA issued a new FAQ #36 on April 26, 2020.

98.     Although the CARES Act did not address headcount or prescribe a formula as to how to count employees for *eligibility* for the PPP loan, FAQ #36 for the first time articulated a new formula for how to count the 500 employee threshold for *eligibility*, resulting in two different "counting" formulas – headcount for eligibility and FTE for forgiveness.

**FAQ #36.**

**Question**: To determine borrower eligibility under the 500-employee or other applicable threshold established by the CARES Act, must a borrower count all employees or only full-time equivalent employees?

**Answer**: For purposes of loan eligibility, the CARES Act defines the term employee to include "individuals employed on a full-time, part-time, or other basis." *A borrower must therefore* calculate the total number of employees, including part-time employees, when determining their employee headcount for purposes of the eligibility threshold. For example, if a borrower has 200 full-time employees and 50 part-time employees each working 10 hours per week, the borrower has a total of 250 employees. By contrast, for purposes of loan forgiveness, the CARES Act uses the standard of "fulltime equivalent employees" to determine the extent to which the loan forgiveness amount will be reduced in the event of workforce reductions. [emphasis added]

99.     When on April 26, 2020 FAQ #36 first became the rule for counting employees to determine PPP loan *eligibility*, Gordon College had already filed two weeks earlier its application listing its number of employees as 495.67, clearly indicating that it had used FTE calculations as the calculation method. On that basis, SBA had already approved Gordon's loan application and both Gordon and its lender had fully executed the PPP loan documents.

**Gordon College's PPP Loan Forgiveness Application and SBA Review**

100.    On or about September 3, 2021, Gordon College submitted its application for forgiveness of its PPP loan requesting forgiveness of the full amount.

101.    At several points during the loan forgiveness review process, the SBA loan examiner requested additional information from Gordon College via requests relayed through the PPP lender Citizens Bank.

102.    On or about November 3, 2021, Gordon College received an email from Citizens Bank stating that:

SBA requests the following documents or information from the borrower:
….
Please also provide a list of locations to include employee count per location.

103.    This SBA request, relayed through Citizens Bank, did not explain the purpose of this inquiry, the relevance of the different locations, the specific time frame for the request, nor the method to be used in determining the number of employees to be listed for each location.

104.    Gordon College responded to this request via email reply to Citizens Bank on November 5, 2021, providing a breakout of employees by state. In making this response, Gordon College used a headcount method to determine employees, rather than the FTE method that it used when it submitted its original SBA Form 2483 loan application or its loan forgiveness application.

105.    At several additional points during the loan forgiveness review process, the SBA loan examiner requested additional information from Gordon College by relaying requests through Citizens Bank and/or communicated through Citizens Bank that SBA, based upon the loan examiner's preliminary review, was considering a Full Denial of the forgiveness amount.

106.    On December 3, 2021, Gordon College submitted to the SBA loan examiner via Citizens Bank a 14-page letter explaining the applicable legal guidance upon which Gordon College had relied and the basis upon which it had calculated the number of employees listed on its original SBA Form 2483 Loan Application filed on April 13, 2020.

107.    On December 15, 2021, Gordon College submitted to the SBA loan examiner via Citizens Bank a 2-page letter identifying additional legal guidance upon which Gordon College had relied specifically related to nonprofit organizations.

108.    In a document titled *Paycheck Protection Program Final SBA Loan Review Decision* dated April 12, 2022 (the "*Loan Decision*"), received by Gordon College via email from Citizens Bank on April 13, 2022, the SBA Office of Capital Access communicated to Gordon College that SBA was denying loan forgiveness. The entire reason stated in the SBA *Loan Decision* is as follows:

> After review of the documentation provided, the SBA concludes the Borrower business, or together with its affiliates, exceeds the maximum allowable number of employees and the SBA small business size standards.

A thorough analysis of the IRS 941 reports and additional supporting documentation confirms that the borrower exceeded the maximum allowable number of employees and therefore does not qualify under the SBA small business size standard qualifications for a Paycheck Protection Program loan. Furthermore, the borrower is listed as 501(c)(3), and therefore is not eligible under the alternative size standard industry qualifications. The Alternative Size Standard Qualifications are limited to for-profit entities, that do not qualify for a PPP loan under the traditional NAICS Employee-Based Size Standard Industry criteria.

**Gordon College's Appeal to SBA Office of Hearings and Appeals**

109.     Following its receipt of the SBA Loan Decision, Gordon College timely filed with the SBA Office of Hearings and Appeals ("OHA") its Appeal Petition and eleven supporting Exhibits.

110.     Gordon's Appeal Petition identified multiple clear errors of law and of fact in the SBA Loan Decision requiring reversal of the Loan Decision. Appeal Petition at pp.1-5.

111.     Gordon's Appeal Petition and Exhibit 11 thereto provided evidence from SBA's own records publicly posted on the SBA web site demonstrating that the SBA *Loan Decision* in Gordon's case contradicts other decisions by other SBA loan examiners involving substantially similar institutions of higher education that had received PPP loans. These included SBA using an FTE analysis in April 2020 to determine that other applicants satisfied all *eligibility* requirements for a PPP loan, and then subsequently determining that the same applicants also satisfied all requirements for PPP loan *forgiveness*.

112.     This evidence shows that numerous colleges and universities received PPP loan forgiveness of amounts between $5 Million and $10 Million with stated number of employees of less than 500 when publicly available government data shows "headcounts" of over 500 employees at time of loan application and at time of loan forgiveness, as determined by the same

IRS Form 941 responses that the SBA loan examiner and final SBA *Loan Decision* used denying Gordon's application for forgiveness.[8]

113.    As Gordon College's Appeal Petition emphasized, it is extremely serious clear error for SBA to apply different legal and factual standards to other Borrowers who are similarly situated to Gordon. On its face, such distinctions are discriminatory, arbitrary, and capricious.

114.    But further, by applying differential standards to Gordon College, a nonprofit religious private college, than to similarly situated colleges that are not religious or are of different religions, the SBA *Loan Decision* may discriminate on the basis of religion in violation (among others) of the First and Fourteenth Amendments to the U.S. Constitution[9] and of the federal Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb-1.[10]

115.    Such disparate treatment would also be contrary to the CARES Act itself and to the *Frequently Asked Questions Regarding Participation of Faith-Based Organizations in the Paycheck Protection Program (PPP) and the Economic Injury Disaster Loan Program (EIDL)* (April 3, 2020)[11] at Section 2:

---

[8] Exhibit 11 to the Appeal Petition provided data for specific comparable loans and borrowers extracted from SBA's internal records that have been publicly posted at https://data.sba.gov/dataset/ppp-foia and specifically the datafile publicly posted at https://data.sba.gov/dataset/ppp-foia/resource/501af711-1c91-477a-80ce-bf6428eb9253.
Administrative Law Judges may take judicial notice of SBA's own internal records and databases, particularly when those same records have also been made publicly available pursuant to the Freedom of Information Act. Gordon could not have submitted this factual data at any prior stage in the proceedings because until the SBA issued its final Loan Decision it was not possible for Gordon to know what, if any, of this information was relevant. There would be no prejudice or even inconvenience to SBA for the ALJ to consider SBA's own records.

[9] *See, e.g.*, *Tandon v. Newsom*, 141 S.Ct. 1294, 1296 (2021) (per curiam) ("government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise."). *See also Fulton v. City of Phila.*, 141 S.Ct. 1868 (2021).

