**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| GORDON COLLEGE<br>255 Grapevine Road<br>Wenham, MA 01984-1899,<br><br><br>*Petitioner / Plaintiff,*<br><br>v.<br><br>UNITED STATES SMALL BUSINESS<br>ADMINISTRATION; ISABELLA CASILLAS<br>GUZMAN, *in her Official Capacity as*<br>*Administrator of the Small Business*<br>*Administration*; *and* THE UNITED STATES OF<br>AMERICA,<br><br>*Respondents / Defendants.* | Case No. 1:23-cv-614-BAH |

**FIRST AMENDED PETITION FOR JUDICIAL REVIEW AND**
**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

COMES NOW the Plaintiff-Petitioner, GORDON COLLEGE, by counsel, and for its petition for judicial review and causes of action against Defendants UNITED STATES SMALL BUSINESS ADMINISTRATION; ISABELLA CASILLAS GUZMAN, *in her Official Capacity as Administrator of the Small Business Administration*; *and* THE UNITED STATES OF AMERICA, alleges and states the following:

**INTRODUCTION**

1. Gordon College (or "Gordon" or "the College" or "GC"), a religious nonprofit higher educational institution, respectfully submits this *First Amended Petition for Judicial Review and Complaint for Declaratory and Injunctive Relief* (the "*Petition/Complaint*").

1

2. "While the COVID-19 pandemic … upended daily life for all, its effects [were] particularly acute for the nation's small businesses[.] Attempting to keep those businesses afloat[,] the federal government on March 27, 2020, passed the [CARES] Act. A critical component of that law was the Paycheck Protection Program [PPP], which enabled the Small Business Administration [SBA] to approve millions of loans on an expedited basis for qualifying individuals and small businesses. The next several months witnessed SBA process an unprecedented $717 billion in loans via the PPP and the separate Economic Injury Disaster Loans (EIDL) program." *WP Co. LLC v. U.S. Small Bus. Admin.*, 502 F.Supp.3d 1, 6 (D.D.C. 2020).

3. Gordon College's *Petition/Complaint* seeks review and reversal of the Decision of Administrative Law Judge ("ALJ") Gary D. Smith ("ALJ Smith") of the SBA Office of Hearings and Appeals ("OHA") issued on January 5, 2023 ("Final Decision"). A true and correct copy of that Final Decision is attached hereto as Exhibit 1. That Final Decision of ALJ Smith denied Gordon College's *Petition for Reconsideration* of his initial decision issued November 21, 2022 ("Initial Decision") denying Gordon College's application for forgiveness of PPP loan number #8289087101 (its "PPP loan"). A true and correct copy of that November 21, 2022 Initial Decision of ALJ Smith is attached hereto as Exhibit 2. A true and correct copy of Gordon College's *Petition for Reconsideration* is attached hereto as Exhibit 3. The bottom line of SBA's decision was a finding that Gordon College exceeded the 500-employee limit for PPP loan eligibility.

4. Gordon College's PPP loan was obtained pursuant to the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116-136, 134 Stat. 281 (Mar. 27, 2020) ("CARES Act"), also available at https://www.congress.gov/bill/116th-congress/house-bill/748/text.

5. Judicial review of the legally erroneous and arbitrary and capricious decision by Defendants SBA and Administrator Guzman to deny forgiveness to Gordon College of its PPP

loan requires (a) the reversal of the SBA's Final Decision and Initial Decision issued by ALJ Smith and (b) the grant of the PPP loan forgiveness sought by Gordon College.

6.      The Final Decision and the Initial Decision are legally erroneous and arbitrary and capricious on the merits. The ALJ applied incorrect legal standards and failed to address the College's legal authorities and arguments regarding the correct legal standards and analysis.

7.      Defendants and ALJ Smith repeatedly refused to consider undisputed evidence from the public records of SBA and from other federal agencies demonstrating that SBA had granted PPP loan forgiveness to more than twenty-five (25) similarly situated private colleges and universities. These similarly situated schools used Full-Time Equivalent employee ("FTE") methods for counting the number of employees they were required to certify in their PPP applications. Gordon College also used FTE methods but was denied PPP loan forgiveness on that basis. Thus, Defendants subjected Gordon College to dissimilar and disparate treatment. To be clear, it was the Defendants' discriminatory rejection of Gordon College's use of the FTE method that caused its total number of employees to exceed the 500 limit of the PPP.

8.      Moreover, in deciding and denying Gordon College's appeal, the SBA committed multiple violations of applicable laws and regulations governing the PPP appeal process. Those violations include, for example, (a) failing to close the Administrative Record at any point in the OHA appeal, (b) failing to rule on Gordon College's *Objections to Administrative Record* prior to ALJ Smith issuing his Initial Decision, and (c) admitting into the Administrative Record of the forgiveness appeal SBA documents that did not exist at the time of the original SBA loan examiner decision – nor at any time until after all briefing on the appeal of that decision had concluded – and that therefore could not properly be part of the Administrative Record under the controlling regulations.

9. Thus, ALJ Smith's Final Decision and Initial Decision were based both upon an incomplete and fundamentally flawed Administrative Record and upon other improper, arbitrary, and capricious actions, all ratified by Defendants SBA and Administrator Guzman.

10. Gordon College's *Petition/Complaint* also requests a Declaratory Judgment that the actions of the Defendants herein violate Gordon College's constitutional and statutory rights under the First and Fifth Amendments to the United States Constitution and under federal statutes and regulations, including without limitation the federal Religious Freedom Restoration Act of 1993, 42 U.S.C. §§ 2000bb *et seq*., and all appropriate injunctive and other relief.

## THE PARTIES

**Plaintiff-Petitioner Gordon College.**

11. Plaintiff-Petitioner Gordon College is a private nonprofit Christian institution of higher education located in Wenham, Massachusetts. The College's principal office is located at 255 Grapevine Road, Wenham, Massachusetts, 01984-1899.

12. In 1889, Gordon College received its charter from the Commonwealth of Massachusetts to carry on the religious educational work that began with the Reverend Adoniram Judson Gordon and has continued without interruption to the present day. Ahead of its time, Gordon College admitted both men and women of various ethnicities from its inception.

13. Gordon College is an expressly and devotedly Christian organization. It was formed to provide instruction in the Bible and other subjects while preparing students for Christian ministry and other forms of Christian work. It requires all of its community members—faculty, staff, and students—to affirm their belief in core tenets of the evangelical Protestant tradition of the Christian faith.

14.     Gordon has maintained its dedication to the historic, evangelical, biblical faith. Should the College ever stray from its core religious mission, its governing charter requires the transfer of all its assets to another evangelical institution.

15.     According to its Restated Articles of Organization, Gordon College was formed "to provide instruction in the Bible and other subjects; to prepare men and women for the work of foreign and home missions, for the duties of the Christian ministry and other special forms of Christian work."

16.     In furtherance of that purpose, the Board of Trustees of the College has approved the following Mission Statement: "Gordon College strives to graduate men and women distinguished by intellectual maturity and Christian character, committed to lives of service and prepared for leadership worldwide. To that end, Gordon College, a Christian community of the liberal arts and sciences, is dedicated to:

- The historic, evangelical, biblical faith;
- Education, not indoctrination;
- Scholarship that is integrally Christian;
- People and programs that reflect the rich mosaic of the Body of Christ;
- Life guided by the teaching of Christ and the empowerment of the Holy Spirit;
- The maturation of students in all dimensions of life: body, mind and spirit;
- The application of biblical principles to transform society and culture."

17.     As the College explains on its website, "We deepen the faith by integrating Christian beliefs and practice into all aspects of our educational experience." (https://perma.cc/7W73-VSUE). The College requires all of its community members—faculty, staff, and students—to affirm their belief in core tenets of the evangelical Protestant tradition of the Christian faith.  Professors are further expected to advance, propagate, and foster the Christian faith in their course instruction and in all other interactions with students.

5

**Respondents/Defendants**

18.    Respondent/Defendant SBA is an independent federal agency created and authorized pursuant to 15 U.S.C. §§ 633 *et seq*. The SBA administers the PPP pursuant to the CARES Act, and related laws and regulations. The SBA posts data at https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program (SBA PPP main page).

19.    Defendant Isabella Casillas Guzman is the Administrator of the SBA ("Administrator Guzman" or "the Administrator") and is sued in her official capacity only, as the Administrator of the SBA. Authority to sue the Administrator is granted by 15 U.S.C. § 634(b).

20.    Defendant United States of America ("United States") is named as a party pursuant to 5 U.S.C. §§ 702, 703. The actions complained of were taken by the United States through its officials or agencies, including Defendants SBA and Administrator Guzman.

## JURISDICTION AND VENUE

21.    This Court has jurisdiction of Plaintiff-Petitioner Gordon College's *Petition/Complaint* under the following statutes, listed in order of their codification: 15 U.S.C. § 634(b)(1) (SBA's Sue and Be Sued Clause); 28 U.S.C. § 1331 (Federal Question); 28 U.S.C. § 1343 (Civil Rights); 28 U.S.C. § 1346(a)(2) (United States as Defendant); 28 U.S.C. § 1361 (Mandamus to Compel U.S. Official to Perform Duty); 28 U.S.C. § 1367 (Supplemental Jurisdiction); and/or 42 U.S.C. §§ 2000bb-1(c) (Religious Freedom Restoration Act or "RFRA"). *See, e.g., Singh v. Berger*, 56 F.4th 88 (D.C. Cir. 2022) ("**Singh**") (unanimous RFRA decision).

22.    Authority for judicial review of federal agency action is further provided by the Administrative Procedures Act ("APA"), at 5 U.S.C. § 701, § 702, § 703, § 704, and § 706. *See, e.g.*, *Biden v. Texas*, 142 S.Ct. 2528, 2538 (2022) ("the District Court clearly had federal question

6

jurisdiction over respondents' suit … arising under … the APA") (citing 28 U.S.C. § 1331); *Borg-Warner Protective Services v. E.E.O.C.*, 245 F.3d 831, 833 (D.C. Cir. 2001)(similar); *See, e.g.*, *Alabama-Coushatta Tribe of Texas v. U.S.*, 757 F.3d 484, 489 (5th Cir. 2014) (discussing § 702's waiver of sovereign immunity).

23. Gordon's *Petition/Complaint* also arises under the United States Constitution, including without limitation the First and Fifth Amendments (and, by incorporation, aspects of the Fourteenth Amendment), and certain other federal laws, including without limitation, the APA, RFRA, and 42 U.S.C. § 1988(b), as authorized by 28 U.S.C. § 1331 (Federal Question). *See, e.g.*, *Xia v. Tillerson*, 865 F.3d 643, 659 n.2 (D.C. Cir. 2017) ("[I]njunctive relief is unquestionably available against federal officials for violation of the Fifth Amendment's Due Process Clause, including its equal protection component.") ("*Xia*").

24. This Court is vested with original jurisdiction over the declaratory judgment claims under 28 U.S.C. § 1331 (Federal Question), 28 U.S.C. § 1343 (Civil Rights), 15 U.S.C. § 634(b)(1) (SBA's Sue and Be Sued Clause), and/or 42 U.S.C. §§ 2000bb-1(c) (RFRA).

25. This Court is vested with authority to grant the requested declaratory judgment under the Declaratory Judgment Act ("DJA"), 28 U.S.C. §§ 2201-2202.

26. This Court has jurisdiction to award the requested injunctive relief under 28 U.S.C. §§ 1331, 1343, 1346(a)(2), 1361, 1367, 15 U.S.C. § 634(b)(1);[1] 5 U.S.C. §§ 702, § 706; and/or 42 U.S.C. §§ 2000bb-1(c) (RFRA) ("appropriate relief against a government"). *See, e.g., Singh*, 56 F.4th at 110 (D.C. Cir.) (RFRA required injunction against Marine Corps).

---

[1] While the reach of Section 634(b)(1) remains unsettled, the "D.C. Circuit has … at a minimum … 'strongly intimated that injunctive relief is available ... when the SBA exceeds its statutory authority.'" *AAPC v. SBA*, 613 F.Supp.3d 360, 369 (D.D.C.) (citation omitted), *aff'd*, 810 F.App'x 8 (D.C. Cir. 2020).

27. This Court has jurisdiction to award costs and attorneys' fees under 42 U.S.C. § 1988(b) (Civil Rights Act, incorporating claims under the Constitution and RFRA), 42 U.S.C. § 2000bb (RFRA), and/or 28 U.S.C. § 2412(b) (Equal Access to Justice Act or "EAJA"). *See, e.g.*, *Northern Cheyenne Tribe v. Jackson*, 433 F.3d 1083, 1085 (8th Cir. 2006) (Courts may "award attorneys' fees to a 'prevailing party' in an action to enforce … RFRA against the United States or its officials.") (citing 42 U.S.C. § 1988(b) and 28 U.S.C. § 2412(b)).

28. Venue is proper in United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(b)&(c) and 5 U.S.C. § 703 because Defendants reside in the District of Columbia and because events giving rise to the claim occurred within said District. *See also* 13 C.F.R. § 134.1211(g) ("Appeal to Federal district court. Final decisions may be appealed to the appropriate Federal district court only.").

29. The SBA's review and denial of Gordon College's appeal through the SBA's OHA became final by Monday, February 6, the first business day immediately following thirty calendar days after service of the ALJ's Final Decision. *See* 13 C.F.R. § 134.1211(c)&(d).

30. Plaintiff-Petitioner Gordon College is entitled to judicial review of the SBA Final Decision and SBA Initial Decision. 13 C.F.R. § 134.1201(d) ("An appeal to OHA is an administrative remedy that must be exhausted before judicial review of a final SBA loan review decision may be sought in a Federal district court."); § 134.1211(g) (quoted in ¶28 above).

## FACTUAL BACKGROUND

**Introduction and Summary**

31. Plaintiff-Petitioner Gordon College seeks judicial review of the erroneous and improper handling of the College's PPP Borrower Application and forgiveness application by Defendant SBA and its Office of Hearing and Appeals ("OHA").

32.     To avert economic and social disaster from the COVID-19 pandemic, the federal government moved swiftly to implement the PPP and encourage its widespread use. The swiftness of this official response, together with the universal public disruption and unease in those early days of the pandemic lockdown, created historic uncertainty and challenges.

33.     Citing SBA and its approved lender network, media reports warned constantly of the PPP's funding limitations and challenges. *See, e.g.*, Richard Danielson, *Uncertainty Surrounds $349 Billion Paycheck Protection Program That Debuts Friday* (April 2, 2020);[2] Jeffrey Scheer, *Paycheck Protection Program Will be First-Come, First-Served* (April 3, 2020);[3] Trish Turner, et al., *'Hot Mess': Small Businesses Besieged by Problems Getting Coronavirus Loans* (April 7, 2020);[4] Robert Bartlett, et al., *Desperate Small Businesses Are Being Pushed to the Back of the Coronavirus Relief Line* (April 7, 2020);[5] Emily Flitter, et al., *Small Business Aid Program Stretches [SBA] to Its Limits* (April 7, 2020);[6] Steve Dubb, *Anatomy of a Rollout Disaster: The Paycheck Protection Program* (April 10, 2020);[7] Jim Tankersley, et al., *Small-Business Aid Funds Run Dry as Program Fails to Reach Hardest Hit* (April 15, 2020);[8] Li Zhou, *The [PPP] Has Already Run Out of Money* (April 16, 2020);[9] Lisa Desjardins, *It Took 13 Days for the [PPP] to*

---

[2] https://www.tampabay.com/news/business/2020/04/02/uncertainty-surrounds-349-billion-paycheck-protection-program-that-debuts-friday.

[3] https://www.jdsupra.com/legalnews/paycheck-protection-program-will-be-75646.

[4] https://abcnews.go.com/Politics/hot-mess-small-businesses-besieged-problems-coronavirus-loans/story?id=70010539.

[5] https://www.latimes.com/opinion/story/2020-04-07/bailout-small-business-loan-cares-act-wells-fargo-bank-of-america.

[6] https://www.nytimes.com/2020/04/07/business/coronavirus-ppp-small-business-aid.html.

[7] https://nonprofitquarterly.org/anatomy-of-a-rollout-disaster-the-paycheck-protection-program.

[8] https://www.nytimes.com/2020/04/15/us/politics/coronavirus-small-business-program.html.

[9] https://www.vox.com/2020/4/16/21223637/paycheck-protection-program-funding.

*Run Out of Money* (April 16, 2020);[10] Spencer Kimball, *Congress Approved $370 Billion More in Small Business Loans, But the Money Could Run Out in Days—Again* (April 25, 2020);[11] Rebecca Jarvis, et al., *What Went Wrong with the [PPP]: The SBA Will Begin Distributing a Second Round of PPP Loans on Monday* (April 25, 2020);[12] Cheyenne Haslett, *Small Business Owners Gear Up For Another Go At Anxiety-Inducing [PPP]* (April 25, 2020);[13] Stacy Cowley, *Bankers Rebuke SBA as Loan System Crashes in Flood of Applications* (April 27, 2020);[14] Anne Sraders, *14 Years in 14 Days: Inside the Chaotic Rollout of the SBA's PPP Loan Plan* (April 29, 2020).[15]

34.    The uncertainty was particularly acute during the first two weeks of the PPP application period (April 3-17, 2020), when Gordon College completed and submitted its PPP application.

35.    To combat uncertainty and to reassure and instruct borrowers and lenders ("PPP participants"), SBA issued official guidance in various forms, including chiefly Interim Final Rules ("IFRs") (https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/ppp-lender-information#section-header-2) and Frequently Asked Questions ("FAQs") (https://www.sba.gov/document/support-faq-ppp-borrowers-lenders).[16]

---

[10] https://www.pbs.org/newshour/politics/it-took-13-days-for-the-paycheck-protection-program-to-run-out-of-money-what-comes-next.

