### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| GORDON COLLEGE, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES SMALL BUSINESS ADMINISTRATION *et al.*, <br><br> Defendants. | Civil Action No. 23-614 (BAH) <br><br> Judge Beryl A. Howell |

### <u>MEMORANDUM OPINION</u>

In March 2020, in response to the COVID-19 pandemic, Congress enacted the

Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Pub. L. No. 116-136, 134 Stat.

281 (2020), which established, in Section 1102, the Paycheck Protection Program ("PPP"), *see*

CARES Act § 1102 (codified at 15 U.S.C. § 636(a)(36)).  To help "alleviate the pandemic's

substantial economic effects on small businesses," the PPP authorized the Small Business

Administration ("SBA") "to guarantee favorable and potentially forgivable loans to businesses

negatively impacted by the pandemic."  *Springfield Hosp., Inc. v. Guzman*, 28 F.4th 403, 408–09

(2d. Cir. 2022); *see also In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1247 (11th

Cir. 2020) (explaining that the CARES Act was "in large part aimed at helping businesses make

payroll and pay operating expenses in order to keep people employed through the [COVID-

induced] economic downturn").

Plaintiff Gordon College, "a religious nonprofit higher educational institution," received

a PPP loan for $7,046,037 but was denied loan forgiveness when SBA concluded that plaintiff

"exceeded the maximum allowable number of employees and therefore does not qualify under

the SBA small business size standard qualifications for a [PPP] loan."  Am. Compl. ¶¶ 1, 152,

172, ECF No. 15.  Plaintiff administratively appealed the denial to SBA's Office of Hearings and Appeals ("OHA"), which denied plaintiff's appeal and plaintiff's subsequent petition for reconsideration and upheld SBA's decision to deny plaintiff's loan forgiveness application.  *Id.* ¶¶ 173, 198–99, 213.

Plaintiff then commenced this eleven-count action against SBA, Isabella Casillas Guzman, in her official capacity as Administrator of SBA, and the United States, alleging that SBA's denial of its loan-forgiveness application violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*; the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.*; the First Amendment's Free Exercise and Establishment Clauses, U.S. Const. amend. I; and the Fifth Amendment's Equal Protection and Due Process Clauses, U.S. Const. amend. V.  Defendants, in turn, have moved, pursuant to Federal Rule of Civil Procedure 12(b)(6), for partial dismissal of the Amended Complaint, namely, of the claims based on RFRA, the First Amendment's Free Exercise and Establishment Clauses, and the Fifth Amendment's Equal Process Clause.  *See* Defs.' Partial Mot. to Dismiss, ECF No. 16; Defs.' Mem. Supp. Partial Mot. to Dismiss ("Defs.' Mem."), ECF No. 16-1; *see also* Pl.'s Opp'n Defs.' Partial Mot. to Dismiss ("Pl.'s Opp'n"), ECF No. 18; Defs.' Reply Supp. Partial Mot. to Dismiss ("Defs.' Reply"), ECF No. 20.

For the reasons below, defendants' partial motion to dismiss is **GRANTED**.

## I.    BACKGROUND

The relevant statutory and regulatory framework, as well as the facts from which this litigation arises, are presented below.

A. **Factual Background**

1. *The Paycheck Protection Program*

SBA was created by the Small Business Act, 15 U.S.C. § 631 *et seq.*, to "aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns," *id.* § 631(a); *see also id.* § 633(a) (establishing SBA). Its "primary mechanism" for doing so is "by financing private 'Section 7(a) loans,'" which are "typically issued by private lenders" and "guarantee[d]" by SBA. *Springfield Hosp.*, 28 F.4th at 408–09; *see also* 15 U.S.C. § 636(a) (Section 7(a) of the Small Business Act); *Small Bus. Admin. v. McClellan*, 364 U.S. 446, 447 (1960) (explaining that SBA has "extraordinarily broad powers to accomplish [its] important objectives, including that of lending money to small businesses whenever they could not get necessary loans on reasonable terms from private lenders"); *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 719 n.3 (1979) (explaining that SBA "prefers to guarantee private loans rather than to disburse funds directly"). To qualify for a Section 7(a) loan, an applicant must be a "small business concern," 15 U.S.C. § 636(a), which SBA has defined to be an entity "operating business," "organized for profit," "located in the United States," under certain "size requirements" that vary by industry, and "demonstrate[s] a need for the desired credit," 13 C.F.R. § 120.100; *see also* 15 U.S.C. § 632(a)(2)(A) (allowing SBA to define "small business concern").

In response to the economic fallout during the COVID-19 pandemic, Congress enacted the CARES Act, which, *inter alia*, established the PPP, "a temporary program targeted at providing small businesses with the funds necessary to meet their payroll and operating expenses and therefore keep workers employed." *Springfield Hosp.*, 28 F.4th at 409; *see also* Business Loan Program Temporary Changes; Paycheck Protection Program ("Apr. 2020 IFR"), 85 Fed. Reg. 20,811, 20,811 (Apr. 15, 2020) (explaining that the PPP is "intended to provide economic

3

relief to small businesses nationwide adversely impacted [by COVID-19]").  "Rather than establishing the PPP as a standalone program, the CARES Act place[d] the PPP under Section 7(a) of the Small Business Act," *Springfield Hosp.*, 28 F.4th at 410, and temporarily expanded SBA's pre-existing business-loan authority by authorizing SBA, "[e]xcept as otherwise provided" in Section 1102, to guarantee PPP loans "under the same terms, conditions, and processes" as an ordinary Section 7(a) loan, 15 U.S.C. § 636(a)(36)(B).  The CARES Act, however, "relaxed many of the Section 7(a) eligibility criteria for PPP applicants and waived some of the standard Section 7(a) requirements altogether."  *Springfield Hosp.*, 28 F.4th at 410 (citing 15 U.S.C. § 636(a)(36)(D), (H)–(J), (R)); *see also In re Gateway Radiology Consultants, P.A.*, 983 F.3d at 1249 (explaining that "the PPP was not created as a standalone program" and "was added into § 7(a), albeit with several of that subsection's general eligibility requirements relaxed").  The CARES Act, for example, "[i]ncreased [the] eligibility" for PPP loans, such that PPP loans could be guaranteed not only to "small business concerns" but also to "any . . . nonprofit organization" that "employs not more than . . . 500 employees" (the "500-employee cap").  15 U.S.C. § 636(a)(36)(D).  The CARES Act further defined "employee," "[f]or purposes of determining whether . . . a nonprofit organization . . . employs not more than 500 employees," to "include[] individuals employed on a full-time, part-time, or other basis."  *Id.* § 636(a)(36)(D)(v).  The PPP was launched on April 3, 2020, with Congress authorizing SBA to guarantee up to $349 billion of PPP loans to small businesses.  *See* Apr. 2020 IFR, 85 Fed. Reg. at 20,812.

Section 1106 of the CARES Act set out the process of loan forgiveness, *see* CARES Act § 1106 (codified at 15 U.S.C. § 636m), and provides that "[a]n eligible recipient shall be eligible for forgiveness of indebtedness" on the portions of the PPP loan used for certain enumerated

purposes, such as payroll costs and payments for rent, utilities, and mortgage interest, 15 U.S.C.

§ 636m(b); *see also id.* § 636(a)(36)(A)(iv) (defining "eligible recipient"); *see also Springfield*

*Hosp.*, 28 F.4th at 409 ("The PPP provides potentially forgivable loans to eligible small

businesses, allowing the recipient to seek loan forgiveness if at least 60% of the loaned funds are

used for specified expenses, such as payroll."); *In re Gateway Radiology Consultants, P.A.*, 983

F.3d at 1247 (explaining that PPP "is designed to give loans to eligible businesses and, if the

loaned funds are used for specified expenses, to allow those loans to be forgiven").  "The amount

of loan forgiveness can be up to the full principal amount of the loan and any accrued interest,"

so long as "the borrower uses all of the loan proceeds for forgivable purposes" and certain

"employee and compensation levels are maintained."  Apr. 2020 IFR, 85 Fed. Reg. at 20,813;

*see also* 15 U.S.C. § 636m(d)(1) ("The amount of loan forgiveness . . . shall not exceed the

principal amount of the financing made available under the applicable covered loan.").