[10] RFRA applies to SBA as a federal governmental agency.

[11] Available at  https://www.sba.gov/document/support-faq-regarding-participation-faith-based-

> The PPP and EIDL loan programs are neutral, generally applicable loan programs that provide support for nonprofit organizations without regard to whether they are religious or secular.... In addition, the CARES Act does not impose unique burdens or limitations on faith-based organizations.

116.   On June 28, 2022, SBA OHA Administrative Judge Gary D. Smith issued a *Notice and Order* establishing the schedule, filings, and due dates for the Appeal. This June 28, 2022 *Notice and Order* did not in any way address the closing of the Administrative Record.

117.   SBA and Gordon requested adjustments to the schedule established by the *Notice and Order*. This required several filings by the parties until the ALJ on July 18, 2022 issued an *Amended Order Granting Extension of Time*. This *Amended Order* did not in any way address the closing of the Administrative Record.

**SBA's Filing of the Administrative Record and Gordon College's Written Objections to the Administrative Record**

118.   On August 19, 2022, SBA counsel filed the Administrative Record for Gordon College's PPP borrower application, forgiveness application, SBA examination, and the SBA Loan Decision comprised of approximately 1562 pages.

119.   On September 19, 2022, Gordon College timely filed written *Objections to SBA Administrative Record (As Filed August 19, 2022)*. Those Objections noted serious deficiencies in the Administrative Record as filed by the SBA, including (without limitation):

(a) Documents were submitted by Gordon College to its Lender Citizens Bank in the process of determining eligibility for the original Paycheck Protection Program loan (the "Appellant PPP Loan") and Gordon's eligibility for forgiveness of the PPP loan that are not in the Administrative Record.

(b) Documents are referred to in the SBA Administrative Record but those documents do not actually appear in the Administrative Record as uploaded.

(c) Documents that are directly relevant to or even controlling of the relevant determinations are referred to in the Administrative Record but do not appear in the AR.

---

organizations-ppp-eidl

(d) Errors or formatting in the Administrative Record make it virtually impossible to read or identify some of the documents included in the Record.

120.    Among other things, Gordon strenuously objected to the fact that Gordon College's original SBA Form 2483 (04/20), the PPP Borrower Application, the document at the heart of the appeal and discussed at length in Gordon's original Appeal Petition, did not appear anywhere in the entire SBA Administrative Record.

121.    Gordon's signed PPP Borrower Application form and supporting documentation are essential given the SBA reviewers' determination that Gordon was not eligible for a PPP loan *at the time of initial application in April 2020*. Indeed, the SBA reviewers determined the central issue of whether Gordon was eligible for a PPP loan at the time of application in early April 2020 using data ambiguously elicited by SBA in 2021 rather than the original 2020 data.

122.    These concerns are magnified further by SBA's later Loan Decision that Gordon would not receive *any* loan forgiveness for the specific reason that Gordon was not eligible for a PPP loan *at the time that it first applied*.

123.    Gordon College specifically requested that the ALJ order the SBA to supplement the Record with all documents related to the submission, processing, approval, funding, and disbursement of funds for the original April 2020 Loan Application.

124.    There were also materials referred to by the SBA in the Administrative Record but that did not appear to have been included in the Administrative Record as uploaded by the SBA. Among other things, Gordon's *Objections* asked the ALJ to order the SBA to supplement the Administrative Record with specific agency and other legal "guidance" that the Record indicated SBA reviewers relied upon or consulted in their review of Gordon's loan eligibility and their ultimate determination that Gordon was not eligible for a PPP loan nor for PPP loan

forgiveness. Gordon's *Objections* cited to multiple sections of the Administrative Record where such guidance was referred to, but such guidance was not included in the Administrative Record.

**The ALJ's Inadvertent September 19, 2022 *Notice and Order.***

125.    On the afternoon of September 19, 2022, the date upon which Gordon College's *Objections to Administrative Record* were due, the ALJ issued a new *Notice and Order* that completely changed all due dates in the case, including the date for SBA to file the Administrative Record and for Gordon College to file its *Objections to Administrative Record*, moving both dates into the following month of October.

126.    Gordon College nonetheless proceeded to timely file its written Objections to Administrative Record on September 19, 2022, as originally ordered. But Gordon noted on the first page of its *Objections* that the ALJ's new *Notice and Order* appeared to change the filing dates in the appeal.

127.    The following day, September 20, 2022, the ALJ issued a new *Order Vacating Inadvertent Notice and Order*, vacating the *Notice and Order* that the ALJ had erroneously issued the preceding day.

128.    This September 20, 2022 *Notice and Order* demonstrated that the ALJ was aware that Gordon College had filed its *Objections to Administrative Record*, yet the ALJ did not in any way rule on or even address those Objections prior to issuing his Initial Decision denying loan forgiveness.

129.    Ironically, only the erroneously issued and subsequently vacated September 19, 2022 *Notice and Order* included any provision addressing the closing of the Administrative Record. It stated in Section II that November 3, 2022 would be the close of record. But that

Notice and Order was vacated by the ALJ one day later and no other Order issued by the ALJ addressed the closing the Administrative Record.

130.    The ALJ never officially closed the Administrative Record closed.

**The ALJ's Initial Decision and Gordon College's Petition to Reconsider.**

131.    Although the ALJ had not closed the Administrative Record nor in any way addressed any of Gordon College's Objections to Administrative Record, the ALJ nevertheless issued on November 21, 2022 his Decision denying Gordon College's Appeal and uphold the SBA's Loan Decision to deny PPP loan forgiveness.

132.    The ALJ's Initial Decision committed multiple clear and material errors of law and of fact. Those errors were so serious that Gordon College filed a *Petition for Reconsideration of SBA Administrative Law Judge's Decision Issued November 21, 2022 and Failure to Address Appellant's Written Objections to the SBA Administrative Record* (the "Petition to Reconsider") identifying no less than nine separate material errors.

133.    Perhaps the most material of the Initial Decision's errors of law and fact is that the Initial Decision cites, quotes, and relies primarily, if not exclusively, upon the *wrong* subsection of the April 15, 2020 Interim Final Rule[12] ("IFR") as the foundation for the Decision's conclusions: (a) that 13 C.F.R. §121.106 applies and controls Gordon College's PPP loan application and this appeal, (b) that §121.106 clearly required use of a headcount method to determine employees for purposes of the PPP Loan Application, and (c) that Gordon College should have known all this at the time of submitting its PPP Loan Application on April 13, 2020.

134.    The Initial Decision quotes and relies heavily upon *subsection (A)* of section (2)(a)(i) of the April 15 IFR, which applies only to *for-profit small business concerns*. But the

---

[12] Fed. Reg. Vol. 85, No. 73, April 15, 2020 at p. 20811.

quotation *excludes* – and the entire ALJ Decision completely ignores – the immediately following *subsection (B)* of section (2)(a)(i), which is the portion that specifically applies to *tax-exempt nonprofit organizations*. This obvious error by the ALJ Decision is even more concerning because Gordon College quoted the correct *subsection (B)* on page 13 of its Appeal Petition.

135.    This material error of law likely arises at least in part from the ALJ Decision's foundational error of material fact. At no point did the Initial Decision recognize that Gordon College is in fact a "tax-exempt nonprofit organization described in section 501(c)(3)" – the central factual question governing whether subsection (A) or (B) of section (2)(a)(i)(B) of the April 15, 2020 IFR applies.