[11] https://www.cnbc.com/2020/04/25/coronavirus-ppp-small-business-loans-could-run-out-in-days.html.

[12] https://abcnews.go.com/Business/inside-paycheck-protection-program-race/story?id=70330643.

[13] https://abcnews.go.com/Business/small-business-owners-gear-anxiety-inducing-paycheck-protection/story?id=70317737.

[14] https://www.nytimes.com/2020/04/27/business/sba-loan-system-crash.html.

[15] https://fortune.com/2020/04/29/sba-ppp-paycheck-protection-program-loans-small-business-administration-inside-chaos.

[16] Both of these links are available on the SBA's PPP main page at https://www.sba.gov/funding-

36.    Given rapid changes in PPP requirements, SBA reassured concerned PPP participants with the commonsense commitment that they could rely on the guidance that was available at the time they applied.

37.    Specifically, on April 6, 2018, SBA issued FAQ #17 to reassure PPP participants that they could rely upon all official PPP guidance in existence at the time of their loan applications for purposes of loan eligibility and forgiveness eligibility. FAQ #17 provided in full:

> 17. **Question:** I filed or approved a loan application based on the version of the PPP Interim Final Rule published on April 2, 2020. Do I need to take any action based on the updated guidance in these FAQs?
>
> **Answer:** No. ***Borrowers and lenders may rely on the laws, rules, and guidance available at the time of the relevant application***. However, borrowers whose previously submitted loan applications have not yet been processed may revise their applications based on clarifications reflected in these FAQs.

https://www.sba.gov/sites/sbagov/files/2023-03/Final%20PPP%20FAQs.pdf (emphasis added).

38.    Gordon College relied upon all such guidance when it prepared its PPP Borrower Application, submitted it to its lender on April 6, 2020, and then, at the request of its lender (Citizen Bank), re-submitted it on April 13, 2020.

39.    Specifically, by April 13, 2020 Gordon College had accurately completed and submitted to SBA, via Gordon's PPP Lender (Citizens Bank), a PPP Borrower Application on SBA's Form 2483 (04/20). A true and correct copy of Gordon College's Form 2843 is attached hereto as Exhibit 4. The SBA Form 2483 (04/20) as promulgated by SBA is available at

---

programs/loans/covid-19-relief-options/paycheck-protection-program. *See also* Treasury's main page at https://home.treasury.gov/policy-issues/coronavirus/assistance-for-small-businesses/paycheck-protection-program. The U.S. Treasury Department played a cooperating role in the PPP process. But the relevant forms, guidance, rules, and regulations cited herein were issued by Respondent/Defendant SBA.

https://www.sba.gov/sites/sbagov/files/2022-02/PPP-Borrower-Application-Form-Fillable.pdf

from https://www.sba.gov/document/sba-form-2483-ppp-first-draw-borrower-application-form.

40.     As required on the face of this Form 2483, Gordon College accurately reported the number of employees that it had during the relevant time-period. *See id*. at 1. As permitted by the rules at that time, the College counted its employees using a full-time equivalent ("FTE") method. Gordon's fractional answer of ***495.67 employees*** left no doubt about the method it used. *See id*.

41.     This use of the FTE method to count Gordon College employees complied with the law at the time. First, it complied with the applicable federal regulation issued by SBA:

> On the Paycheck Protection Program application, an authorized representative of the applicant must certify in good faith to all of the below: … iv. Documentation verifying the number of ***full-time equivalent employees*** on payroll as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities for the eight week period following this loan will be provided to the lender.

Business Loan Program Temporary Changes: PPP, at §III.2.t.iv, 85 Fed. Reg. 20811, 20814 (Apr. 15, 2020) (emphasis added); https://www.federalregister.gov/documents/2020/04/15/2020-07672/business-loan-program-temporary-changes-paycheck-protection-program (same). This is the first of many Interim Final Rules by SBA. *It was first posted publicly on April 2, 2020*.

42.     Second, this use of the FTE method complied with the very SBA Form 2483 filed by Gordon College in this case, that Gordon "verify[]" the "number of ***full-time equivalent*** employees on [its] payroll." GC's Form 2483 (Exhibit 4) at 2. That Form 2843 required that "[t]he Applicant will provide to the Lender documentation verifying the number of ***full-time equivalent*** employees on the Applicant's payroll as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities for the eight-week period following this loan." (emphasis added)

12

43. Gordon College was not the only college to use FTEs to certify employee count in reliance on the PPP regulations and application forms issued by Defendant SBA. (The term "colleges" as used herein includes universities and similar institutions of higher learning.)

44. Specifically, more than twenty-five (25) colleges similarly situated to Gordon College used an FTE method to count employees for purposes of completing SBA Form 2483 and determining PPP loan eligibility.

45. Gordon College's Form 2483 was quickly approved by its lender Citizens Bank and Defendant SBA on April 15, 2020, and the PPP loan was fully funded on April 23, 2020.

46. Gordon College used the PPP loan proceeds for the precise purposes set forth in the CARES Act and the existing regulations, IFRs, FAQs, and Form 2483.

47. Accordingly, the College expended all PPP funds to keep its employees employed during the pandemic lockdown in 2020.

48. On April 26, 2020—13 days after Gordon's April 13 PPP application, 11 days after Gordon's April 15 PPP approval, and 3 days after Gordon's PPP loan was fully funded April 23 PPP—Defendant SBA issued new guidance on counting employees.

49. Specifically, on April 26, 2020—after Gordon had prepared, submitted, and fully executed its PPP loan application and all loan documents and its PPP loan had been approved and funded—Defendant SBA issued FAQ #36, indicating for the first time that a headcount method, rather than an FTE method, should be used to count employees for purposes of PPP loan eligibility. PPP FAQ #36, https://www.sba.gov/sites/sbagov/files/2023-03/Paycheck-Protection-Program-Frequently-Asked-Questions_04%2026%2020.pdf (April 26, 2020) (rejecting "full-time equivalent" calculation in favor of "the total number of employees, including part-time employees, when determining their employee headcount for purposes of the eligibility threshold").

50. By retroactively and selectively applying this new guidance to Gordon, Defendants violated their own assurances and basic due process. Defendants also have misunderstood and misapplied their own PPP regulations and guidance in a number of ways.

51. Defendants' grounds and justifications for their retroactive determinations that Gordon College was not eligible for a PPP loan at the time it submitted its Form 2438 on April 13, 2020 have shifted substantively during the intervening period.

52. The legal reasoning of the SBA ALJ's Initial Decision and ALJ's Final Decision differ substantially from that of the SBA loan examiner who initially denied loan forgiveness.

53. Moreover, SBA never communicated to Gordon College the legal reasoning SBA would use to justify its Final Decision against the College at any time prior to the College's Appeal Petition to the SBA OHA on May 13, 2022, nor even at any time prior to September 19, 2022, the final date for Gordon College to make any scheduled filing in the OHA appeal proceedings.

54. In addition, SBA continues to urge after-the-fact justifications for retroactively applying to Gordon College arguments and standards that SBA itself did not articulate, and apparently did not even recognize, until two years *after* (a) Gordon submitted its PPP application to its SBA lender, (b) the SBA approved Gordon's PPP application and funded the loan, and (c) Gordon properly expended all PPP funds entirely to keep its employees on its payroll.

55. For these and other reasons set forth below, the applicable decisions of the Defendants in this case are clearly erroneous, arbitrary and capricious, not supported by applicable law, and unconstitutional, and the SBA's Final Agency Decision should be reversed.

**Enactment of the CARES ACT (March 27, 2022) in Response to COVID-19 Lockdowns.**

56. In March 2020, in response to the escalating global pandemic, the U.S. Government oversaw a virtual lockdown of the U.S. economy. On March 11, 2020, the World Health

14

Organization, after more than 118,000 cases in 114 countries and 4,291 deaths, declared COVID-19 a pandemic. On March 13, 2020, the President of the United States declared a nationwide emergency. By March 15, 2020, states began to implement lockdowns and shutdowns of businesses, schools, and other public gatherings in order to prevent the spread of COVID-19. *See* https://www.cdc.gov/museum/timeline/covid19.htm.

57.     Starting March 10, 2020, the Governor of Massachusetts declared a state of emergency and began issuing a series of pandemic-related Executive Orders that, among other things, prohibited gatherings of more than 25 people and led to the lockdown, shutdown, and/or severe restriction ("shutdown restrictions") of public and private colleges in the state.

58.     The purpose and effect of these shutdown restrictions was to stem the pandemic and save lives, including the lives of students, teachers, and staff of thousands of colleges such as Gordon. However, such severe restrictions had consequences commensurate with their severity.

59.     The shutdown restrictions occurred while Gordon College students were on their Spring Break. The College leadership ultimately decided that to comply with the shutdown restrictions it would have to shut down on-campus classes and residential attendance and to shift entirely to online classes and education.

60.     The shutdown restrictions caused severe harm to nonprofits, businesses, and individuals, and particularly to small colleges such as Gordon.

61.     The shutdowns created practical, financial, and existential challenges and extreme uncertainty for colleges, particularly for colleges focused on residential undergraduate education, like Gordon College, which had to refund a substantial portion of all room and board funds for the semester due to the shutdowns.

62.     In response to these unprecedented public-health threats, and related restrictions and harms, the U.S. Government enacted the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116-136, 134 Stat. 281 (Mar. 27, 2020) (the "CARES Act").

63.     The CARES Act provided measures to enable and encourage employers to keep their employees employed during the shutdowns. One such measure was the Paycheck Protection Program, which funded forgivable loans to employers to support their ongoing operations in order to keep their employees on payroll. To induce widespread use of PPP funds, PPP loans would be forgiven if employers met certain conditions related to "protecting paychecks," i.e., maintaining certain levels of employment and payroll.

**The Paycheck Protection Program and Its Implementation.**

64.     To implement the PPP, Congress designated the Small Business Administration to administer the PPP application and forgiveness process, and distribute PPP funds, through SBA's existing nationwide network of SBA-approved private-sector lenders.

65.     The CARES Act gave SBA an almost impossible task: to implement urgently, across a nation in crisis, a massive new loan program with little guidance or infrastructure.

66.     While the nationwide network of SBA-approved lenders existed, there was little existing legal and regulatory infrastructure to implement the PPP.

67.     The duty of issuing rules and guidance for the urgent and unprecedented PPP fell to SBA, as supported by the Treasury Department. As described by Treasury: "The Paycheck Protection Program established by the CARES Act, is implemented by the Small Business Administration    with    support    from    the    Department    of    the    Treasury." https://home.treasury.gov/policy-issues/coronavirus/assistance-for-small-businesses/paycheck-protection-program (Treasury's PPP main page).

16

68.     Once the PPP commenced on April 3, 2020, SBA rolled out new rules and guidance nearly every day to help borrowers, lenders, and their advisers understand PPP loan and forgiveness eligibility and procedures and the consequences.

69.     It is vital to note here that SBA and its nationwide lending network had little or no prior experience with federal programs such as PPP that included religious, faith-based nonprofit organizations like Gordon College.

70.     Many such faith-based organizations ("FBOs") declined or delayed applications for PPP loans until they understood their eligibility for loans and forgiveness and the potential impact of PPP participation on their religious freedom.

71.     Many FBOs also were stymied by the inability of many banks, including large banks, to quickly implement needed technology and systems for PPP loan processing.

72.     For example, Gordon initially submitted its PPP loan application on April 6, 2020, but was asked by its lender (Citizens Bank) to re-submit its application on April 13, 2020.

73.     After PPP was announced, the federal government stated frankly and frequently that funds were limited and available on a first come, first serve basis until funding ran out or the program terminated on June 30, 2020. News media reinforced this urgency.

74.     The rush was on for this limited pool of PPP funds via an application process that would commence on April 3, 2020 and be developed and governed under an unknown schedule.

75.     SBA acknowledged in its first Interim Final Rule on the PPP, issued April 15, 2020, that there was significant lack of clear guidance and widespread uncertainty about how to apply for a loan and the terms of a loan under Section 1102 of the Act and stressed the importance of SBA providing such guidance as soon as possible. *See* Business Loan Program Temporary Changes: Paycheck Protection Program, at §II, 85 Fed. Reg. 20811 (Apr. 15, 2020).

17

76.     Section II of that Rule states that PPP applicants "need to be informed on how to apply for a loan and the terms of the loan under section 1102 of the Act as soon as possible because the last day to apply for and receive a loan is June 30, 2020. The immediate effective date of this interim final rule will benefit [applicants] so that they can immediately apply for the loan with a full understanding of loan terms and conditions…. This rule is being issued to allow for immediate implementation of this program." *Id.* at 20814 (emphasis added). This Rule is also available at https://www.federalregister.gov/documents/2020/04/15/2020-07672/business-loan-program-temporary-changes-paycheck-protection-program.

77.     By April 3, 2020, Defendant SBA was issuing official guidance almost daily, even as PPP applications flooded its approved lenders. Interim Final Rules ("IFRs"), Forms, an evolving list of Frequently Asked Questions ("FAQs"), and other official guidance were cumulative and ongoing throughout the PPP loan application process. Different rules were available and applicable to applicants depending on when they applied for their PPP loan.

78.     Lenders of all sizes were overwhelmed as they grappled with a new, untested, and urgent PPP evaluation and approval process. Technical issues abounded, and some banks halted application intake due to inability to sync with SBA portals. At the same time, official and media sources emphasized the need to hurry and apply before the PPP funds ran out. *See* above.

79.     Gordon College signed its Form 2483 loan application on April 6, 2020, but could not submit it to its PPP lender (Citizens Bank) until April 13, 2020, because Citizens had to pause its intake of PPP applications due to technical issues. *See* GC's Form 2483 (Exhibit 4).

80.     In those early days of PPP, some lenders had virtually no guidance even as to what documents the loan applicants were to submit.

18

81.     It initially was unclear whether nonprofit organizations would be considered eligible ("small business") applicants and, if so, whether the faith-based organizations ("FBOs") among them also would be eligible and, if so, what size standards applied to them and, if FBOs qualified, what institutional autonomy or other religious freedoms might be jeopardized.

82.     Thus began a series of IFRs, FAQs, Forms, Notices, Letters, Memos, Instructions, Data, and other guidance from SBA posted to its website at https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program.

83.     The key SBA guidance was posted at https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/ppp-lender-information#section-header-2 (32 IFRs in 2020-2021; 2 Letters from SBA Administrator; 26 Lender Notices; 4 Borrower Application Forms; 1 Borrower Disclosure; 2 Loan Necessity Questionnaires; 4 Lender Forms; Lender Assistance Line) and at https://www.sba.gov/document/support-faq-ppp-borrowers-lenders (a total of 71 FAQs issued in 24 *Version* documents beginning April 6, 2020 and ending July 8, 2022).[17]

84.     SBA's guidance was cumulative and rolling in nature and an applicant only had available to it the relevant laws, rules, and guidance at the time of completing and filing its application for the PPP loan. Gordon clearly was entitled to rely on the rules then in-force.

---

[17] As noted above, Treasury also played a role. For example, all 24 Versions of the PPP FAQs state they were issued by the "Small Business Administration (SBA), in consultation with the Department of the Treasury." See any FAQ Versions at https://www.sba.gov/document/support-faq-ppp-borrowers-lenders. But most/all of the 32 *Interim* and *Final* PPP Rules that were posted by SBA or by Treasury were *issued* by SBA. See any Rule at https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/ppp-lender-information#section-header-2 or https://home.treasury.gov/policy-issues/coronavirus/assistance-for-small-businesses/paycheck-protection-program.

**Determining "Employees" for PPP Loan Eligibility Purposes Under the CARES Act.**

85.    CARES Act §1102(a)(2)(36)(D), entitled "Increased eligibility for certain small businesses and organizations," defines relevant PPP eligibility standards as follows:

> (i) In general.—During the covered period, in addition to small business concerns, any business concern, nonprofit organization, veterans organization, or Tribal business concern … shall be eligible to receive a covered loan if the … nonprofit organization … employs **not more than** the greater of—(I) **500 employees; ….**
>
> (v) Employee.—For purposes of determining whether a business concern, nonprofit organization … employs **not more than 500 employees** under clause (i)(I), **the term 'employee' includes individuals employed on a full-time, part-time, or other basis**. [All emphasis added.]

Pub. L. 116-136, §1102(a)(2)(36)(D), 134 STAT. 288-89, 15 U.S.C. § 636(a)(36)(D).

86.    Thus, to be eligible for a PPP loan, a nonprofit organization such as Gordon College must certify that it has "not more than 500 employees," which "includes individuals employed on a full-time, part-time, or other basis."

87.    This *no[]-more-than-500-employee* (or *up-to-500-employee*) threshold, within the meaning of the CARES Act, is critical to this case.

88.    There are only three uses of the term "part-time employee" in the CARES Act, and none define the term. The term "headcount" is not used in the CARES Act. There is no formula for counting employees provided in the CARES Act. The Act made it clear that part-time employees were "included" in the <u>definition</u> of employee but did not address the method required to calculate the sum of these full-time and part-time employees into a total number.

89.    At the time Gordon College applied for and received its PPP loan in mid-April 2020, it was unclear for purposes of determining the no-more-than-500-employee threshold for PPP loan eligibility whether such part-time employees should each be counted as one employee (regardless of any specific part-time threshold hours standard) – i.e., a "headcount" formula – or whether such employees should (or could) be included in a full-time equivalent (FTE) formula.