   To obtain forgiveness, a borrower must submit a PPP loan forgiveness application and

supporting documentation to its lender.  *See* 15 U.S.C. § 636m(e)–(f).  Within 60 days of

receiving the application, the lender must "issue a decision on the . . . application."  *Id.*

§ 636m(g).  If the lender determines that the borrower is entitled to loan forgiveness, it submits a

request for payment to SBA, and SBA, within 90 days, must "remit to the lender an amount

equal to the amount of forgiveness, plus any interest accrued through the date of payment."  *Id.*

§ 636m(c)(3).

   "In light of the structure of the PPP . . . , in which loans and loan forgiveness are

provided based on the borrower's certifications and documentation provided by the borrower,"

SBA established a series of "procedures and criteria through which SBA will review" a

borrower's eligibility for a PPP loan, calculation of the loan amount, use of loan proceeds, and

entitlement to loan forgiveness "to ensure that PPP loans are directed to the entities Congress intended, and that PPP loan proceeds are used for the purposes Congress required."  Business Loan Program Temporary Changes; Paycheck Protection Program ("June 2020 IFR"), 85 Fed. Reg. 33,010, 33,012 (June 1, 2020).  "SBA may undertake a review at any time in SBA's discretion."  *Id.*  "If SBA determines that a borrower is ineligible for the PPP loan, SBA will direct the lender to deny the loan forgiveness application," and "if SBA determines that the borrower is ineligible for the loan amount or loan forgiveness amount claimed by the borrower, SBA will direct the lender to deny the loan forgiveness application in whole or in part, as appropriate."  *Id.*  If a loan has already been forgiven, "SBA may also seek repayment of the outstanding PPP loan balance or pursue other available remedies."  *Id.*

**B.  Procedural Background**

In April 2020, plaintiff submitted a PPP loan application to its lender, Citizen Bank, and reported, in its application, that it had 495.67 employees.  *See* Am. Compl. ¶¶ 38, 40; *see also* Am. Compl., Ex. 4, ECF No. 15-5.  Plaintiff arrived at this 495.67 number using the full-time equivalent ("FTE") method, which counts part-time employees as a fraction of an employee. Am. Compl. ¶ 40.  Plaintiff's application was "quickly approved," and plaintiff received a loan for $7,046,037 on April 24, 2020.  *Id.* ¶¶ 45, 152; *see also* Am. Compl., Ex. 2 ("Initial ALJ Decision") at 1, ECF No. 15-3.[1]

In July 2021, plaintiff applied for full forgiveness of its PPP loan.  *See* Initial ALJ Decision at 1.  SBA sought additional information about plaintiff's loan, on September 7, 2021, and informed plaintiff, on October 13, 2021, that a "Hold Code" had been placed on its loan

---

[1]    The dates in the Amended Complaint and the ALJ's Initial and Final Decisions differ slightly.  For example, the date that plaintiff's PPP loan was disbursed is listed as April 23, 2020, in the Amended Complaint, *see* Am. Compl. ¶ 45, and April 24, 2020, in the ALJ's Initial Decision, *see* Initial ALJ Decision at 1.  These differences in dates are not material to the dispute, but, for consistency, the dates in the ALJ's decision will be used here.

based on its "Employee Count," which was "indicative of concern" and a "[p]otential eligibility issue." *Id.* at 1–2. To complete its "quality control process and review [of plaintiff's] loan file," SBA requested, on at least four separate occasions, additional documentation related to plaintiff's number of employees, such as plaintiff's "most recent 3 years Federal Tax Returns"; a "list of locations to include employee count per location"; and a variety of reports for the 2019 fiscal year, including reports summarizing employer health contributions, employment retirement contributions, and payroll per employee. *Id.* at 2–4; *see also* Am. Compl. ¶ 164. On November 15, 2021, and again on December 8, 2021, SBA informed plaintiff that although "a thorough review of all documentation provided" to support plaintiff's application for loan forgiveness was ongoing, "[b]ased on our preliminary findings of the review, we are considering recommending a Full Denial" because plaintiff had, in relevant part, self-reported "639 employees for the Massachusetts location, which exceeds the maximum limit of 500 employees per location." Initial ALJ Decision at 2–3. On April 12, 2022, SBA issued its Final Loan Review Decision, denying forgiveness of plaintiff's PPP loan and explaining that plaintiff "was ineligible for the PPP loan" based on SBA's conclusion that plaintiff "exceeded the maximum allowable number of employees and therefore does not qualify under the SBA small business size standard qualifications for a [PPP] loan." Am. Compl., Ex. 6 at 1, ECF No. 15-7.

Plaintiff administratively appealed the denial to OHA, which affirmed the denial. *See* Initial ALJ Decision at 1. Plaintiff then petitioned for reconsideration. *See* Am. Compl. ¶ 199; Am. Compl., Ex. 3 at 1, ECF No. 15-4. Although admitting that its initial decision erroneously categorized plaintiff as a "small business concern," rather than a "tax-exempt nonprofit," OHA explained that this categorization "changes the analysis but not the result of the Initial Decision,"

and again upheld SBA's decision to deny plaintiff's loan forgiveness application.  Am. Compl., Ex. 1 ("Final ALJ Decision") at 1–2, ECF No. 15-2.

The ALJ explained that, under the CARES Act, nonprofit organizations that "employ[] not more than 500 employees" are eligible for a PPP loan, and "employee" is defined to "include[] individuals employed on a full-time, part-time, or other basis."  *Id.* at 2 (emphasis omitted) (quoting 15 U.S.C. § 636(a)(36)(D)(i)).  "[T]he CARES Act's text resolves the employee-counting dispute" and is "very clear": "SBA's proposed 'headcount' method—that is, counting every employed individual regardless of full-time or part-time status as an 'employee'—is the proper method with which to determine whether a nonprofit organization is eligible for a PPP loan based on the 500-employee threshold," not the FTE method for which plaintiff advocated.  *Id.* at 3.

On March 6, 2023, plaintiff initiated this action, alleging, in eleven counts, that the denial of its loan forgiveness application by SBA violates RFRA and the First and Fifth Amendments, and that the process by which its loan forgiveness application was denied violates the APA and Fifth Amendment.  Specifically, the complaint, as amended, alleges that application of the PPP's 500-employee cap to plaintiff substantially burdens its exercise of religion, in violation of RFRA, *see* Am. Compl. ¶¶ 311–38 (Count 3); amounts to disparate treatment, "non-generally applicable treatment," and "especially harsh treatment," in violation of the First Amendment's Free Exercise Clause, *see id.* ¶¶ 339–55 (Count 4); *id.* ¶¶ 356–72 (Count 5); *id.* ¶¶ 373–86 (Count 6), and the Fifth Amendment's Equal Protection Clause, *see id.* ¶¶ 417–31 (Count 9); *id.* ¶¶ 432–45 (Count 10); demonstrates a denominational preference, in violation of the First Amendment's Establishment Clause, *see id.* ¶¶ 387–96 (Count 7); and interferes with religions autonomy, in violation of the First Amendment's Free Exercise and Establishment Clauses, *see*

*id.* ¶¶ 397–416 (Count 8).  Plaintiff further alleges that the ALJ's decision, affirming SBA's

denial of its loan forgiveness application, was arbitrary and capricious or an abuse of discretion,

in violation of the APA, *see id.* ¶¶ 293–300 (Count 1); *id.* ¶¶ 301–10 (seeking, in Count 2, a

declaratory judgment to this effect pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201

*et seq.*), and that the ALJ denied plaintiff a fair hearing, in violation of the Fifth Amendment's

Due Process Clause, *see id.* ¶¶ 446–60 (Count 11).

Defendants have moved, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss

the claims based the application of the PPP's 500-employee cap to plaintiff, pursuant to RFRA

(Count 3), the First Amendment (Counts 4–8), and the Fifth Amendment (Count 9–10).  *See*

Defs.' Mem. at 1 n.1 (explaining that defendants do not move to dismiss Counts 1, 2, and 11).

Defendants' motion is now ripe for consideration.