**The ALJ's Two December 2, 2022 Orders and the SBA's Improper "Supplement".**

136.    In response to Gordon's Petition to Reconsider, the ALJ on December 2, 2022 issued two new Orders.

137.    The ALJ's Order for SBA to Supplement the Administrative Record (Dec. 2, 2022) finally admitted that "the record does not contain a copy of Appellant's Borrower Application Form (SBA Form 2483)." It ordered SBS "**to immediately upload its copy of Appellant's Form 2483, as well as any additional pertinent documentation related to how it calculated Appellant's number of employees, to the Document Portal for Appellant's Petition for Reconsideration.**" (emphasis in original)

138.    The ALJ also issued a *Notice of Filing Petition for Reconsideration and Date for Response* giving the SBA "**until December 16, 2022 to file its response** to the Appellant's Petition for Reconsideration if it intends to do so." (emphasis in original).

139.    On December 5, 2022, SBA submitted Gordon College's SBA Form 2483 as originally submitted to the SBA on April 13, 2020. "

140.    SBA never filed any response or other briefing as permitted by the ALJ's December 2 Notice. But instead on December 8, 2022, SBA counsel filed a document to which it gave the title *Supplement to the Administrative Record*.

141.    Despite the title, SBA's purported "Supplement" to the Administrative Record was not in any way a supplement to the Record.

142.    On December 19, 2022, Gordon College therefore filed written *Objections to SBA's Supplement to The Administrative Record (Filed December 8, 2022)* ("Objections").

143.    As Gordon's *Objections* noted, the SBA "Supplement" was comprised of a document that on its face was dated September 22, 2022, and updated December 5, 2022. The original of this document thus was created:

1.  more than twenty-eight (28) months after Gordon's PPP Borrower Application Form 2483 was submitted by Gordon to its lender, approved by the lender, fully funded by the SBA, and expended by Gordon entirely to keep existing Gordon employees employed and on the Gordon payroll;

2.  more than five (5) months after SBA issued its Final Loan Review Decision that was the subject of Gordon's OHA appeal;

3.  more than four (4) months after Gordon filed its Appeal Petition with OHA;

4.  more than one (1) month after SBA filed the "Administrative Record" in the Appeal; and

5.  three (3) days after Gordon College filed its *Objections to Administrative Record* in the Appeal – the last filing of any sort by Gordon that was specifically identified in any of the ALJ's scheduling orders.

144.    SBA's submission of its Supplement, and any consideration or inclusion of it in the Administrative Record by the ALJ, was in violation of the PPP regulations at 13 CFR § 134.1207 and 13 CFR § 134.1209(a).

**The ALJ's January 5, 2023 Final Decision on Appellant's Petition for Reconsideration.**

145.    On January 5, 2023, the ALJ issued a 7-page *Decision on Appellant's Petition for Reconsideration* (the "Final Decision").

146.    The ALJ's Final Decision denied Gordon College's *Petition to Reconsider* in full and affirmed the ALJ's November 21, 2022 Initial Decision.

147.    The ALJ dispensed with Gordon's *Objections* to the December 8, 2022 SBA "Supplement" and instead recharacterized the Supplement as a brief and permitted its filing, thereby further tainting the Administrative Record before the ALJ.

**Defendants' Actions are Unconstitutional.**

148.    Plaintiff-Petitioner repeats and realleges each and every allegation contained above as if fully set forth herein.

149.    In addition to violating the Administrative Procedures Act ("APA"), the CARES Act, and other applicable laws and regulations, including SBA's own regulations and practices, the Defendants' actions in this case have violated fundamental rights guaranteed by the United States Constitution and the Religious Freedom Restoration Act ("RFRA"), including the rights of due process of law, equal protection of the law, and religious freedom.

150.    Agency adjudication that blurs separation of powers has long been tolerated, and Plaintiff-Petitioner is not challenging that reality yet.[13]

151.    But the powers of constitutional government are never without constitutional limits, and, at a minimum, any public agency's process must provide fundamental fairness.

152.    The blending of legislative, executive, and judicial powers only heightens the need to assure and maintain fundamental fairness through other means.

---

[13] Plaintiff-Petitioner reserves its right to challenge the role of SBA acting in multiple capacities, especially if the Supreme Court alters longstanding precedent. "The justices are considering whether those facing agency claims can go straight to federal court with constitutional challenges—including attacks on the use of in-house judges to handle cases. Critics say the system gives agencies an unfair home-field advantage." https://news.bloomberglaw.com/us-law-week/supreme-court-signals-it-may-allow-court-challenges-to-sec-ftc (Nov. 7, 2022).

153.     "It is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'"[14] "This applies to *administrative agencies which adjudicate as well as to courts*. Not only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent *even the probability of unfairness*.'"[15]

154.     The process for "agency adjudication" should be "characterized by the same degree of procedural integrity and independence as the judicial process."[16] Thus, an agency tribunal's "overlap" "between prosecutorial and adjudicative functions … potentially raises a greater concern about bias."[17] "Even the most minimal guarantees of procedural due process require that the decision be issued by 'a neutral and detached hearing body[.]'"[18]

155.     In short, a private party in any government tribunal must have "a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker."[19]

156.     In sum, due process requires judicial-like process, which Defendants completely failed to provide in this case.

157.     In addition, Defendants violated Plaintiff-Petitioner's religious freedom and equal protection rights by singling out Plaintiff-Petitioner for adverse and even especially harsh treatment in its analysis of the 500-employee size standard.

158.     As Plaintiff-Petitioner argued before the ALJ in both decisions below, publicly

---

[14] *Caperton v. A.T. Massey Coal*, 556 U.S. 868, 876 (2009); *accord William Jefferson & Co. v. Bd. of Ass'mt*, 695 F.3d 960, 963-64 (9th Cir. 2012) (applying *Caperton* to local agency process).

[15] *Withrow v. Larkin*, 421 U.S. 35, 46 (1975) (citations omitted; emphasis added); *accord Cox v. Com'r*, 514 F.3d 1119, 1126 (10th Cir. 2008); *Hurles v. Ryan*, 752 F.3d 768, 788 (9th Cir. 2014).

[16] *Harline v. DEA*, 148 F.3d 1199, 1205 (10th Cir. 1998).

[17] *William Jefferson & Co.*, 695 F.3d at 965.

[18] *Victory v. Pataki*, 814 F.3d 47, 63 (2d Cir. 2016) (citation omitted) (parole board hearing).

[19] *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004); *accord Hicks v. Comm'r of Soc. Sec.*, 909 F.3d 786, 799 (6th Cir. 2018) (applying *Hamdi* to administrative agency adjudication).

available data show that SBA has treated other institutions of higher learning ("colleges"), both religious and secular, more favorably than it has treated Plaintiff-Petitioner. In addition to publicly available data, Plaintiff-Petitioner is awaiting SBA's responses to additional, relevant requests under the Freedom of Information Act ("FOIA").

159.   "These other loan forgiveness decisions reflect SBA using an FTE analysis in April, May, and June 2020 to determine that other nonprofit applicants satisfied all *eligibility* requirements for a PPP loan, and then subsequently determining that the same applicants also satisfied all requirements for PPP loan *forgiveness*. This has occurred even where the other applicants have as many or more employees at time of loan application and at time of loan forgiveness as does Appellant, as determined by the same IRS Form 941 responses that the specific SBA examiner and thus the final *Loan Decision* used here. This comparative data is provided on the spreadsheet attached as Exhibit 11 to Appellant's Appeal Petition." Plaintiff's Pet. for Recon. (Nov. 21, 2022) at 16-17.