20

**SBA PPP Loan Application Guidance: Early Days (March 27–April 3, 2020).**

90.    The CARES Act became law on March 27, 2020. It was silent on many threshold PPP issues, including the 500-employee formula. But the national crisis required SBA to implement PPP promptly, and SBA announced that PPP loan applications could be filed starting April 3, 2020.

91.    Beginning or about March 27, 2020, Defendants began publicly posting official guidance about the PPP loan application process, including the guidance described beneath the bold headings below.

**Paycheck Protection Program Borrower Application Form (April 2, 2020).**

92.    The paramount document in this case is the PPP Borrower Application Form signed and submitted by Gordon College. *See* GC's Form 2483 (Exhibit 4).

93.    The Form signed and submitted by Gordon College was SBA Form 2483 (04/20), Version 1 (Effective April 2, 2020). It was first posted by SBA late on April 2, 2020. https://www.sba.gov/sites/sbagov/files/2022-02/PPP-Borrower-Application-Form-Fillable.pdf from https://www.sba.gov/document/sba-form-2483-ppp-first-draw-borrower-application-form.

94.    This Version 1 of Form 2483 (04/20) was the only Borrower Application available at the time Gordon College completed and submitted it in early-to-mid April 2020.

95.    This Form 2483 (04/20) was not replaced with Version 2—Form 2483 (06/20)—until June 12, 2020, two months after Gordon's application was submitted to SBA. *See* https://www.sba.gov/document/sba-form-2483-ppp-first-draw-borrower-application-form.

96.    This Form 2483 (04/20) explicitly required the Borrower to provide its Lender with documentation verifying the Borrower's number of ***full-time equivalent (FTE) employees***. The Form did not limit this FTE requirement to loan-forgiveness only; it did not even state that it was designed for forgiveness or any other specific purpose.

21

97. Specifically, page two of this Form 2483 (04/20) required the Borrower to make a series of certifications, including the following:

> The applicant will provide to the Lender documentation *verifying the number of* **full-time equivalent employees** *on the Applicant's payroll* as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities for the eight-week period following this loan.

*Id.* (Form 2483 (04/20), at page 2, emphasis added).

98. Nothing in this or any other certification on page two suggested that this FTE information was limited to loan **forgiveness**.

99. Any such suggestion, even if it existed, would seem to contradict common sense by indicating this *Borrower Application for a Loan* was dedicated, not to this *Application for the Loan*, but instead to some later process about potential forgiveness of that potential Loan.

100. No official guidance on forgiveness even existed at this time. Regarding forgiveness, the first Application Form was issued in May 2020,[18] the first Rule in June 2020,[19] the first (and only) Lender Notice in July 2020,[20] and the first FAQ in August 2020.[21]

101. Pages three and four of this Form 2483 (04/20) provided "Instructions for completing this form." These Instructions were silent on any formula for how to count the number of employees.

---

[18] Form 3508 (05/20), Version 1 (May 15, 2020) https://www.sba.gov/sites/sbagov/files/2020-05/3245-0407%20SBA%20Form%203508%20PPP%20Forgiveness%20Application.pdf, from https://www.sba.gov/document/sba-form-3508-ppp-loan-forgiveness-application-instructions.

[19] https://www.federalregister.gov/documents/2020/06/01/2020-11536/business-loan-program-temporary-changes-paycheck-protection-program-requirements-loan-forgiveness (Issued June 1, 2020; Effective May 28, 2020), from https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/ppp-lender-information#section-header-2.

[20] https://www.sba.gov/document/procedural-notice-5000-20038-procedures-lender-submission-paycheck-protection-program-loan-forgiveness-decisions-sba-sba (July 23, 2020).

[21] *See* FAQs About PPP Loan Forgiveness, Version 1 (Effective Aug. 4, 2020), at https://www.sba.gov/document/support-faq-about-ppp-loan-forgiveness.

102.    Nothing in these Instructions indicated that the FTE-related certification on page 2 of this *Borrower Application for a Loan* was related, not to this *Application for the Loan*, but instead to some later process about potential forgiveness of that Loan.

103.    In fact, the very first item in the Instructions stated just the opposite:

> "**Purpose of this form**: This form is to be completed by the authorized representative of the Applicant and submitted to your SBA Participating Lender. Submission of the requested information is *required to make a determination regarding **eligibility*** for financial assistance. Failure to submit the information would affect that determination.

https://www.sba.gov/sites/sbagov/files/2022-02/PPP-Borrower-Application-Form-Fillable.pdf (Form 2483 (04/20), at page 3, emphasis added).

104.    This Purpose statement in the PPP Borrower Application for a Loan reinforced the common-sense notion that this Application for a Loan was dedicated to "eligibility" for that Loan and not some later process about potential forgiveness of that potential Loan.

105.    Moreover, this initial PPP Borrower Application Form 2483 (04/20) evidently was designed for use by business entities, not nonprofit entities, which was unsurprising given the general unfamiliarity of SBA and its lender network with nonprofit/charitable entities.

106.    This Form 2483 (04/20) evidently was cobbled together from existing Forms naturally geared to commercial (for-profit) business entities, not to nonprofit entities.

107.    For example, the second section on page one of this Form, entitled "**Applicant Ownership**," required the applicant to "List all owners of 20% or more of the equity of the Applicant." *Id*. (Form 2483 (04/20), at page 1).

108.    This section has no application to a nonprofit entity like Gordon College. Federally tax-exempt organizations such as Gordon College are not owned by any individuals or companies. There is no "equity" to own.

109.    The eight yes/no "**Questions**" on page one of the Form also applied to businesses and had little or no bearing on nonprofit organizations like Gordon College.

110.    In summary, the FTE method that Gordon College used to count employees complied with the very SBA Form 2483 filed in this case, that Gordon College "verify[]" the "number of *full-time equivalent* employees on [its] payroll." GC's Form 2483 (Exhibit 4) at 2 ("The Applicant will provide to the Lender documentation verifying the number of *full-time equivalent* employees on the Applicant's payroll as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities for the eight-week period following this loan.") (emphasis added).

111.    Furthermore, nonprofits like Gordon College should receive the benefit of any doubt when it comes to vagueness or ambiguity. Since Form 2483 (04/20) was designed for commercial business entities, from materials created for such entities, there were additional uncertainties and challenges in applying that Form to nonprofit entities like Gordon College.

**Small Business Paycheck Protection Program (Overview) (late March 2020).**

112.    Among the earliest PPP guidance was a one-page overview entitled, *Small Business Paycheck Protection Program*, posted shortly after the March 27, 2020 enactment of the CARES Act. https://home.treasury.gov/system/files/136/PPP%20--%20Overview.pdf. Its only reference to employee numbers or size standards was the following:

> **All Small Businesses Eligible**. Small businesses with 500 or fewer employees—including nonprofits, veterans organizations, tribal concerns, self-employed individuals, sole proprietorships, and independent contractors—are eligible. Businesses with more than 500 employees are eligible in certain industries.

Small Business PPP (overview), id. at 1.

24

**Paycheck Protection Program Information Sheet: Borrowers (late March 2020).**

113.    Another early PPP guidance document was a four-page sheet entitled: *PPP Information Sheet: Borrowers*.[22] On page 1, it answers the question, *Who can apply?*, by stating:

> All businesses – including nonprofits … with 500 or fewer employees can apply. Businesses in certain industries can have more than 500 employees if they meet applicable SBA employee-based size standards for those industries.

PPP Information Sheet: Borrowers, *id*. at page 1.

114.    On page 3, this Information Sheet answers the question, *How can I request loan forgiveness?*, by stating: "You can submit a request to the lender that is servicing the loan. The request will include documents that verify the number of full-time equivalent employees." *Id*. at page 3. This same FTE requirement is also referenced in the certifications on page 3.

115.    It was not until April 26, 2020—four weeks after the above Form 2483 (04/20) and guidance documents were posted *and two weeks after Gordon's Form 2483 was submitted*—that SBA determined that FTE analysis was *not* to be the up-to-500-employee standard for PPP loan *eligibility*, but only the standard for potential later *forgiveness* of the potential loan. *See* FAQ #36, the last FAQ in Version 6 of the FAQ for PPP Borrowers and Lenders. PPP FAQ #36, https://www.sba.gov/sites/sbagov/files/2023-03/Paycheck-Protection-Program-Frequently-Asked-Questions_04%2026%2020.pdf (April 26, 2020) (rejecting "full-time equivalent" calculation in favor of "the total number of employees, including part-time employees, when determining their employee headcount for purposes of the eligibility threshold").

---

[22]    https://home.treasury.gov/system/files/136/PPP%20Borrower%20Information%20Fact%20Sheet.pdf. A copy of this Information Sheet was included as Exhibit 6 to Gordon College's Appeal Petition originally filed with the SBA.

116.    This determination in FAQ #36 was inconsistent with Form 2483 (04/20), Gordon's own Form 2483, and all relevant guidance in effect during Gordon's application process, as explained in detail above. *See* ¶¶84-113 above; *see also* ¶¶48-50 above.

117.    For the same reasons, Gordon's use of FTE in its Form 2483 Application (Exhibit 4) was consistent with the Form 2483 itself and with all applicable guidance.

**SBA Interim Final Rule (Posted April 2, 2020; Published/Effective April 15, 2020).**

118.    Critically, the FTE method that Gordon College used to count employees also was consistent with the law—the applicable federal regulation issued by SBA:

> On the Paycheck Protection Program *application*, an authorized representative of the applicant must certify in good faith to all of the below: … iv. Documentation verifying the number of *full-time equivalent employees* on payroll as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities for the eight week period following this loan will be provided to the lender.

Business Loan Program Temporary Changes-PPP, at §III.2.t.iv, 85 Fed. Reg. 20811, 20814 (Apr. 15, 2020) (emphasis added); https://www.federalregister.gov/documents/2020/04/15/2020-07672/business-loan-program-temporary-changes-paycheck-protection-program (same rule); https://home.treasury.gov/system/files/136/PPP--IFRN%20FINAL.pdf (same).

119.    This Interim Final Rule was the first federal regulation issued by SBA for the PPP. This initial IFR may be cited hereinafter as the "Initial Rule."

120.    Since Gordon's FTE employee calculation was not inconsistent with the CARES Act, and was consistent with the applicable federal regulation and SBA Form, Gordon's application was consistent with the highest level of legal authority in existence at the time.

**Interim Final Rule–Affiliations (Posted April 3, 2020; Published/Eff. April 15, 2020).**

121.    This IFR on Affiliations ("IFR-AFF") was the second federal regulation for the PPP, posted by SBA just one day after posting its Initial Rule (discussed immediately above).

26

Business Loan Program Temporary Changes ("IFR-AFF"), at 1, 85 FR 20817 (Apr. 15, 2020); https://www.federalregister.gov/documents/2020/04/15/2020-07673/business-loan-program-temporary-changes-paycheck-protection-program (same rule as posted to SBA's PPP web page); https://home.treasury.gov/system/files/136/SBA%20IFR%202.pdf (same as posted by Treasury).

122.    The purpose of this IFR-AFF was to alter longstanding SBA rules developed under SBA's flagship *Section 7(a)* lending program. "The SBA's primary mechanism for aiding small businesses is by financing private 'Section 7(a) loans' under the Small Business Act." *Springfield Hosp. v. Guzman*, 28 F.4th 403, 408–09 (2d Cir. 2022) (citing 15 U.S.C. § 636).

123.    In the CARES Act, Congress chose to use the SBA's national lending network under 7(a) to distribute PPP funds. But the application of SBA's standard business rules could harm the religious freedom of Faith-Based Organizations ("FBOs"), whom Congress wanted in the PPP because FBOs employed millions of Americans (whose paychecks needed protection) and because it would be unfair (and unconstitutional) to exclude FBOs and their employees.

124.    The IFR-AFF was a significant determination for FBOs such as Gordon College. It provided FBOs a broad exemption from SBA's affiliation rules "where the application of the affiliation rules would substantially burden those organizations' religious exercise."[23]

125.    Under SBA affiliation rules, a borrower would be considered together with its affiliates for purposes of determining loan eligibility. Affiliates were generally identified by having such factors as stock ownership, overlapping management, and identity of interest. Of particular interest here is how the IFR-AFF addressed the conflict between the SBA's affiliation rules for small businesses and the application of those rules to FBOs.

---

[23] *BLPTC-PPP* (IFR-AFF), at III.2, 85 FR 20817, 20819.

126.     Prior to the CARES Act, nonprofits were not eligible for SBA's 7(a) program. The CARES Act made nonprofits eligible for the PPP (via the 7(a) program), subjecting them to 7(a) requirements such as SBA's affiliation rules. (Section 1102 of the Act did this explicitly.)

127.     The IFR-AFF exempts FBOs from otherwise applicable affiliation rules because many FBOs—such as hierarchical churches, religious denominations, and many other kinds of religious institutions—affiliate for religious purposes. A religious governance structure (or polity) enables religious affiliation as well as organizational governance. Many FBOs express their faiths by and through their polities and various "affiliates" and "affiliations."

128.     SBA determined that it would violate the Religious Freedom Restoration Act ("RFRA") and the First Amendment to the U.S. Constitution to pressure such FBOs to change their religious polities, hierarchies, and organizational ties (affiliations) to try to meet the no-more-than-500-employee limit, which Congress obviously wanted them to meet by including them (and their millions of employees) in the PPP. *Id.* at III.2, 85 FR 20817, 20819-20820.

129.     A similar course was available to Defendants in Gordon College's case.

**SBA FAQs for Faith-Based Organizations (Posted & Effective April 3, 2020).**

130.     On April 3, 2020, the SBA issued *FAQs Regarding Participation of Faith-Based Organizations in PPP and EIDL* ("FBO-FAQs"). https://www.sba.gov/document/support-faq-regarding-participation-faith-based-organizations-ppp-eidl. In eight FAQs, SBA gave specific guidance and reassurance to FBOs, consistent with its IFR-AFF regulation above, that FBOs could apply for the PPP loan without fear of harm to their religious liberties or their tax-exempt status. https://www.sba.gov/sites/sbagov/files/2020-06/SBA%20Faith-Based%20FAQ%20Final-508.pdf.

131. For example, FBO-FAQ #4 provides: An FBO's "request" and "[r]eceipt of a loan through any SBA program does not (1) limit [the FBO's] authority … to define the standards, responsibilities, and duties of membership; (2) limit [its] freedom … to select individuals to perform work connected to [its] religious exercise; nor (3) constitute waiver of any rights under federal law, including rights protecting religious autonomy and exercise under [RFRA, under Title VII's religious organization exemption, or under] the First Amendment." *Id*.

132. Size standards for FBOs are addressed in FBO-FAQ #8. *Id*. The SBA Loan Decision similarly stated that SBA industry size standards do not apply to Gordon College.

**The 25 FAQs Posted as of April 13, 2020 (date Gordon's Application was submitted).**

133. SBA's FAQs for Borrowers and Lenders (the general PPP "FAQs") were posted (published) beginning April 3, 2020. As described in the footnotes of each of the 24 "versions" of the FAQs, FAQ #1 was published on April 3, 2020; FAQs #2-18 on April 6, 2020; FAQs #19-20 on April 8, 2020; FAQs #21-25 on April 13, 2020; and so on until #71 on July 8, 2022. *See* https://www.sba.gov/document/support-faq-ppp-borrowers-lenders (scroll to listing of all 24 *Versions* of the FAQs: from Version 1 of April 6, 2020 to Version 24 of July 8, 2022).

134. As indicated above, SBA had posted 25 FAQs as of April 13, 2020, the day Gordon's Form 2483 Borrower Application was submitted to SBA. *See* FAQ Version 4 at https://www.sba.gov/sites/sbagov/files/2023-03/Paycheck-Protection-Program-Frequently-Asked-Questions_04%2023%2020.pdf (Effective April 23, 2020). This Version 4 includes all 25 FAQs available through April 13, 2020.

135. Of these 25 FAQs, FAQ #17 promised fundamental fairness (basic due process) and therefore was pivotal for most or all applicants, including Gordon College:

**Q**: I filed or approved a loan application based on the version of the PPP Interim Final Rule published on April 2, 2020. Do I need to take any action based on the updated guidance in these FAQs?

**A**: No. *Borrowers and lenders **may rely** on the **laws, rules, and guidance available at the time** of the relevant application.* However, borrowers whose previously submitted loan applications have not yet been processed may revise their applications based on clarifications reflected in these FAQs.

*Id*. (FAQ Version 4), at FAQ #17 (published April 6, 2020) (emphasis added).

136. Only two of these 25 FAQs that were available when Gordon College submitted its Borrower Application referenced number of employees, and then only tangentially.

137. FAQ #3 clarified that PPP loans "are also available for qualifying tax-exempt nonprofit organizations described in Section 501(c)(3) … that have 500 or fewer employees whose principal place of residence is in the United States, or meet the SBA employee-based or revenue-based size standards for the industry corresponding to its primary industry." *Id*. (FAQ Version 4), at FAQ #3. There are no *industry* size standards available to Gordon here. *Cf*. SBA Size Standards Table, available at: https://www.sba.gov/sites/default/files/2022-05/Table%20of%20Size%20Standards_Effective%20May%202%202022_Final.pdf. Also, per FBO-FAQ #8, posted April 3, 2020: "Faith-based nonprofit organizations that do not fall under a primary industry that is listed with an employee-based size standard must have 500 employees or fewer to be considered small." https://www.sba.gov/sites/sbagov/files/2020-06/SBA%20Faith-Based%20FAQ%20Final-508.pdf (FBO-FAQ #8).