## II.    LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, "the complaint must contain sufficient

factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Wood v.*

*Moss*, 572 U.S. 744, 757–58 (2014) (citation omitted).  A claim is facially plausible when the

plaintiff pleads factual content that is more than "'merely consistent with' a defendant's liability"

and "allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 557 (2007)); *see also Banneker Ventures, LLC v. Graham*, 798 F.3d

1119, 1129 (D.C. Cir. 2015) ("Plausibility requires more than a sheer possibility that a defendant

has acted unlawfully." (citation omitted)).

In deciding a motion under Rule 12(b)(6), a court must consider the whole complaint,

accepting all factual allegations in the complaint as true, even if doubtful in fact, and construing

all reasonable inferences in the plaintiff's favor.  *Twombly*, 550 U.S. at 555; *see also Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 210 (D.C. Cir. 2022).  A court, however, does not "accept inferences drawn by a plaintiff if such inferences are unsupported by the facts set out in the complaint."  *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) (alterations in original accepted and citation omitted); *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").  In determining whether a complaint fails to state a claim, a court may consider only the facts alleged in the complaint and "any documents either attached to or incorporated in the complaint and matters of which the court may take judicial notice."  *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020) (alterations in original accepted and citation omitted).

## III.   DISCUSSION

As a threshold observation, plaintiff's real dispute appears to be with the process and reasoning applied by the ALJ in reviewing SBA's denial of plaintiff's loan forgiveness application, resulting in affirmance of SBA's decision.  *See, e.g.*, Pl.'s Opp'n at 10–11 (focusing, as a "specific[]" example of "dissimilar, disparate, and discriminatory treatment," on the ALJ's alleged "refus[al] to consider th[e] undisputed evidence from the public records of SBA and from other federal agencies demonstrating that SBA had granted PPP loan forgiveness to more than 25 similarly situated private colleges"; and contending that "in denying [plaintiff's] appeal, SBA committed multiple violations of laws and regulations governing the PPP appeal process," including "(a) failing to close the Administrative Record at any point in the OHA appeal, (b) failing to rule on Gordon's Objections to Administrative Record prior to ALJ Smith issuing his Initial Decision, and (c) admitting into the Administrative Record of the forgiveness appeal SBA documents that did not exist at the time of the original SBA loan examiner decision—nor at

any time until after all briefing on the appeal of that decision had concluded—and that therefore could not properly be part of the Administrative Record under the controlling regulations" (emphasis omitted)); *id.* at 19 (arguing that dismissing plaintiff's action would "go[] far beyond any reasonable deference to administrative agencies and instead would insulate SBA and the individual SBA decisionmakers from any meaningful judicial review of their actions"); *id.* at 28 (critiquing the "the ALJ's initial decision [for] rel[ying] upon the wrong statutory provision and fail[ing] to recognize that Gordon is a nonprofit religious college"); *id.* at 32 (criticizing "SBA's ALJs" for "treat[ing] two virtually identical PPP loan forgiveness applications differently"). The review plaintiff seeks of the ALJ's ruling may be pursued under the APA and Due Process claims set out in Counts 1, 2, and 11, which are not at issue in defendants' pending partial motion to dismiss.

The eight claims at issue in defendants' motion concern the application of the PPP's 500-employee cap to plaintiff. Specifically, plaintiff alleges that such application substantially burdens its religious exercise, in violation of RFRA (Count 3); is non-neutral and non-generally applicable and thus is subject to, but fails to satisfy, strict scrutiny, in violation of the Free Exercise and Equal Protection Clauses (Counts 4, 5, 6, 9, and 10); demonstrates a denominational preference, in violation of the Establishment Clause (Count 7); and interferes with plaintiff's religious autonomy, in violation of the First Amendment (Count 8). For the reasons set forth below, each of these claims fails, and defendants' partial motion to dismiss is granted.

### A.     RFRA Claim (Count 3)

"RFRA prohibits the 'Government from substantially burdening a person's exercise of religion even if the burden results from a rule of general applicability' unless the Government

'demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.'" *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 705 (2014) (alteration in original accepted and emphasis omitted) (quoting 42 U.S.C. § 2000bb-1); *see also Nat'l Religious Broads. Noncommercial Music License Comm. v. Copyright Royalty Bd.*, 77 F.4th 949, 967 (D.C. Cir. 2023). "Only if a litigant can establish that their exercise of religion has been substantially burdened does the burden shift to the government" to show that its actions satisfy strict scrutiny, *Iowaska Church of Healing v. Werfel*, No. 23-5122, 2024 WL 3076918, at *3 (D.C. Cir. June 21, 2024), and this is "an 'exceptionally demanding' test," *Singh v. Berger*, 56 F.4th 88, 93 (D.C. Cir. 2022) (quoting *Holt v. Hobbes*, 574 U.S. 352, 364 (2015)).

"Congress in enacting RFRA only sought to provide process and standards for the protection of religious exercise," *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 167 (D.C. Cir. 2003), and defined "exercise of religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(A). Although "the burdened practice need not be compelled by [a specific] religion to merit statutory protection," the "claimed beliefs must be sincere and the practice at issue must be of a religious nature." *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008) (alteration in original accepted and citation omitted); *see also Henderson v. Kennedy*, 253 F.3d 12, 17 (D.C. Cir. 2001) (explaining that the "proper . . . inquiry" is "whether the government has placed a substantial burden on the observation of a central religious belief or practice" (citation omitted)). "A substantial burden exists when government action puts 'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Kaemmerling*, 553 F.3d at 678 (quoting *Thomas v. Rev. Bd.*, 450 U.S. 707, 718 (1981)). "An inconsequential or *de minimis*

burden on religious practice does not rise to this level, nor does a burden on activity unimportant to the adherent's religious scheme." *Id.*; *see also Levitan v. Ashcroft*, 281 F.3d 1313, 1321 (D.C. Cir. 2002) (explaining that a plaintiff's "assertion of a view so totally foreign to the creed with which he claimed to affiliate might well lead the court to question his sincerity").

Here, plaintiff fails to identify a "sincere religious belief" that has been infringed by application of the PPP's 500-employee cap to plaintiff. *Hobby Lobby*, 573 U.S. at 720. Read most generously, the Amended Complaint alleges that defendants "substantially burden[ed]" plaintiff's ability "to alter [its] internal management and governance requirements" by conditioning plaintiff's "seven-million-dollar forgivable loan" on having fewer than 500 employees. Am. Compl. ¶¶ 315, 320; *see also* Pl.'s Opp'n at 16 (alleging that the PPP "pressure[s]" plaintiff "to alter its internal operations to satisfy the whims of government"). Absent here, however, is any articulated connection between plaintiff's asserted need to have more than 500 employees and its exercise of religion. Plaintiff, for example, does not allege that "any religious group" has "as one of its tenets" the requirement that an associated religious institution have more than 500 employees, that it "ha[s] followed—or attempted to follow—any such practice," or that it has treated having more than 500 employees to "ris[e] to [any] level of significance in [its] religion." *Henderson*, 253 F.3d at 16–17. Plaintiff also does not contend than the 500-employee cap "forces [it] to engage in conduct that [its] religion forbids or that it prevents [it] from engaging in conduct [its] religion requires," *id.* at 16; *see also Mahoney v. Doe*, 642 F.3d 1112, 1121 (D.C. Cir. 2011) (explaining that "focus[ing] RFRA's 'substantial burden' inquiry on the nexus between religious practice and religious tenet" "adher[es] to RFRA's plain text," "avoids expanding RFRA's coverage beyond what Congress intended," and "prevent[s] RFRA claims from being reduced into questions of fact").