160.   "[T]he ALJ [failed] to consider how other SBA loan examiners and ALJs could have reached a conclusion directly opposite to that reached by the SBA Examiner in Gordon's case and by the ALJ Decision. As best counsel can determine, this ALJ Decision is the first time that SBA has ultimately resolved a tax-exempt university's PPP loan review of an application submitted prior to the publication of SBA FAQ #36 by relying upon the 13 C.F.R. §121.106 standard embraced by this Decision. The publicly available evidence from SBA's own records demonstrates that SBA has forgiven more than thirty such loans in full, yet the ALJ Decision adopts a different standard and reaches a contrary result." *Id*. at 18.

**Applicable Constitutional Standards: Strict Scrutiny or Absolute Protection.**

161.    *Strict Scrutiny (Balancing Test)*. The default test to protect most individual rights under RFRA and the First and Fourteenth Amendments is strict scrutiny. In its most common formulation, this test requires the government to prove that its challenged action was the "least restrictive means of achieving some compelling state interest."[20] Under this test, "only those interests of the highest order [can] overbalance legitimate claims to the free exercise of religion.'"[21] This two-part balancing test "is the most demanding test known to constitutional law."[22] Defendants must prove that they satisfy it.

162.    *Absolute Protection (Categorical Approach: No Balancing)*. Some constitutional rights may not be infringed at all. Certain government actions are categorically barred as intolerable and never justifiable, no matter what the government's interests or means may be. For example, government must never punish belief.[23] It must never discriminate among religions.[24] It must never act out of invidious intent (animus) against religion.[25] It must never "interfere" with the "autonomy" of religious groups "'to define their own *doctrine*, *membership*, organization, and *internal requirements*.'"[26] All such action are flatly barred.

---

[20] *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981).

[21] *Id*. (quoting *Wisc. v. Yoder*, 406 U.S. 205, 215 (1972)).

[22] *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).

[23] "The First Amendment obviously excludes all 'governmental regulation of religious *beliefs* as such.'" *Emp't Div. v. Smith*, 494 U.S. 872, 877 (1990). *Smith* lists many other examples.

[24] It is "usually flatly forbidden without reference to" strict scrutiny. *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1266 (10th Cir. 2008) (McConnell, J.) (citing cases, including *Larson v. Valente*, 456 U.S. 228 (1982)) ("***Colo. Christian***").

[25] "To be sure, where [states] discriminate out of 'animus' against particular religions, such decisions are plainly unconstitutional." *Jesus Christ is the Answer Ministries v. Baltimore Cty.*, 915 F.3d 256, 262 n.3 (4th Cir. 2019) ("***Jesus Christ is the Answer***"). "Religious animus is not a permissible government interest, much less a compelling one." *Id*.

[26] *Demkovich v. St. Andrew the Apostle Par.*, 3 F.4th 968, 975 (7th Cir. 2021) (en banc) (citation

**Defendants Proactively Protected Religious Freedom in Its Initial PPP Regulations.**

163.    Defendant SBA itself proactively recognized and implemented these fundamental principles in its own initial PPP regulations. Its Interim Final Rule on Affiliation 85 FR 20817 (April 15, 2020) ("IFR-AFF"), "exempt[ed] otherwise qualified faith-based organizations from the SBA's affiliation rules, including those set forth in 13 CFR part 121, where the application of the affiliation rules would substantially burden those organizations' religious exercise." 85 FR 20817, 20819. According to this IFR-AFF, SBA held such an exemption was compelled by RFRA and a long line of Supreme Court precedent beginning with *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94 (1952).

164.    Specifically, SBA acted, on its own initiative, to exempt faith-based organizations ("FBOs") like Plaintiff-Petitioner from the burdensome result on some FBOs of requiring them to aggregate their "affiliates" in a way that would cause them to exceed the 500-employee threshold for a PPP loan. "An entity generally is eligible for the PPP if it, combined with its affiliates, is a small business as defined in section 3 of the Small Business Act (15 U.S.C. 632), or (1) has 500 or fewer employees[.]" 85 FR 20817, 20819.

165.    "Accordingly, the SBA's affiliation rules, including those set forth in 13 CFR part 121, do not apply to the relationship of any church, convention or association of churches, or other faith-based organization or entity to any other person, group, organization, or entity that is based on a sincere religious teaching or belief or otherwise constitutes a part of the exercise of religion. This includes any relationship to a parent or subsidiary and other applicable aspects of organizational structure or form." 85 FR 20817, 20820.

166.    Moreover, a "faith-based organization seeking loans under this program may rely on a reasonable, good faith interpretation in determining whether its relationship to any other

to McConnell omitted; emphasis added) (collecting Supreme Court cases) ("*Demkovich*").

person, group, organization, or entity is exempt from the affiliation rules under this provision, and SBA will not assess, and will not require participating lenders to assess, the reasonableness of the faith-based organization's determination." 85 FR 20817, 20820.

167. SBA held this relief from the 500-employee requirement was required by both RFRA and the Religion Clauses of the First Amendment. It was correct in this assessment: both that this ameliorative action was required and that the SBA was authorized and duty bound to act and not abandon its own high duty to the Constitution and RFRA in deference to some potential future corrective judicial review, such as what is occurring now in this very case.

168. Defendant SBA itself proactively recognized and implemented these fundamental principles in its own PPP regulations. Its Interim Final Rule on Affiliation 85 FR 20817 (April 15, 2020) ("IFR-AFF"), "exempt[ed] otherwise qualified faith-based organizations from the SBA's affiliation rules, including those set forth in 13 CFR part 121, where the application of the affiliation rules would substantially burden those organizations' religious exercise." 85 FR 20817, 20819. According to this IFR-AFF, SBA held such an exemption was compelled by RFRA and a long line of Supreme Court precedent beginning with *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94 (1952).

169. Specifically, SBA acted, on its own initiative, to exempt faith-based organizations ("FBOs") like Plaintiff-Petitioner from the burdensome result on some FBOs of requiring them to aggregate their "affiliates" in a way that would cause them to exceed the 500-employee threshold for a PPP loan. "An entity generally is eligible for the PPP if it, combined with its affiliates, is a small business as defined in section 3 of the Small Business Act (15 U.S.C. 632), or (1) has 500 or fewer employees[.]" 85 FR 20817, 20819.

170.    "Accordingly, the SBA's affiliation rules, including those set forth in 13 CFR part 121, do not apply to the relationship of any church, convention or association of churches, or other faith-based organization or entity to any other person, group, organization, or entity that is based on a sincere religious teaching or belief or otherwise constitutes a part of the exercise of religion. This includes any relationship to a parent or subsidiary and other applicable aspects of organizational structure or form." 85 FR 20817, 20820.

171.    Moreover, a "faith-based organization seeking loans under this program may rely on a reasonable, good faith interpretation in determining whether its relationship to any other person, group, organization, or entity is exempt from the affiliation rules under this provision, and SBA will not assess, and will not require participating lenders to assess, the reasonableness of the faith-based organization's determination." 85 FR 20817, 20820.

172.    SBA held this relief from the 500-employee requirement was required by both RFRA and the Religion Clauses of the First Amendment. It was correct in this assessment: both that this ameliorative action was required and that the SBA was authorized and duty bound to act and not abandon its own high duty to the Constitution and RFRA in deference to some potential future corrective judicial review, such as what is occurring now in this very case.