138. FAQ #14 provided:

**Q**: What time period should borrowers use to determine their number of employees and payroll costs to calculate their maximum loan amounts?

**A**: In general, borrowers can calculate their aggregate payroll costs using data either from the previous 12 months or from calendar year 2019 [and] may use their average employment over the same time periods to determine their number of employees, for the purposes of applying an employee-based size standard.

*Id*. (FAQ Version 4), at FAQ #14. Again, Gordon College had no such employee-based industry size standard available to it as a faith-based nonprofit organization.

**Gordon College PPP Borrower Application Form (Submitted April 13, 2020).**

139.    This section necessarily repeats and reinforces some key facts from above. Gordon College's completed SBA Form 2483 (04/20) Borrower Application was submitted to the SBA Portal by Gordon's lender (Citizens Bank) no later than April 13, 2020.

140.    Gordon's Borrower Application clearly indicated that Gordon College was a 501(c)(3) nonprofit organization. *See* GC's Form 2483 (Exhibit 4).

141.    Gordon's Application requested a loan in the amount of $7,046,037. *Id*. at 1.

142.    In good faith reliance upon then-existing SBA guidance (*see* FAQ #17 above), Gordon's Application listed its number of employees as "495.67." *Id*. at 1.

143.    The fractional percentage ".67" in "495.67" proved that Gordon was using an FTE method to calculate the number of employees (no fractional percentage of human beings being possible) and was not counting heads (requiring a whole number).

144.    On page 2 of Gordon's Application (*id*. at 2; emphasis added), Gordon made all required certifications, under penalty of perjury, including the fourth certification:

> The applicant will provide to the Lender documentation *verifying the number of **full-time equivalent employees** on the Applicant's payroll* as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities for the eight-week period following this loan.

145.    Nothing in this or any other document suggested that this FTE information was limited to loan forgiveness, and no official guidance on forgiveness even existed at this time.

146.    Any such suggestion, even if it existed, would seem to contradict common sense by indicating this *Borrower Application for a Loan* was dedicated, not to this *Application for the Loan*, but instead to some later process about potential forgiveness of that potential Loan.

147.    Nothing in the *Instructions* on pages 3-4 of Gordon's *Borrower Application for a Loan* indicated that the FTE certification on page 2 was related, not to its *Application for the Loan*, but instead to some later process about potential forgiveness of that potential Loan.

148.    In fact, the very first item in the Instructions (page 3) stated just the opposite:

"**Purpose of this form**: This form is to be completed by the authorized representative of the Applicant and submitted to your SBA Participating Lender. Submission of the requested information is *required to make a determination regarding **eligibility*** for financial assistance. Failure to submit the information would affect that determination.

149.    This Purpose statement in Gordon's Borrower Application for a Loan reinforced the common-sense notion that its Application for a Loan was dedicated to its "eligibility" for that Loan and not some later process about potential forgiveness of that potential Loan.

150.    Gordon's Application was submitted and beyond its control by April 13, 2020.

151.    Gordon was entitled to rely on its Application Form and on the laws, rules, and guidance available at the time its Application was submitted to SBA on April 13, 2020.

152.    Gordon's Borrower Application was approved on April 15, 2020 in the requested amount of $7,046,037.00.

153.    Even if the Application had remained within Gordon's control after its submission to SBA on April 13, 2020, Gordon was entitled to rely on all official guidance available at the time its Application was approved by SBA on April 15, 2020.

154.    The Loan Agreement and all related documentation were executed by both parties on or before April 23, 2020.

155.    Even if the Application process had remained within Gordon's control after SBA's approval of the Application on April 15, 2020, Gordon was entitled to rely on all official guidance available at the time of loan execution/disbursement on or before April 23, 2020.

156.    No law, regulation, or official guidance prior to April 23, 2020 indicated that Gordon College was not permitted to calculate employees using an FTE method.

157.    Gordon College relied on FAQ #17 and expended the entire PPP loan proceeds of $7,046,037 entirely on payroll and related permissible personnel costs to keep its employees employed, protecting their paychecks, the reason for the Paycheck Protection Program.

**FAQ #36's Clarification of 500 Employee Calculation (April 26, 2020).**

158.    *After* Gordon's PPP Borrower Application was (a) submitted to SBA on April 13, 2020, (b) was approved by SBA on April 15, 2020, and (c) executed and funded by SBA on or before April 23, 2020, SBA issued a new FAQ #36 on April 26, 2020.

159.    Although no law, regulation, or guidance addressed headcount or prescribed a standard for counting employees for loan *eligibility*, FAQ #36 for the first time articulated a new standard for determining the 500-employee limit for *eligibility*, resulting in two different "counting" standards: (a) headcount for eligibility and (b) FTE for forgiveness.

160.    Published and posted on April 26, 2020, FAQ #36 provided:

**Q**: To determine borrower eligibility under the 500-employee or other applicable threshold established by the CARES Act, must a borrower count all employees or only full-time equivalent employees?

**A**: For purposes of loan *eligibility*, the CARES Act defines the term employee to include "individuals employed on a full-time, part-time, or other basis." A *borrower must therefore* calculate the total number of employees, including part-time employees, when determining their employee *headcount* for purposes of the *eligibility* threshold. For example, if a borrower has 200 full-time employees and 50 part-time employees each working 10 hours per week, the borrower has a total of 250 employees. By contrast, for purposes of loan *forgiveness*, the CARES Act uses the standard of "fulltime equivalent employees" to determine the extent to

which the loan forgiveness amount will be reduced in the event of workforce reductions.

PPP FAQ #36, https://www.sba.gov/sites/sbagov/files/2023-03/Paycheck-Protection-Program-Frequently-Asked-Questions_04%2026%2020.pdf (emphasis added). "Question 36 published April 26, 2020." *Id*. at footnote 13.

161.    By April 26, 2020, when FAQ #36 first became the official guidance for counting employees to determine PPP loan *eligibility*, Gordon College had already filed two weeks earlier its Application listing its number of employees at 495.67, clearly indicating its FTE calculation.

162.    On the basis of that FTE calculation, SBA approved Gordon's Application and both Gordon and its lender fully executed the PPP loan documents—prior to FAQ #36.

**Gordon College's PPP Loan Forgiveness Application and SBA Review.**

163.    On or about September 3, 2021, Gordon's application for *forgiveness* of its PPP loan was reviewed and approved by its lender Citizens Bank and then was submitted without substantive changes by the lender to the SBA, requesting forgiveness of the full amount of $7,046,037.00.

164.    At various points in the loan-forgiveness review process, the SBA loan examiner requested additional information from Gordon College, via requests to its lender (Citizens Bank).

165.    Among others, Gordon College received an email from Citizens Bank dated October 28, 2021, stating: "SBA requests the following documents or information from the borrower:.… Please also provide a list of locations to include employee count per location." A true and correct copy of this email is attached as Exhibit 5.

166.    This SBA request did not explain the purpose of this inquiry, the relevance of the different locations, its use of the term "count," the specific time frame for the request, nor the method to be used in determining the number of employees to be listed for each location.

34

167.    Gordon responded to this request via email reply to Citizens Bank on November 5, 2021, providing a breakout of employees by state for the "covered period" of twenty-four weeks called for under the *forgiveness* application rather than the eight-week period required by the original SBA Form 2843 *eligibility* application. In making this response to the SBA's request for "employee count," Gordon used a headcount method to determine employees, rather than the FTE method that it used when it submitted its SBA Form 2483 Borrower Application or its loan forgiveness application.

168.    At some point in the loan forgiveness review process, Gordon learned that SBA, based on the loan examiner's preliminary review, was considering Full Denial of forgiveness.

169.    Consequently, on December 3, 2021, Gordon submitted to the SBA loan examiner (via its lender, Citizens Bank) a 14-page letter explaining the applicable legal guidance upon which Gordon had relied and the basis upon which it had calculated the number of employees listed on its SBA Borrower Application Form 2483 submitted to SBA on April 13, 2020.

170.    On December 15, 2021, Gordon submitted to the SBA loan examiner (via Citizens Bank) a 2-page letter identifying additional legal guidance upon which Gordon had relied specifically related to nonprofit organizations.

171.    SBA's initial determination on forgiveness reached Gordon College (via Citizens Bank) on April 13, 2022 in the form of document entitled *Paycheck Protection Program Final SBA Loan Review Decision* and dated April 12, 2022. *See* "Loan Decision" (Exhibit 6).

172.    In this Loan Decision, the SBA Office of Capital Access indicated that SBA was denying loan forgiveness. The entire reason for denial in the SBA *Loan Decision* is as follows:

> After review of the documentation provided, the SBA concludes the Borrower business, or together with its affiliates, exceeds the maximum allowable number of employees and the SBA small business size standards.

A thorough analysis of the IRS 941 reports and additional supporting documentation confirms that the borrower exceeded the maximum allowable number of employees and therefore does not qualify under the SBA small business size standard qualifications for a Paycheck Protection Program loan. Furthermore, the borrower is listed as 501(c)(3), and therefore is not eligible under the alternative size standard industry qualifications. The Alternative Size Standard Qualifications are limited to for-profit entities, that do not qualify for a PPP loan under the traditional NAICS Employee-Based Size Standard Industry criteria.
[Loan Decision (Exhibit 6).]

**Gordon College's Appeal to SBA Office of Hearings and Appeals.**

173. On May 13, 2022 Gordon filed with the SBA Office of Hearings and Appeals a petition to appeal SBA's Loan Decision, along with eleven supporting Exhibits. A true and correct copy of this Appeal Petition (but *not* including all eleven supporting exhibits thereto) is attached hereto as Exhibit 7.

174. This "Appeal Petition" (Exhibit 7) identified multiple clear errors of law and of fact in the SBA Loan Decision requiring its reversal. *See id*. at 1-5.

175. Gordon's Appeal Petition and Exhibit 11 thereto provided evidence from SBA's own records publicly posted on its website demonstrating that the SBA *Loan Decision* in Gordon's case contradicts other decisions by other SBA loan examiners involving substantially similar institutions of higher education that had received PPP loans.

176. Exhibit 11 to Gordon's Appeal Petition provided data for specific comparable loans and borrowers extracted from SBA's internal records that have been publicly posted at https://data.sba.gov/dataset/ppp-foia and specifically the datafile publicly posted at https://data.sba.gov/dataset/ppp-foia/resource/501af711-1c91-477a-80ce-bf6428eb9253. Surely, Administrative Law Judges may take judicial notice of SBA's own internal records and databases, particularly when those same records have also been made publicly available pursuant to the Freedom of Information Act. Gordon could not have submitted this factual data at any prior stage

in the proceedings because until the SBA issued its final Loan Decision it was not possible for Gordon to know what, if any, of this information was relevant. There would be no prejudice or even inconvenience to SBA for the ALJ to consider SBA's own records. A true and correct copy of Exhibit 11 to Gordon's Appeal Petition is attached hereto as Exhibit 8.

177.    According to this evidence, numerous colleges received PPP loan forgiveness of amounts between $5 Million and $10 Million based upon stated number of employees of less than 500 when publicly available government data show "headcounts" of over 500 at time of loan application and at time of loan forgiveness, as shown by the same IRS Form 941 and Form 990 responses that the SBA loan examiner and final SBA *Loan Decision* used to deny Gordon forgiveness.

178.    As Gordon's Appeal Petition emphasized, it is clear error for SBA to apply different legal and factual standards to other Borrowers who are similarly situated to Gordon College. On their face, such distinctions are discriminatory, arbitrary, and capricious.

179.    Further, by applying standards to Gordon College, a nonprofit private Christian college, differently from similarly situated colleges that are not religious or are of different religions, the SBA *Loan Decision* may discriminate on the basis of religion in violation of (among others) the First and Fifth Amendments to the U.S. Constitution and of the federal Religious Freedom Restoration Act. *See, e.g.*, *Tandon v. Newsom*, 141 S.Ct. 1294, 1296 (2021) ("government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise."). *See also Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021).

180.    Such disparate treatment also contradict the CARES Act itself, as described by the SBA itself in FBO-FAQ #2:

37

> The PPP and EIDL loan programs are neutral, generally applicable loan programs that provide support for nonprofit organizations without regard to whether they are religious or secular.... In addition, the CARES Act does not impose unique burdens or limitations on faith-based organizations.

https://www.sba.gov/sites/sbagov/files/2020-06/SBA%20Faith-Based%20FAQ%20Final-508.pdf.

**SBA Initial Notice and Order by ALJ Smith (June 28, 2022).**

181.    On June 28, 2022, ALJ Gary D. Smith of SBA's OHA issued a *Notice and Order* establishing the schedule, filings, and due dates for the Appeal.

182.    SBA and Gordon requested adjustments to the schedule established by the *Notice and Order*. This process required several filings by the parties until the ALJ on July 18, 2022 issued an *Amended Order Granting Extension of Time*.

183.    All SBA adjudication in the underlying case proceeded before ALJ Smith ("ALJ Smith" or "the ALJ"), who issued the Final Agency Decision for SBA.

**SBA's Filing of the Administrative Record and Gordon's Written Objections Thereto.**

184.    On August 19, 2022, SBA counsel filed the Administrative Record for Gordon College's PPP borrower application, forgiveness application, SBA examination, and the SBA Loan Decision comprised of approximately 1,562 pages.

185.    On September 19, 2022, Gordon College timely filed written *Objections to SBA Administrative Record (As Filed August 19, 2022)*. Those Objections (Exhibit 9) noted serious deficiencies in the Administrative Record as filed by the SBA, including (without limitation):

> (a) Documents were submitted by Gordon College to its Lender Citizens Bank in the process of determining eligibility for the original Paycheck Protection Program loan (the "Appellant PPP Loan") and Gordon's eligibility for forgiveness of the PPP loan that are not in the Administrative Record.

> (b) Documents are referred to in the SBA Administrative Record but those documents do not actually appear in the Administrative Record as uploaded.

(c) Documents that are directly relevant to or even controlling of the relevant determinations are referred to in the Administrative Record but do not appear in the Administrative Record.

(d) Errors or formatting in the Administrative Record make it virtually impossible to read or identify some of the documents included in the Record.

186. Among other things, Gordon objected to the fact that its SBA Form 2483 (04/20) Borrower Application—the document at the heart of the appeal and discussed at length in Gordon's original Appeal Petition—did not appear anywhere in the SBA Administrative Record.

187. Gordon's signed Borrower Application and supporting documentation are essential given the SBA reviewers' determination that Gordon was not eligible for a PPP loan *at the time that Application was submitted on April 13, 2020*. Indeed, SBA reviewers determined the central issue of whether Gordon was eligible for a PPP loan at the time of its Application in April 2020 using data ambiguously elicited by SBA in 2021 rather than the original 2020 data.

188. These concerns are magnified by SBA's later Loan Decision that Gordon would not receive *any* loan forgiveness for the specific reason that Gordon was not eligible for a PPP loan *at the time that it first applied*.

189. Gordon College specifically requested ALJ Smith to order the SBA to supplement the Record with all documents related to the submission, processing, approval, funding, and disbursement of funds for Gordon's April 2020 Borrower Application.

190. There also were materials referred to by the SBA in the Administrative Record that did not appear to have been included in the Administrative Record as uploaded by the SBA.

191. For example, Gordon's *Objections* asked the ALJ to order the SBA to supplement the Administrative Record with specific agency and other legal "guidance" that the Record indicated SBA reviewers relied upon or consulted in their review of Gordon's loan eligibility and their ultimate determination that Gordon was not eligible for a PPP loan nor for PPP loan

forgiveness. Gordon's *Objections* cited to multiple sections of the Administrative Record where such guidance was referred to, but such guidance was not included in the Administrative Record.

**The ALJ's Inadvertent September 19, 2022 *Notice and Order Issued and Vacated.***

192.    On the afternoon of September 19, 2022, the date on which Gordon's *Objections to Administrative Record* were due, the ALJ issued a new *Notice and Order* (Exhibit 10) that changed all due dates in the case, including the date for SBA to file the Administrative Record and for Gordon to file its *Objections* thereto, moving both dates into the month of October.

193.    Gordon timely filed its written Objections to Administrative Record on September 19, 2022, as originally ordered. But Gordon noted on page one of its *Objections* (Exhibit 9) that the ALJ's new *Notice and Order* appeared to change the filing dates in the appeal.

194.    The following day, September 20, 2022, the ALJ issued a new *Order Vacating Inadvertent Notice and Order* (Exhibit 11), which vacated the *Notice and Order* that the ALJ had erroneously issued the preceding day.

195.    This September 20, 2022 *Notice and Order* demonstrated that the ALJ was aware that Gordon had filed its *Objections to Administrative Record*, yet the ALJ did not in any way rule on or even address those Objections prior to issuing his Initial Decision denying forgiveness.

196.    Ironically, only the erroneously issued and subsequently vacated September 19, 2022 *Notice and Order* included any provision addressing the closing of the Administrative Record. It stated in Section II that November 3, 2022 would be the close of record. But that Notice and Order was vacated by the ALJ one day later and no other Order issued by the ALJ addressed the closing the Administrative Record.

197.    The ALJ never officially closed the Administrative Record, as required by law and discussed further below.

**The ALJ's Initial Decision and Gordon College's Petition to Reconsider.**

198.    Although the ALJ had not closed the Administrative Record nor in any way addressed any of Gordon College's Objections to Administrative Record, the ALJ on November 21, 2022 issued his Decision denying Gordon College's Appeal and upholding the SBA's Loan Decision to deny PPP loan forgiveness. *See* ALJ's "Initial Decision" (Exhibit 2).