Indeed, plaintiff alleges *no facts* connecting its number of employees to any religious practice and has thus failed to establish that the PPP's 500-employee cap burdens—much less substantially burdens—its exercise of religion.  *See, e.g.*, *Henderson*, 253 F.3d at 16 (concluding that a ban on selling t-shirts on the National Mall does not substantially burden the exercise of religion); *Archdiocese of Wash. v. Wash. Metro. Area Transit*, 897 F.3d 314, 333 (D.C. Cir. 2018) (concluding that a regulation prohibiting religious advertising does not substantially burden the exercise of religion because plaintiff "has not alleged that its religion requires displaying advertisements on WMATA's buses promoting the season of Advent, much less the display of any advertisements at all"); *Holy Land Found. for Relief & Dev.*, 333 F.3d at 167 (concluding that an executive order blocking the property of certain terrorist organizations was not a substantial burden on the exercise of religion); *Levitan*, 281 F.3d at 1321 (noting that "a litigant challenging a rule limiting his right to wear sunglasses" would likely not satisfy the threshold "exercise of religion" requirement); *Branch Ministries v. Rossotti*, 211 F.3d 137, 142–43 (D.C. Cir. 2000) (concluding that the conditioning of tax-exempt status on a withdrawal by the Church from electoral politics was not a substantial burden on the exercise of religion where "the Church d[id] not maintain that a withdrawal from electoral politics would violate its beliefs"); *cf. Jimmy Swaggart Ministries v. Bd. of Equalization of Cal.*, 493 U.S. 378, 391 (1990) (concluding that the "collection and payment" of a California sales tax did not "violate[] [plaintiff's] sincere religious beliefs").

Plaintiff raises a plethora of arguments in opposition, but only one is responsive to the fundamental flaw that plaintiff failed to identify a "sincere religious belief" that has been infringed by application of the PPP's 500-employee cap to plaintiff.[2]  Specifically, plaintiff

---

[2]       Except for *Hobby Lobby* and *Singh*, the cases cited by plaintiff involve unequal treatment claims brought under the Free Exercise Clause or the Religious Land Use and Institutionalized Persons Act, and not RFRA, which

argues, for the first time in opposition, that the PPP's 500-employee cap "limit[s] [plaintiff's] right to exercise its religious faith in how it structures its relationships and operations with its full-time faculty, adjunct faculty, employees, and student work-study employees in carrying out its religious educational mission in the manner that [plaintiff] believes is required by its faith in Christ." Pl.'s Opp'n at 16.[3] Yet the law is well-settled that "a complaint may not be amended by the briefs in opposition to a motion to dismiss." *BEG Invs., LLC v. Alberti*, 85 F. Supp. 3d 13, 26 (D.D.C. 2015) (citation omitted); *see also Williams v. Spencer*, 883 F. Supp. 2d 165, 181 n.8 (D.D.C. 2012) (collecting cases); *Jones v. Ass'n of Am. Med. Colls.*, No. 22-cv-1680, 2023 WL 2327901, at *8 (D.D.C. Mar. 2, 2023) (same). In any case, these additional allegations still do not explain why plaintiff's number of employees has any relation to its religious mission, religious faith, or how it "structures its relationships and operations with its faculty," much less how the PPP's 500-employee cap would substantially burden any such religious exercise. *See Holt*, 574 U.S. at 360–61 (explaining that a religious exercise, as defined in 42 U.S.C. § 2000cc-5(7)(A), must be "based on a religious belief and not some other motivation"). Plaintiff's attempts to suggest that refusal to forgive its PPP loans will decrease the amount of money

---

has no analogous unequal treatment provision, s*ee* Pl.'s Opp'n at 14–17 (citing *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144 (3d Cir. 2002); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017); *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464 (2020); *Carson as Next Friend of O.C. v. Makin*, 596 U.S. 767 (2022); *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253 (3d Cir. 2007); *Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 750 F.3d 184 (2d Cir. 2014)), and thus these cited cases are unpersuasive.

[3]     Plaintiff also argues, for the first time in opposition, that the PPP's 500-employee cap "limit[s] [plaintiff's] right to exercise its religious faith . . . in discipling its students through work-study programs and other forms of limited time and low compensation employment where the employment compensation is secondary to the religious and educational purposes of the work study." Pl.'s Opp'n at 16. Even setting aside the fact that plaintiff has failed to connect the availability of work study opportunities with any religious practice, plaintiff cannot allege that the PPP's 500-employee cap affects the availability of work study opportunities because part-time student work study employees are not counted as employees under the PPP, and even without counting these students, plaintiff's employee count exceeds 500. *See* Am. Compl., Ex. 16 at 15–16, ECF No. 15-17; *see also* Defs.' Reply at 11 (explaining that plaintiff "does not allege that SBA pressured it to modify or abandon any aspect of its work-study program" and could not so allege because "work-study students are excluded from the number of a borrower's employees for PPP loan eligibility and forgiveness purposes, and [plaintiff] would still exceed the 500-employee threshold even excluding *all* of its 256 student employees" (citation omitted)).

available for its religious practices also do not save its RFRA claim, *see* Pl.'s Opp'n at 14, 16,

since "[t]he Supreme Court has declared . . . that such a burden 'is not constitutionally

significant.'" *Branch Ministries*, 211 F.3d at 142 (quoting *Jimmy Swaggart Ministries*, 493 U.S.

at 391).

To avoid this finding, plaintiff raises several arguments pertaining to its obligation

merely to allege a "substantial burden" as triggering defendants' subsequent burden to show that

their actions satisfy strict scrutiny.  These arguments are immaterial here, where plaintiff has

failed to identify *any* exercise of religion that has been burdened by the PPP's 500-employee cap.

*See Iowaska Church of Healing*, 2024 WL 3076918, at *3 (explaining that plaintiff must first

establish that its "exercise of religion has been substantially burdened" before "the burden shifts

to the government"); *see also Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546

U.S. 418, 424 (2006) (explaining that satisfaction of the compelling interest test is an

"exception" to RFRA's requirement that "the Federal Government may not, as a statutory matter,

substantially burden a person's exercise of religion," and thus that plaintiff must establish that its

exercise of religious has been substantially burdened).

For example, plaintiff first contends that "the proper legal analysis" should focus not on

the PPP's 500-employee cap but on "the discretionary decision[]" "to deny PPP loan forgiveness

to [plaintiff], while granting such forgiveness to similarly situated non-religious colleges and to

other private colleges of different religious identity or affiliation."  Pl.'s Opp'n at 13.  Such

discrimination, plaintiff contends, is itself a substantial burden.  *Id.* at 14; *see also* Am. Compl.

¶¶ 331–34.  Even setting aside the fact that plaintiff has failed to allege religious discrimination,

*see infra* Section III.B, plaintiff offers no support for its argument that discrimination itself can

be a substantial burden, *see* Defs.' Reply at 9 ("So far as Defendants are aware, no court has

16

endorsed [plaintiff's] argument that '[d]iscrimination itself is a substantial burden' under

RFRA.").  Rather, this argument that religious discrimination qualifies to support a RFRA claim

cannot be squared with RFRA's prohibition on the substantial burdening of a person's "exercise

of religion."  42 U.S.C. § 2000bb-1(a).

"Religious exercise necessarily involves an action or practice."  *Kaemmerling*, 553 F.3d

at 679; *see also Wilson v. James*, No. 15-5338, 2016 WL 3043746, at *1 (D.C. Cir. May 17,

2016) (same); *Exercise*, Merriam-Webster, https://www.merriam-

webster.com/dictionary/exercise ("the act of putting into use, action, or practice").  A

"substantial burden" on religious exercise "exists when government action puts substantial

pressure on an adherent to modify his behavior and to violate his beliefs."  *Kaemmerling*, 553

F.3d at 678 (citation omitted); *see also Little Sisters of the Poor Saints Peter & Paul Home v.

Pennsylvania*, 591 U.S. 657, 692 (2020) (Alito, J., concurring) (explaining that the inquiry is

whether "non-compliance [would] have substantial adverse practical consequences," then

whether "compliance [would] cause the objecting party to violate its religious beliefs").  Put

simply, alleged government action, standing alone, is insufficient, absent allegations that such

action prompted modification of religious conduct in a manner "that would violate [an

adherent's] beliefs."  *Kaemmerling*, 553 F.3d at 679–80 (comparing *Sherbert v. Verner*, 374 U.S.