**Defendants Completely Abandoned Their Duty to Protect Religious Freedom Here.**

173.    Rather than honor its obligations under the Constitution and RFRA, as it did with the IFR-AFF, the SBA not only did not take initiative to respect its own limits and Plaintiff-Petitioner's rights, but expressly disregarded all of Plaintiff-Petitioner's constitutional and RFRA arguments as insufficient "grounds upon which *this Court* could permissibly grant Appellant's appeal." SBA ALJ Decision (Nov. 21, 2022) at 9 (emphasis added).

174.    This SBA "Court" did not act like a court. It said it did not and could "not take a position on the alleged RFRA or constitutional violations," because it "does not have the authority to issue decisions based on its interpretation of RFRA or the Federal Constitution." *Id*.

175.    The last time a Court did something like this, at least when religious freedom was at stake, the United States Supreme Court issued this rebuke: "Given the conflict between the Free Exercise Clause and the application of the [state constitutional] provision here, the Montana Supreme Court should have 'disregard[ed]' the [state constitutional] provision and decided this case 'conformably to the [C]onstitution' of the United States." That '*supreme* law of the land' condemns discrimination against religious [organizations whose] exclusion from the scholarship program here is 'odious to our Constitution and 'cannot stand.'" *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2262-63 (2020) (citations omitted).

176.    In sum, this SBA Court refused to even consider an exemption or other relief from a cramped and unconstitutional interpretation of the "500 employee" threshold, properly argued by a party before it, when SBA's Administrator had acted *sua sponte* within days of the PPP's enactment to recognize a broad and flexible nationwide exemption from the same 500-employee threshold to preempt substantial burdens on the religious exercise of FBOs nationwide.

177.    The SBA Court failed its duty not once but twice: in its initial decision noted above and again in denying reconsideration. SBA ALJ Decision Denying Recon. (Jan. 5, 2023).

178.    In so doing, Defendants have interfered with the autonomy of Plaintiff-Petitioner define its own *doctrine*, *membership*, *employment*, and other *internal requirements*.

**FIRST CAUSE OF ACTION:
JUDICIAL REVIEW OF AGENCY ACTION**

179.    The allegations contained in the foregoing paragraphs are realleged and restated herein.

180.    This Court is authorized and empowered to review the SBA Final Decision and Initial Decision for errors. The Final Decision and Initial Decision should be reversed and set aside as arbitrary and capricious or, alternatively, as an abuse of discretion. See 5 U.S.C. § 706(2)(A).

181.    The Final Decision was erroneous as a matter of law, constituted arbitrary and capricious conduct by the SBA, or, alternatively, was an abuse of discretion.

## SECOND CAUSE OF ACTION:
## <u>DECLARATORY JUDGMENT</u>

182.    The allegations contained in the foregoing paragraphs are realleged and restated herein.

183.    There is an actual and existing controversy between the parties as to the correctness of the SBA's Final Decision and Initial Decision to deny PPP loan forgiveness to Gordon College.

184.    The SBA's Final Decision and Initial Decision to deny PPP loan forgiveness to Gordon College was legal error, was arbitrary and capricious, was made in excess of SBA's statutory authority, and constituted an abuse of discretion (to the extent it had discretion).

185.    Gordon College is entitled to a judgment declaring that the SBA's Final Decision and Initial Decision to deny PPP loan forgiveness to Gordon College was legal error, was arbitrary and capricious, and was made in excess of SBA's statutory authorization and short of Gordon College's statutory rights, or, in the alternative, constituted an abuse of discretion.

186.    Gordon College is entitled to a judgment declaring that the SBA's Final Decision and Initial Decision to deny PPP loan forgiveness to Gordon College error, the resulting Final Decision and Initial Decision were issued in error, and Gordon College's PPP loan should be forgiven.

187.    Defendants' actions are in violation of the Administrative Procedures Act ("APA"), the CARES Act, and other applicable laws and regulations, including SBA's own regulations and practices.

**THIRD CAUSE OF ACTION: VIOLATION OF**
**THE RELIGIOUS FREEDOM RESTORATION ACT:**
**SUBSTANTIAL BURDEN (Strict Scrutiny)**

188.    Plaintiff-Petitioner repeats and realleges each and every allegation contained above as if fully set forth herein.

189.    As SBA recognized in its IFR-AFF, "the Religious Freedom Restoration Act (RFRA) (Pub. L. 103-141) … provides that the '[g]overnment shall not substantially burden a person's exercise of religion' unless the government can 'demonstrate[] that application of the burden' to the person is both 'in furtherance of a compelling governmental interest' and 'the least restrictive means of furthering that compelling governmental interest." 85 FR 20817, 20819 (quoting 42 U.S.C. 2000bb-1).

190.    This standard is commonly referred to "strict scrutiny."

191.    The loss of a seven-million-dollar forgivable loan surely qualifies as "substantial economic consequences" sufficient to trigger RFRA's substantial burden requirement. *Burwell v. Hobby Lobby Stores, Inc*., 573 U.S. 682, 720 (2014). Such a significant economic consequence "clearly imposes a substantial burden" on Plaintiff-Petitioner's religious exercise. *Id*. at 726.

192.    In light of the allegations above, it is not possible for Defendants to satisfy strict scrutiny, i.e., to meet their burden to prove that the treatment of Plaintiff-Petitioner in this case was the least restrictive means to achieve a compelling government interest.

193.    "Rather than rely on 'broadly formulated interests,' courts must 'scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants.' The question,

then, is not whether [SBA] has a compelling interest in enforcing its [500-employee] policies generally, but whether it has such an interest in denying an exception" or relief to Plaintiff-Petitioner." *Fulton v. City of Phila.*, 141 S.Ct. 1868, 1881 (2021).

194.     "Put another way, so long as the government can achieve its interests in a manner that does not burden religion, it must do so." 141 S.Ct. at 1881.

195.     As a proximate result of Defendants' actions, Plaintiff-Petitioner was damaged and continues to be damaged.

196.     Plaintiff-Petitioner is entitled to injunctive and/or declaratory relief prohibiting Defendants from violating its constitutional and civil rights.

197.     WHEREFORE, Plaintiff-Petitioner respectfully requests that the Court grant the relief set forth hereinafter in the prayer for relief.

### FOURTH CAUSE OF ACTION: VIOLATION OF THE FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT: NON-NEUTRAL TREATMENT (Strict Scrutiny)

198.     Plaintiff-Petitioner repeats and realleges each and every allegation contained above as if fully set forth herein.

199.     Under the non-neutrality aspect of the Free Exercise Clause, the Court's "task is to decide whether the burden [SBA] has placed on the religious exercise of [Plaintiff-Petitioner] is constitutionally permissible."[27]

200.     "First, government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise."[28]

---

[27] *Fulton v. City of Phila.*, 141 S.Ct. 1868, 1876 (2021) ("**Fulton**").

[28] *Tandon v. Newsom*, 141 S.Ct. 1294, 1296 (2021) ("**Tandon**") (emphasis in original) (citing

201.    "Neutrality and general applicability are interrelated [and] failure to satisfy one requirement is a likely indication that the other has not been satisfied."[29]

202.    But "neutral" and "generally applicable" are distinct requirements (with separate analytical rules)—*both* of which government action must meet to avoid strict scrutiny.[30]

203.    As argued in the SBA proceedings, Defendants have treated other colleges, both religious and secular, more favorably than it has treated Plaintiff-Petitioner.

204.    By singling out Plaintiff-Petitioner for adverse and even especially harsh treatment in its analysis and application of the 500-employee size standard, it has treated Plaintiff-Petitioner non-neutrally.