199.    The ALJ's Initial Decision committed multiple clear and material errors of law and of fact. Consequently, Gordon College filed a *Petition for Reconsideration of SBA Administrative Law Judge's Decision Issued November 21, 2022 and Failure to Address Appellant's Written Objections to the SBA Administrative Record* ("Petition to Reconsider"), identifying no fewer than nine separate material errors. *See* Gordon Petition to Reconsider (Exhibit 3).

200.    Perhaps the most material of the Initial Decision's errors of law and fact is that the Initial Decision cites, quotes, and relies primarily, if not exclusively, upon the *wrong* subsection of the April 15, 2020 Interim Final Rule ("Initial Rule"),[24] as the foundation for the Decision's conclusions: (a) that 13 C.F.R. § 121.106 applies and controls Gordon's PPP loan application and this appeal, (b) that § 121.106 clearly required use of a headcount method to determine employees for purposes of the PPP Borrower Application, and (c) that Gordon should have known all this at the time of submitting its Borrower Application on April 13, 2020.

201.    The Initial Decision quotes and relies heavily upon *subsection (A)* of section III.2.A.i of the Initial Rule, which applies only to *for-profit small business concerns*. But the quotation *excludes*—and the ALJ Decision ignores—the immediately following *subsection (B)* of

---

[24] BLPTC-PPP ("Initial IFR" or "Initial Rule"), 85 Fed. Reg. 20811 (April 15, 2020); https://www.federalregister.gov/documents/2020/04/15/2020-07672/business-loan-program-temporary-changes-paycheck-protection-program (same rule as posted to SBA's PPP web page); https://home.treasury.gov/system/files/136/PPP--IFRN%20FINAL.pdf (same rule at Treasury's).

section III.2.A.i, which is the part that specifically applies to *tax-exempt nonprofit organizations*. *See id*. (Initial Rule) at §III.2.A.i, 85 Fed. Reg. 20811, 20812. This obvious error by the ALJ Decision is even more concerning because Gordon College quoted the correct *subsection (B)* on page 13 of its Appeal Petition.

202.    This error of law may arise from the Initial Decision's foundational error of material fact: At no point did the Initial Decision recognize that Gordon College is in fact a "tax-exempt nonprofit organization described in section 501(c)(3)"—the central issue governing whether subsection (A) or (B) of section III.2.A.i of the Initial Rule applies.

**The ALJ's Two December 2, 2022 Orders.**

203.    In response to Gordon's Petition to Reconsider, the ALJ on December 2, 2022 issued two new Orders.

204.    The ALJ's Order for SBA to Supplement the Administrative Record (Dec. 2, 2022) (Exhibit 13) finally admitted that "the record does not contain a copy of Appellant's Borrower Application Form (SBA Form 2483)." It ordered SBA "**to immediately upload its copy of Appellant's Form 2483, as well as any additional pertinent documentation related to how it calculated Appellant's number of employees, to the Document Portal for Appellant's Petition for Reconsideration.**" (emphasis in original)

205.    The ALJ also issued a *Notice of Filing Petition for Reconsideration and Date for Response* (Exhibit 12), giving the SBA "**until December 16, 2022 to file its response** to the Appellant's Petition for Reconsideration if it intends to do so." (emphasis in original).

206.    On December 5, 2022, SBA submitted for the record Gordon's SBA Form 2483 Borrower Application as it was officially submitted to SBA on April 13, 2020. The SBA

42

submission indicated that the SBA did not have its own copy of Gordon's SBA Form 2483 but instead had to request a copy from Gordon's lender Citizens' Bank.

**The SBA's Improper "Supplement" to the Administrative Record.**

207.    SBA never filed any response to, or as permitted by, the ALJ's December 2 Notice. Instead, on December 8, 2022, SBA counsel filed a document to which it gave the title *Supplement to the Administrative Record* (Exhibit 14).

208.    Despite the title, SBA's purported "Supplement" to the Administrative Record was not in any way a supplement to the Record.

209.    On December 19, 2022, Gordon filed written *Objections to SBA's Supplement to The Administrative Record (Filed December 8, 2022)* ("Objections") (Exhibit 15).

210.    As Gordon's *Objections* explained, the SBA "Supplement" consisted of a document that on its face was dated September 22, 2022, and updated December 5, 2022. Thus, the original of this document was created:

1. more than twenty-eight (28) months after Gordon's PPP Borrower Application Form 2483 was submitted by Gordon to its lender (April 13, 2020), approved by the lender (April 15, 2020), fully funded by the SBA (on or before April 23, 2020), and expended by Gordon entirely to keep existing Gordon employees employed and on the Gordon payroll (during the next few months);

2. more than five (5) months after SBA issued its Final SBA Loan Review Decision ("Loan Decision") (April 12, 2022) that was the subject of Gordon's OHA appeal;

3. more than four (4) months after Gordon filed its Appeal Petition (May 13, 2022);

4. more than one (1) month after SBA filed the "Administrative Record" in the Appeal (August 19, 2022); and

5. three (3) days after Gordon College filed its *Objections to Administrative Record* in the Appeal (September 19, 2022)—the last filing of any sort by Gordon that was specifically identified in any of the ALJ's scheduling orders.

211.    SBA's submission of this "Supplement," and any consideration or inclusion of it in the Administrative Record by the ALJ, violated the PPP regulations at 13 C.F.R. § 134.1207 and 13 C.F.R. § 134.1209 (ALJ not to admit evidence beyond the administrative record).

**The ALJ's January 5, 2023 Final Decision on Gordon's Petition for Reconsideration.**

212.    On January 5, 2023, the ALJ issued a 7-page *Decision on Appellant's Petition for Reconsideration*. This was the Final Agency Decision or "Final Decision" (Exhibit 1).

213.    This Final Decision by ALJ Smith denied Gordon College's *Petition to Reconsider* in full and affirmed his November 21, 2022 Initial Decision.

214.    The ALJ largely ignored Gordon's *Objections* to the December 8, 2022 SBA "Supplement" and, instead, recharacterized the Supplement as the SBA's legal brief and permitted its filing, thereby further tainting the Administrative Record before the ALJ.

215.    The ALJ's decision to receive and consider SBA's December 8, 2022 Supplement violated (among other things) 13 C.F.R. § 134.1207, which provides in part:

> **§ 134.1207 The administrative record**.
>
> (a) *Time limits.* The administrative record will be due 20 calendar days after issuance of the Notice and Order unless additional time is requested and granted.
>
> (b) *Contents.* The administrative record shall include non-privileged, relevant documents **that SBA considered in making its final loan review decision or that were before SBA at the time of the final loan review decision**. The administrative record need not, however, contain all documents pertaining to the appellant. [13 C.F.R. § 134.1207 (emphasis added).]

216.    The SBA Supplement did not exist at the time SBA made its Final Loan Review Decision in April 2022. The Supplement was not "submitted" even within SBA until September 22, 2022, more than five months after the SBA's Final Loan Review Decision, more than four months after Gordon filed its OHA *Appeal Petition*, and three days *after* Gordon filed its *Objections to Administrative Record* with the OHA ALJ.

217.    Further, any admission or consideration of the SBA's "Supplement" by the ALJ also violated 13 C.F.R. § 134.1209(a), which provides in full that "Generally, the Judge may not admit evidence beyond the administrative record."

44

**Defendants Discriminated Against Gordon Vis-a-Vis Similarly Situated Colleges.**

218. Although Defendants have resolutely denied loan forgiveness to Gordon College, Defendants have granted loan forgiveness, in whole or substantial part, to more than twenty-five (25) other comparable colleges and universities in situations substantially similar to Gordon's.

219. SBA applied a *different standard* to these more than twenty-five other colleges and universities ("colleges") whose loans it forgave despite their using an FTE analysis and having total "headcount" beyond the 500-employee maximum (just like Gordon).

220. Both the Administrative Record as filed by SBA on August 19, 2022, and the purported "Supplement" filed by SBA on December 8, 2022, further demonstrate that SBA changed its loan review analysis after February 2022.

221. The SBA loan examiner's Loan Decision denying forgiveness to Gordon contradicts other decisions by other SBA Examiners involving comparable borrowers and facts.

222. Upon information and belief, from April 2020 through February 2022, SBA loan examiners used FTE analysis to determine that other PPP borrowers satisfied all requirements regarding the maximum number of employees for purposes of PPP loan *eligibility*.

223. Upon information and belief, from April 2020 through February 2022, SBA loan examiners used FTE analysis to determine that other PPP borrowers satisfied all requirements regarding the maximum number of employees for purposes of PPP loan *forgiveness*.

224. This treatment has occurred even where other applicants had as many or more employees at the times of loan application and loan forgiveness as did Gordon, as measured by the same data that the SBA loan examiner used for the Loan Decision in this case.

225. Set forth in Exhibit 8 here are (a) Those colleges, (b) the relevant public PPP data from publicly available SBA records regarding loans, amounts, numbers of employees reported, loan forgiveness, and associated dates, and (c) the relevant public data from other federal agencies

45

regarding their number of employees as determined by the same headcount methods that Defendants have applied to Gordon College are set forth in **Exhibit 8** hereto.

226.    Exhibit 8 gathers SBA data produced by SBA in response to federal court orders enforcing Freedom of Information Act ("FOIA") requirements. This chart provides data for specific comparable loans and borrowers extracted from SBA's internal records publicly posted at https://data.sba.gov/dataset/ppp-foia and specifically from the datafile publicly posted at: https://data.sba.gov/dataset/ppp-foia/resource/501af711-1c91-477a-80ce-bf6428eb9253.  Gordon College specifically requested that OHA and the ALJ take judicial notice of such SBA internal records and databases, particularly because those same records have also been made publicly available pursuant to the Freedom of Information Act.

227.    Exhibit 8 gathers SBA data related to PPP loans ranging from $5 million to $10 million made to colleges, universities, and other institutions of higher education ("colleges").

228.    The SBA data in Exhibit 8 shows there are more than twenty-five (25) colleges whose PPP loan applications were approved, who received and utilized PPP loan funds, and who received PPP loan forgiveness from SBA of all or substantially all of their PPP loan amounts.

229.    Exhibit 8 shows that these colleges, which received forgiveness of PPP loan amounts between $5 Million and $10 Million, had stated number of employees under 500 when publicly available federal government data shows their "headcounts" at over 500 employees.

230.    Of these colleges, at least twelve (12) had loan approval dates after April 15, 2020, the date on which Gordon College's PPP loan was approved. *See* Exhibit 8 (Loans #6489537405; #9067147900;  #5682607704;  #8796348108;  #4895567410;  #4112937201;  #4179517710; #6685747210; #2885397208; #3800297209; #3607897210; #3951297402).

231.     Of these colleges, at least eleven (11) had loan approval dates after April 26, 2020, the date on which SBA issued FAQ #36 which for the first time specified the headcount method as the appropriate method for determining number of employees. *See* Exhibit 8 (Loans #6489537405; #9067147900; #5682607704; #8796348108; #4895567410; #4112937201; #4179517710; #6685747210; #3800297209; #3607897210; #3951297402).

232.     All of these colleges reported fewer than 500 "employees" on their SBA Form 2483 PPP Borrower Applications submitted to the SBA, just as Gordon did.

233.     At least three of these colleges on their SBA Form 2483 PPP Borrower Applications submitted to SBA reported a number of employees greater than the 495.67 reported by Gordon College. *See* Exhibit 8 (Loans #9067147900; #4112937201; # 7130567107).

234.     All these colleges reported in other federal agency filings that their respective total number of employees in 2018, 2019, and 2020 was greater than five hundred (500).

235.     Upon information and belief, these other colleges (like Gordon) used FTE rather than headcount methods for determining their relevant number of employees for PPP purposes.

**The Husson University Appeal and Subsequent OHA ALJ Decisions.**

236.     At least one other private college comparable to Gordon received an initial SBA loan examiner decision denying forgiveness on the grounds that the college was not eligible for a PPP loan because, like Gordon, although its total number of employees via FTE was below the 500-employee limit, its number of employees via "headcount" exceeded the 500-employee limit.

237.     Husson University ("Husson"), a private secular university located in Bangor, Maine, applied for a PPP loan on April 8, 2020. Husson's PPP Borrower Application Form 2483 reported that Husson had 492 employees. Husson determined its number of employees for purposes of the Borrower Application Form and PPP loan eligibility using an FTE method.

238.    Husson's PPP loan was approved on April 14, 2020 (one day before Gordon's), in the amount of approximately $5,965.000. On April 23, 2020 (about the same time as Gordon's), SBA disbursed to Husson a PPP loan in the amount of $5,962,000.

239.    On July 16, 2021, Husson filed its application for PPP loan forgiveness.

240.    On December 28, 2021, SBA issued its final loan review decision finding that Husson was ineligible for the PPP loan it received and therefore was not eligible for PPP loan forgiveness. Specifically, the SBA found after review of the documentation provided by Husson that Husson, or together with its affiliates, exceeded the 500-employee maximum allowable number of employees and the SBA small business size standards.

241.    On January 26, 2022, Husson filed an appeal with the SBA Office of Hearings and Appeals seeking reversal of the SBA's loan determination.

242.    Husson's primary argument in its OHA appeal was substantially the same as that presented by Gordon in its OHA appeal, specifically, that the university had used the FTE method to determine its number of employees for purposes of PPP loan eligibility in reliance upon the published Interim Final Rules, FAQs, and other SBA guidance publicly available at the time it submitted its PPP Borrower Application Form 2483 that required that the applicant certify, under penalty of perjury, the number of employees.

243.    On August 4, 2022, SBA ALJ James M. Caulfield issued his Initial Decision granting Husson's appeal, reversing the final SBA loan decision as clearly erroneous, and ordering SBA to issue a new loan decision forgiving in full Husson's PPP loan of $5,965,000. A true and correct copy of this August 4, 2022 Initial Decision of SBA ALJ Caulfield is attached hereto as Exhibit 16.

244.    In support of its appeal arguments, Husson also submitted an email received from an SBA official in the SBA District Office confirming that use of the FTE method to determine the number of employees for purposes of the PPP Borrower Application Form was permissible. This email dated May 13, 2020, from the SBA District Office is quoted in the Initial Decision of SBA ALJ Caulfield (Exhibit 16) at page 14.

245.    On August 15, 2022, SBA filed a Petition for Reconsideration, asking ALJ Caulfield to reconsider his Initial Decision in favor of Husson. SBA argued, among other things, that Husson's FTE-based calculation in its PPP Borrower Application in April 2020 was not permissible under the publicly available SBA regulations and guidance in effect at the time that Husson's PPP Borrower Application was approved on April 14, 2020.

246.    On November 1, 2022, U.S. Senator Susan Collins of Maine, *the co-author of the Paycheck Protection Program*, sent a formal letter to the Defendant SBA Administrator in support of Husson's appeal and loan forgiveness. In this letter, Senator Collin supported the use of the FTE method for PPP loan eligibility and expressed her concerns about the SBA's discriminatory treatment of Husson's loan forgiveness in contrast to other colleges for which SBA had granted loan forgiveness. A true and correct copy of this November 1, 2022 letter from Senator Collins (including all enclosures thereto) is attached hereto as Exhibit 17.

247.    On February 7, 2023, ALJ Caulfield issued his Final Decision against SBA by denying Reconsideration. This Final Decision by ALJ Caulfield against SBA reaffirmed his Initial Decision against SBA, which had reversed the SBA loan review decision and granted Husson full forgiveness of its PPP loan. A true and correct copy of this February 7, 2023 Final Decision by ALJ Caulfield is attached hereto as Exhibit 18.

248.    ALJ Caulfield's Final Decision in favor of Husson became the Final Agency Decision of the SBA on March 9, 2023, after thirty (30) days had passed without the SBA Administrator electing to review or reverse the ALJ Decision. *See* 13 C.F.R. § 134.1211(d).

249.    The legal and factual posture of Husson's case is not just substantially similar but virtually identical to Gordon's case, with one exception: Gordon is a religious college.

250.    The outcomes in these two SBA cases were opposites: Husson won and Gordon lost. In nearly identical situations, SBA ultimately ruled in favor of Husson but against Gordon.

**Defendants' Actions Are Unconstitutional.**

251.    Plaintiff-Petitioner Gordon College (or simply "Plaintiff-Petitioner") repeats and realleges each and every allegation contained above as if fully set forth herein.

252.    In addition to violating the Administrative Procedures Act, 5 U.S.C. §§ 701 *et seq.* ("APA"), the CARES Act, and other applicable laws and regulations, including SBA's own regulations and practices, the Defendants' actions in this case have violated fundamental rights guaranteed by the United States Constitution and the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb, *et seq.* ("RFRA"), including the rights of due process of law, equal protection of the law, and religious freedom.

253.    Agency adjudication that blurs separation of powers has long been tolerated, and Plaintiff-Petitioner may not challenge that reality yet.[25]

---

[25] Plaintiff-Petitioner reserves its right to challenge the role of SBA acting in multiple capacities if the Supreme Court alters longstanding precedent. In *Cochran v. S.E.C.*, 20 F.4th 194 (5th Cir. 2021), *cert. granted*, 142 S.Ct. 2707 (Argued Nov. 7, 2022), the "justices are considering whether those facing agency claims can go straight to federal court with constitutional challenges—including attacks on the use of in-house judges to handle cases. Critics say the system gives agencies an unfair home-field advantage." https://news.bloomberglaw.com/us-law-week/supreme-court-signals-it-may-allow-court-challenges-to-sec-ftc (Nov. 7, 2022).

254.    But the powers of constitutional government are never without constitutional limits, and, at a minimum, any public agency's process must provide fundamental fairness.