398 (1963), "where the denial of unemployment benefits impeded the observance of the

plaintiff's religion by pressuring her to work on Saturday in violation of the tenets of her

religion," and *Wisconsin v. Yoder*, 406 U.S. 205 (1972), "where the compulsory education law

compelled the Amish to perform acts undeniably at odds with fundamental tenets of their

religious beliefs," with *Bowen v. Roy*, 476 U.S. 693 (1986), where "the state's use of a Native

American child's Social Security number in determining eligibility for federal welfare benefit

programs did not impair her parents' freedom to exercise their religious beliefs, a tenet of which was that use of the number beyond her control would rob her spirit"; and concluding that plaintiff, who "allege[d] that the DNA Act's requirement that the federal government collect and store his DNA information requires the government to act in ways that violate his religious beliefs," but did allege that "these governmental acts pressure him to modify his own behavior in any way that would violate his beliefs," failed to state a RFRA claim, having failed to "suggest[] that the Act imposes any restriction on what [he] can believe or can do" (citations omitted)); *see also Carmichael v. Pompeo*, 486 F. Supp. 3d 360, 371 (D.D.C. 2020) (explaining that where "plaintiff's behavior required no modification," plaintiff "was not substantially burdened"); *Ferguson v. Owen*, No. 23-5102, 2024 WL 120099, at *1 (D.C. Cir. Jan. 11, 2024) (finding no substantial burden where plaintiff had "not shown that the [government's] decision prevented conduct required by [plaintiff's] religion or placed substantial pressure on him to violate his beliefs"). Being allegedly subjected to discrimination, without any resultant actions taken by plaintiff, does not constitute a substantial burden on the exercise of religion.

Second, plaintiff argues that *Singh v. Berger* is analogous and dispositive, *see* Pl.'s Opp'n at 3–4, 23–24, but in *Singh*, the parties did not dispute "the sincerity of the Plaintiffs' faith," that the conduct at issue, "maintaining unshorn hair and carrying religious articles," is "an inviolable aspect of [plaintiffs'] exercise," or that "refusing the Plaintiffs any religious accommodation during boot camp—which is their only route into service in the Corps—imposes a substantial burden on the exercise of their faith," 56 F.4th at 97. *Singh* is a far cry from the instant case, where plaintiff has not alleged that having more than 500 employees is an inviolable aspect of its religious exercise or is, in any other way, connected to plaintiff's exercise of religion. Without this threshold allegation, plaintiff cannot state a RFRA claim and the question whether plaintiff's

religious exercise has been substantially burdened need not be reached, much less the question whether the law survive strict scrutiny.

Third, plaintiff posits that "[t]he loss of a seven-million-dollar forgivable loan," "a significant economic consequence," is alone sufficient to establish a "substantial burden."  Am. Compl. ¶¶ 320–21 (quoting *Hobby Lobby*, 573 U.S. at 720); *see also* Pl.'s Opp'n at 14.  Again, the "substantial economic consequences" of not forgiving plaintiff's PPP loan are undisputed, but RFRA requires that plaintiff allege not only a substantial burden but also one that burdens "the exercise of religion."  *Hobby Lobby*, 573 U.S. at 720 (explaining that plaintiffs have "a sincere religious belief," then that the mandate at issue "demands that they engage in conduct that seriously violates th[is] religious belief[]," then finally that if plaintiffs "do not yield to [the mandate], the economic consequences will be severe," thereby resulting in a substantial burden on the exercise of religion).  For the reasons explained above, plaintiff has failed to do so here.

Fourth and finally, plaintiff argues that "[a]s-applied challenges like this are ill-suited for dismissal" at the motion to dismiss stage because the questions of discriminatory treatment, substantial burden, and narrow tailoring inquiries are fact-specific.  Pl.'s Opp'n at 6; *see also id.* at 6–8, 18–19.  Plaintiff further argues that any failure "to provide sufficient factual allegations" is the fault of defendants, not plaintiff, because defendants "have made it more difficult for [plaintiff] (and others) to obtain data concerning whether SBA has engaged in disparate treatment or other discriminatory conduct."  *Id.* at 18; *see also id.* at 5 (blaming "[d]efendants' failure at every turn to provide the data SBA was duty-bound to provide").  Plaintiff has it backwards.  As a reminder, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" and "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted). Although "plausibility" does not require "probability," "it asks for more than a sheer possibility that a defendant has acted unlawfully," and "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (citation omitted). Put differently, "the doors of discovery" are not "unlock[ed]" for "a plaintiff armed with nothing more than conclusions." *Id.* at 678–69. To be sure, questions of discrimination, substantial burden, and narrow tailoring are fact-specific, but the problem with plaintiff's complaint is more fundamental. Accepting as true all of plaintiff's factual allegations, plaintiff has failed to state a plausible RFRA claim, having failed to allege, at the threshold, any religious exercise that was infringed, information that is squarely in plaintiff's—not defendants'—possession. *See United States v. Bauer*, 84 F.3d 1549, 1559 (9th Cir. 1996) ("It is not enough in order to enjoy the protections of the Religious Freedom Restoration Act to claim the name of a religion as a protective cloak.").[4]

Though "mindful of the Supreme Court's warning that judging the centrality of different religious practices is akin to 'the unacceptable business of evaluating the relative merits of differing religious claims,'" it is "sometimes the case that litigants can make no credible showing that the affected practice is either central or important in their religious scheme." *Levitan*, 281 F.3d at 1320–21 (quoting *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 887 (1990)). This case, where plaintiff has alleged no facts connecting the 500-employee cap to any

---

[4]     In a footnote, plaintiff contends that if its allegations are inadequate, the Amended Complaint should be dismissed "without prejudice, and with leave to amend." Pl.'s Opp'n at 29 n.18. To be sure, courts "should freely give leave when justice so requires," Fed. R. Civ. P. 15(a)(2), but "Rule 15(a)—even as liberally construed—applies only when the plaintiff actually has moved for leave to amend the complaint; absent a motion, there is nothing to be freely given," *Schmidt v. United States*, 749 F.3d 1064, 1069 (D.C. Cir. 2014) (citation omitted).

religious practice, is such a case, and any "*de minimis* burden imposed by the challenged law is not constitutionally cognizable." *Id.* at 1321.  Accordingly, plaintiff's RFRA claim is dismissed.

### B.  Free Exercise and Equal Protection Claims (Counts 4, 5, 6, 9, and 10)

The Free Exercise Clause prohibits Congress from making laws "prohibiting the free exercise" of religion, U.S. Const. Amend. I, and protects "the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of (or abstention from) physical acts," *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022) (quoting *Emp. Div.*, 494 U.S. at 877).  "[T]he right of free exercise," however, "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Emp. Div.*, 494 U.S. at 879 (citation omitted).  "Where a law is both neutral and generally applicable," therefore, "rational basis review applies." *M.A. on Behalf of H.R. v. Rockland Cnty. Dep't of Health*, 53 F.4th 29, 36 (2d Cir. 2022); *see also Fulton v. City of Philadelphia, Pa.*, 593 U.S. 522, 533 (2021) ("*Smith* held that laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable.").  In contrast, where a law is not neutral or generally applicable, "a government entity may not burden a person's sincere religious practice," unless the government can satisfy strict scrutiny by demonstrating that "the action is narrowly tailored in pursuit of a compelling state interest." *Nat'l Religious Broad. Noncommercial Music License Comm.*, 77 F.4th at 967 (alterations in original accepted) (quoting *Bremerton Sch. Dist.*, 597 U.S. at 522–23); *see also Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020).

In "cases involving claims of religious discrimination," Equal Protection claims should be analyzed "under the Free Exercise Clause." *Mo. Dep't of Corr. v. Finney*, No. 23-203, 2024

WL 674657, at *2 n.* (U.S. 2024) (Gorsuch, J., statement respecting the denial of certiorari) (cataloguing cases); *see, e.g.*, *Locke v. Davey*, 540 U.S. 712, 720 n.3 (2004) (analyzing Equal Protection and Free Exercise claims jointly); *see also Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993) ("At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons."); *id.* at 540 (explaining that the Free Exercise "neutrality" inquiry "requires an equal protection mode of analysis"); *see also Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1257 (10th Cir. 2008) (explaining that "[t]he [Supreme] Court has suggested that the Equal Protection Clause's requirement [of neutral treatment of religions] is parallel" to the Free Exercise Clause's).  The parties analyze plaintiff's Free Exercise and Equal Protection claims together, *see* Defs.' Mot at 21–22; Pl.'s Opp'n at 35; *see also* Am. Compl. ¶¶ 421, 436 (alleging that defendants violate the Equal Protection Clause by "violat[ing] the Free Exercise Clause"), and thus the Court will do the same.