205.    For purposes of non-neutral/disparate treatment, "merely the intent to treat differently" can establish discrimination. *Colo. Christian*, 534 F.3d at 1260. Personal motives, such as animus, are immaterial. *Id.* at 1260 n.7. It thus makes no difference if "faith-based bigotry did not motivate [SBA's treatment of Plaintiff-Petitioner]. The constitutional benchmark is 'government neutrality,' not 'governmental avoidance of bigotry.'" *Roberts*, 958 F.3d at 415 (quoting *Colo. Christian*, at 1260). Such intentional differential treatment disfavoring religion triggers strict scrutiny, regardless of motive.

206.    While the strict scrutiny standard under the Free Exercise Clause is the same as under RFRA, the Free Exercise Clause does not require a showing of "substantial burden" by the religious claimant. A "burden" or "restriction" on religious exercise is sufficient, if the government acted non-neutrally.

207.    For the same reason explained above, Defendants cannot satisfy strict scrutiny.

---

*Roman Catholic Diocese v. Cuomo*, 141 S.Ct. 63, 67 (2020) ("**RCD**")).

[29] *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531 (1993) ("**Lukumi**").

[30] *Fulton*, 141 S.Ct. at 1877 (citations omitted).

208.    As a proximate result of Defendants' actions, Plaintiff-Petitioner was damaged and continues to be damaged.

209.    Plaintiff-Petitioner is entitled to injunctive and/or declaratory relief prohibiting Defendants from violating its constitutional and civil rights.

210.    WHEREFORE, Plaintiff-Petitioner respectfully requests that the Court grant the relief set forth hereinafter in the prayer for relief.

### FIFTH CAUSE OF ACTION: VIOLATION OF THE FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT: NON-GENERALLY APPLICABLE TREATMENT (Strict Scrutiny)

211.    Plaintiff-Petitioner repeats and realleges each and every allegation contained above as if fully set forth herein.

212.    As noted above, "neutral" and "generally applicable" are distinct requirements (with separate analytical rules)—*both* of which government action must meet to avoid strict scrutiny.[31]

213.    "[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise."[32]

214.    As alleged above, SBA has treated *many* similarly situated, secular colleges better than it has treated Plaintiff-Petitioner, and many is more than *any* (or one).

215.    Even where, as here, evidence suggests violation of the *neutrality* standard, it may be "more straightforward to resolve [such] case under the rubric of general applicability."[33]

---

[31] *Fulton*, 141 S.Ct. at 1877 (citations omitted).

[32] *Tandon v. Newsom*, 141 S.Ct. 1294, 1296 (2021) ("**Tandon**") (emphasis in original) (citing *Roman Catholic Diocese v. Cuomo*, 141 S.Ct. 63, 67 (2020) ("**RCD**")).

216.    Government action "will fail the general applicability requirement if it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," or if it provides "a mechanism for individualized exemptions."[34]

217.    Where as here, "the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of religious hardship without compelling reason."[35]

218.    Unlike neutrality, general applicability focuses neither on religion (*per se*) nor intent. It focuses on mechanisms and process. Thus, "a law might appear to be generally applicable on the surface but not be so in practice due to exceptions for comparable secular activities."[36] "As a rule of thumb, the more exceptions to a prohibition, the less likely it will count as a generally applicable, non-discriminatory law."[37]

219.    General applicability does not rely on discerning motive, an often-challenging judicial enterprise. Instead, it examines any mechanism that invites or results in an uneven application of the law in a way that burdens or has a disparate impact on religion.

220.    The question under general applicability is whether the law or regulation, on its face or in practice, applies *generally* to similarly situated persons, or does not. If it does not, and if the uneven result is due to a system of exceptions that provides opportunities for discretionary decision-making, strict scrutiny applies. Such settings may mask hidden bias or may invite considerations regarding religion to play a hidden role. Religion enters the equation indirectly. It is the mechanism or opportunity for discretionary decision-making that demands closer scrutiny.

---

[33] *Fulton*, 141 S.Ct. at 1877.

[34] *Kennedy*, 142 S.Ct. at 2422 (quoting *Fulton*, 141 S.Ct. at 1877).

[35] *Fulton*, 141 S.Ct. at 1877 (all citations and internal punctuation omitted).

[36] *Roberts v. Neace*, 958 F.3d 409, 413 (6th Cir. 2020) ("**Roberts**").

[37] *Robert v. Neace*, 958 F.3d at 413.

221.    The allegations herein show that SBA has not applied its loan eligibility and/or forgiveness criterial *generally* to similarly situated persons, but rather operates under a "mechanism for individualized exemptions" that provides opportunities for discretionary decision-making.

222.    This situation requires, and fails, strict scrutiny, for the reasons stated above.

223.    As a proximate result of Defendants' actions, Plaintiff-Petitioner was damaged and continues to be damaged.

224.    Plaintiff-Petitioner is entitled to injunctive and/or declaratory relief prohibiting Defendants from violating its constitutional and civil rights.

225.    WHEREFORE, Plaintiff-Petitioner respectfully requests that the Court grant the relief set forth hereinafter in the prayer for relief.

### SIXTH CAUSE OF ACTION: VIOLATION OF THE
### FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT:
### ESPECIALLY HARSH TREATMENT
### (Flagrant But Without Animus) (Strict Scrutiny)

226.    Plaintiff-Petitioner repeats and realleges each and every allegation contained above as if fully set forth herein.

227.    Under the First Amendment, the free exercise of religion can never be "singled out" for "especially harsh treatment."[38] As with the general applicability doctrine above, this doctrine focuses more intently on the regulatory mechanism itself than on any particular official actions taken thereunder.

---

[38] *RCD*, 141 S.Ct. at 66.

228.    Thus, "regulations cannot be viewed as neutral [when] they single out houses of worship for especially harsh treatment."[39]

229.    This doctrine treats the harshness of government regulatory regimes and/or their results, without regard to motive, as conditions that compel close judicial examination.

230.    Defendants have "singled out" Plaintiff-Petitioner for "especially harsh treatment," as alleged above, providing and forgiving loans of equal or greater amount than that loaned to Plaintiff-Petitioner to and for many other similarly situated colleges.

231.    This situation requires, and fails, strict scrutiny, for the reasons stated above.

232.    As a proximate result of Defendants' actions, Plaintiff-Petitioner was damaged and continues to be damaged.

233.    Plaintiff-Petitioner is entitled to injunctive and/or declaratory relief prohibiting Defendants from violating its constitutional and civil rights.

234.    WHEREFORE, Plaintiff-Petitioner respectfully requests that the Court grant the relief set forth hereinafter in the prayer for relief.

### SEVENTH CAUSE OF ACTION: VIOLATION OF THE ESTABLISHMENT CLAUSE OF THE FIRST AMENDMENT: DISCRIMINATION AGAINST & AMONG RELIGIONS (Categorical Bar)

235.    Plaintiff-Petitioner repeats and realleges each and every allegation contained above as if fully set forth herein.

236.    The Establishment Clause demands the strictest neutrality toward and among religions such that it categorically bars discrimination against or among religions or particular faiths or exercise.[40]

---

[39] *RCD*, 141 S.Ct. at 66.

[40] *See, e.g.*, *Larson v. Valente*, 456 U.S. 228, 244, (1982) ("*Larson*"); *Trump v. Hawaii*, 138

237.    "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."[41]

238.    For the same reasons that Defendants' actions violate the Free Exercise Clause above, they also independently violate this strictest of antidiscrimination principles embodied in the Establishment Clause.