255.    The blending of legislative, executive, and judicial powers only heightens the need to assure and maintain fundamental fairness through other means.

256.    "It is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'" *Caperton v. A.T. Massey Coal*, 556 U.S. 868, 876 (2009); *accord William Jefferson & Co. v. Bd. of Ass'mt*, 695 F.3d 960, 963-64 (9th Cir. 2012) (applying *Caperton* to local agency process). "This applies to *administrative agencies which adjudicate as well as to courts*. Not only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent *even the probability of unfairness*.'" *Withrow v. Larkin*, 421 U.S. 35, 46 (1975) (citations omitted; emphasis added); *accord Cox v. Com'r*, 514 F.3d 1119, 1126 (10th Cir. 2008); *Hurles v. Ryan*, 752 F.3d 768, 788 (9th Cir. 2014).

257.    The process for "agency adjudication" should be "characterized by the same degree of procedural integrity and independence as the judicial process." *Harline v. DEA*, 148 F.3d 1199, 1205 (10th Cir. 1998). Thus, an agency tribunal's "overlap" "between prosecutorial and adjudicative functions … potentially raises a greater concern about bias." *William Jefferson & Co.*, 695 F.3d at 965. "Even the most minimal guarantees of procedural due process require that the decision be issued by 'a neutral and detached hearing body[.]'" *Victory v. Pataki*, 814 F.3d 47, 63 (2d Cir. 2016) (citation omitted) (parole board hearing).

258.    In short, a private party in any government tribunal must have "a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker." *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004); *accord Hicks v. Comm'r of Soc. Sec.*, 909 F.3d 786, 799 (6th Cir. 2018) (applying *Hamdi* to administrative agency adjudication).

51

259.    In sum, due process requires fundamentally fair, judicial-like process, which Defendants completely failed to provide in this case.

260.    In addition, Defendants violated Plaintiff-Petitioner's religious freedom and equal protection rights by singling out Plaintiff-Petitioner for adverse and even especially harsh treatment in its analysis of the 500-employee size standard.

261.    As Plaintiff-Petitioner argued before the ALJ in both decisions below, publicly available data show that SBA has treated other institutions of higher learning ("colleges"), both religious and secular, more favorably than it has treated Plaintiff-Petitioner.

262.    In addition to publicly available data, counsel is awaiting SBA's responses to additional relevant requests under the Freedom of Information Act.

263.    These other loan forgiveness decisions reflect SBA's use of an FTE analysis in April, May, and June 2020 to determine that other nonprofit applicants satisfied all *eligibility* requirements for a PPP loan, and then subsequently determining that the same applicants also satisfied all requirements for PPP loan *forgiveness*.

264.    This pattern has occurred even where the other applicants have as many or more employees at the times of loan application and loan forgiveness as did Gordon, as measured by the same data that the SBA loan examiner used for the Loan Decision in this case. This comparative data is provided on the spreadsheet attached as Exhibit 11 to Appellant's Appeal Petition. *See also* Gordon's Petition for Reconsideration (Exhibit 3) at 16-17.

265.    The ALJ failed to consider how other SBA loan examiners and ALJs reached a conclusion directly opposite to that reached by the SBA examiner and ALJ in Gordon's case.

266.    On information and belief, the Final Agency Decision against Gordon is the first time that SBA ultimately resolved a tax-exempt college's PPP loan review of an application

submitted prior to the publication of SBA FAQ #36 by relying upon the 13 C.F.R. § 121.106 standard embraced by the Final Agency Decision in this case.

267.    In fact, the publicly available evidence from SBA's own records demonstrates that SBA has forgiven more than twenty-five (25) such loans. *See supra*.

268.    Yet the SBA here, through its ALJ making the Final Agency Decision, adopted a different standard and reached a contrary result, to Gordon's harm.

269.    Such disparate treatment of Gordon College contradicts not only the Constitution and RFRA but also the CARES Act itself, as described by the SBA itself in FBO-FAQ #2:

> The PPP and EIDL loan programs are neutral, generally applicable loan programs that provide support for nonprofit organizations without regard to whether they are religious or secular.... In addition, the CARES Act does not impose unique burdens or limitations on faith-based organizations.

https://www.sba.gov/sites/sbagov/files/2020-06/SBA%20Faith-Based%20FAQ%20Final-508.pdf.

**Applicable Constitutional Standards: Strict Scrutiny or Absolute Protection.**

270.    *Strict Scrutiny (Balancing Test)*. The default test to protect most individual rights under RFRA and the First and Fifth Amendments is strict scrutiny. In its most common formulation, this test requires the government to prove that its challenged action was the "least restrictive means of achieving some compelling state interest." *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981);  42 U.S.C. § 2000bb-1(b) (same standard). Under this test, "only those interests of the highest order [can] overbalance legitimate claims to the free exercise of religion.'" *Id*. (quoting *Wisc. v. Yoder*, 406 U.S. 205, 215 (1972)). This two-part balancing test "is the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). Defendants must prove that they satisfy it.

271.     *Absolute Protection (Categorical Approach: No Balancing)*. Some constitutional rights may not be infringed at all. Certain government actions are categorically barred as intolerable and never justifiable, no matter what the government's interests or means may be. For example, government must never punish belief. "The First Amendment obviously excludes all 'governmental regulation of religious *beliefs* as such.'" *Emp't Div. v. Smith*, 494 U.S. 872, 877 (1990) ("***Smith***"). Government must never discriminate among religions, as such discrimination is "usually flatly forbidden without reference to" strict scrutiny. *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1266 (10th Cir. 2008) (McConnell, J.) (citing cases, including *Larson v. Valente*, 456 U.S. 228 (1982)) ("***Colo. Christian***"). Government must never act out of invidious intent (animus) against religion. *Jesus Christ is the Answer Ministries v. Baltimore Cty.*, 915 F.3d 256, 262 n.3 (4th Cir. 2019) ("***Jesus Christ is the Answer***") ("To be sure, where [states] discriminate out of 'animus' against particular religions, such decisions are plainly unconstitutional."). "Religious animus is not a permissible government interest, much less a compelling one." *Id*. Government must never "interfere" with the "autonomy" of religious groups "'to define their own *doctrine*, *membership*, organization, and *internal requirements*.'" *Demkovich v. St. Andrew the Apostle Par.*, 3 F.4th 968, 975 (7th Cir. 2021) (en banc) (citation omitted; emphasis added) (collecting Supreme Court cases) ("***Demkovich***"). All such actions are flatly barred.

**Defendant SBA Proactively Protected Religious Freedom in the Initial PPP Regulations.**

272.     Defendant SBA itself recognized its proper role when it enforced these religious freedom principles in its own initial PPP regulations. In its Interim Final Rule on Affiliation, 85 FR 20817 (April 15, 2020) ("IFR-AFF"), SBA "exempt[ed] otherwise qualified faith-based organizations from the SBA's affiliation rules, including those set forth in 13 CFR part 121, where the application of the affiliation rules would substantially burden those organizations' religious

exercise." 85 FR 20817, 20819 (referencing 13 C.F.R. § 121.101 *et seq.*). In this IFR-AFF, SBA ruled that such an exemption was compelled by RFRA, and by a long line of Supreme Court cases beginning with *Kedroff v. Saint Nicholas Cathedral*, 344 U.S. 94 (1952).

273.    Specifically, SBA, early in the pandemic, acted on its own initiative to exempt faith-based organizations ("FBOs") from the burdensome result of requiring them to aggregate their "affiliates" in a way that would exceed the 500-employee threshold for a PPP loan.

274.    As SBA acknowledged, an "entity generally is eligible for the PPP if it, combined with its affiliates, is a small business as defined in section 3 of the Small Business Act (15 U.S.C. § 632), or (1) has 500 or fewer employees[.]" 85 FR 20817, 20818-19. But as SBA ruled, the application of such general eligibility criteria could infringe religious freedom.

275.    "Accordingly, the SBA's affiliation rules, including those set forth in 13 CFR part 121, do not apply to the relationship of any church, convention or association of churches, or other faith-based organization or entity to any other person, group, organization, or entity that is based on a sincere religious teaching or belief or otherwise constitutes a part of the exercise of religion. This includes any relationship to a parent or subsidiary and other applicable aspects of organizational structure or form." 85 FR 20817, 20820 (referencing 13 C.F.R. § 121.101 *et seq.*).

276.    Moreover, a "faith-based organization seeking loans under this program may rely on a reasonable, good faith interpretation in determining whether its relationship to any other person, group, organization, or entity is exempt from the affiliation rules under this provision, and SBA will not assess, and will not require participating lenders to assess, the reasonableness of the faith-based organization's determination." 85 FR 20817, 20820.

277.    In this IFR-AFF, SBA proactively complied with our nation's highest legal protections for religious freedom, as was precisely correct in the circumstances.

278. In the IFR-AFF, SBA ruled that proactive relief from strict enforcement of the 500-employee requirement was required both by RFRA and by the First Amendment.

279. In the IFR-AFF, SBA was correct in its assessment: (a) that this ameliorative, preemptive action was necessary and (b) that the SBA was authorized and duty bound to act and not abandon its own high duty to the Constitution and RFRA in deference to some potential future corrective judicial review, such as what is occurring now in this very case.

280. The IFR-AFF was signed and enforced by the agency head, SBA's then-Administrator Jovita Carranza, a predecessor of Defendant Isabella Casillas Guzman. It would have been appropriate for Defendant Guzman to follow this pattern and precedent.

**Defendants Should Not Have Abandoned Their Duty to Protect Religious Freedom Here.**

281. Rather than honor its obligations under the Constitution and RFRA here, as it did with the IFR-AFF above, SBA not only failed to take initiative to respect Gordon's rights, but expressly disregarded all of Gordon's constitutional and RFRA arguments as insufficient "grounds upon which *this Court* could permissibly grant Appellant's appeal." ALJ's Final Decision (Exhibit 1) at 9 (emphasis added).

282. This SBA "Court" did not act like a court. It said it did not and could "not take a position on the alleged RFRA or constitutional violations," because it "does not have the authority to issue decisions based on its interpretation of RFRA or the Federal Constitution." *Id*. This position directly contradicts the action taken by the agency head in the IFR-AFF above.

283. Here, the ALJ (and the SBA Administrator on review) "should have 'disregard[ed]' the [conflicting] provision and decided this case 'conformably to the [C]onstitution' of the United States. That '*supreme* law of the land' condemns discrimination against religious [organizations whose] exclusion from the … program here is 'odious to our Constitution and 'cannot stand.'"

*Espinoza v. Montana Dept. of Rev.*, 140 S.Ct. 2246, 2262 (2020) (citations omitted). RFRA imposed a similar duty on the Marine Corps in *Singh v. Berger*, 56 F.4th 88 (D.C. Cir. 2022).

284. In sum, the SBA (both the ALJ and SBA's Administrator) refused to even consider an exemption or other relief from a cramped and unconstitutional interpretation of the "500 employee" threshold, in this case, as properly argued by a party before it. In contrast, SBA's Administrator had acted *sua sponte* within days of the PPP's enactment to recognize a broad and flexible nationwide exemption from the same 500-employee threshold to preempt substantial burdens on the religious exercise of faith-based organizations nationwide.

285. Defendants, acting by and through the ALJ, changed the rules after-the-fact in violation of basic due process and fundamental fairness required by the Constitution, laws, and SBA's own PPP guidance. *See* SBA FAQ #17 (Apr. 6, 2020) ("***Borrowers and lenders may rely on the laws, rules, and guidance available at the time of the relevant application***."). https://www.sba.gov/sites/sbagov/files/2023-03/Final%20PPP%20FAQs.pdf (emphasis added).

286. Defendants, acting by and through the ALJ, also discriminated against Gordon College by treating it differently, even especially harshly, when compared to its peers and other comparable applicants.

287. The SBA failed its duty not once but twice: in its Initial Decision (Exhibit 2) and again in its Final Decision denying reconsideration (Exhibit 1).

288. Rather than lift the burden caused by a strict and discriminatory application of the 500-employee standard, as it did with the IFR-AFF, SBA chose to interfere with and burden the internal labor-related management decisions of Gordon College, effectively pressuring it and other religious applicants to alter their HR accounting and hiring practices in order to satisfy SBA or to minimize risks of arbitrary changes in SBA guidance, as occurred in this case.

289. Thus, SBA's justification for the IFR-AFF—to alleviate burdens on religious applicants from affiliation-rule compliance that would pressure those applicants to alter their religious polities and associational requirements in order to meet the 500-employee threshold—applied equally to Gordon College in this case, though for slightly different reasons.

290. In the IFR-AFF, SBA preempted the "counting pressures" posed by its affiliation rules, which otherwise might cause religious entities to modify their governance and methods to reduce their "affiliations" in order to reduce the number of employees attributed to them.

291. Likewise here, SBA should have preempted the counting pressures imposed on Gordon by SBA's April 26, 2020 FAQ #36 change of mind on employee-counting methods.

292. Instead, Defendants have interfered with the autonomy of Gordon College to define its own doctrine, membership, employment, and other *internal requirements* without artificial and unconstitutional pressure to change its HR accounting, contracting, and methods—including the conditions of hiring, designating, and (necessarily) supervising its staff—in order to reduce its "headcount" or the number of employees otherwise attributed to the College.

## FIRST CAUSE OF ACTION: JUDICIAL REVIEW OF AGENCY ACTION UNDER THE ADMINISTRATIVE PROCEDURES ACT

293. Plaintiff-Petitioner Gordon College repeats and realleges each and every allegation contained above as if fully set forth herein.

294. This Court is authorized to review the Final Agency Decision of the SBA, embodied in the ALJ's Denial of Reconsideration (Final Decision), the rationale for which is embodied in his Initial Decision.

295. Thus, as used hereinafter, "Final Agency Decision" (or simply "Final Decision") incorporates the rationale of the Initial Decision.

296.    The SBA's Final Agency Decision should be reversed and set aside as arbitrary and capricious or, alternatively, as an abuse of discretion, in violation of the Administrative Procedures Act ("APA") at 5 U.S.C. § 706(2)(A).

297.    The Final Agency Decision was erroneous as a matter of law, constituted arbitrary and capricious conduct by SBA, or, alternatively, was an abuse of discretion.

298.    As a proximate result of Defendants' actions, Plaintiff-Petitioner was damaged and continues to be damaged as set forth herein.

299.    Plaintiff-Petitioner is entitled to injunctive and/or declaratory relief prohibiting Defendants from violating its rights under the APA.

300.    WHEREFORE, Plaintiff-Petitioner Gordon College respectfully requests that the Court grant the relief set forth hereinafter in the prayer for relief.

## SECOND CAUSE OF ACTION:
## DECLARATORY JUDGMENT UNDER
## THE DECLARATORY JUDGMENT ACT

301.    Plaintiff-Petitioner Gordon College repeats and realleges each and every allegation contained above as if fully set forth herein.

302.    There is an actual and existing controversy between the parties as to the correctness of SBA's Final Decision to deny PPP loan forgiveness to Plaintiff-Petitioner.

303.    The SBA's Final Decision to deny PPP loan forgiveness to Plaintiff-Petitioner was legal error, was arbitrary and capricious, was made in excess of SBA's statutory authority, and constituted an abuse of discretion (to the extent it had discretion).

304.    Plaintiff-Petitioner is entitled to a judgment, pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 ("DJA"), declaring that SBA's Final Decision to deny PPP loan forgiveness to Plaintiff-Petitioner was legal error, was arbitrary and capricious, and was made in

59

excess of SBA's statutory authorization and short of Plaintiff-Petitioner's statutory rights, or, in the alternative, constituted an abuse of discretion.

305.    Plaintiff-Petitioner is further entitled to a judgment, pursuant to the DJA, declaring that SBA's Final Decision against Plaintiff-Petitioner violated its rights under, and/or exceeded Defendants authority under, the Religious Freedom Restoration Act and the First and Fifth Amendments to the United States Constitution, both facially and as applied.

306.    Plaintiff-Petitioner is entitled to a judgment declaring that SBA's Final Decision against Plaintiff-Petitioner was erroneous, unlawful, and unconstitutional, the Final Decision was issued in error, and Plaintiff-Petitioner's PPP loan should be forgiven.

307.    Defendants' actions were and are in violation of the APA, the CARES Act, the Constitution, the RFRA, and other applicable laws and regulations, including SBA's own regulations and practices.

308.    As a proximate result of Defendants' actions, Plaintiff-Petitioner was damaged and continues to be damaged as set forth herein.

309.    Plaintiff-Petitioner is entitled to a judgment declaring its federal rights under all applicable federal provisions invoked herein.

310.    WHEREFORE, Plaintiff-Petitioner Gordon College respectfully requests that the Court grant the declaratory relief set forth hereinafter in the prayer for relief.

### THIRD CAUSE OF ACTION: VIOLATION OF THE RELIGIOUS FREEDOM RESTORATION ACT: SUBSTANTIAL BURDEN (Strict Scrutiny)

311.    Plaintiff-Petitioner Gordon College repeats and realleges each and every allegation contained above as if fully set forth herein.

312.    As SBA recognized in its FAQs for Faith-Based Organizations ("FBO-FAQs"), RFRA guarantees that any religious applicant can "request and receive" a PPP loan without "sacrificing its autonomy or its First Amendment or statutory rights." FBO-FAQ #4. https://www.sba.gov/sites/sbagov/files/2020-06/SBA%20Faith-Based%20FAQ%20Final-508.pdf.

313.    As SBA boldly and correctly declared, citing RFRA: "Simply put, a faith-based organization that receives a loan will retain its independence, autonomy, right of expression, religious character, and authority over its governance, and no faith-based organization will be excluded from receiving funding because leadership with, membership in, or employment by that organization is limited to persons who share its religious faith and practice." *Id*.