Plaintiff alleges that defendants' application of the PPP's 500-employee cap to plaintiff was non-neutral, *see* Am Compl. ¶¶ 339–55 (Count 4), not generally applicable, *see id.* ¶¶ 356–72 (Count 5), and especially harsh, *see id.* ¶¶ 373–86 (Count 6), thereby triggering strict scrutiny under the Free Exercise Clause.[5]  Plaintiff then contends that defendants are unable to satisfy strict scrutiny, for the same reasons as in the RFRA context.  *See id.* ¶¶ 352, 369, 383; Pl.'s Opp'n at 24 ("Other [than] the 'substantial burden' requirement, which applies to RFRA but not the Free Exercise Clause, the judicial analysis under RFRA and the First Amendment is the same.").  Plaintiff further argues that by "violat[ing] the Free Exercise Clause," defendants have

---

[5]   Plaintiff does not bring a facial challenge to the PPP's 500-employee cap and challenges the cap only as applied to plaintiff.  *See* Pl.'s Opp'n at 1 ("This lawsuit is not an attack on the validity of statutes, regulations, or guidance.  It merely challenges SBA's implementation of law as applied to Gordon in this case."), 2 ("Gordon's constitutional claims are not facial challenges.").

"burden[ed] [its] fundamental right" to the "free exercise of religion," *see* Am. Compl. ¶¶ 417–31 (Count 9), and have discriminated against plaintiff based on religion, *see id.* ¶¶ 432–45 (Count 10), in violation of the Equal Protection Clause.

At the outset, for the reasons explained above, plaintiff fails to identify any "exercise of religion" that has been burdened, and thus plaintiff's claims can be dismissed on this basis alone. *See Branch Ministries*, 211 F.3d at 142 ("To sustain its claim under either the Constitution or [RFRA], [plaintiff] must first establish that its free exercise right has been substantially burdened."); *Levitan*, 281 F.3d at 1320 (explaining that plaintiff must make a "threshold showing" that a law or regulation imposes a "burden on the litigant's religious practice"); *see, e.g.*, *Bremerton Sch. Dist.*, 597 U.S. at 525 (asking, as the first question, whether plaintiff sought "to engage in a sincerely motivated religious exercise").[6]  In any case, for the reasons explained below, the application of the PPP's 500-employee cap to plaintiff is neutral and generally applicable, thereby triggering rational basis review, rather than strict scrutiny.  Plaintiff has failed to bring a rational-basis challenge by not plausibly alleging that no reasonable set of facts could provide a rational basis for the PPP's 500-employee cap.  Accordingly, plaintiff's Free Exercise and Equal Protection claims are dismissed.

### 1. *Neutrality*

"Non-neutral laws are impermissible because they have as their 'object to infringe upon or restrict practices because of their religious motivation." *Archdiocese of Wash.*, 897 F.3d at

---

[6]  While plaintiff is correct in its observation that the Supreme Court has suggested that "a plaintiff may [prove] a free exercise violation . . . by showing that a government entity has *burdened*"—rather than substantially burdened—"his sincere religious practice pursuant to a policy that is not neutral or generally applicable," Pl.'s Opp'n at 23 (quoting *Kennedy*, 597 U.S. at 525); *see also Booth v. Bowser*, 597 F. Supp. 3d 1, 25 (D.D.C. 2022) ("[R]ecent Supreme Court decisions have applied strict scrutiny to non-neutral and generally applicable laws without asking whether these laws impose *substantial* burdens."), the Court need not resolve whether the "burden" or "substantially burden" standard applies here, where plaintiff has failed to identify any exercise of religion that has been burdened, and the PPP's 500-employee cap is both neutral and generally applicable.

331 (alteration in original accepted) (quoting *Lukumi*, 508 U.S. at 533); *see also Fulton*, 593 U.S. at 533 ("Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature."). "To determine the object of a law, we must begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face." *Lukumi*, 508 U.S. at 533. Plaintiff concedes that the PPP's 500-employee cap and SBA's methods for counting employees are facially neutral. *See* Pl.'s Opp'n at 22 (emphasizing, again, that plaintiff brings "an as-applied challenge").

Facial neutrality alone, however, is not enough. Rather, a "[c]ourt must survey meticulously the circumstances of governmental categories" to determine whether there are "subtle departures from neutrality," "covert suppression of particular religious beliefs," or "religious gerrymander[ing]." *Lukumi*, 508 U.S. at 534 (citation omitted). A facially neutral law will still run afoul of the neutrality principle "if a religious exercise is otherwise its 'object,'" *Bremerton Sch. Dist.*, 597 U.S. at 526 (citation omitted), such as, for example, if it "targets religious conduct for distinctive treatment," *Lukumi*, 508 U.S. at 534, or "single[s] out" religious conduct "for especially harsh treatment," *Roman Cath. Diocese of Brooklyn*, 592 U.S. at 17. "Factors relevant to the assessment of government neutrality include the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018) (citation omitted). "These objective factors bear on the question of discriminatory object." *Lukumi*, 508 U.S. at 540.

Plaintiff alleges no facts that even remotely suggest that the "object" of the PPP's 500-employee cap or SBA's methods for counting employees is "a religious exercise." *Bremerton*

24

*Sch. Dist.*, 597 U.S. at 526.  No allegation is made that the 500-employee cap or SBA's methods for counting employees were enacted to target or single out any religious conduct or institutions, *see, e.g.*, *Lukumi*, 508 U.S. at 533 (striking down three facially neutral city ordinances enacted to target a specific religious practice); *Roman Cath. Diocese of Brooklyn*, 592 U.S. at 16–17 (enjoining a COVID-19 executive order that imposed more severe restrictions on attendance at religious services than "essential businesses," resulting in clear "categorizations" and "disparate treatment"), nor that the cap or employee-counting methodology employed have an adverse impact on religion, *see, e.g.*, *Lukumi*, 508 U.S. at 535 (noting that adverse impact "will not always lead to a finding of impermissible targeting" but finding "impermissible targeting," where, *inter alia*, "almost the only conduct subject to [the ordinances] is the religious exercise of Santeria church members").  Plaintiff does not even allege that SBA knew of its religious affiliation or that the 500-employee cap or SBA's methods for counting employees were applied differently to plaintiff because of its religion.  *See, e.g.*, *Niemotko v. Maryland*, 340 U.S. 268, 272–73 (1951) (concluding that municipal ordinance was applied in unconstitutional manner when interpreted to prohibit preaching in a public park by a Jehovah's Witness but to permit preaching during course of Catholic mass or protestant church service); *Masterpiece Cakeshop*, 584 U.S. at 636–38 (explaining that, on four occasions, "the Civil Rights Division considered the refusal of bakers to create cakes with images that conveyed disapproval of same-sex marriage, along with religious text," and ruled against only plaintiff, who argued that such ruling was "to disfavor the religious basis of his objection" to baking the cake).[7]

---

[7]  Plaintiff does not meaningfully address defendants' argument that no facts are alleged suggesting that the PPP's 500-employee cap or SBA's methods for counting employees targeted religious exercise, arguing only that religious animus is not required, *see* Pl.'s. Opp'n at 25–26, a legal proposition that is not in dispute.