239.    As alleged herein, Defendants have discriminated against Plaintiff-Petitioner, an evangelical Christian college with religiously and socially conservative views, by treating other, similarly situated religious colleges better than it has Plaintiff-Petitioner.[42]

240.    All such discrimination under the Establishment Clause is "usually flatly forbidden without reference to" strict scrutiny or any other balancing test.[43]

241.    In any event, Defendants' actions are not the means least restrictive of religious exercise to further any governmental interest, much less a compelling one.

242.    As a proximate result of Defendants' actions, Plaintiff-Petitioner was damaged and continues to be damaged.

243.    Plaintiff-Petitioner is entitled to injunctive and/or declaratory relief prohibiting Defendants from violating its constitutional and civil rights.

244.    WHEREFORE, Plaintiff-Petitioner respectfully requests that the Court grant the relief set forth hereinafter in the prayer for relief.

---

S.Ct. 2392, 2418 (2018); *Colo. Christian*, 534 F.3d at 1266.

[41] *Lund v. Rowan Cty.*, 863 F.3d 268, 280 (4th Cir. 2017) (en banc) (quoting *Larson*, at 244)).

[42] *Larson*, 456 U.S. at 244; *Colo. Christian*, 534 F.3d at 1266. Protections for religious exercise to fulfill the Free Exercise Clause (e.g., religious safe harbors) obviously do not constitute discrimination in violation of the Establishment Clause. *See, e.g.*, *Liberty Univ. v. Lew*, 733 F.3d 72, 100 (4th Cir.), *cert. denied*, 571 U.S. 1071 (2013) (rejecting Establishment Clause and Equal Protection Clause challenges to the ACA safe harbor in IRC §5000A(d)(2)(B)).

[43] *Colo. Christian*, 534 F.3d at 1266 (collecting Supreme Court cases).

**EIGHTH CAUSE OF ACTION: VIOLATION OF**
**BOTH RELIGION CLAUSES OF THE FIRST AMENDMENT:**
**INTERFERENCE WITH RELIGIOUS AUTONOMY (Categorical Bar)**

245.    Plaintiff-Petitioner repeats and realleges each and every allegation contained above as if fully set forth herein.

246.    Religious institutions possess strong religious autonomy rights arising under both the Free Exercise Clause and Establishment Clause. "[T]he Religion Clauses protect religious institutions [in] matters 'of faith and doctrine' [and "internal management decisions" against] government intrusion. State interference in that sphere would obviously violate the free exercise of religion, and any attempt by government to dictate or even to influence such matters would constitute [an] establishment of religion. The First Amendment outlaws such intrusion."[44]

247.    Religious institutions have the right "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine."[45]

248.    The state must never "interfere" with the "autonomy" of religious groups "'to define their own *doctrine*, *membership*, organization, and *internal requirements*.'"[46]

249.    Such state action is categorically barred.

250.    This principle is primary reason cited by the SBA itself in exempting faith-based organizations seeking PPP loans from SBA's "affiliation rules" that might cause many FBOs, like Plaintiff-Petitioner, to exceed the 500-employee threshold. *See* IFR-AFF above.

251.    Defendants have interfered with the autonomy of Plaintiff-Petitioner to define its own doctrine, membership, employment, staffing, affiliation, and other internal requirements in

---

[44] *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S.Ct. 2049, 2060 (2020) (citations omitted) ("***OLG***").

[45] *OLG*, 140 S.Ct. at 2060 (citing *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952)).

[46] *Demkovich v. St. Andrew the Apostle Par.*, 3 F.4th 968, 975 (7th Cir. 2021) (en banc) (emphasis added) (collecting Supreme Court cases).

precisely the way the First Amendment (and RFRA), as embraced in the SBA's own IFR-AFF, was designed to prevent.

252.    Defendants have done so, among other things, by insisting on certain requirements for determining staffing and employment, including the definition of "employee," without a basis in law and inconsistently with RFRA and the Constitution.

253.    Defendants' actions violate the religious autonomy rights of Plaintiff-Petitioner protected under both the Free Exercise and Establishment Clauses and improperly entangle the government in the internal affairs of Plaintiff-Petitioner.

254.    These actions are categorically barred. The Supreme Court does not apply any kind of balancing test. Actions that violate this principle are simply and flatly barred.[47]

255.    In any event, Defendants have no rational, much less compelling, interest that would justify infringing upon Plaintiff-Petitioner's free exercise and anti-establishment rights by interfering with such matters of internal governance, employment, and staffing.

256.    In any event, Defendants' actions are not the means least restrictive of religious exercise to further any governmental interest, much less a compelling one.

257.    As a proximate result of Defendants' actions, Plaintiff-Petitioner was damaged and continues to be damaged.

258.    Plaintiff-Petitioner is entitled to injunctive and/or declaratory relief prohibiting Defendants from violating its constitutional and civil rights.

259.    WHEREFORE, Plaintiff-Petitioner respectfully requests that the Court grant the relief set forth hereinafter in the prayer for relief.

---

[47] *E.g., OLG*, 140 S.Ct. at 2060 (relying *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 186-96 (2012) (unanimous) ("***Hosanna***")).

**NINTH CAUSE OF ACTION: VIOLATION OF THE**
**EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT:**
**DISCRIMINATION INVOLVING FUNDAMENTAL RIGHT (Strict Scrutiny)**

260.    Plaintiff-Petitioner repeats and realleges each and every allegation contained above as if fully set forth herein.

261.    The Equal Protection Clause of the Fourteenth Amendment requires that any government action that interferes with a "fundamental right" be subject to strict scrutiny.[48]

262.    "Unquestionably, the free exercise of religion is a fundamental constitutional right."[49]

263.    Defendants' actions described herein interfere with Plaintiff-Petitioner's free exercise of religion and thereby independently violate the Equal Protection Clause of the Fourteenth Amendment to the Constitution, for all the reasons alleged above.

264.    The same "intent to treat differently"[50] that violates the Free Exercise Clause violates the Equal Protection Clause because it burdens a "fundamental right."

265.    If motivated by animus, Defendants' actions are flagrantly unconstitutional, as "[r]eligious animus is not a permissible government interest, much less a compelling one."[51]

266.    Upon information and belief, Defendants' differential treatment of Plaintiff-Petitioner, Defendants' actions toward Plaintiff as described herein may be motivated by animus.

267.    Any such actions patently violate the Fourteenth Amendment.

268.    Even if not motivated by animus, the actions of Defendants hereunder are subject to strict scrutiny since they infringe the fundamental right of free exercise of religion.

---

[48] *Plyler v. Doe*, 457 U.S. 202, 216-17 (1982).

[49] *Johnson v. Robison*, 415 U.S. 361, 375 n.14 (1974); *accord Jesus Christ is the Answer Ministries, Inc. v. Balt. Cty.*, 915 F.3d 256, 265 (4th Cir. 2019) (quoting *Johnson*).

[50] *Colo. Christian*, 534 F.3d at 1260 (McConnell, J.).

[51] *Jesus Christ is the Answer*, 915 F.3d at 262 n.3.

269.    Defendants do not have a rational, let alone compelling, reason for their actions.

270.    Defendants' actions also are not the means least restrictive of religious exercise to further any governmental interest, much less a compelling one.