314.    As SBA recognized in its second formal PPP Rule (IFR-AFF), "the Religious Freedom Restoration Act … provides that the government shall not substantially burden a person's exercise of religion unless the government can demonstrate that application of the burden to the person is both 'in furtherance of a compelling governmental interest and the least restrictive means of furthering that compelling governmental interest." 85 FR 20817, 20819 (quoting 42 U.S.C. § 2000bb-1) (internal punctuation omitted).

315.    As SBA correctly ruled therein, RFRA precludes SBA from substantially burdening religion by pressuring religious applicants to alter their internal management and governance requirements to meet the 500-employee threshold for a PPP loan.

316.    RFRA's standard of review is commonly referred to as "strict scrutiny."

317.    Under this strict-scrutiny test, if a private party can show that federal action has substantially burdened its religious exercise, the government must prove that the burden is the

"least restrictive means" to achieve a "compelling governmental interest." 42 U.S.C. § 2000bb-1(b).

318.    This form of "[s]trict scrutiny is an 'exceptionally demanding' test. *Singh*, 56 F.4th at 93. In fact, it "is the most demanding test known to constitutional law." *City of Boerne*, 521 U.S. at 534.

319.    This strict scrutiny is triggered by a showing of "substantial burden" on religion.

320.    The loss of a seven-million-dollar forgivable loan surely qualifies as "substantial economic consequences" sufficient to trigger RFRA's substantial burden requirement. *Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 720 (2014) ("**Hobby Lobby**").

321.    Such a significant economic consequence "clearly imposes a substantial burden" on Plaintiff-Petitioner's religious exercise. *Hobby Lobby*, 573 U.S. at 726.

322.    Therefore, strict scrutiny applies.

323.    In light of the allegations herein, it is not possible for Defendants to satisfy this scrutiny, i.e., to meet their burden to prove that the treatment of Plaintiff-Petitioner in this case was the least restrictive means to achieve a compelling government interest.

324.    A unanimous D.C. Circuit panel of Judges Millett, Rao, and Childs recently analyzed RFRA's requirements in the context of "weighty competing interests" involving the discipline and readiness of U.S. Marines and its new recruits. The panel gave those weighty interests due regard but ruled they must yield to even weightier interests protected by RFRA. *Singh*, 56 F.4th at 91-93.

325.    "RFRA challenges should be adjudicated in the *same manner as constitutionally mandated applications of the test*[.]""As under the First Amendment, RFRA's 'compelling interest test' is an 'affirmative defense' for which the Government bears the burden of persuasion, and it

subjects governmental action to strict scrutiny." *Singh*, 56 F.4th at 92 (citations omitted; emphasis added).

326. The strict scrutiny of "RFRA prohibits the federal government from substantially burden[ing] a person's exercise of religion unless the Government demonstrates that application of the burden to the person is the least restrictive means of furthering a compelling interest." *Singh*, 56 F.4th at 92 (quoting 42 U.S.C. § 2000bb-1) (internal punctuation omitted).

327. Under RFRA, the Government must carry "its burden of showing 'why it has a particular interest' in denying [religious] exceptions to these Plaintiffs 'while making them available to others' in the same or analogous form." *Singh*, 56 F.4th at 103 (citations omitted).

328. It is not enough to articulate a compelling interest "at a general level." "RFRA requires more than pointing to interests at such a broad level. The [Government] has to show that its substantial burdening of these Plaintiffs' religion furthers that compelling interest by the least restrictive means." *Singh*, 56 F.4th at 106–07 (citations omitted).

329. If the Marine Corps is subject to such strict scrutiny under RFRA, then SBA surely must be. SBA must prove it has a compelling interest, in the context of this case, which cannot be achieved by less restrictive means. *Singh*, 56 F.4th at 106–09.

330. "Rather than rely on broadly formulated interests, courts must scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants. The question, then, is not whether [SBA] has a compelling interest in enforcing its [500-employee] policies generally, but whether it has such an interest in denying an exception" to Plaintiff-Petitioner. "Put another way, so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton v. City of Philadelphia*, 141 S.Ct. 1868, 1881 (2021) (internal punctuation omitted).

331.    Under RFRA, SBA has the power and duty to provide an exemption or other relief from a strict application of the 500-employee limit, precisely as it did with the IFR-AFF.

332.    Under RFRA, SBA must avoid or remedy a discriminatory application of its 500-employee limit, since religious discrimination "is not a permissible government interest, much less a compelling one." *Jesus Christ is the Answer*, 915 F.3d at 262 n.3.

333.    In the instant case, it appears SBA applied a more generous interpretation of the 500-employee threshold to virtually every other comparable applicant than it did to Plaintiff-Petitioner. Stated another way, SBA relieved other applicants from the SBA's restrictive "headcount" method for interpreting the 500-employee threshold that SBA applied to Plaintiff-Petitioner.

334.    This differential or disparate treatment plainly amounts to discrimination, which cannot be justified under any standard of review or level of judicial scrutiny, much less RFRA's strict scrutiny: "the most demanding test known to constitutional law."

335.    It is clear, then, that the SBA could have achieved, and still can achieve, "its interests in a manner that does not burden" the religion of Plaintiff-Petitioner. *Fulton*, 141 S.Ct. at 1881. SBA bears the burdens of strict scrutiny. If it cannot satisfy them, SBA (or this Court acting in its stead) must grant relief to Plaintiff-Petitioner.

336.    As a proximate result of Defendants' actions, Plaintiff-Petitioner was damaged and continues to be damaged.

337.    Plaintiff-Petitioner is entitled to injunctive and/or declaratory relief prohibiting Defendants from violating its constitutional and civil rights.

338.    WHEREFORE, Plaintiff-Petitioner Gordon College respectfully requests that the Court grant the relief set forth hereinafter in the prayer for relief.

**FOURTH CAUSE OF ACTION: VIOLATION OF THE**
**FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT:**
**<u>NON-NEUTRAL TREATMENT (Strict Scrutiny)</u>**

339.    Plaintiff-Petitioner Gordon College repeats and realleges each and every allegation contained above as if fully set forth herein.

340.    Under the non-neutrality aspect of the Free Exercise Clause, the Court's "task is to decide whether the burden [SBA] has placed on the religious exercise of [Plaintiff-Petitioner] is constitutionally permissible." *Fulton*, 141 S.Ct. at 1876.

341.    "First, government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S.Ct. 1294, 1296 (2021) (emphasis in original) (citing *Roman Catholic Diocese v. Cuomo*, 141 S.Ct. 63, 67-68 (2020)).

342.    "Neutrality and general applicability are interrelated [and] failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531 (1993)).

343.    But "neutral" and "generally applicable" are distinct requirements (with separate analytical rules)—*both* of which federal action must meet to avoid strict scrutiny. *Fulton*, 141 S.Ct. at 1877.

344.    As argued above, Defendants have treated at least 25 other colleges—religious and secular—more favorably than it has treated Plaintiff-Petitioner. *See supra*.

345.    The case of Husson University is just one example. *See supra*.

346.    The legal and factual posture of Husson's case is not just substantially similar but virtually identical to Gordon's case, with one exception: Gordon is a religious college.

347.    The outcomes in these two SBA cases were opposites: Husson won and Gordon lost. In nearly identical situations, SBA ultimately ruled in favor of Husson but against Gordon.

348.    By treating secular Husson better than (indeed, the opposite of) religious Gordon, SBA treated "*any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S.Ct. 1294, 1296 (2021) (emphasis in original) (citing *Roman Catholic Diocese v. Cuomo*, 141 S.Ct. 63, 67-68 (2020)). This fact alone resolves this case against the SBA and requires that it grant Gordon College the same full loan forgiveness that the SBA ultimately (and correctly) granted to Husson.

349.    In addition, by singling out Plaintiff-Petitioner for adverse and even especially harsh treatment in its analysis and application of the 500-employee size standard, SBA has treated Plaintiff-Petitioner non-neutrally.

350.    For purposes of non-neutral/disparate treatment, "merely the intent to treat differently" can establish discrimination. Personal motives, such as animus, are immaterial. *Colo. Christian*, 534 F.3d at 1260 & n.7 (McConnell, J.). It thus makes no difference if "faith-based bigotry did not motivate [SBA's treatment of Plaintiff-Petitioner]. The constitutional benchmark is 'government neutrality,' not 'governmental avoidance of bigotry.'" *Roberts v. Neace*, 958 F.3d 409, 415 (6th Cir. 2020) (quoting *Colo. Christian*, at 1260). Such intentional differential treatment disfavoring religion triggers strict scrutiny, regardless of motive.

351.    While the strict-scrutiny test under the Free Exercise Clause is the same as under RFRA, *Singh*, 56 F.4th at 92 ("RFRA challenges should be adjudicated in the same manner as constitutionally mandated applications of the test"), the Free Exercise Clause, unlike RFRA, does not require a showing of "substantial burden" by the religious claimant. A "burden" or "restriction"

66

on religious exercise is sufficient, if the government acted non-neutrally. *See Fulton*, 141 S.Ct. at 1876-77, 1881).

352. For the same reasons explained in the Third Cause of Action (RFRA), *supra*, Defendants cannot satisfy strict scrutiny.

353. As a proximate result of Defendants' actions, Plaintiff-Petitioner was damaged and continues to be damaged.

354. Plaintiff-Petitioner is entitled to injunctive and/or declaratory relief prohibiting Defendants from violating its constitutional and civil rights.

355. WHEREFORE, Plaintiff-Petitioner Gordon College respectfully requests that the Court grant the relief set forth hereinafter in the prayer for relief.

**FIFTH CAUSE OF ACTION: VIOLATION OF THE
FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT:
<u>NON-GENERALLY APPLICABLE TREATMENT (Strict Scrutiny)</u>**

356. Plaintiff-Petitioner Gordon College repeats and realleges each and every allegation contained above as if fully set forth herein.

357. As noted, "neutral" and "generally applicable" are distinct requirements (with separate analytical rules)—*both* of which federal action must meet to avoid strict scrutiny. *Fulton*, 141 S.Ct. at 1877 (citations omitted).

358. "[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon*, 141 S.Ct. at 1296 (emphasis retained) (citing *Rom. Cath. Dioc.*, 141 S.Ct. at 67-68).

359. As argued above, Defendants have treated at least 25 other colleges—religious and secular—more favorably than it has treated Plaintiff-Petitioner. *See supra*.

360.    Husson University is just one prominent example. *See supra*.

361.    Thus, SBA has treated not just one but *many* similarly situated, secular colleges better than it has treated Plaintiff-Petitioner. This clearly violated neutrality.

362.    Even where, as here, the evidence proves violation of the *neutrality* standard, it may be "more straightforward to resolve [such] case under the rubric of general applicability." *Fulton*, 141 S.Ct. at 1877.

363.    Government action "will fail the general applicability requirement if it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way,'" or if it provides "a mechanism for individualized exemptions." *Kennedy v. Bremerton School District*, 142 S.Ct. 2407, 2422 (2022) (quoting *Fulton*, 141 S.Ct. at 1877).

364.    Where as here, "the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of religious hardship without compelling reason." *Fulton*, 141 S.Ct. at 1877 (all citations and internal punctuation omitted).

365.    Unlike neutrality, general applicability focuses neither on religion (*per se*) nor intent. It focuses on mechanisms and process. Thus, "a law might appear to be generally applicable on the surface but not be so in practice due to exceptions for comparable secular activities." And "[a]s a rule of thumb, the more exceptions to a prohibition, the less likely it will count as a generally applicable, non-discriminatory law." *Roberts*, 958 F.3d at 413.

366.    General applicability does not rely on discerning motive. Instead, it examines any mechanism that invites or results in an uneven application of the law in a way that burdens or has a disparate impact on religion.

367.    The question under general applicability is whether the regulation, on its face or in practice, applies *generally* to similarly situated persons, or does not. If it does not, and if the uneven

result is due to a system of exceptions that provides opportunities for discretionary decision-making, strict scrutiny applies. Such situations may mask hidden bias or may invite considerations regarding religion to play a hidden role. Religion enters the equation indirectly. It is the mechanism or opportunity for discretionary decision-making that demands closer scrutiny.

368.    The evidence shows SBA has not applied its loan eligibility and/or forgiveness criteria *generally* to similarly situated persons, but rather operates under a "mechanism for individualized exemptions" that provides opportunities for discretionary decision-making.

369.    This situation requires, and fails, strict scrutiny, for the reasons explained in the Third Cause of Action (RFRA), *supra*.

370.    As a proximate result of Defendants' actions, Plaintiff-Petitioner was damaged and continues to be damaged.

371.    Plaintiff-Petitioner is entitled to injunctive and/or declaratory relief prohibiting Defendants from violating its constitutional and civil rights.

372.    WHEREFORE, Plaintiff-Petitioner Gordon College respectfully requests that the Court grant the relief set forth hereinafter in the prayer for relief.

**SIXTH CAUSE OF ACTION: VIOLATION OF THE
FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT:
ESPECIALLY HARSH TREATMENT
(Flagrant But Without Animus) (Strict Scrutiny)**

373.    Plaintiff-Petitioner Gordon College repeats and realleges each and every allegation contained above as if fully set forth herein.

374.    Under the First Amendment, the free exercise of religion can never be "singled out" for "especially harsh treatment." *Roman Catholic Diocese*, 141 S.Ct. at 66. This doctrine focuses on the regulatory mechanism itself as well as particular official actions taken thereunder.

69

375. Thus, "regulations cannot be viewed as neutral [when] they single out houses of worship for especially harsh treatment." *Id*.

376. This doctrine treats the harshness of government regulatory regimes and/or their results, without regard to motive, as conditions that compel "strict scrutiny." *Id.,* at 67.

377. Defendants here have "singled out" Plaintiff-Petitioner for "especially harsh treatment," as alleged above, by providing and forgiving loans of equal or greater amount to and for many other similarly situated colleges.

378. Without any justification and or evenhandedness, Defendants denied all forgiveness to Gordon, costing it $7,046,037.00 (plus interest).

379. That is significant financial harm. But Gordon's losses are not just financial.

380. By depriving Gordon of its constitutional rights, Defendants inflicted on Gordon the indignities associated with such loss, and such "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id*.

381. Furthermore, this litigation is costing Gordon in many ongoing, quantifiable ways, including the chilling of its constitutional and statutory rights.

382. As the First Amendment bars "not only unconstitutional laws but [also] unnecessary *litigation* that chills" constitutional rights, it is "important" to resolve "First Amendment cases at the earliest possible junction." *Green v. Miss USA*, 52 F.4th 773, 800 (9th Cir. 2022) (citations omitted). Thus, courts often "bypass[]" all secondary issues to "resolve the claim immediately on First Amendment grounds." *Id.*, at 796 (collecting cases). This "well-trodden path" of "reaching and deciding a dispositive First Amendment issue [will] avoid forcing the parties through unnecessary and protracted litigation." *Id.*, at 800 (collecting cases).

383. This situation requires, and fails, strict scrutiny, for the reasons explained in the Third Cause of Action (RFRA), *supra*.

384. As a proximate result of Defendants' actions, Plaintiff-Petitioner was damaged and continues to be damaged.

385. Plaintiff-Petitioner is entitled to injunctive and/or declaratory relief prohibiting Defendants from violating its constitutional and civil rights.

386. WHEREFORE, Plaintiff-Petitioner Gordon College respectfully requests that the Court grant the relief set forth hereinafter in the prayer for relief.

**SEVENTH CAUSE OF ACTION: VIOLATION OF
THE ESTABLISHMENT CLAUSE OF THE FIRST AMENDMENT:
<u>DISCRIMINATION AGAINST & AMONG RELIGIONS (Categorical Bar)</u>**

387. Plaintiff-Petitioner Gordon College repeats and realleges each and every allegation contained above as if fully set forth herein.

388. The Establishment Clause demands the strictest neutrality toward and among religions such that it categorically bars discrimination against or among religions or particular faiths or exercise. *See, e.g.*, *Larson v. Valente*, 456 U.S. 228, 244, (1982); *Trump v. Hawaii*, 138 S.Ct. 2392, 2418 (2018); *Colo. Christian*, 534 F.3d at 1266.

389. "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Lund v. Rowan Cty.*, 863 F.3d 268, 280 (4th Cir. 2017) (en banc) (quoting *Larson*, at 244)).

390. For the same reasons that Defendants' actions violate the Free Exercise Clause above, they also independently violate this strictest of antidiscrimination principles embodied in the Establishment Clause.

71

391.    As alleged herein, Defendants have discriminated against Plaintiff-Petitioner, a Christian college with religiously and socially conservative views, by treating other, similarly situated religious colleges better than it has Plaintiff-Petitioner. *Larson*, 456 U.S. at 244; *Colo. Christian*, 534 F.3d at 1266.[26]

392.    All such discrimination under the Establishment Clause is "usually flatly forbidden without reference to" strict scrutiny or any other balancing test. *Colo. Christian*, 534 F.3d at 1266 (collecting Supreme Court cases).

393.    In any event, Defendants' actions are not the means least restrictive of religious exercise to further any governmental interest, much less a compelling one.

394.    As a proximate result of Defendants' actions, Plaintiff-Petitioner was damaged and continues to be damaged.

395.    Plaintiff-Petitioner is entitled to injunctive and/or declaratory relief prohibiting Defendants from violating its constitutional and civil rights.

396.    WHEREFORE, Plaintiff-Petitioner Gordon College respectfully requests that the Court grant the relief set forth hereinafter in the prayer for relief.