Plaintiff relies on only allegations that it is a religious institution, was denied loan forgiveness, was treated less "favorably" by defendants than "at least 25 other colleges—religious and secular," and that "[u]pon information and belief," defendants used the FTE method to calculate the number of employees for these "25 other colleges," but the headcount method to calculate plaintiff's number of employees.  *See* Am. Compl. ¶¶ 221–223, 344–45; *see* Pl.'s Opp'n at 27; Am. Compl., Ex. 8, ECF No. 15-9.  Accepting as true plaintiff's allegation that "SBA applied *a different standard* to these more than twenty-five other colleges," Am. Compl. ¶ 219, plaintiff still fails, except with respect to Husson University ("Husson"), to allege that defendants knew of plaintiff's religious affiliation or that any differential treatment was due to religion or otherwise to allege discriminatory intent.  Plaintiff, in addition, offers no facts to support its conclusory allegation that these 25 other colleges are similarly situated—much less similarly situated in all respects except religious affiliation.  *See id.* ¶¶ 7, 44, 218–39, 344 (alleging only that these 25 colleges were treated more favorably, without noting whether these other colleges have any religious affiliation); Pl.'s Opp'n at 20 (explaining that these 25 other colleges were not granted loan forgiveness at the same stage of proceedings, with some being granted loan forgiveness by SBA, and others being granted loan forgiveness "after an OHA appeal and reversal by SBA ALJ"); *see also Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 324 (D.C. Cir. 2015) (explaining that a "similarly situated" individual must be "nearly identical" in "all of the relevant aspects" (citation omitted)).[8]

The Husson example, undermines, rather than supports plaintiff's conclusory allegations of discrimination.  Plaintiff contends that Husson was in a "nearly identical situation[]" to

---

[8]     Indeed, plaintiff admits that several of these "25 other colleges" are religious institutions.  *See* Am. Compl. ¶ 344; *see also* Am. Compl., Ex. 8 (listing these colleges); Am. Compl. ¶¶ 390–91 (resting plaintiff's Establishment Clause claims on the difference in treatment between plaintiff and these "similarly situated religious colleges").

plaintiff except that plaintiff is "a religious college" and Husson is "a private secular university." Am. Compl. ¶¶ 237, 249–50.  Plaintiff thus argues that since "Husson won," *i.e.*, its loans were forgiven, and "Gordon lost," *i.e.*, its loans were not forgiven, this is outcome determinative and requires a finding of religious discrimination.  *Id.* ¶¶ 250, 348.  As plaintiff concedes, however, SBA treated Husson and plaintiff the same and denied loan forgiveness to both on the basis that each exceeded the PPP's 500-employee cap, though for different reasons.  *See id.* ¶¶ 172 (plaintiff), 240 (Husson).  When Husson and plaintiff administratively appealed their respective denials, SBA took the position, in both proceedings, that neither qualified for loan forgiveness because both "exceed[ed] the maximum allowable number of employees and the SBA small business size standards," though, again, for different reasons.  Am. Compl., Ex. 16 ("Initial Husson ALJ Decision") at 2, ECF No. 15-17; Initial ALJ Decision at 4–5.  Whereas the ALJ agreed with SBA in plaintiff's case, *see* Initial ALJ Decision at 1; *see also supra* Section I.B, a different ALJ disagreed with SBA in Husson's case, concluding, primarily, that SBA had erroneously counted part-time student employees on work study towards Husson's employee count, *see* Initial Husson ALJ Decision at 15 (explaining that doing so "would result in an anomalous outcome" by "prevent[ing] some small educational institutions from receiving PPP loans due solely to their provision of financial aid to students in the form of work study," and "result[ing] in the exclusion of small educational institutions whose part-time work study headcount dwarfs their full-time faculty and staff head counts").[9]  Plaintiff does not dispute that the question whether work-study students constitute "employees" was not at issue in its PPP loan forgiveness application or appeal, nor that, excluding work-study students, plaintiff still has more than 500 employees.  In sum, even setting aside the fact that Husson and plaintiff were not in

---

[9]    SBA sought reconsideration of Husson's case, arguing that the ALJ's conclusion was "clearly erroneous," but its petition was denied.  *See* Am. Compl., Ex. 18, ECF No. 15-19.

"nearly identical situations," Am. Compl. ¶ 250; *see also Scahill v. District of Columbia*, 909 F.3d 1177, 1186 (D.C. Cir. 2018) ("[T]he district court need not 'accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice." (quoting *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004))), plaintiff has failed to allege, where SBA took the same position in these "virtually identical" cases, Am. Compl. ¶ 346, that plaintiff was singled out or treated especially harshly—much less because of plaintiff's religious beliefs or affiliations.

To be clear, at this procedural juncture, the ALJ's analysis is not subject to review, as called for in plaintiff's APA and Due Process claims in Counts 1, 2, and 11, which defendants have not moved to dismiss.  Plaintiff's allegations are simply insufficient to allege that defendants had "as their object to infringe upon or restrict practices because of their religious motivation."  *Archdiocese of Wash.*, 897 F.3d at 331; *see also Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 475 (2020) ("distill[ing]" the Supreme Court's Free Exercise jurisprudence to stand for the "'unremarkable' conclusion that disqualifying otherwise eligible recipients from a public benefit '*solely because of their religious character*' imposes 'a penalty on the free exercise of religion that triggers the most exacting scrutiny'" (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017))).  The application of the PPP's 500-employee cap to plaintiff is thus neutral.

### 2. *General Applicability*

"A law is not generally applicable if it 'invites' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions,'" or "if it prohibits religious conduct while permitting secular conduct that undermines the

government's asserted interests in a similar way." *Fulton*, 593 U.S. at 533–34 (quoting *Emp. Div.*, 494 U.S. at 884).

The PPP does not provide "a mechanism for individualized exemptions" to the 500-employee cap and thus does not "give government officials discretion to decide whether a particular individual's reasons for requesting [an] exemption are meritorious." *We the Patriots USA, Inc. v. Conn. Off. of Early Childhood Dev.*, 76 F.4th 130, 150 (2d Cir. 2023). Without disputing this fact, plaintiff argues only that the question is not whether the PPP offers a mechanism for individualized exemptions, but, instead, is whether "SBA decisionmakers, ranging from initial loan forgiveness examiners to the SBA offices . . . to SBA OHA Administrative Law Judges to Defendant SBA Administrator Guzman all exercise substantial discretion in deciding whether and how to interpret and apply the relevant law, regulations, and published guidance to specific applications and appeals." Pl.'s Opp'n at 29; *see also id.* at 22–23. Plaintiff misunderstands the law, which provides that "where the State has in place *a system of individual exemptions*, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Emp. Div.*, 494 U.S. at 884 (emphasis added); *see, e.g.*, *Fulton*, 593 U.S. at 534–35 (framing the question as whether the law "permit[s] the government to grant exemptions based on the circumstances underlying each application," offering, as an example, a law that provides exceptions for "good cause," and finding that the refusal to extend to cases of "religious hardship" a law that expressly "incorporate[d] a system of individual exemptions, made available . . . at the 'sole discretion' of the Commissioner" was unconstitutional); *Tandon v. Newsom*, 593 U.S. 61, 64 (2021) (emphasizing that California's COVID restrictions expressly "contain[] myriad exceptions and accommodations" and thus "requir[e] the application of strict

29

scrutiny"). As plaintiff concedes, no such "system" exists here.[10] Rather, the 500-employee cap is a statutorily imposed limitation on PPP eligibility, and the PPP does not provide any mechanism for individual exemptions. As explained previously, to the extent plaintiff seeks to challenge the ALJ's decision, *see* Pl.'s Opp'n at 30 (arguing that the "mechanism for individualized exemptions" includes the ALJ's "discretion" "to limit the evidence that would be subject to judicial review" and "to reach inconsistent conclusions in the Husson and Gordon appeals"), it can still do so pursuant to its APA and Due Process claim in Counts 1, 2, and 11, which defendants have not moved to dismiss.

The PPP's 500-employee cap, in addition, does not "prohibit[] religious conduct while permitting secular conduct" and thus cannot do so in a way that "undermines the government's asserted interests in a similar way," *Fulton*, 593 U.S. at 534, for the reasons explained above, *see also* Am. Compl. ¶¶ 359–63 (alleging that the PPP prohibits "religious conduct while permitting secular conduct" by referring to plaintiffs' allegations about non-neutrality); *see also Lukumi*, 508 U.S. at 531 ("Neutrality and general applicability are interrelated."). The PPP's 500-employee cap is thus generally applicable.