271.    As a proximate result of Defendants' actions, Plaintiff-Petitioner was damaged and continues to be damaged.

272.    Plaintiff-Petitioner is entitled to injunctive and/or declaratory relief prohibiting Defendants from violating its constitutional and civil rights.

273.    WHEREFORE, Plaintiff-Petitioner respectfully requests that the Court grant the relief set forth hereinafter in the prayer for relief.

## TENTH CAUSE OF ACTION: VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT: DISCRIMINATION INVOLVING SUSPECT CLASS (Strict Scrutiny)

274.    Plaintiff-Petitioner repeats and realleges each and every allegation contained above as if fully set forth herein.

275.    The Equal Protection Clause of the Fourteenth Amendment requires that any government action that discriminates against a "suspect class" be subject to strict scrutiny.[52]

276.    "Religion is a suspect class."[53]

277.    The differential treatment of Plaintiff-Petitioner due to its "religious beliefs and practices would result in classifying them based on membership in a suspect class, and would violate the Equal Protection Clause unless the classification satisfies strict scrutiny."[54]

---

[52] *Plyler v. Doe*, 457 U.S. 202, 216-17 (1982).

[53] *Saud v. Days*, 50 F.4th 705, 710 (9th Cir. 2022) (citing *New Orleans v. Dukes*, 427 U.S. 297, 303 (1976)).

[54] *Saud v. Days*, 50 F.4th at 710.

278.    For all the reasons stated in the preceding Cause of Action, the actions of Defendants discriminate against Plaintiff-Petitioner, in violation of the Fourteenth Amendment.

279.    Even if not motivated by animus, the actions of Defendants hereunder are subject to strict scrutiny since they infringe the fundamental right of free exercise of religion.

280.    To the extent Defendants may have been motivated by animus against the religion or religious exercise or beliefs of Plaintiff-Petitioner, those actions patently violate the Fourteenth Amendment and are flatly barred.

281.    Otherwise, such actions of Defendants are subject to strict scrutiny.

282.    Defendants do not have a rational, let alone compelling, reason for their actions.

283.    Defendants' actions also are not the means least restrictive of religious exercise to further any governmental interest, much less a compelling one.

284.    As a proximate result of Defendants' actions, Plaintiff-Petitioner was damaged and continues to be damaged.

285.    Plaintiff-Petitioner is entitled to injunctive and/or declaratory relief prohibiting Defendants from violating its constitutional and civil rights.

286.    WHEREFORE, Plaintiff-Petitioner respectfully requests that the Court grant the relief set forth hereinafter in the prayer for relief.

## ELEVENTH CAUSE OF ACTION: VIOLATION OF THE DUE PROCESS CLAUSE: DENIAL OF FAIR HEARING PROCESS (Functional Test (Strict Scrutiny)

287.    Plaintiff-Petitioner repeats and realleges each and every allegation contained above as if fully set forth herein.

288.    As alleged herein, Defendants have violated the Due Process Clause of the Fourteenth Amendment, and the rights of Plaintiff-Petitioner guaranteed thereunder, by failing to provide Plaintiff-Petitioner with the full protections that due process requires.

289.    "It is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'"[55] "This applies to *administrative agencies which adjudicate as well as to courts*. Not only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent *even the probability of unfairness*.'"[56]

290.    The process for "agency adjudication" should be "characterized by the same degree of procedural integrity and independence as the judicial process."[57] Thus, an agency tribunal's "overlap" "between prosecutorial and adjudicative functions … potentially raises a greater concern about bias."[58] "Even the most minimal guarantees of procedural due process require that the decision be issued by 'a neutral and detached hearing body[.]'"[59]

291.    The blending of powers within SBA, including the "overlap between prosecutorial and adjudicative functions," "raises a greater concern about bias." That combination of powers makes it difficult if not impossible for SBA to avoid the appearance or "probability of unfairness."[60]

_____

[55] *Caperton v. A.T. Massey Coal*, 556 U.S. 868, 876 (2009); *accord William Jefferson & Co. v. Bd. of Ass'mt*, 695 F.3d 960, 963-64 (9th Cir. 2012) (applying *Caperton* to agency process).

[56] *Withrow v. Larkin*, 421 U.S. 35, 46 (1975) (citations omitted; emphasis added); *accord Cox v. Com'r*, 514 F.3d 1119, 1126 (10th Cir. 2008); *Hurles v. Ryan*, 752 F.3d 768, 788 (9th Cir. 2014).

[57] *Harline v. DEA*, 148 F.3d 1199, 1205 (10th Cir. 1998).

[58] *William Jefferson & Co.*, 695 F.3d at 965.

[59] *Victory v. Pataki*, 814 F.3d 47, 63 (2d Cir. 2016) (citation omitted) (parole board hearing).

[60] Agency adjudication that blurs separation of powers has long been allowed. But Plaintiff-Petitioner reserves its right to challenge the role of agencies acting in multiple capacities, especially if the Supreme Court alters longstanding precedent. "The justices are considering whether those facing agency claims can go straight to federal court with constitutional

292.     Under the Fourteenth Amendment, the bare minimum that "due process requires is notice and opportunity to be heard by a 'disinterested decisionmaker.'"[61]

293.     Defendants and the SBA administrative process deny this bare minimum of due process to Plaintiff-Petitioner.

294.     Among other things, Defendants have prejudged this case with demonstrated hostility to religious institutions, such as Plaintiff-Petitioner, with avowedly conservative religious and cultural beliefs.

295.     Defendants' actions cannot withstand any form of judicial scrutiny.

296.     Defendants do not have a rational, let alone compelling, reason for their actions.

297.     Defendants' actions also are not a rational or even minimally acceptable means to further any governmental interest, much less a compelling one.

298.     As a proximate result of Defendants' actions, Plaintiff-Petitioner was damaged and continues to be damaged.

299.     Plaintiff-Petitioner is entitled to injunctive and/or declaratory relief prohibiting Defendants from violating its constitutional and civil rights.

300.     WHEREFORE, Plaintiff-Petitioner respectfully requests that the Court grant the relief set forth hereinafter in the prayer for relief.

/ / / /

/ / / /

---

challenges—including attacks on the use of in-house judges to handle cases. Critics say the system gives agencies an unfair home-field advantage." https://news.bloomberglaw.com/us-law-week/supreme-court-signals-it-may-allow-court-challenges-to-sec-ftc (Nov. 7, 2022).

[61] *Clearone, Inc. v. Shure Acquisition Holdings, Inc.*, 35 F.4th 1345, 1352 (Fed. Cir. 2022).

Dated this 6th day of March, 2023

Respectfully submitted,

  /s/
John R. Flores Sr., Esq.
Bar ID: VA078
GAMMON & GRANGE, P.C.
1945 Old Gallows Road, Suite 650
Vienna, VA 22182
(703) 761-5007 (telephone)
(703) 761-5007 (facsimile)
Email : JRF@GG-Law.com


J. Matthew Szymanski, Esq.
Bar ID: VA157
(Membership Status: Pending)
GAMMON & GRANGE, P.C.
1945 Old Gallows Road, Suite 650
Vienna, VA 22182
(703) 761-5030 (telephone)
(703) 761-5030 (facsimile)
Email: JMS@gg-law.com


Scott J. Ward, Esq.
Bar ID: VA158
(Membership Status: Pending)
GAMMON & GRANGE, P.C.
1945 Old Gallows Road
Suite 650
Vienna, VA 22182
(703) 761-5012 (telephone)
(703) 761-5012 (facsimile)
Email: SJW@gg-law.com