**EIGHTH CAUSE OF ACTION: VIOLATION OF
BOTH RELIGION CLAUSES OF THE FIRST AMENDMENT:
INTERFERENCE WITH RELIGIOUS AUTONOMY (Categorical Bar)**

397.    Plaintiff-Petitioner Gordon College repeats and realleges each and every allegation contained above as if fully set forth herein.

---

[26] Protections for religious exercise to fulfill the Free Exercise Clause (e.g., religious safe harbors) obviously do not constitute discrimination in violation of the Establishment Clause. *See, e.g.*, *Liberty Univ. v. Lew*, 733 F.3d 72, 100 (4th Cir.), *cert. denied*, 571 U.S. 1071 (2013) (rejecting Establishment Clause and Equal Protection Clause challenges to the ACA's safe harbor in IRC §5000A(d)(2)(B)).

398. Religious institutions possess strong religious autonomy rights arising under both the Free Exercise Clause and Establishment Clause. "[T]he Religion Clauses protect religious institutions [in] matters 'of faith and doctrine' [and "internal management decisions" against] government intrusion. State interference in that sphere would obviously violate the free exercise of religion, and any attempt by government to dictate or even to influence such matters would constitute [an] establishment of religion. The First Amendment outlaws such intrusion." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S.Ct. 2049, 2060 (2020) (citations omitted) ("**OLG**").

399. Religious institutions have the right "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *OLG*, 140 S.Ct. at 2060 (citing *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952)).

400. The state must never "interfere" with the "autonomy" of religious groups "'to define their own *doctrine*, *membership*, organization, and *internal requirements*.'" *Demkovich v. St. Andrew the Apostle Par.*, 3 F.4th 968, 975 (7th Cir. 2021) (en banc) (emphasis added) (collecting Supreme Court cases). Such state action is categorically barred.

401. This right to autonomy is the primary constitutional principle cited by SBA itself for exempting faith-based organizations from SBA's "affiliation rules" that might cause FBOs like Plaintiff-Petitioner to exceed the 500-employee threshold. *See* IFR-AFF above, 85 FR 20817, 20819-20820.

402. Defendants have interfered with the autonomy of Plaintiff-Petitioner to define its own doctrine, membership, employment, staffing, affiliation, and other internal requirements in precisely the way the First Amendment (and RFRA) was designed to prevent. *See, e.g.*, SBA's IFR-AFF, 85 FR 20817, 20819-20820.

403.    Defendants have done so by, among other things, insisting on certain require-ments for determining staffing and employment, including the definition of "employee," without a basis in law and inconsistently with RFRA and the Constitution.

404.    Rather than lift the burden caused by a strict and discriminatory application of the 500-employee standard, as it did with the IFR-AFF, SBA chose to interfere with and burden the internal labor-related management decisions of Gordon College, effectively pressuring it to alter its HR accounting and hiring practices in order to satisfy SBA or to minimize risks of arbitrary changes in SBA guidance, as occurred in this case.

405.    Thus, SBA's justification for the IFR-AFF—to alleviate burdens on religious applicants from affiliation-rule compliance that would pressure those applicants to alter their religious polities and associational requirements in order to meet the 500-employee threshold—applied equally to Gordon College in this case, though for slightly different reasons.

406.    In the IFR-AFF, SBA preempted the "counting pressures" posed by its affiliation rules, which otherwise might cause religious entities to modify their governance and methods to reduce their "affiliations" in order to reduce the number of employees attributed to them.

407.    Similarly, SBA should have preempted the counting pressures imposed on Gordon by SBA's April 26, 2020 FAQ #36 change of mind on employee-counting methods.

408.    Instead, Defendants have interfered with the autonomy of Gordon College to define its own doctrine, membership, employment, and other *internal requirements* without artificial and unconstitutional pressure to change its HR accounting, contracting, and methods—including the conditions of hiring, designating, and (necessarily) supervising its staff—in order to reduce its "headcount" or the number of employees otherwise attributed to the College.

409.   Defendants' actions violate the religious autonomy rights of Plaintiff-Petitioner protected under both the Free Exercise and Establishment Clauses and improperly entangle the government in the internal affairs of Plaintiff-Petitioner.

410.   These actions are "outlaw[ed]," *OLG*, 140 S.Ct. at 2060, *i.e.*, categorically barred.

411.   In such situations, the Supreme Court does not apply any form of scrutiny or balancing test. Instead, actions that violate this principle are simply and flatly barred. *E.g., OLG*, 140 S.Ct. at 2060 (relying on *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 186-96 (2012) (unanimous).

412.   In any event, Defendants have no rational, much less compelling, interest that would justify infringing upon Plaintiff-Petitioner's free exercise and anti-establishment rights by interfering with such matters of internal governance, employment, and staffing.

413.   In any event, Defendants' actions are not the means least restrictive of religious exercise to further any governmental interest, much less a compelling one, and would fail strict scrutiny for the reasons explained in the Third Cause of Action (RFRA), *supra*.

414.   As a proximate result of Defendants' actions, Plaintiff-Petitioner was damaged and continues to be damaged.

415.   Plaintiff-Petitioner is entitled to injunctive and/or declaratory relief prohibiting Defendants from violating its constitutional and civil rights.

416.   WHEREFORE, Plaintiff-Petitioner Gordon College respectfully requests that the Court grant the relief set forth hereinafter in the prayer for relief.

**NINTH CAUSE OF ACTION: VIOLATION OF THE
EQUAL PROTECTION COMPONENT OF THE FIFTH AMENDMENT:
DISCRIMINATION INVOLVING FUNDAMENTAL RIGHT (Strict Scrutiny)**

417.    Plaintiff-Petitioner Gordon College repeats and realleges each and every allegation contained above as if fully set forth herein.

418.    The Equal Protection component of the Fifth Amendment requires that any government action that interferes with a "fundamental right" be subject to strict scrutiny. *Plyler v. Doe*, 457 U.S. 202, 216-17 (1982). "The Fifth Amendment's due process clause incorporates an equal protection component[.]" *Gebretsadike v. D.C.*, 2023 WL 2708822, at *4 (D.D.C. Mar. 30, 2023) (citing *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954)) "[I]njunctive relief is unquestionably available against federal officials for violation of the Fifth Amendment's Due Process Clause, including its equal protection component." *Xia*, 865 F.3d at 659 n.2 (D.C. Cir.).

419.    "Unquestionably, the free exercise of religion is a fundamental constitutional right." *Johnson v. Robison*, 415 U.S. 361, 375 n.14 (1974); *accord Jesus Christ is the Answer*, 915 F.3d at 265 (quoting *Johnson*).

420.    Defendants' actions described herein interfere with Plaintiff-Petitioner's free exercise of religion and thereby independently violate the Equal Protection component of the Fifth Amendment to the Constitution, for all the reasons alleged above.

421.    The same "intent to treat differently" that violates the Free Exercise Clause violates the Equal Protection Clause because it burdens a "fundamental right." *Colo. Christian*, 534 F.3d at 1260.

422.    Thus, Defendants' non-neutral (discriminatory) actions need not be motivated by animus to be unconstitutional. If such actions are motivated by animus, however, those actions are flagrantly unconstitutional, as "[r]eligious animus is not a permissible government interest, much less a compelling one." *Jesus Christ is the Answer*, 915 F.3d at 262 n.3.

76

423. Upon information and belief, Defendants' differential treatment of Plaintiff-Petitioner as described herein may be motivated by animus toward Plaintiff-Petitioner's particular religious views, which might be considered socially or culturally conservative.

424. Any such actions would patently violate the Fifth Amendment and be flatly forbidden or categorically barred.

425. Even if not motivated by animus, the actions of Defendants hereunder are subject to strict scrutiny since they infringe the fundamental right of free exercise of religion.

426. Defendants do not have a rational, let alone compelling, reason for their actions.

427. Defendants' actions also are not the means least restrictive of religious exercise to further any governmental interest, much less a compelling one.

428. Thus, Defendants' actions fail strict scrutiny for the reasons explained in the Third Cause of Action (RFRA), *supra*.

429. As a proximate result of Defendants' actions, Plaintiff-Petitioner was damaged and continues to be damaged.

430. Plaintiff-Petitioner is entitled to injunctive and/or declaratory relief prohibiting Defendants from violating its constitutional and civil rights.

431. WHEREFORE, Plaintiff-Petitioner Gordon College respectfully requests that the Court grant the relief set forth hereinafter in the prayer for relief.

**TENTH CAUSE OF ACTION: VIOLATION OF THE
EQUAL PROTECTION COMPONENT OF THE FIFTH AMENDMENT:
DISCRIMINATION INVOLVING SUSPECT CLASS (Strict Scrutiny)**

432. Plaintiff-Petitioner Gordon College repeats and realleges each and every allegation contained above as if fully set forth herein.

433. The Equal Protection component of the Fifth Amendment requires that any government action that discriminates against a "suspect class" be subject to strict scrutiny. *Plyler v. Doe*, 457 U.S. 202, 216-17 (1982); *see Xia*, 865 F.3d at 659 n.2 (D.C. Cir.).

434. "Religion is a suspect class." *Saud v. Days*, 50 F.4th 705, 710 (9th Cir. 2022) (citing *New Orleans v. Dukes*, 427 U.S. 297, 303 (1976)).

435. The differential treatment of Plaintiff-Petitioner due to its "religious beliefs and practices would result in classifying them based on membership in a suspect class, and would violate the Equal Protection Clause unless the classification satisfies strict scrutiny." *Saud v. Days*, 50 F.4th at 710.

436. For all the reasons stated in the preceding Cause of Action, the actions of Defendants discriminate against Plaintiff-Petitioner, in violation of the Fifth Amendment.

437. Even if not motivated by animus, the actions of Defendants hereunder are subject to strict scrutiny since they infringe the fundamental right of free exercise of religion.

438. To the extent Defendants may have been motivated by animus against the religion or religious exercise or beliefs of Plaintiff-Petitioner, those actions patently violate the Fifth Amendment and are flatly barred.

439. Otherwise, such actions of Defendants are subject to strict scrutiny.

440. Defendants do not have a rational, let alone compelling, reason for their actions.

441. Defendants' actions also are not the means least restrictive of religious exercise to further any governmental interest, much less a compelling one.

442. Thus, Defendants' actions fail strict scrutiny for the reasons explained in the Third Cause of Action (RFRA), *supra*.

443.    As a proximate result of Defendants' actions, Plaintiff-Petitioner was damaged and continues to be damaged.

444.    Plaintiff-Petitioner is entitled to injunctive and/or declaratory relief prohibiting Defendants from violating its constitutional and civil rights.

445.    WHEREFORE, Plaintiff-Petitioner Gordon College respectfully requests that the Court grant the relief set forth hereinafter in the prayer for relief.

**ELEVENTH CAUSE OF ACTION: VIOLATION OF
THE DUE PROCESS CLAUSE:
DENIAL OF FAIR HEARING PROCESS (Functional Test / Strict Scrutiny)**

446.    Plaintiff-Petitioner Gordon College repeats and realleges each and every allegation contained above as if fully set forth herein.

447.    As alleged herein, Defendants have violated the Due Process Clause of the Fifth Amendment, and the rights of Plaintiff-Petitioner guaranteed thereunder, by failing to provide Plaintiff-Petitioner with even the minimal protection that due process requires. *Xia*, 865 F.3d at 659 n.2 (D.C. Cir.) ("injunctive relief is unquestionably available against federal officials for violation of the Fifth Amendment's Due Process Clause").

448.    "It is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'" *Caperton v. A.T. Massey Coal*, 556 U.S. 868, 876 (2009); *accord William Jefferson & Co. v. Bd. of Ass'mt*, 695 F.3d 960, 963-64 (9th Cir. 2012) (applying *Caperton* to agency process). "This applies to *administrative agencies which adjudicate as well as to courts*. Not only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent *even the probability of unfairness*.'" *Withrow v. Larkin*, 421 U.S. 35, 46 (1975) (citations omitted; emphasis added); *accord Cox v. Com'r*, 514 F.3d 1119, 1126 (10th Cir. 2008); *Hurles v. Ryan*, 752 F.3d 768, 788 (9th Cir. 2014).

79

449.    The process for "agency adjudication" should be "characterized by the same degree of procedural integrity and independence as the judicial process." *Harline v. DEA*, 148 F.3d 1199, 1205 (10th Cir. 1998).Thus, an agency tribunal's "overlap" "between prosecutorial and adjudicative functions … potentially raises a greater concern about bias." *William Jefferson & Co*., 695 F.3d at 965. "Even the most minimal guarantees of procedural due process require that the decision be issued by 'a neutral and detached hearing body[.]'" *Victory v. Pataki*, 814 F.3d 47, 63 (2d Cir. 2016) (citation omitted) (parole board hearing).

450.    The blending of powers within SBA, including the "overlap between prosecutorial and adjudicative functions," "raises a greater concern about bias." That combination of powers makes it difficult if not impossible for SBA to avoid the appearance or "probability of unfairness."[27]

451.    Under the Fifth Amendment, the bare minimum that "due process requires is notice and opportunity to be heard by a 'disinterested decisionmaker.'" *Clearone, Inc. v. Shure Acquisition Holdings, Inc*., 35 F.4th 1345, 1352 (Fed. Cir. 2022).

452.    Defendants and the SBA administrative process deny this bare minimum of due process to Plaintiff-Petitioner.

453.    Among other things, Defendants have prejudged this case with demonstrated hostility to religious institutions, such as Plaintiff-Petitioner, with avowedly conservative religious and cultural beliefs.

454.    Defendants' actions cannot withstand any form of judicial scrutiny.

455.    Defendants do not have a rational, let alone compelling, reason for their actions.

---

[27] Plaintiff-Petitioner reserves its right to challenge the role of agencies acting in multiple capacities if the Supreme Court alters longstanding precedent. *See Cochran v. S.E.C.*, 20 F.4th 194 (5th Cir. 2021), *cert. granted*, 142 S.Ct. 2707 (Argued Nov. 7, 2022).

456.   Defendants' actions also are not a rational or even minimally acceptable means to further any governmental interest, much less a compelling one.

457.   Thus, Defendants' actions fail strict scrutiny for the reasons explained in the Third Cause of Action (RFRA), *supra*.

458.   As a proximate result of Defendants' actions, Plaintiff-Petitioner was damaged and continues to be damaged.

459.   Plaintiff-Petitioner is entitled to injunctive and/or declaratory relief prohibiting Defendants from violating its constitutional and civil rights.

460.   WHEREFORE, Plaintiff-Petitioner Gordon College respectfully requests that the Court grant the relief set forth hereinafter in the prayer for relief.

## PRAYER FOR RELIEF

Plaintiff-Petitioner Gordon College prays for judgment as follows:

a)   That this Court judicially review the SBA's Final Decision, the SBA's Initial Decision, and the SBA's underlying loan examiner decision denying PPP loan forgiveness ("Forgiveness Decision"), and set aside the Final Agency Decision as arbitrary and capricious or, alternatively, as an abuse of discretion, in violation of the Administrative Procedures Act;

b)   That this Court reverse and set aside the SBA decisions described above and direct Defendants SBA and Administrator to issue a new decision on Gordon College's PPP loan forgiveness application forgiving its PPP loan in full;

c)   That this Court render judgment declaring that the Final Agency Decision—and the associated actions of Defendants—were legal error, were arbitrary and capricious, exceeded SBA's statutory authorization, constituted an abuse of discretion, and violated Plaintiff-Petitioner's federal statutory and constitutional rights, both facially and as applied;

81

d)    That this Court issue a Preliminary and Permanent Injunction to enjoin Defendant Guzman, and all persons and agents acting in concert with her and/or Defendant SBA, from denying loan forgiveness to Plaintiff-Petitioner in violation of its federal statutory and constitutional rights;

e)    That this Court declare the legal entitlement of Plaintiff-Petitioner to loan forgiveness in full and on no less favorable terms as and to no less extent than the most favorable that Defendants have offered to similarly-situated colleges and educational entities (such as, for example, Husson University);

f)    That this Court preliminarily and permanently enjoin the Defendants from depriving Plaintiff-Petitioner of loan forgiveness on the same terms and to the same extent Defendants have offered to similarly situated colleges and educational entities (e.g., Husson);

g)    That this Court issue the requested injunctive relief without a condition of bond or other security being required of Plaintiff-Petitioner;

h)    That this Court direct Defendants to reimburse Plaintiff-Petitioner for any payments it was required by its lender to make on its PPP loan, or any interest or other financial obligation that accrued, as a result of the erroneous and wrongful SBA decisions above;

i)    That this Court award Plaintiff-Petitioner its attorneys' fees and all other costs and expenses, pursuant to RFRA, 42 U.S.C. § 1988, and/or any other applicable fee-shifting statute; and

j)    That this Court award Plaintiff-Petition such other relief as the Court may deem just and appropriate.

/ / / /

/ / / /

Dated this 1st day of September, 2023

Respectfully submitted,


 /s/ *J. Matthew Szymanski*
J. Matthew Szymanski, Esq.
D.D.C. Bar ID: VA157
GAMMON & GRANGE, P.C.
1945 Old Gallows Road, Suite 650
Vienna, VA 22182
(703) 761-5030 (telephone)
(703) 761-5030 (facsimile)
Email: JMS@gg-law.com

Scott J. Ward, Esq.
D.D.C. Bar ID: VA158
GAMMON & GRANGE, P.C.
1945 Old Gallows Road
Suite 650
Vienna, VA 22182
(703) 761-5012 (telephone)
(703) 761-5012 (facsimile)
Email: SJW@gg-law.com

83