### 3.   *Rational Basis Review*

The PPP's 500-employee cap is neutral and generally applicable and thus rational basis, rather than strict scrutiny, applies. "To succeed on a rational-basis challenge, a plaintiff must meet a demanding standard." *Sanchez v. Off. of State Superintendent of Educ.*, 45 F.4th 388, 395 (D.C. Cir. 2022). "[T]he policy choices of the political branches" are afforded "a strong

---

[10]   Plaintiff suggests that a mechanism for individual exemptions is embodied in 13 C.F.R. 134.122(d), which provides that the Administrator "may elect to review and/or reverse an initial OHA decision or a reconsidered initial OHA decision," Pl.'s Opp'n at 28 (quoting 13 C.F.R. 134.122(d)), but this argument fails, having not been raised in plaintiff's Amended Complaint, *see BEG Invs., LLC*, 85 F. Supp. 3d at 26 ("[A] complaint may not be amended by the briefs in opposition to a motion to dismiss.").

presumption of validity," and judicial intervention "is generally unwarranted no matter how unwisely a political branch has acted." *Id.* at 395–96 (alteration in original accepted) (quoting *Fed. Commc'ns Comm'n v. Beach Commc'ns*, 508 U.S. 307, 314–15 (1993)).  To succeed on a rational-basis challenge at the motion to dismiss stage, a "plaintiff must plausibly allege facts showing that no reasonable conceivable state of facts could provide a rational basis for the challenged policy"—a "demanding" and "unenviable" challenge.  *Id.*

Plaintiff makes little attempt to satisfy its burden here, arguing, in its Amended Complaint, only that strict scrutiny applies, without any reference to rational basis, and stating, in a conclusory fashion in opposition, that "[t]here is no rational basis to grant PPP loan forgiveness to more than 25 colleges that employed many more beyond the 500-employee cap SBA asserts and yet to deny such forgiveness to Gordon" and that "[t]he only rational approach here would be to grant PPP loan forgiveness to the one remaining college to which SBA has denied it— Gordon." Pl.'s Opp'n at 32.  Again, plaintiff misunderstands the law, appearing to rely on the colloquial definition of "rational" rather than addressing the operative question of whether the PPP's 500-employee cap rationally relates to a legitimate government interest.  It does.  SBA has a legitimate interest in supporting small businesses, and "limiting eligible borrowers to those that employ no more than 500 employees is rationally related to the goal of assuring businesses receiving aid are indeed small." Defs.' Mot. at 15.  Plaintiff has thus not plausibly stated that the PPP's 500-employee cap offends the Free Exercise or Equal Protection Clauses, and plaintiff's Free Exercise and Equal Protection claims are dismissed.

### C.     Denominational Preference Claim (Count 7)

The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I.  "[T]he clearest command of the Establishment

Clause is that one religious denomination cannot be officially preferred over another." *Trump v. Hawaii*, 585 U.S. 667, 699 (2018) (quoting *Larson v. Valente*, 456 U.S. 228, 244 (1982)); *see also Zorach v. Clauson*, 343 U.S. 306, 314 (1952) ("The government must be neutral when it comes to competition between sects."). When presented with a law granting a denominational preference, a court must "treat the law as suspect" and "apply strict scrutiny in adjudging its constitutionality." *Larson*, 456 U.S. at 246; *see also In re Navy Chaplaincy*, No. 19-5204, 2020 WL 11568892, at *3 (D.C. Cir. Nov. 6, 2020) (explaining that one way "[t]o state a claim under the Establishment Clause" is to allege that "the policy failed under *Larson v. Valente*, 456 U.S. 228 (1982), in that it granted a denominational preference without narrow tailoring to serve a compelling government interest").[11]

Plaintiff's allegations regarding the Establishment Clause are sparse, stating only that defendants violate the Establishment Clause "[f]or the same reasons that Defendants' actions violate the Free Exercise Clause," and that "Defendants have discriminated against [plaintiff], a Christian college with religiously and socially conservative views, by treating other, similarly situated religious colleges better than it has [plaintiff]." Am. Compl. ¶¶ 390–91. These allegations are insufficient to establish denominational preference. Plaintiff does not, for example, allege that any of the "other, similarly situated religious colleges" are of a different religious domination to plaintiff, that defendant exhibited a preference of one religion over another, or any other form of favoritism. In fact, plaintiff concedes that the PPP is facially

---

[11]     Under D.C. Circuit precedent, if a plaintiff cannot establish denominational preference, the plaintiff can state an Establishment Clause claim by alleging that a law "run[s] afoul of *Lemon v. Kurtzman*, 403 U.S. 602 (1971)." *In re Navy Chaplaincy*, 738 F.3d 425, 430 (D.C. Cir. 2013). The Supreme Court, however, recently overruled *Lemon* and "instructed that the Establishment Clause must be interpreted by reference to historical practices and understanding." *Bremerton Sch. Dist.*, 597 U.S. at 535 (citation omitted). The D.C. Circuit has not had the opportunity to consider the impact of *Bremerton School District*. Plaintiff, here, relies exclusively on denominational preference and does not rely on either *Lemon* or *Bremerton School District* to establish an Establishment Clause violation, and thus the impact of *Bremerton School District* need not be addressed.

neutral.  *See* Pl.'s Opp'n at 2; *see also In re Navy Chaplaincy*, 738 F.3d 425, 441 (D.C. Cir.

2013) ("*Larson* teaches that, when it is claimed that a denominational preference exists, the

initial inquiry is whether the law facially differentiates among religions.").  Plaintiff, in essence,

alleges only that plaintiff did not receive loan forgiveness and states, in a conclusory fashion,

that other similarly situated religious colleges did.  The Establishment Clause is not offended

simply because certain religious groups and organizations benefit from neutral government

programs, especially where plaintiff fails to allege that it was excluded "solely because of

religious status." *Espinoza*, 591 U.S. at 476 (citation omitted).  Plaintiff falls far short of stating

an Establishment Clause claim, and its Establishment Clause claim is dismissed.[12]

### D.  Religious Autonomy Claim (Count 8)

Together, the First Amendment's "Religion Clauses protect," *inter alia*, "the right of

churches and other religious institutions to decide matters of faith and doctrine without

government intrusion."  *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746

(2020) (citation omitted).  "State interference in that sphere would obviously violate the free

exercise of religion, and any attempt by government to dictate or even to influence would

constitute one of the central attributes of an establishment of religion."  *Id.*  Although the First

Amendment protects religious institutions' "autonomy with respect to internal management of

decisions that are essential to the institution's central mission," religious institutions do not

"enjoy a general immunity from secular laws."  *Id.*

---

[12]     Plaintiff does not meaningfully respond to defendants' Establishment Clause arguments and dedicates only two paragraphs of its 35-page opposition to its Establishment Clause claim, which paragraphs purport to provide only the applicable legal standard.  *See* Pl.'s Opp'n at 33–34.  Although plaintiff has thus arguably conceded that it has failed to state an Establishment Clause claim, plaintiff's claim is dismissed on the merits, rather than as conceded.  *See CSX Transp., Inc. v. Com. Union Ins. Co.*, 82 F.3d 478, 482–83 (D.C. Cir. 1996) (explaining that when a party fails to respond to an argument raised by another party, or even when the response is "somewhat half-hearted," the party has "waived the issue").

Here, plaintiff alleges that "[d]efendants have interfered with the autonomy of [plaintiff] to define its own doctrine, membership, employment, staffing, affiliation, and other internal requirements" by "insisting on certain require-ments [sic] for determining staffing and employment, including the definition of 'employee,'" thereby imposing "counting pressures" on plaintiff "to reduce its 'headcount' or the number of employees otherwise attributed to [plaintiff]."  Am. Compl. ¶¶ 402–03, 406, 408.  As explained above, *see* Section III.A, plaintiff has failed to allege that having more than 500 employees is "essential" to its "central mission," or to explain why the PPP's 500-employee cap or defendants' application thereof interfered with any "matters of faith and doctrine."  Plaintiff's religious autonomy claim is thus dismissed.[13]

## IV.    CONCLUSION

For the foregoing reasons, even with all the facts and assumed inferences drawn in its favor, plaintiff has failed to state a claim under RFRA, the Free Exercise Clause, the Equal Protection Clause, or the Establishment Clause.  Accordingly, defendant's Partial Motion to Dismiss, ECF 16, is **GRANTED**.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  July 18, 2024

_____
**BERYL A. HOWELL**
United States District Judge

---

[13]    Again, plaintiff does not meaningfully respond to defendants' religious autonomy arguments and dedicates only two paragraphs of its 35-page opposition to its religious autonomy claim, which paragraphs purport only to provide the applicable legal standard.  *See* Pl.'s Opp'n at 34–35.  Although plaintiff has thus arguably conceded that it has failed to state an Establishment Clause claim, plaintiff's claim is dismissed on the merits, rather than as conceded.  *See CSX Transp., Inc.*, 82 F.3d at 482–83.