**UNITED STATES SMALL BUSINESS ADMINISTRATION**
**OFFICE OF HEARINGS AND APPEALS**

**APPELLANT GORDON COLLEGE'S**
**APPEAL PETITION FOR REVIEW OF**
*PAYCHECK PROTECTION PROGRAM FINAL SBA LOAN REVIEW DECISION*

| | |
|---|---|
| *Borrower:* | GORDON COLLEGE |
| *SBA Loan No.:* | 8289087101 |
| *Approved Loan Amount:* | $7,046,037.00 |
| *Loan Approval Date:* | 04/15/2020 |
| *Lender Forgiveness Decision Submission Date:* | 09/03/2021 |
| *Lender Forgiveness Decision Amount:* | $7,046,037.00 |
| *SBA Final Forgiveness Amount:* | $ 0.00 |

Appellant Gordon College, a religious nonprofit institution of higher education located in Wenham, Massachusetts, by and though its undersigned legal counsel, hereby submits this Appeal Petition to the Small Business Administration ("SBA") Office of Hearings and Appeals ("OHA").

*(1)* ***Decision Below***. Appellant seeks review and reversal of the *Paycheck Protection Program Final SBA Loan Review Decision* dated April 12, 2022 (the "*Loan Decision*") and received by Appellant on April 13, 2022. A copy of this *Loan Decision* is attached as Exhibit 01.

*(2)* ***Basis for Jurisdiction***. The OHA has jurisdiction of this appeal pursuant to 13 CFR § 134.1204. This appeal is timely filed under 13 CFR § 134.1204 *et seq.* The *Paycheck Protection Program Final SBA Loan Review Decision* is dated April 12, 2022. Appellant Gordon College first received the *Loan Decision* (via its lender, Citizens Bank, National Association) via email the following day on April 13, 2022.[1] Gordon College is timely filing this appeal on May 12, 2022.

*(3)* ***Standard of Review***. The *Loan Decision* was based on a clear error of fact or law and must be reversed. *See* 13 CFR § 134.1210. Review of the evidence in this appeal inexorably leads to a

---

[1] A copy of the email from Citizens Bank, National Office transmitting the SBA Loan Review Decision and dated April 13, 2022, is attached as Exhibit 02.

definite and firm conviction that a mistake has been committed by the SBA reviewer.[2]

*(4)    Relief Sought by Appellant*. Appellant Gordon College respectfully requests that the Office of Hearings and Appeals ("OHA") reverse the SBA's final *Loan Decision* and grant Gordon College full forgiveness of its Paycheck Protection Program ("PPP") loan in the Approved Loan Amount of $7,046,037.00. Reversal of the final Loan Decision and granting full forgiveness, rather than remand, is proper because SBA's decision to deny forgiveness was premised upon clear legal and factual errors. Further, when the correct standard is applied, the record demonstrates that Gordon satisfied the applicable requirements for PPP loan eligibility and for PPP loan forgiveness.

*(5)    Statement Of Why the SBA Loan Decision Is Erroneous*. The SBA's final *Loan Decision* retroactively overruled SBA's April 15, 2020 determination that Gordon College was eligible for its PPP loan and on that basis alone denied Gordon's application for forgiveness of its $7,046,037 PPP loan. The entire reason stated in the SBA *Loan Decision* is as follows:

> After review of the documentation provided, the SBA concludes the Borrower business, or together with its affiliates, exceeds the maximum allowable number of employees and the SBA small business size standards.

> A thorough analysis of the IRS 941 reports and additional supporting documentation confirms that the borrower exceeded the maximum allowable number of employees and therefore does not qualify under the SBA small business size standard qualifications for a Paycheck Protection Program loan. Furthermore, the borrower is listed as 501(c)(3), and therefore is not eligible under the alternative size standard industry qualifications. The Alternative Size Standard Qualifications are limited to for-profit entities, that do not qualify for a PPP loan under the traditional NAICS Employee-Based Size Standard Industry criteria.

This *Loan Decision* is based on clear errors of fact and of law and must be reversed. *See* 13 CFR § 134.1210. The specific reasons are set forth below and expanded upon in the following sections.

**First**, the *Loan Decision* makes a clear error by applying the wrong legal standard. As

---

[2] *See, e.g., Concrete Pipe & Prods. of Cal. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602 (1993); *PGBA, LLC v. United States*, 389 F.3d 1219, 1224 (Fed. Cir. 2004).

explained below, the SBA Examiner retroactively applied a standard for determining the number of employees for PPP loan *eligibility* purposes **that did not exist** at the time Gordon submitted its application on April 13, 2020. Rather, Gordon College relied in good faith upon the public guidance provided by SBA and Department of Treasury ("Treasury") at the time, as it was expressly authorized to do under SBA's PPP FAQ #17 (quoted below).

Gordon College's application was completely submitted to the SBA Portal by lender Citizen's Bank by no later than April 13, 2020. The Loan Application thus was beyond Gordon's control by April 13, 2020. The Loan Application was approved by SBA by April 15, 2020. The Loan Agreement was executed by both parties by no later than April 23, 2020.

At each such time, all publicly available SBA/ Treasury guidance either was silent on this or indicated that an applicant should determine its number of employees for purposes of the 500 employee maximum for PPP loan eligibility by calculating full-time equivalent employees ("FTEs"). Indeed, the SBA's Loan Application form at that time required that Gordon certify that:[3]

> The applicant will provide to the Lender documentation *verifying the number of **full-time equivalent employees** on the Applicant's payroll* as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities for the eight-week period following this loan. [emphasis added]

The first public guidance even suggesting that SBA would determine number of employees for purposes of PPP loan eligibility by using a "headcount" method was issued on April 26, 2020, **after all** these dates and two weeks after Gordon's loan was submitted to SBA. The certification on the Loan Application form remained unchanged through multiple iterations until January 2021.

**Second**, there is a second clear error by SBA in retroactively overruling its April 2020

---

[3] This was the fourth certification. "Instructions for completing this form" (p.3-4) in April 2020 did not address the formula for how to count number of employees nor in any way suggest that the certification's requirement to verify *full-time equivalent employees* was only for forgiveness and not eligibility purposes.

legal and factual determinations. On its April 13, 2020 Loan Application, and at all times since, Gordon consistently listed its total number of employees for determining loan eligibility as **495.67**. On its face, that is a precise FTE calculation, not a "headcount." (No employee has "0.67" of a "head" to count.). SBA originally determined that Gordon was eligible for a PPP loan on April 15, 2020 using this FTE calculation. This was clearly correct at that time. Yet two years later, the SBA examiner re-visits and retroactively overrules SBA's earlier (correct) determination by retroactively applying *ex post facto* a headcount test not in existence at time of application.

**Third**, the SBA *Loan Decision* under appeal utterly disregards SBA PPP FAQ #17 issued April 6, 2020 (and repeated in every PPP FAQ since that time) which expressly provides:

> **Question**: I filed or approved a loan application based on the version of the PPP Interim Final Rule published on April 2, 2020. Do I need to take any action based on the updated guidance in these FAQs?

> **Answer**: No. *Borrowers and lenders may rely on the laws, rules, and guidance available at the time of the relevant application.* However, borrowers whose previously submitted loan applications have not yet been processed may revise their applications based on clarifications reflected in these FAQs. [emphasis added)]

Gordon College's application was submitted to SBA on April 13, 2020; SBA approved the loan on April 15, 2020; all loan documents were executed on or before April 23, 2020. PPP FAQ #17 requires that SBA determine Gordon's loan eligibility by applying the guidance that existed on April 13, 2020, and not retroactively applying rules that were only subsequently promulgated.

**Fourth**, not only is this a clear error of law, it also causes serious detrimental reliance harms to Appellant. For two full years, Gordon has relied in good faith and to its substantial detriment on FAQ #17, on the SBA Loan Application form, and on all SBA/Treasury regulations and guidance that had been publicly issued by SBA/Treasury when Gordon submitted its Loan Application on April 13, 2020. Gordon College in good faith reliance has expended all of its $7,046,037.00 PPP loan on employee payroll and benefits to retain its employees – precisely the

purposes of the PPP loan program. Gordon fully satisfied all *eligibility* requirements that existed at the time it applied. Gordon satisfies all **forgiveness** requirements that existed at the time it applied for forgiveness and that currently govern the forgiveness determination. Gordon is entitled to rely, and has relied to its great detriment, on the "laws, rules, and guidance available at the time of the relevant application".

**Fifth**, the SBA examiner's final *Loan Decision* in Appellant's case contradicts other decisions by other SBA Examiners involving substantially similar Borrowers and relevant facts. These include SBA using an FTE analysis in April 2020 to determine that other applicants satisfied all *eligibility* requirements for a PPP loan, and then subsequently determining that the same applicants also satisfied all requirements for PPP loan *forgiveness*. This has occurred even where the other applicants have as many or more employees at time of loan application and at time of loan forgiveness as does Appellant, as determined by the same IRS Form 941 responses that the specific SBA examiner and thus the final *Loan Decision* used here. This comparative data is provided on the spreadsheet attached as Exhibit 11 to this Appeal Petition.[4]

**Sixth**, it is a separate but extremely serious clear error for SBA to apply different legal and factual standards to other Borrowers who are similarly situated to Appellant. On its face, such distinctions are discriminatory and arbitrary, and likely even capricious. But further, by applying differential standards to Appellant Gordon College, a nonprofit religious private college, than to

---

[4] This spreadsheet provides data for specific comparable loans and borrowers extracted from SBA's internal records that have been publicly posted at https://data.sba.gov/dataset/ppp-foia and specifically the datafile publicly posted at https://data.sba.gov/dataset/ppp-foia/resource/501af711-1c91-477a-80ce-bf6428eb9253. OHA and its Administrative Law Judges may take judicial notice of SBA's own internal records and databases, particularly when as here those same records have also been made publicly available pursuant to the Freedom of Information Act. Appellant could not have submitted this factual data at any prior stage in these proceedings because until the SBA issued its Loan Decision it was not possible for Gordon to know what, if any, of this information was relevant. And there is no prejudice or even inconvenience to SBA for the OHA ALJ to consider SBA's own internal records.

similar non-religious colleges, the SBA *Loan Decision* may discriminate on the basis of religion in violation (among others) of the First and Fourteenth Amendments to the U.S. Constitution[5] and of the federal Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb-1.[6] Such disparate treatment would also be contrary to the CARES Act itself and to the *Frequently Asked Questions Regarding Participation of Faith-Based Organizations in the Paycheck Protection Program (PPP) and the Economic Injury Disaster Loan Program (EIDL)* (April 3, 2020)[7] at Section 2:

> The PPP and EIDL loan programs are neutral, generally applicable loan programs that provide support for nonprofit organizations without regard to whether they are religious or secular.... In addition, the CARES Act does not impose unique burdens or limitations on faith-based organizations.

### 6.    *Factual Background.*

### 6.1.    **The Borrower – Appellant Gordon College**.

Appellant and Borrower here is Gordon College, a private religious college located in Wenham, Massachusetts. Gordon and other colleges were particularly hit hard by the national and state orders to shelter-in-place beginning in March 2020 due to COVID-19. The lockdowns created serious practical, financial, and even existential issues for colleges, particularly those focused on residential undergraduate education, like Gordon. How long would lockdowns last – months, semesters, or (academic) years? How would they impact summer programs that help provide needed year-round revenue? What would be the costs to retool for distance learning? Would colleges have to refund tuition and fees and room and board?

Further, Gordon College, like most colleges, has a vast array of types of employees that

---

[5] *See, e.g., Tandon v. Newsom*, 141 S.Ct. 1294, 1296 (2021) (per curiam) ("government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise."). *See also Fulton v. City of Phila.*, 141 S.Ct. 1868 (2021).

[6] RFRA applies to SBA as a federal governmental agency.

[7] Available at https://www.sba.gov/document/support-faq-regarding-participation-faith-based-organizations-ppp-eidl

span full-time, part-time, and those who earn just a few hours of pay each week. Operations of a small college campus require numerous part-time workers in such diverse areas as classroom instruction, groundskeeping, food service, and plant and facility maintenance. Student employees seek part-time work for even a few hours a week to offset their costs of attending the college. Student aid packages often provide for students to work a certain number of hours per semester. Summer programs require seasonal staff and Gordon often hires its own students to serve in those summer programs. In one calendar year, there are two different payrolls given the two different academic years. Employees change frequently at the transition from one school calendar year to another. Part-time turnover is especially frequent. This is typical of most college campus operations. Yet it means that any "headcount" assessment of employees would vastly distort actual employment and payroll at colleges and that FTE assessment is more accurate and realistic.

**6.2.    The Novel Paycheck Protection Program ("PPP")**. The SBA was given an almost impossible task – to administer a brand new Paycheck Protection Program loan program urgently authorized by Congress in a time of national crisis, a worldwide pandemic, and national and state ordered shelter-in-place orders. The duty of establishing rules and guidance to clarify uncertainty and confusion in the loan application and forgiveness process fell to the Treasury and the SBA. SBA and Treasury rolled out new rules, guidance, and clarifications every few days that were eagerly anticipated and devoured by borrowers and their attorneys and CPAs to understand such critical issues as loan eligibility and loan application procedures.

Many faith-based organizations such as Gordon College delayed applying due to needing clarification of their eligibility and the impact on their organizations of receiving federal PPP loans. Other organizations, including Gordon, were held up by the inability of larger banks to develop the technology and systems to receive and process loan applications. Uncertainty abounded.

When the PPP program was announced, the government stated frankly and frequently that

funds were limited and the program would operate on first come, first serve until the funds ran out

or the program terminated on June 30, 2020. News media compounded this urgency. There was a

rush to apply for this limited pool of funds for which applications would open on April 3, 2020,

which ran headlong into the need for rules and guidance that was yet to be forthcoming. Both

Treasury and SBA were issuing rules and guidance at the same time that PPP applications were

flooding in. Interim Final Rules, SBA/Treasury instructions and guidance, and an evolving list of

FAQs were cumulative and ongoing throughout the PPP loan application process. Different rules

were available to applicants depending on when the applicant applied for the PPP loan.

Lenders – both national and community banks – were also overwhelmed as they were

enlisted into the process as well. Some banks halted intake of loan applications due to technological

issues of syncing up with the SBA portals, while at the same time media and government

representatives were touting the limited funds and the need to hurry up and apply before the PPP

funds ran out. Gordon College signed its application on April 6, 2020, yet its bank, Citizens Bank

had to halt intake of PPP loan applications due to technical issues, and it was a week until Citizens

Bank submitted the Gordon College PPP loan application to SBA on April 13, 2020.

Small businesses and nonprofits were overwhelmed in trying to discern how long, and what

the impact national lockdowns would have on their respective businesses and organizations.

Executives, business owners, and college administrators were all grappling with the loss of

consumers of their goods and services and the loss of operational revenues. For example, Gordon

College students were on spring break at the time of the lockdown and would not be returning to

campus that semester due to national and state-wide shelter in place orders.

Many aspects of the PPP program are outside of regular SBA experience and jurisdiction.

SBA was conscripted to serve as the administrator of a program that had few rules at the beginning

and was unprecedented in size, impact, and necessity.  SBA primarily handles loan programs for

small businesses, not nonprofits, let alone religious and educational nonprofits. SBA itself was under enormous pressure to get the program up and running immediately. It was a gargantuan task.

There were many issues that needed clarification and rules and guidance for both borrowers and lenders to be developed, announced, and implemented. However, the urgency factor and the crush of applicants at the beginning due to all the uncertainty of economic survival created a clash between access to a much needed program and the lack of clear guidance. The question in any review of SBA application with two years of hindsight is what a prudent employer, facing the imminent financial threat as a result of a national shelter-in-place order and state shutdown related to the COVID-19 virus pandemic, must do to certify in good faith the information and specific certifications required in the SBA's PPP Loan Application. That should guide what Gordon College should have known when its Loan Application was submitted to SBA on April 13, 2020.

Employers across the country analyzed what was available at the time of certification and submission, examined the limited guidance provided by SBA and Treasury, and made reasonable good faith decisions in calculating the maximum loan amount and number of employees. With burdensome penalties for knowingly making a false statement, it was difficult for loan applicants to secure adequate unambiguous guidance on many issues, even though clear guidance was needed to be absolutely certain that all information provided in the application and supporting documents was true and accurate in all material respects. In fact, early in the PPP program, some lenders had virtually no guidance even as to what documents the applicants were to submit. Additionally, it was unclear whether nonprofit organizations would be eligible as a "small business", what size standards would be applied, and if so what did faith-based nonprofit organizations give up in ways of autonomy or other concerns by applying for a PPP loan.

Thus began a series of Interim Final Rules and sequentially numbered Frequently Asked Questions (FAQs) posted on the PPP Loan website issued by SBA and Treasury. These were

cumulative and rolling in nature and the applicant only had available to it the relevant laws, rules and guidance at the time of completing and filing its application for the PPP loan.

**7.        Timeline of SBA/Treasury PPP Loan Application Guidance.**

The following analysis focuses on the laws, rules and guidance available to Gordon College as of April 13, 2020, the date Appellant's PPP Loan Application was submitted to SBA, particularly related to the size standards, definitions of employees, or how to count employees.

**7.1    *The CARES Act - effective 03-27-22***. The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") was enacted by Congress on March 27, 2020. The CARES ACT provided the definition of "employee" for purposes of this PPP loan program:

> (v) EMPLOYEE. — For purposes of determining whether a business concern, non-profit organization, veterans organization, or Tribal business concern described in section 31(b)(2)(C) employs not more than 500 employees under clause (i)(I), **the term 'employee' includes individuals employed on a full-time, part-time, or other basis**. [emphasis added]

There are only three uses of the term "part-time employee" in the CARES Act and none define the term. The term "headcount" is not used in the CARES Act. There is no formula for counting employees provided in the CARES Act. The Act made it clear that part-time employees were "included" in the <u>definition</u> of employee but did not address how to calculate the sum of these full-time and part-time employees into a total number. At least until the issuance of FAQ #36 on April 26, 2020, it was unclear for purposes of determining the 500 maximum number of employees for PPP loan eligibility whether such part-time employees are each counted as one employee (regardless of any specific part-time threshold hours standard) – a "headcount" formula – or whether the full-time equivalent (FTE) calculation was appropriate. Although the CARES Act did not address the formula for calculation of 500 employee threshold, SBA and Treasury announced that SBA would begin taking applications for the PPP Loan on April 3, 2020.

**7.2    *Treasury PPP Website PPP Loan Information -provided 03/31/2020***.  On March 31,

2020, the special PPP section of the Treasury Department website provided four new documents:

- PAYCHECK PROTECTION PROGRAM APPLICATION FORM – OMB Control No.: 3245-0407 Expiration Date: 09/30/2020 [Exhibit 03]
- SMALL BUSINESS PAYCHECK PROTECTION PROGRAM [Exhibit 04]
- PAYCHECK PROTECTION PROGRAM (PPP) INFORMATION SHEET LENDERS [Exhibit 05]
- PAYCHECK PROTECTION PROGRAM (PPP) INFORMATION SHEET: BORROWERS [Exhibit 06]

In these four documents, the following information is provided about size standards and/or calculation of number of employees.

**7.2.1    Paycheck Protection Program Application Form**. The PPP Application Form itself stated that the Borrower should provide the Lender documentation verifying the number of full-time equivalent employees. The PPP Application Form available in April 2020 and that Gordon used did not state that this was for forgiveness only; it did not even state that it was for forgiveness or any other specific purposes at all. Gordon's PPP Borrower Loan Application Form, including the instructions at that time, was certified by Stephen Lacorazza, Director of Finance and Controller, Gordon College on April 06, 2020, and filed with SBA by Citizens Bank on April 13, 2020.[8] Page two of that Form requires the Borrower to make certifications that include:

> The applicant will provide to the Lender documentation *verifying the number of **full-time equivalent employees** on the Applicant's payroll* as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities for the eight-week period following this loan. [emphasis added]

Pages three and four of the form provided "Instructions for completing this form". These instructions did not address any formula for how to count the number of employees, nor undermine the emphasis in the certification on verifying the number of *full-time equivalent employees* on the Applicant's payroll as only for the forgiveness application purposes. At the time of the initial PPP

---

[8] A copy of Gordon's completed Application Form is attached as <u>Exhibit 03</u>. This Application Form consisted of two pages of the application form and applicant certifications and two pages of instructions.

Application Form, the form was stylized for businesses, and not for nonprofits.[9]

### 7.2.2   Small Business Paycheck Protection Program. The only reference to employee

numbers or size standards in this one page memo summarizing the PPP program was the following:

> All Small Businesses Eligible. Small businesses with 500 or fewer employees—including nonprofits, veterans organizations, tribal concerns, self-employed individuals, sole proprietorships, and independent contractors— are eligible. Businesses with more than 500 employees are eligible in certain industries.

### 7.2.3   Paycheck Protection Program (PPP) Information Sheet: Lenders. There are no

references in this document to number of employees or size standards.

### 7.2.4   Paycheck Protection Program (PPP) Information Sheet: Borrowers.  Relevant

information is found on page 1 and page 3. It answers the question "Who can apply?" by stating:

> All businesses – including nonprofits . . . with 500 or fewer employees can apply. Businesses in certain industries can have more than 500 employees if they meet applicable SBA employee-based size standards for those industries.

The question "How can I request loan forgiveness?" receives the following answer:

> You can submit a request to the lender that is servicing the loan. The request will include documents that verify *the number of full-time equivalent employees*.... [emphasis added]

On pages 3-4, the document repeats the certifications and informs a borrower applying for

forgiveness of a PPP loan that "as part of your application, you will need to certify in good faith. . ."

and again references the full-time equivalent documentation that the applicant will provide to the

lender for the eight-week period of the loan:

> You will provide to the lender documentation that verifies **the number of full-time equivalent employees** on payroll and the dollar amounts of payroll costs. [emphasis added]

---

[9] For example, it asked for Applicant Ownership and required the applicant to "list all owners of Applicant with greater than 20% ownership stakes." Federally tax-exempt organizations such as Gordon College are not owned by any individuals or companies. Many of the questions required to have a yes or no answer also applied to businesses and not nonprofit organizations. This Form is available at https://home.treasury.gov/system/files/136/PPP-Borrower-Application-Form-Fillable.pdf

It was not until April 26, 2020 that SBA clarified that the full-time equivalent employees analysis was *not* to be the standard for PPP loan *eligibility* when counting to 500 employees, but only the standard for *forgiveness* of PPP loans. Prior to April 26, 2020, nothing in these documents or the CARES Act and related FAQs and Interim Final Rules provided by SBA or Treasury stated that the full-time equivalent employee standard would not apply for *eligibility*. To the contrary, the references to full-time equivalent employees and documentation that the applicant had to provide to the lender strongly indicated that full-time equivalent employees were an acceptable form of "counting" to get to 500 employees. In good faith, Gordon College provided its FTE calculations on its Loan Application Form, stating clearing that the number of employees was 495.67.

### 7.3    *Interim Final Rule Issued April 2, 2020*.

This 31-page Interim Final Rule ("IFR") was first posted on April 2, 2020 and published April 15, 2020.[10] Its stated purpose was to outline "the key provisions of SBA's implementation of sections 1102 and 1106 of the Act in formal guidance". It provides (in pertinent part):

> 2. What Do borrowers Need to Know and Do?
> a. Am I eligible?
> You are eligible for a PPP loan if you have 500 or fewer employees whose principal place of residence is in the United States, or are a business that operates in a certain industry and meet the applicable SBA employee-based size standards for that industry, and:
>> i. You are: …….
>>> B. A tax-exempt nonprofit organization described in section 501(c)(3) of the Internal Revenue Code (IRC) . . .

There is no guidance regarding calculation of number of employees and no reference to a definition of employee or "part-time" employee included. There is, however, a reference to "full-time equivalent employees" at section 2(t)(iv), where it again repeats the required certification that the borrower will provide " [d]ocumentation verifying the number of *full-time equivalent employees*

---

[10] 85 F.R. 20811 (Apr. 15, 2020). Copy attached as Exhibit 07. Also available at:
https://home.treasury.gov/system/files/136/PPP--IFRN%20FINAL.pdf

*on payroll....*" [emphasis added]

**7.4    *Frequently Asked Questions Regarding Participation of Faith-Based Organizations in the Paycheck Protection Program (PPP) and the Economic Injury Disaster Loan Program (EIDL)– issued April 3, 2020.***

On April 3, 2020, the SBA issued specific guidance as to whether nonprofits and faith-based organizations such as Gordon College could apply for the PPP loan without impunity or impact on its tax-exempt status, in its *Frequently Asked Questions Regarding Participation Of Faith-Based Organizations In The Paycheck Protection Program (PPP) and the Economic Injury Disaster Loan Program (EIDL)* and provided FAQs #1 –8 (attached as Exhibit 08). Information on size standards for nonprofits was provided at Question 8:

> 8. How do I know where my organization fits in SBA's size standards table? Should I use the table to determine whether my organization is a small business that is eligible to participate in the PPP program?
>
> SBA's size standards can be found at 13 CFR § 121.201. Under the CARES Act, a non-profit organization qualifies as small, and is eligible for assistance, if (1) it has no more than 500 employees or (2) the NAICS code associated with its primary industry has a higher employee-based size standard. Some industries—including "religious organizations"—are currently listed in the size standards table with a monetary cap on annual receipts rather than an employee-based size standards cap. For nonprofit organizations whose primary industry is listed with a monetary cap on annual receipts, the size standards table therefore cannot be used to determine eligibility for the PPP program. Faith-based nonprofit organizations that do not fall under a primary industry that is listed with an employee-based size standard must have 500 employees or fewer to be considered small.[11]

**7.5    *Interim Final Rule on Affiliations Issued April 3, 2020; Effective April 15, 2020.***

The stated purpose of this IRF on Affiliations ("IFR-AFF") was to supplement the "Initial Rule" (see 7.3 above) "with additional guidance regarding the application of certain affiliate rules applicable to SBA's implementation of sections 1102 and 1106 of the [CARES] Act". [12]

---

[11] The SBA Loan Decision similarly stated that SBA industry size standards do not apply to Appellant.

[12] This IFR-AFF was published at 85 F.R. 20817 (Apr. 15, 2020) and is also available at:

This IFR-AFF was a significant determination for Faith Based Organizations (FBOs) as it exempted FBOs from the SBA affiliation rules "where the application of the affiliation rules would substantially burden those organizations' religious exercise." Generally, a borrower was considered together with its affiliates for purposes of determining eligibility for the PPP. Affiliates were generally identified by having such factors as stock ownership, overlapping management, and identity of interest. Of particular interest is how the IFR-AFF addressed the conflict between the SBA's existing affiliation rules for small businesses and the application of those rules to FBOs.

Prior to the CARES Act, nonprofits were not eligible for SBA Business Loan Programs under section 7(a) of the Small Business Act. The CARES Act not only made nonprofits eligible for the PPP but subjected them to the SBA affiliation rules (Section 1102 of the Act stated this explicitly). The IFR-AFF exempts FBOs from these SBA affiliation rules listed in 13 CFR part 121 because application of those rules to FBOs would impose a substantial burden on their free exercise of religion. The IFR-AFF further revised Section 121.103(b) by adding subsection (b)(10) addressing those free exercise considerations and explaining both the process for a Faith Based Organization to acknowledge that the FBO would have been an eligible borrower but for the application of the SBA rules and how the FBO can assert that exemption on its loan application.

In this IFR-AFF, SBA/Treasury acknowledged that nonprofits were not eligible for the previously existing SBA Business Loan section 7(a) and that some long-established rules provided for that regular SBA program not open to nonprofits would work to the detriment of the faith-

---

https://www.federalregister.gov/documents/2020/04/15/2020-07673/business-loan-program-temporary-changes-paycheck-protection-program

https://www.govinfo.gov/content/pkg/FR-2020-04-15/pdf/2020-07673.pdf

*See also Affiliations Rules Applicable to U.S. Small Business Administration Paycheck Protection Program* outlining tests for affiliation posted on treasury.gov on April 3, 2020 at Borrower Information at: https://home.treasury.gov/system/files/136/Affiliation%20rules%20overview%20%28for%20public%29.pdf

based nonprofit securing the desperately needed PPP loan funds.

**7.6** *Treasury FAQs Posted as of April 13, 2020 – date of Gordon College PPP Application Submission to SBA.*

To assist borrowers, Treasury posted on its website Frequently Asked Questions (FAQs) and the answers on a continually updated basis. There were 25 FAQs issued as of the date of the filing of the Gordon College loan application with SBA on April 13, 2020. [Exhibit 09] Of these first 25 FAQs publicly available to Gordon at the time of its certifications and submission of its PPP loan application, only two FAQs tangentially reference number of employees:

**FAQ #3** clarified that PPP loans "are also available for qualifying tax-exempt nonprofit organizations described in Section 501(c)(3) of the Internal Revenue Code (IRC). . . *that have 500 or fewer employees whose principal place of residence is in the United States, or meets the SBA employee-based or revenue-based size standards for the industry corresponding to its primary industry*." [emphasis added] There are no SBA employee-based standards for Gordon's industry of higher education (NAICS 611310 Colleges, Universities and Professional Schools).[13] As discussed above in Section 7.4, for those industries with only a compensation standard and not a size standard, the size standards table cannot be used. Additionally, "Faith-based nonprofit organizations that do not fall under a primary industry that is listed with an employee-based size standard must have 500 employees or fewer to be considered small."

As originally posted by SBA/Treasury,[14] **FAQ #14** provided:

**Question**: What time period should borrowers use to determine their number of employees and payroll costs to calculate their maximum loan amounts?

---

[13] *See* Size Standards Table, *U. S. Small Business Administration Table of Small Business Size Standards Matched to North American Industry Classification System Codes*, at page 38, attached as Exhibit 10 and also available at: https://www.sba.gov/sites/default/files/2022-05/Table%20of%20Size%20Standards_Effective%20May%202%202022_Final.pdf

[14] The original version of FAQ #14 is no longer posted on the SBA site. Footnote 17 to the version of FAQ #14 currently posted at www.SBA.gov explains the edits to the text.

**Answer**: In general, borrowers can calculate their aggregate payroll costs using data either from the previous 12 months or from calendar year 2019. . . Borrowers may use their *average employment over the same time periods to determine their number of employees*, for the purposes of applying an employee-based size standard. [emphasis added]

The answer addressed which time periods to use when calculating number of employees for purposes of applying an employee-based size standard. However, Gordon College had no such employee-based size standard available to it as a faith-based nonprofit organization.

The most critical of these FAQs to the argument that the SBA decision below failed to take into consideration is the ability of an applicant to rely on the laws, rules, and guidance provided as of the date the employer applies for the PPP loan. **FAQ #17** issued April 06, 2020 provided:

**Question**: I filed or approved a loan application based on the version of the PPP Interim Final Rule published on April 2, 2020. Do I need to take any action based on the updated guidance in these FAQs?

**Answer**: No. *Borrowers and lenders may rely on the laws, rules, and guidance available at the time of the relevant application.* However, borrowers whose previously submitted loan applications have not yet been processed may revise their applications based on clarifications reflected in these FAQs. [emphasis added]

Gordon College was entitled to rely on the laws, rules and guidance available at the time of its application that was submitted to SBA on April 13, 2020.

### 7.7    *Treasury FAQ #36 – Issued April 26, 2020 -- Clarification on 500 Employee Calculation*.

Only *after* Gordon College's PPP Loan Application was submitted to SBA on April 13, 2020, approved by SBA on April 15, 2020, and all loan documents executed by April 23, 2020, Treasury/SBA issued a new FAQ #36 on April 26, 2020. Although the CARES Act did not address headcount or prescribe a formula as to how to count employees for *eligibility* for the PPP loan, FAQ #36 articulated a new formula for how to count the 500 employee threshold for *eligibility*, resulting in two different "counting" formulas – headcount for eligibility and FTE for forgiveness.

**FAQ #36.**

**Question**: To determine borrower eligibility under the 500-employee or other applicable

threshold established by the CARES Act, must a borrower count all employees or only full-time equivalent employees?

**Answer**: For purposes of loan eligibility, the CARES Act defines the term employee to include "individuals employed on a full-time, part-time, or other basis." *A borrower must therefore* calculate the total number of employees, including part-time employees, when determining their employee headcount for purposes of the eligibility threshold. For example, if a borrower has 200 full-time employees and 50 part-time employees each working 10 hours per week, the borrower has a total of 250 employees. By contrast, for purposes of loan forgiveness, the CARES Act uses the standard of "fulltime equivalent employees" to determine the extent to which the loan forgiveness amount will be reduced in the event of workforce reductions. [emphasis added]

When on April 26, 2020 FAQ #36 first became the rule for counting employees to determine PPP loan *eligibility*, Gordon College had already filed two weeks earlier its application listing its number of employees as 495.67, clearly indicating that it had used FTE calculations as the calculation method. On that basis, SBA had already approved its loan application and both Gordon and its lender had fully executed the PPP loan documents. The SBA Loan Review Decision commits clear error by applying the April 26, 2020 headcount eligibility standard retroactively to Gordon College's April 13, 2020 PPP loan application to deny Gordon's forgiveness application.

**8.    *Appellant Gordon College's Detrimental Reliance*.**

As discussed above, FAQ #17 issued on April 6, 2020, early in the process, but not so early that many borrowers had already submitted their applications and even received PPP loan funding. Nonetheless, SBA/Treasury made it explicit April 06, 2020 in FAQ #17 that an applicant was only to be held to the rules, regulations, and standards there were in effect at the time of application:

**Borrowers and lenders may rely on the laws, rules, and guidance available at the time of the relevant application**. …. [emphasis added]

Gordon College relied on FAQ #17 and expended the entire PPP loan proceeds of $7,046,037 entirely on payroll costs for its employees. It had mortgages and utilities, which would have been eligible forgiveness expenses, but its first priority was to keep its people on the payroll – the quintessential reason for the Paycheck Protection Program as designed by Congress. It has

been two years between the time SBA approved Gordon's loan application and the SBA denial of forgiveness. Gordon has relied on the PPP loan proceeds to keep its educational institution afloat during the extraordinarily long and uncertain Covid lockdowns that especially hit colleges hard as they had to comply with laws to keep students off the premises where they offer educational services. The SBA Loan Decision below revokes the eligibility of Gordon College for the PPP loan proceeds based on applying new rules created after the time Gordon had submitted, and SBA had approved, Gordon's application. That is clear error.

In addition, it is inequitable for SBA to treat one institution of higher education differently than others. SBA provides on its website available to the general public detailed data about PPP loans pursuant to FOIA requests. Exhibit 11 is a spreadsheet that gathers FOIA data related to PPP loans ranging from $5 million to $10 million made to institutions of higher education. The chart shows the number of institutions of higher learning (colleges and universities) who received PPP loan funds and loan forgiveness. The chart also captures public information indicates that numerous colleges and universities received the PPP loan forgiveness of amounts between $5 Million and $10 Million with stated number of employees of less than 500 when publicly available government data shows "headcounts" of over 500. To treat Gordon College differently raises serious issues about the SBA's review process and even possible questions of discrimination.

**9.    *Conclusion*.**

To hold Gordon College ineligible now for its PPP loan based on its April 13, 2020 application because of a new SBA rule it established on April 26, 2020 is erroneous and inequitable and contrary to SBA's own rules and guidance established on April 6, 2020 in FAQ #17. To use a college analogy, it is akin to a college granting a four year full scholarship to a qualified student. The student walks across the stage, shakes the hand of the President, receives the hard-earned diploma, and then proudly steps down off the stage. There she is greeted by the Vice-President of

Finance with a letter that says, "We didn't mean it. You now owe us the full amount." Yet she is the only one in the full-ride scholarship cohort who is required now to pay the funds back.

We respectfully request that the SBA decision below be reversed, that Gordon College be found to have been eligible at the time of its submission of its PPP Loan Application as of April 13, 2020, and that Gordon College be granted full forgiveness of its PPP Loan.

**10.     *Signature of Appellant and/or Its Attorney*.**

In compliance with 13 CFR § 134.1202, Appellant Gordon College hereby submits this appeal by and under the signature of its legal counsel, Scott J. Ward, Esq., and Nancy Oliver LeSourd, Esq., of Gammon & Grange, P.C., with the following mailing address, email addresses, and cell and office phone numbers:

|          | __/s/   Scott J. Ward_____ | __/s/   Nancy Oliver LeSourd_____ |
|----------|-------------------------------|-----------------------------------|
| Name:    | Scott J. Ward, Esq.           | Nancy Oliver LeSourd, Esq.        |
| Address: | Gammon & Grange, P.C.,        | Gammon & Grange, P.C.,            |
|          | 1945 Old Gallows Road, Suite 650 | 1945 Old Gallows Road, Suite 650 |
|          | Vienna, VA 22182              | Vienna, VA 22182                  |
| Email:   | SJW@GG-Law.com                | NOL@GG-Law.com                    |
| Phone:   | 703-298-6088 (cell)           | 703-909-7999 (cell)               |
|          | 703-761-5012 (office – direct) | 703-761-5015 (office – direct)   |

JA0020

SBA_000020



**SMALL BUSINESS ADMINISTRATION
WASHINGTON, DC 20416**

04/12/2022

VIA FORGIVENESS PLATFORM

Barbara Gaulien

Citizens Bank, National Association

Re: PAYCHECK PROTECTION PROGRAM FINAL SBA LOAN REVIEW DECISION
   Borrower: GORDON COLLEGE
   SBA Loan No.: 8289087101
   Approved Loan Amount: $7,046,037.00
   Loan Approval Date: 04/15/2020
   Lender Forgiveness Decision Submission Date: 09/03/2021
   Lender Forgiveness Decision Amount: $7,046,037.00
   SBA Final Forgiveness Amount: $ 0.00

*Dear: Barbara Gaulien*

The U.S. Small Business Administration (SBA) has completed its review of the above-referenced Paycheck Protection Program (PPP) loan. Based on a review of lender and/or borrower submissions, and consideration of the facts and circumstances, SBA has made a final SBA loan review decision.

---

**SBA has determined that the borrower was ineligible for the PPP loan. The reason(s) for SBA's decision is as follows:**

**After review of the documentation provided, the SBA concludes the Borrower business, or together with its affiliates, exceeds the maximum allowable number of employees and the SBA small business size standards.**

**A thorough analysis of the IRS 941 reports and additional supporting documentation confirms that the borrower exceeded the maximum allowable number of employees and therefore does not qualify under the SBA small business size standard qualifications for a Paycheck Protection Program loan. Furthermore, the borrower is listed as 501 (c)(3), and therefore is not eligible under the alternative size standard industry qualifications. The Alternative Size Standard qualifications are limited to for-profit entities, that do not qualify for a PPP loan under the traditional NAICS Employee-Based Size Standard Industry criteria.**

---

SBA_000021

Based on the above stated reason(s), SBA has determined that forgiveness in the amount of $0.00 is appropriate. Additional details regarding the forgiveness payment amount (if any) will be provided in a Notice of Paycheck Protection Program Forgiveness Payment.

Within 5 business days of the date of this letter, you must provide a copy of this final SBA loan review decision to the borrower.

You must continue to service the loan. You must notify the borrower that the remaining balance of the loan after application of the forgiveness payment (if any) must be repaid on or before the maturity date. The notification must include the date on which the first principal and interest payment is due and the amount of the borrower's regular payment. As set forth below, if the borrower files a timely appeal with SBA's Office of Hearings and Appeals (OHA), the deferment period of the loan will be extended pursuant to 13 CFR § 134.1211.

Pursuant to 13 CFR § 134.1201(b), the borrower has the right to appeal to SBA's Office of Hearings and Appeals a final SBA loan review decision that the borrower:

1. was ineligible for a PPP loan;
2. was ineligible for the PPP loan amount received or used the PPP loan proceeds for unauthorized uses;
3. is ineligible for PPP loan forgiveness in the amount determined by the lender in its full approval or partial approval decision issued to SBA; and/or
4. is ineligible for PPP loan forgiveness in any amount when the lender has issued a full denial decision to SBA.

Any appeal must be made in accordance with the SBA Rules of Practice for Borrower Appeals of Final SBA Loan Review Decisions Under the Paycheck Protection Program, located at 13 CFR § 134.1201, *et seq.*, including but not limited to the following:

- An appeal petition must be filed with SBA's Office of Hearings and Appeals (OHA) within 30 calendar days after the borrower's receipt of the final SBA loan review decision. 13 CFR § 134.1202(a). To file and manage an appeal of a final SBA loan review decision with OHA, refer to Office of Hearings and Appeals.
- Borrower must include, among other things, a copy of this final SBA loan review decision with its appeal. 13 CFR § 134.1204(a).
- Borrower must provide you (the lender) with a copy of the timely appeal petition filed with OHA so that you can extend the deferment period of the loan. 13 CFR § 134.1202(b).
- An appeal to OHA is an administrative remedy that must be exhausted before judicial review of a final SBA loan review decision may be sought in a federal district court. 13 CFR § 134.1201(d).

Thank you for your cooperation.

Sincerely,

Office of Capital Access
U.S. Small Business Administration

JA0022

**From:** Sweeney, Janet E <Janet.Sweeney@CITIZENSBANK.com>
**Sent:** Wednesday, April 13, 2022 8:42 AM
**To:** Stephen Lacorazza <Stephen.Lacorazza@gordon.edu>
**Cc:** Muller, Thomas C <Thomas.Muller@citizensbank.com>
**Subject:** PPP Loan Forgiveness Denial

> **CAUTION:** External Email: Do not click links or open attachments unless you recognize sender and know content is safe.

Good afternoon Stephen,

I tried to call you earlier but the voice mail I received was for Rebecca in the finance office.

Citizens received notification late yesterday that SBA has made its final decision with regard to forgiveness of your PPP loan, and have denied forgiveness of the entire amount of the loan.   The reason stated was that Gordon College exceeds the maximum allowable number of employees, and does not meet the SBA Alternative Size Standard qualifications.

If you choose to pursue, there is an appeals process.  See the link embedded in the language below (which we are required to provide to you) which will take you to the SBA's website providing information specifically about the appeals process.

My understanding is that if you choose to appeal the ruling, then you will not be billed for payment of the loan until the appeals process has been completed.

> *Dear Stephen,*
> *Please find attached the final loan review decision rendered with respect to your PPP loan number 8289087101.   Payments will now be due and owing upon the expiration of your deferral period as identified in your promissory note.  Should you wish to file an appeal of this decision as described in your letter, further information can be found at PPP Appeals (sba.gov)*

Please let me know if you have questions regarding how to proceed, whether or not you choose to appeal the SBA's decision.

Thanks,

Janet


**Janet Sweeney**
Senior Vice President
Healthcare and Non-Profit Banking
**Citizens**

Cell:  603-562-0701
janet.sweeney@citizensbank.com

This message is confidential and subject to terms at: https://www.citizensbank.com/account-safeguards/overview.aspx.
If you are not the intended recipient, please delete this message and notify the sender immediately. Any unauthorized use is strictly prohibited.

SBA_000023



### Paycheck Protection Program
### Borrower Application Form

OMB Control No.: 3245-0407
Expiration Date: 09/30/2020

| Check One: | ☐ Sole proprietor ☐ Partnership ☐ C-Corp ☐ S-Corp ☐ LLC<br>☐ Independent contractor ☐ Eligible self-employed individual<br>■ 501(c)(3) nonprofit ☐ 501(c)(19) veterans organization<br>☐ Tribal business (sec. 31(b)(2)(C) of Small Business Act) ☐ Other | DBA or Tradename if Applicable |
|---|---|---|

| Business Legal Name | | |
|---|---|---|
| Gordon College | | |

| Business Address | Business TIN (EIN, SSN) | Business Phone |
|---|---|---|
| 255 Grapevine Rd | 04-2104258 | 978 867 4883 |
| Wenham MA 01984 | **Primary Contact**<br>Stephen Lacorazza | **Email Address**<br>stephen.lacorazza@gordon.edu |

| Average Monthly Payroll: | $ 2,818,415 | x 2.5 + EIDL, Net of Advance (if Applicable) Equals Loan Request: | $ 7,046,037 | Number of Employees: | 495.67 |
|---|---|---|---|---|---|

| Purpose of the loan<br>(select more than one): | ■Payroll ☐Lease / Mortgage Interest ■Utilities ☐Other (explain):_____ |
|---|---|

### Applicant Ownership

List all owners of 20% or more of the equity of the Applicant. Attach a separate sheet if necessary.

| Owner Name | Title | Ownership % | TIN (EIN, SSN) | Address |
|---|---|---|---|---|
| Non Profit | Non Profit | 100 | 042104258 | 255 Grapevine Rd Wenham |
| | | | | |

*If questions (1) or (2) below are answered "Yes," the loan will not be approved.*

| Question | Yes | No |
|---|---|---|
| 1. Is the Applicant or any owner of the Applicant presently suspended, debarred, proposed for debarment, declared ineligible, voluntarily excluded from participation in this transaction by any Federal department or agency, or presently involved in any bankruptcy? | ☐ | ■ |
| 2. Has the Applicant, any owner of the Applicant, or any business owned or controlled by any of them, ever obtained a direct or guaranteed loan from SBA or any other Federal agency that is currently delinquent or has defaulted in the last 7 years and caused a loss to the government? | ☐ | ■ |
| 3. Is the Applicant or any owner of the Applicant an owner of any other business, or have common management with, any other business? If yes, list all such businesses and describe the relationship on a separate sheet identified as addendum A. | ■ | ☐ |
| 4. Has the Applicant received an SBA Economic Injury Disaster Loan between January 31, 2020 and April 3, 2020? If yes, provide details on a separate sheet identified as addendum B. | ☐ | ■ |

*If questions (5) or (6) are answered "Yes," the loan will not be approved.*

| Question | Yes | No |
|---|---|---|
| 5. Is the Applicant (if an individual) or any individual owning 20% or more of the equity of the Applicant subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction, or presently incarcerated, or on probation or parole?<br>Initial here to confirm your response to question 5 → SDL | ☐ | ■ |
| 6. Within the last 5 years, for any felony, has the Applicant (if an individual) or any owner of the Applicant 1) been convicted; 2) pleaded guilty; 3) pleaded nolo contendere; 4) been placed on pretrial diversion; or 5) been placed on any form of parole or probation (including probation before judgment)?<br>Initial here to confirm your response to question 6 → SDL | ☐ | ■ |
| 7. Is the United States the principal place of residence for all employees of the Applicant included in the Applicant's payroll calculation above? | ■ | ☐ |
| 8. Is the Applicant a franchise that is listed in the SBA's Franchise Directory? | ☐ | ■ |



**Paycheck Protection Program**
**Borrower Application Form**

**By Signing Below, You Make the Following Representations, Authorizations, and Certifications**

CERTIFICATIONS AND AUTHORIZATIONS

I certify that:
- I have read the statements included in this form, including the Statements Required by Law and Executive Orders, and I understand them.
- The Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck Protection Program Rule).
- The Applicant (1) is an independent contractor, eligible self-employed individual, or sole proprietor or (2) employs no more than the greater of 500 or employees or, if applicable, the size standard in number of employees established by the SBA in 13 C.F.R. 121.201 for the Applicant's industry.
- I will comply, whenever applicable, with the civil rights and other limitations in this form.
- All SBA loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rule.
- To the extent feasible, I will purchase only American-made equipment and products.
- The Applicant is not engaged in any activity that is illegal under federal, state or local law.
- Any loan received by the Applicant under Section 7(b)(2) of the Small Business Act between January 31, 2020 and April 3, 2020 was for a purpose other than paying payroll costs and other allowable uses loans under the Paycheck Protection Program Rule.

For Applicants who are individuals:  I authorize the SBA to request criminal record information about me from criminal justice agencies for the purpose of determining my eligibility for programs authorized by the Small Business Act, as amended.

CERTIFICATIONS

The authorized representative of the Applicant must certify in good faith to all of the below by **initialing** next to each one:

SDL
The Applicant was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC.

SDL
Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.

SDL
The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud.

SDL
The Applicant will provide to the Lender documentation verifying the number of full-time equivalent employees on the Applicant's payroll as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities for the eight-week period following this loan.

SDL
I understand that loan forgiveness will be provided for the sum of documented payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities, and not more than 25% of the forgiven amount may be for non-payroll costs.

SDL
During the period beginning on February 15, 2020 and ending on December 31, 2020, the Applicant has not and will not receive another loan under the Paycheck Protection Program.

SDL
I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

SDL
I acknowledge that the lender will confirm the eligible loan amount using required documents submitted. I understand, acknowledge and agree that the Lender can share any tax information that I have provided with SBA's authorized representatives, including authorized representatives of the SBA Office of Inspector General, for the purpose of compliance with SBA Loan Program Requirements and all SBA reviews.

Stephen D Lacorazza    Digitally signed by Stephen D Lacorazza
                        Date: 2020.04.12 12:23:21 -04'00'

4/6/2020

_____    _____
Signature of Authorized Representative of Applicant    Date

Stephen D Lacorazza    Dir of Finance & Controller

_____    _____
Print Name    Title

**JA0025**

2

SBA_000025

SBA Form 2483 (04/20)



**Paycheck Protection Program**
**Borrower Application Form**

**Purpose of this form:**

This form is to be completed by the authorized representative of the Applicant and *submitted to your SBA Participating Lender*. Submission of the requested information is required to make a determination regarding eligibility for financial assistance. Failure to submit the information would affect that determination.

**Instructions for completing this form:**

With respect to "purpose of the loan," payroll costs consist of compensation to employees (whose principal place of residence is the United States) in the form of salary, wages, commissions, or similar compensation; cash tips or the equivalent (based on employer records of past tips or, in the absence of such records, a reasonable, good-faith employer estimate of such tips); payment for vacation, parental, family, medical, or sick leave; allowance for separation or dismissal; payment for the provision of employee benefits consisting of group health care coverage, including insurance premiums, and retirement; payment of state and local taxes assessed on compensation of employees; and for an independent contractor or sole proprietor, wage, commissions, income, or net earnings from self-employment or similar compensation.

For purposes of calculating "Average Monthly Payroll," most Applicants will use the average monthly payroll for 2019, excluding costs over $100,000 on an annualized basis for each employee.  For seasonal businesses, the Applicant may elect to instead use average monthly payroll for the time period between February 15, 2019 and June 30, 2019, excluding costs over $100,000 on an annualized basis for each employee. For new businesses, average monthly payroll may be calculated using the time period from January 1, 2020 to February 29, 2020, excluding costs over $100,000 on an annualized basis for each employee.

If Applicant is refinancing an Economic Injury Disaster Loan (EIDL): Add the outstanding amount of an EIDL made between January 31, 2020 and April 3, 2020, less the amount of any "advance" under an EIDL COVID-19 loan, to Loan Request as indicated on the form.

All parties listed below are considered owners of the Applicant as defined in 13 CFR § 120.10, as well as "principals":

- For a sole proprietorship, the sole proprietor;

- For a partnership, all general partners, and all limited partners owning 20% or more of the equity of the firm;

- For a corporation, all owners of 20% or more of the corporation;

- For limited liability companies, all members owning 20% or more of the company; and

- Any Trustor (if the Applicant is owned by a trust).

**Paperwork Reduction Act –** You are not required to respond to this collection of information unless it displays a currently valid OMB Control Number. The estimated time for completing this application, including gathering data needed, is 8 minutes.  Comments about this time or the information requested should be sent to : Small  Business Administration, Director, Records Management Division, 409 3rd St., SW, Washington DC 20416., and/or SBA Desk Officer, Office of Management and Budget, New Executive Office Building, Washington DC 20503.

**Privacy Act (5 U.S.C. 552a) –** Under the provisions of the Privacy Act, you are not required to provide your social security number. Failure to provide your social security number may not affect any right, benefit or privilege to which you are entitled. (But see Debt Collection Notice regarding taxpayer identification number below.) Disclosures of name and other personal identifiers are required to provide SBA with sufficient information to make a character determination.  When evaluating character, SBA considers the person's integrity, candor, and disposition toward criminal actions. Additionally, SBA is specifically authorized to verify your criminal history, or lack thereof, pursuant to section 7(a)(1)(B), 15 USC Section 636(a)(1)(B) of the Small Business Act (the Act).

**Disclosure of Information –** Requests for information about another party may be denied unless SBA has the written permission of the individual to release the information to the requestor or unless the information is subject to disclosure under the Freedom of Information Act. The Privacy Act authorizes SBA to make certain "routine uses" of information protected by that Act. One such routine use is the disclosure of information maintained in SBA's system of records when this information indicates a violation or potential violation of law, whether civil, criminal, or administrative in nature. Specifically, SBA may refer the information to the appropriate agency, whether Federal, State, local or foreign, charged with responsibility for, or otherwise involved in investigation, prosecution, enforcement or prevention of such violations. Another routine use is disclosure to other Federal agencies conducting background checks but only to the extent the information is relevant to the requesting agencies' function. <u>See</u>, 74 F.R. 14890 (2009), and as amended from time to time for additional background and other routine uses. In addition, the CARES Act, requires SBA to register every loan made under the Paycheck Protection Act using the Taxpayer Identification Number (TIN) assigned to the borrower.

**Debt Collection Act of 1982, Deficit Reduction Act of 1984 (31 U.S.C. 3701 et seq. and other titles) –** SBA must obtain your taxpayer identification number when you apply for a loan. If you receive a loan, and do not make payments as they come due, SBA may: (1) report the status of your  loan(s) to credit bureaus, (2) hire a collection agency to collect your loan, (3) offset your income tax refund or other amounts due to you from the Federal Government, (4) suspend or debar you or your company from doing business with the Federal Government, (5) refer your loan to the Department of Justice, or (6) foreclose on collateral or take other action permitted in the loan instruments.

**Right to Financial Privacy Act of 1978 (12 U.S.C. 3401) –** The Right to Financial Privacy Act of 1978, grants  SBA access rights to financial records held by financial institutions that are or have been doing business with you or your business including any financial

SBA Form 2483 (04/20)



**Paycheck Protection Program**
**Borrower Application Form**

institutions participating in a loan or loan guaranty. SBA is only required provide a certificate of its compliance with the Act to a financial institution in connection with its first request for access to your financial records. SBA's access rights continue for the term of any approved loan guaranty agreement. SBA is also authorized to transfer to another Government authority any financial records concerning an approved loan or loan guarantee, as necessary to process, service or foreclose on a loan guaranty or collect on a defaulted loan guaranty.

**Freedom of Information Act (5 U.S.C. 552)** – Subject to certain exceptions, SBA must supply information reflected in agency files and records to a person requesting it. Information about approved loans that will be automatically released includes, among other things, statistics on our loan programs (individual borrowers are not identified in the statistics) and other information such as the names of the borrowers (and their officers, directors, stockholders or partners), the collateral pledged to secure the loan, the amount of the loan, its purpose in general terms and the maturity. Proprietary data on a borrower would not routinely be made available to third parties. All requests under this Act are to be addressed to the nearest SBA office and be identified as a Freedom of Information request.

**Occupational Safety and Health Act (15 U.S.C. 651 et seq.)** – The Occupational Safety and Health Administration (OSHA) can require businesses to modify facilities and procedures to protect employees. Businesses that do not comply may be fined, forced to cease operations, or prevented from starting operations. Signing this form is certification that the applicant, to the best of its knowledge, is in compliance with the applicable OSHA requirements, and will remain in compliance during the life of the loan.

**Civil Rights (13 C.F.R. 112, 113, 117)** – All businesses receiving SBA financial assistance must agree not to discriminate in any business practice, including employment practices and services to the public on the basis of categories cited in 13 C.F.R., Parts 112, 113, and 117 of SBA Regulations. All borrowers must display the "Equal Employment Opportunity Poster" prescribed by SBA.

**Equal Credit Opportunity Act (15 U.S.C. 1691)** – Creditors are prohibited from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status or age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act.

**Debarment and Suspension Executive Order 12549; (2 CFR Part 180 and Part 2700)** – By submitting this loan application, you certify that neither the Applicant or any owner of the Applicant have within the past three years been: (a) debarred, suspended, declared ineligible or voluntarily excluded from participation in a transaction by any Federal Agency; (b) formally proposed for debarment, with a final determination still pending; (c) indicted, convicted, or had a civil judgment rendered against you for any of the offenses listed in the regulations or (d) delinquent on any amounts owed to the U.S. Government or its instrumentalities as of the date of execution of this certification.

# SMALL BUSINESS PAYCHECK PROTECTION PROGRAM

The Paycheck Protection Program provides small businesses with funds to pay up to 8 weeks of payroll costs including benefits. Funds can also be used to pay interest on mortgages, rent, and utilities.

## Fully Forgiven

Funds are provided in the form of loans that will be fully forgiven when used for payroll costs, interest on mortgages, rent, and utilities (due to likely high subscription, at least 75% of the forgiven amount must have been used for payroll). Loan payments will also be deferred for six months. No collateral or personal guarantees are required. Neither the government nor lenders will charge small businesses any fees.

## Must Keep Employees on the Payroll—or Rehire Quickly

Forgiveness is based on the employer maintaining or quickly rehiring employees and maintaining salary levels. Forgiveness will be reduced if full-time headcount declines, or if salaries and wages decrease.

## All Small Businesses Eligible

Small businesses with 500 or fewer employees—including nonprofits, veterans organizations, tribal concerns, self-employed individuals, sole proprietorships, and independent contractors—are eligible. Businesses with more than 500 employees are eligible in certain industries.

## When to Apply

Starting April 3, 2020, small businesses and sole proprietorships can apply. Starting April 10, 2020, independent contractors and self-employed individuals can apply. We encourage you to apply as quickly as you can because there is a funding cap.

## How to Apply

You can apply through any existing SBA 7(a) lender or through any federally insured depository institution, federally insured credit union, and Farm Credit System institution that is participating. Other regulated lenders will be available to make these loans once they are approved and enrolled in the program. You should consult with your local lender as to whether it is participating. All loans will have the same terms regardless of lender or borrower. A list of participating lenders as well as additional information and full terms can be found at www.sba.gov.

**The Paycheck Protection Program is implemented by the Small Business Administration with support from the Department of the Treasury. Lenders should also visit www.sba.gov or www.coronavirus.gov for more information.**

## PAYCHECK PROTECTION PROGRAM (PPP) INFORMATION SHEET

### LENDERS

**Who is eligible to lend?** All existing SBA-certified lenders will be given delegated authority to speedily process PPP loans.

All federally insured depository institutions, federally insured credit unions, and Farm Credit System institutions are eligible to participate in this program.

A broad set of additional lenders can begin making loans as soon as they are approved and enrolled in the program. New lenders will need to submit their application to DelegatedAuthority@sba.gov to apply with the SBA.

**Are these loans guaranteed by the SBA?** Yes, the SBA guarantees 100% of the outstanding balance, and that guarantee is backed by the full faith and credit of the United States.

**Are there guarantee fees?** The SBA waives all SBA guaranty fees, including the upfront and annual servicing fees.

**What underwriting is required?** You will need to verify that a borrower was in operation on February 15, 2020. You will need to verify that a borrower had employees for whom the borrower paid salaries and payroll taxes. You will need to verify the dollar amount of average monthly payroll costs. You will need to follow applicable Bank Secrecy Act requirements.

**How will lenders be compensated?** Processing fees will be based on the balance of the financing outstanding at the time of final disbursement:

- Loans $350,000 and under: 5.00%
- Loans greater than $350,000 to $2 million: 3.00%
- Loans greater than $2 million: 1.00%

Lenders may not collect any fees from the applicant.

**Who can be an agent?** An agent is an authorized representative and can be:

- An attorney;
- An accountant;
- A consultant;
- Someone who prepares an applicant's application for financial assistance and is employed and compensated by the applicant;
- Someone who assists a lender with originating, disbursing, servicing, liquidating, or litigating SBA loans;
- A loan broker; or
- Any other individual or entity representing an applicant by conducting business with the SBA.

**How will agents be compensated?** Agent fees will be paid out of lender fees. The lender will pay the agent. Agents may not collect any fees from the applicant.

SBA_000029

- Loans $350,000 and under: 1.00%
- Loans greater than $350,000 to $2 million: 0.50%
- Loans greater than $2 million: 0.25%

**Can these loans be sold in the secondary market?** PPP loans can be sold in the secondary market. The SBA will not collect any fee for any guarantee sold into the secondary market.

## PAYCHECK PROTECTION PROGRAM (PPP) INFORMATION SHEET:

## BORROWERS

The Paycheck Protection Program ("PPP") authorizes up to $349 billion in forgivable loans to small businesses to pay their employees during the COVID-19 crisis. ***All loan terms will be the same for everyone.***

The loan amounts will be forgiven as long as:

- The loan proceeds are used to cover payroll costs, and most mortgage interest, rent, and utility costs over the 8 week period after the loan is made; and
- Employee and compensation levels are maintained.

Payroll costs are capped at $100,000 on an annualized basis for each employee. Due to likely high subscription, it is anticipated that not more than 25% of the forgiven amount may be for non-payroll costs.

Loan payments will be deferred for 6 months.

**When can I apply?**

- Starting April 3, 2020, small businesses and sole proprietorships can apply for and receive loans to cover their payroll and other certain expenses through existing SBA lenders.
- Starting April 10, 2020, independent contractors and self-employed individuals can apply for and receive loans to cover their payroll and other certain expenses through existing SBA lenders.
- Other regulated lenders will be available to make these loans as soon as they are approved and enrolled in the program.

**Where can I apply?** You can apply through any existing SBA lender or through any federally insured depository institution, federally insured credit union, and Farm Credit System institution that is participating. Other regulated lenders will be available to make these loans once they are approved and enrolled in the program. You should consult with your local lender as to whether it is participating. Visit www.sba.gov for a list of SBA lenders.

**Who can apply?** All businesses – including nonprofits, veterans organizations, Tribal business concerns, sole proprietorships, self-employed individuals, and independent contractors – with 500 or fewer employees can apply. Businesses in certain industries can have more than 500 employees if they meet applicable SBA employee-based size standards for those industries (click HERE for additional detail).

For this program, the SBA's affiliation standards are waived for small businesses (1) in the hotel and food services industries (click HERE for NAICS code 72 to confirm); or (2) that are franchises in the SBA's Franchise Directory (click HERE to check); or (3) that receive financial assistance from small business investment companies licensed by the SBA. Additional guidance may be released as appropriate.

JA0031

**What do I need to apply?** You will need to complete the Paycheck Protection Program loan application and submit the application with the required documentation to an approved lender that is available to process your application by June 30, 2020. Click HERE for the application.

**What other documents will I need to include in my application?** You will need to provide your lender with payroll documentation.

**Do I need to first look for other funds before applying to this program?** No. We are waiving the usual SBA requirement that you try to obtain some or all of the loan funds from other sources (i.e., we are waiving the Credit Elsewhere requirement).

**How long will this program last?** Although the program is open until June 30, 2020, we encourage you to apply as quickly as you can because there is a funding cap and lenders need time to process your loan.

**How many loans can I take out under this program?** Only one.

**What can I use these loans for?** You should use the proceeds from these loans on your:

- Payroll costs, including benefits;
- Interest on mortgage obligations, incurred before February 15, 2020;
- Rent, under lease agreements in force before February 15, 2020; and
- Utilities, for which service began before February 15, 2020.

**What counts as payroll costs?** Payroll costs include:

- Salary, wages, commissions, or tips (capped at $100,000 on an annualized basis for each employee);
- Employee benefits including costs for vacation, parental, family, medical, or sick leave; allowance for separation or dismissal; payments required for the provisions of group health care benefits including insurance premiums; and payment of any retirement benefit;
- State and local taxes assessed on compensation; and
- For a sole proprietor or independent contractor: wages, commissions, income, or net earnings from self-employment, capped at $100,000 on an annualized basis for each employee.

**How large can my loan be?** Loans can be for up to two months of your average monthly payroll costs from the last year plus an additional 25% of that amount. That amount is subject to a $10 million cap. If you are a seasonal or new business, you will use different applicable time periods for your calculation. Payroll costs will be capped at $100,000 annualized for each employee.

**How much of my loan will be forgiven?** You will owe money when your loan is due if you use the loan amount for anything other than payroll costs, mortgage interest, rent, and utilities payments over the 8 weeks after getting the loan. Due to likely high subscription, it is anticipated that not more than 25% of the forgiven amount may be for non-payroll costs.

You will also owe money if you do not maintain your staff and payroll.

SBA_000032

- <u>Number of Staff</u>: Your loan forgiveness will be reduced if you decrease your full-time employee headcount.
- <u>Level of Payroll</u>: Your loan forgiveness will also be reduced if you decrease salaries and wages by more than 25% for any employee that made less than $100,000 annualized in 2019.
- <u>Re-Hiring</u>: You have until June 30, 2020 to restore your full-time employment and salary levels for any changes made between February 15, 2020 and April 26, 2020.

**How can I request loan forgiveness?** You can submit a request to the lender that is servicing the loan. The request will include documents that verify the number of full-time equivalent employees and pay rates, as well as the payments on eligible mortgage, lease, and utility obligations. You must certify that the documents are true and that you used the forgiveness amount to keep employees and make eligible mortgage interest, rent, and utility payments. The lender must make a decision on the forgiveness within 60 days.

**What is my interest rate?** 0.50% fixed rate.

**When do I need to start paying interest on my loan?** All payments are deferred for 6 months; however, interest will continue to accrue over this period.

**When is my loan due?** In 2 years.

**Can I pay my loan earlier than 2 years?** Yes. There are no prepayment penalties or fees.

**Do I need to pledge any collateral for these loans?** No. No collateral is required.

**Do I need to personally guarantee this loan?** No. There is no personal guarantee requirement. ***However, if the proceeds are used for fraudulent purposes, the U.S. government will pursue criminal charges against you.***

**What do I need to certify?** As part of your application, you need to certify in good faith that:

- Current economic uncertainty makes the loan necessary to support your ongoing operations.
- The funds will be used to retain workers and maintain payroll or to make mortgage, lease, and utility payments.
- You have not and will not receive another loan under this program.
- You will provide to the lender documentation that verifies the number of full-time equivalent employees on payroll and the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities for the eight weeks after getting this loan.
- Loan forgiveness will be provided for the sum of documented payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities. Due to likely high subscription, it is anticipated that not more than 25% of the forgiven amount may be for non-payroll costs.
- All the information you provided in your application and in all supporting documents and forms is true and accurate. Knowingly making a false statement to get a loan under this program is punishable by law.

- You acknowledge that the lender will calculate the eligible loan amount using the tax documents you submitted. You affirm that the tax documents are identical to those you submitted to the IRS. And you also understand, acknowledge, and agree that the lender can share the tax information with the SBA's authorized representatives, including authorized representatives of the SBA Office of Inspector General, for the purpose of compliance with SBA Loan Program Requirements and all SBA reviews.

# Rules and Regulations

**Federal Register**

Vol. 85, No. 73

Wednesday, April 15, 2020

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents.

## SMALL BUSINESS ADMINISTRATION

### 13 CFR Part 120

**[Docket No. SBA–2020–0015]**

**RIN 3245–AH34**

### Business Loan Program Temporary Changes; Paycheck Protection Program

**AGENCY:** U.S. Small Business Administration.

**ACTION:** Interim final rule.

**SUMMARY:** This interim final rule announces the implementation of sections 1102 and 1106 of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act or the Act). Section 1102 of the Act temporarily adds a new product, titled the "Paycheck Protection Program," to the U.S. Small Business Administration's (SBA's) 7(a) Loan Program. Section 1106 of the Act provides for forgiveness of up to the full principal amount of qualifying loans guaranteed under the Paycheck Protection Program. The Paycheck Protection Program and loan forgiveness are intended to provide economic relief to small businesses nationwide adversely impacted under the Coronavirus Disease 2019 (COVID–19) Emergency Declaration (COVID–19 Emergency Declaration) issued by President Trump on March 13, 2020. This interim final rule outlines the key provisions of SBA's implementation of sections 1102 and 1106 of the Act in formal guidance and requests public comment.

**DATES:**

*Effective date:* This interim final rule is effective April 15, 2020.

*Applicability date:* This interim final rule applies to applications submitted under the Paycheck Protection Program through June 30, 2020, or until funds made available for this purpose are exhausted.

*Comment Date:* Comments must be received on or before May 15, 2020.

**ADDRESSES:** You may submit comments, identified by number SBA–2020–0015 through the Federal eRulemaking Portal: *http://www.regulations.gov*. Follow the instructions for submitting comments.

SBA will post all comments on *www.regulations.gov*. If you wish to submit confidential business information (CBI) as defined in the User Notice at *www.regulations.gov,* please send an email to *ppp-ifr@sba.gov*. Highlight the information that you consider to be CBI and explain why you believe SBA should hold this information as confidential. SBA will review the information and make the final determination whether it will publish the information.

**FOR FURTHER INFORMATION CONTACT:** Call Center Representative at 833–572–0502, or the local SBA Field Office; the list of offices can be found at *https://www.sba.gov/tools/local-assistance/districtoffices*.

**SUPPLEMENTARY INFORMATION:**

## I. Background Information

On March 13, 2020, President Trump declared the ongoing Coronavirus Disease 2019 (COVID–19) pandemic of sufficient severity and magnitude to warrant an emergency declaration for all states, territories, and the District of Columbia. With the COVID–19 emergency, many small businesses nationwide are experiencing economic hardship as a direct result of the Federal, State, and local public health measures that are being taken to minimize the public's exposure to the virus. These measures, some of which are government-mandated, are being implemented nationwide and include the closures of restaurants, bars, and gyms. In addition, based on the advice of public health officials, other measures, such as keeping a safe distance from others or even stay-at-home orders, are being implemented, resulting in a dramatic decrease in economic activity as the public avoids malls, retail stores, and other businesses.

On March 27, 2020, the President signed the Coronavirus Aid, Relief, and Economic Security Act (the CARES Act or the Act) (Pub. L. 116–136) to provide emergency assistance and health care response for individuals, families, and businesses affected by the coronavirus pandemic. The Small Business Administration (SBA) received funding and authority through the Act to modify existing loan programs and establish a new loan program to assist small businesses nationwide adversely impacted by the COVID–19 emergency.

Section 1102 of the Act temporarily permits SBA to guarantee 100 percent of 7(a) loans under a new program titled the "Paycheck Protection Program." Section 1106 of the Act provides for forgiveness of up to the full principal amount of qualifying loans guaranteed under the Paycheck Protection Program. A more detailed discussion of sections 1102 and 1106 of the Act is found in section III below.

## II. Comments and Immediate Effective Date

The intent of the Act is that SBA provide relief to America's small businesses expeditiously. This intent, along with the dramatic decrease in economic activity nationwide, provides good cause for SBA to dispense with the 30-day delayed effective date provided in the Administrative Procedure Act. Specifically, small businesses need to be informed on how to apply for a loan and the terms of the loan under section 1102 of the Act as soon as possible because the last day to apply for and receive a loan is June 30, 2020. The immediate effective date of this interim final rule will benefit small businesses so that they can immediately apply for the loan with a full understanding of loan terms and conditions. This interim final rule is effective without advance notice and public comment because section 1114 of the Act authorizes SBA to issue regulations to implement Title 1 of the Act without regard to notice requirements. This rule is being issued to allow for immediate implementation of this program. Although this interim final rule is effective immediately, comments are solicited from interested members of the public on all aspects of the interim final rule, including section III below. These comments must be submitted on or before May 15, 2020. The SBA will consider these comments and the need for making any revisions as a result of these comments.

## III. Temporary New Business Loan Program: Paycheck Protection Program

*Overview*

The CARES Act was enacted to provide immediate assistance to individuals, families, and businesses

JA0035

affected by the COVID–19 emergency. Among the provisions contained in the CARES Act are provisions authorizing SBA to temporarily guarantee loans under a new 7(a) loan program titled the "Paycheck Protection Program." Loans guaranteed under the Paycheck Protection Program (PPP) will be 100 percent guaranteed by SBA, and the full principal amount of the loans may qualify for loan forgiveness. The following outlines the key provisions of the PPP.

1. General

SBA is authorized to guarantee loans under the PPP through June 30, 2020. Congress authorized a program level of $349,000,000,000 to provide guaranteed loans under this new 7(a) program. The intent of the Act is that SBA provide relief to America's small businesses expeditiously, which is expressed in the Act by giving all lenders delegated authority and streamlining the requirements of the regular 7(a) loan program. For example, for loans made under the PPP, SBA will not require the lenders to comply with section 120.150 "What are SBA's lending criteria?." SBA will allow lenders to rely on certifications of the borrower in order to determine eligibility of the borrower and use of loan proceeds and to rely on specified documents provided by the borrower to determine qualifying loan amount and eligibility for loan forgiveness. Lenders must comply with the applicable lender obligations set forth in this interim final rule, but will be held harmless for borrowers' failure to comply with program criteria; remedies for borrower violations or fraud are separately addressed in this interim final rule. The program requirements of the PPP identified in this rule temporarily supersede any conflicting Loan Program Requirement (as defined in 13 CFR 120.10).

2. What do borrowers need to know and do?

a. Am I eligible?

You are eligible for a PPP loan if you have 500 or fewer employees whose principal place of residence is in the United States, or are a business that operates in a certain industry and meet the applicable SBA employee-based size standards for that industry, and:

i. You are:

A. A small business concern as defined in section 3 of the Small Business Act (15 U.S.C. 632), and subject to SBA's affiliation rules under 13 CFR 121.301(f) unless specifically waived in the Act; or

B. A tax-exempt nonprofit organization described in section 501(c)(3) of the Internal Revenue Code (IRC), a tax-exempt veterans organization described in section 501(c)(19) of the IRC, Tribal business concern described in section 31(b)(2)(C) of the Small Business Act, or any other business; and

ii. You were in operation on February 15, 2020 and either had employees for whom you paid salaries and payroll taxes or paid independent contractors, as reported on a Form 1099–MISC.

You are also eligible for a PPP loan if you are an individual who operates under a sole proprietorship or as an independent contractor or eligible self-employed individual, and you were in operation on February 15, 2020.

You must also submit such documentation as is necessary to establish eligibility such as payroll processor records, payroll tax filings, or Form 1099–MISC, or income and expenses from a sole proprietorship. For borrowers that do not have any such documentation, the borrower must provide other supporting documentation, such as bank records, sufficient to demonstrate the qualifying payroll amount.

SBA intends to promptly issue additional guidance with regard to the applicability of affiliation rules at 13 CFR 121.103 and 121.301 to PPP loans.

b. Could I be ineligible even if I meet the eligibility requirements in (a) above?

You are ineligible for a PPP loan if, for example:

i. You are engaged in any activity that is illegal under Federal, state, or local law;

ii. You are a household employer (individuals who employ household employees such as nannies or housekeepers);

iii. An owner of 20 percent or more of the equity of the applicant is incarcerated, on probation, on parole; presently subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction; or has been convicted of a felony within the last five years; or

iv. You, or any business owned or controlled by you or any of your owners, has ever obtained a direct or guaranteed loan from SBA or any other Federal agency that is currently delinquent or has defaulted within the last seven years and caused a loss to the government.

The Administrator, in consultation with the Secretary of the Treasury (the Secretary), determined that household employers are ineligible because they are not businesses. 13 CFR 120.100.

c. How do I determine if I am ineligible?

Businesses that are not eligible for PPP loans are identified in 13 CFR 120.110 and described further in SBA's Standard Operating Procedure (SOP) 50 10, Subpart B, Chapter 2, except that nonprofit organizations authorized under the Act are eligible. (SOP 50 10 can be found at *https://www.sba.gov/ document/sop-50-10-5-lender-development-company-loan-programs*.)

d. I have determined that I am eligible. How much can I borrow?

Under the PPP, the maximum loan amount is the lesser of $10 million or an amount that you will calculate using a payroll-based formula specified in the Act, as explained below.

e. How do I calculate the maximum amount I can borrow?

The following methodology, which is one of the methodologies contained in the Act, will be most useful for many applicants.

i. Step 1: Aggregate payroll costs (defined in detail below in f.) from the last twelve months for employees whose principal place of residence is the United States.

ii. Step 2: Subtract any compensation paid to an employee in excess of an annual salary of $100,000 and/or any amounts paid to an independent contractor or sole proprietor in excess of $100,000 per year.

iii. Step 3: Calculate average monthly payroll costs (divide the amount from Step 2 by 12).

iv. Step 4: Multiply the average monthly payroll costs from Step 3 by 2.5.

v. Step 5: Add the outstanding amount of an Economic Injury Disaster Loan (EIDL) made between January 31, 2020 and April 3, 2020, less the amount of any "advance" under an EIDL COVID–19 loan (because it does not have to be repaid).

The examples below illustrate this methodology.

i. Example 1—No employees make more than $100,000
   Annual payroll: $120,000
   Average monthly payroll: $10,000
   Multiply by 2.5 = $25,000
   Maximum loan amount is $25,000

ii. Example 2—Some employees make more than $100,000
   Annual payroll: $1,500,000
   Subtract compensation amounts in excess of an annual salary of $100,000: $1,200,000
   Average monthly qualifying payroll: $100,000
   Multiply by 2.5 = $250,000
   Maximim loan amount is $250,000

iii. Example 3—No employees make more than $100,000, outstanding EIDL loan of $10,000.
Annual payroll: $120,000
Average monthly payroll: $10,000
Multiply by 2.5 = $25,000
Add EIDL loan of $10,000 = $35,000
Maximum loan amount is $35,000
iv. Example 4—Some employees make more than $100,000, outstanding EIDL loan of $10,000
Annual payroll: $1,500,000
Subtract compensation amounts in excess of an annual salary of $100,000: $1,200,000
Average monthly qualifying payroll: $100,000
Multiply by 2.5 = $250,000
Add EIDL loan of $10,000 = $260,000
Maximum loan amount is $260,000

**f. What qualifies as ''payroll costs?''**

Payroll costs consist of compensation to employees (whose principal place of residence is the United States) in the form of salary, wages, commissions, or similar compensation; cash tips or the equivalent (based on employer records of past tips or, in the absence of such records, a reasonable, good-faith employer estimate of such tips); payment for vacation, parental, family, medical, or sick leave; allowance for separation or dismissal; payment for the provision of employee benefits consisting of group health care coverage, including insurance premiums, and retirement; payment of state and local taxes assessed on compensation of employees; and for an independent contractor or sole proprietor, wages, commissions, income, or net earnings from self-employment, or similar compensation.

**g. Is there anything that is expressly excluded from the definition of payroll costs?**

Yes. The Act expressly excludes the following:
i. Any compensation of an employee whose principal place of residence is outside of the United States;
ii. The compensation of an individual employee in excess of an annual salary of $100,000, prorated as necessary;
iii. Federal employment taxes imposed or withheld between February 15, 2020 and June 30, 2020, including the employee's and employer's share of FICA (Federal Insurance Contributions Act) and Railroad Retirement Act taxes, and income taxes required to be withheld from employees; and
iv. Qualified sick and family leave wages for which a credit is allowed under sections 7001 and 7003 of the Families First Coronavirus Response Act (Pub. L. 116–127).

**h. Do independent contractors count as employees for purposes of PPP loan calculations?**

No, independent contractors have the ability to apply for a PPP loan on their own so they do not count for purposes of a borrower's PPP loan calculation.

**i. What is the interest rate on a PPP loan?**

The interest rate will be 100 basis points or one percent.

The Administrator, in consultation with the Secretary, determined that a one percent interest rate is appropriate. First, it provides low cost funds to borrowers to meet eligible payroll costs and other eligible expenses during this temporary period of economic dislocation caused by the coronavirus. Second, for lenders, the 100 basis points offers an attractive interest rate relative to the cost of funding for comparable maturities. For example, the FDIC's weekly national average rate for a 24-month CD deposit product for the week of March 30, 2020 is 42 basis points for non-jumbo and 44 basis points for jumbo (*https://www.fdic.gov/regulations/resources/rates/*). Third, the interest rate is higher than the yield on Treasury securities of comparable maturity. For example, the yield on the Treasury two-year note is approximately 23 basis points. This higher yield combined with the fact that the loans are 100 percent guaranteed by the SBA and the fact that lenders will receive a substantial processing fee from the SBA provide ample inducement for lenders to participate in the PPP.

**j. What will be the maturity date on a PPP loan?**

The maturity is two years. While the Act provides that a loan will have a maximum maturity of up to ten years from the date the borrower applies for loan forgiveness (described below), the Administrator, in consultation with the Secretary, determined that a two year loan term is sufficient in light of the temporary economic dislocations caused by the coronavirus. Specifically, the considerable economic disruption caused by the coronavirus is expected to abate well before the two year maturity date such that borrowers will be able to re-commence business operations and pay off any outstanding balances on their PPP loans.

**k. Can I apply for more than one PPP loan?**

No. The Administrator, in consultation with the Secretary, determined that no eligible borrower may receive more than one PPP loan. This means that if you apply for a PPP

loan you should consider applying for the maximum amount. While the Act does not expressly provide that each eligible borrower may only receive one PPP loan, the Administrator has determined, in consultation with the Secretary, that because all PPP loans must be made on or before June 30, 2020, a one loan per borrower limitation is necessary to help ensure that as many eligible borrowers as possible may obtain a PPP loan. This limitation will also help advance Congress' goal of keeping workers paid and employed across the United States.

**l. Can I use e-signatures or e-consents if a borrower has multiple owners?**

Yes, e-signature or e-consents can be used regardless of the number of owners.

**m. Is the PPP ''first-come, first-served?''**

Yes.

**n. When will I have to begin paying principal and interest on my PPP loan?**

You will not have to make any payments for six months following the date of disbursement of the loan. However, interest will continue to accrue on PPP loans during this six-month deferment. The Act authorizes the Administrator to defer loan payments for up to one year. The Administrator determined, in consultation with the Secretary, that a six-month deferment period is appropriate in light of the modest interest rate (one percent) on PPP loans and the loan forgiveness provisions contained in the Act.

**o. Can my PPP loan be forgiven in whole or in part?**

Yes. The amount of loan forgiveness can be up to the full principal amount of the loan and any accrued interest. That is, the borrower will not be responsible for any loan payment if the borrower uses all of the loan proceeds for forgiveable purposes described below and employee and compensation levels are maintained. The actual amount of loan forgiveness will depend, in part, on the total amount of payroll costs, payments of interest on mortgage obligations incurred before February 15, 2020, rent payments on leases dated before February 15, 2020, and utility payments under service agreements dated before February 15, 2020, over the eight-week period following the date of the loan. However, not more than 25 percent of the loan forgiveness amount may be attributable to non-payroll costs. While the Act provides that borrowers are eligible for forgiveness in an amount equal to the sum of payroll costs and

any payments of mortgage interest, rent, and utilities, the Administrator has determined that the non-payroll portion of the forgivable loan amount should be limited to effectuate the core purpose of the statute and ensure finite program resources are devoted primarily to payroll. The Administrator has determined in consultation with the Secretary that 75 percent is an appropriate percentage in light of the Act's overarching focus on keeping workers paid and employed. Further, the Administrator and the Secretary believe that applying this threshold to loan forgiveness is consistent with the structure of the Act, which provides a loan amount 75 percent of which is equivalent to eight weeks of payroll (8 weeks/2.5 months = 56 days/76 days = 74 percent rounded up to 75 percent). Limiting non-payroll costs to 25 percent of the forgiveness amount will align these elements of the program, and will also help to ensure that the finite appropriations available for PPP loan forgiveness are directed toward payroll protection. SBA will issue additional guidance on loan forgiveness.

p. Do independent contractors count as employees for purposes of PPP loan forgiveness?

No, independent contractors have the ability to apply for a PPP loan on their own so they do not count for purposes of a borrower's PPP loan forgiveness.

q. What forms do I need and how do I submit an application?

The applicant must submit SBA Form 2483 (Paycheck Protection Program Application Form) and payroll documentation, as described above. The lender must submit SBA Form 2484 (Paycheck Protection Program Lender's Application for 7(a) Loan Guaranty) electronically in accordance with program requirements and maintain the forms and supporting documentation in its files.

r. How can PPP loans be used?

The proceeds of a PPP loan are to be used for:
i. payroll costs (as defined in the Act and in 2.f.);
ii. costs related to the continuation of group health care benefits during periods of paid sick, medical, or family leave, and insurance premiums;
iii. mortgage interest payments (but not mortgage prepayments or principal payments);
iv. rent payments;
v. utility payments;
vi. interest payments on any other debt obligations that were incurred before February 15, 2020; and/or

vii. refinancing an SBA EIDL loan made between January 31, 2020 and April 3, 2020. If you received an SBA EIDL loan from January 31, 2020 through April 3, 2020, you can apply for a PPP loan. If your EIDL loan was not used for payroll costs, it does not affect your eligibility for a PPP loan. If your EIDL loan was used for payroll costs, your PPP loan must be used to refinance your EIDL loan. Proceeds from any advance up to $10,000 on the EIDL loan will be deducted from the loan forgiveness amount on the PPP loan.

However, at least 75 percent of the PPP loan proceeds shall be used for payroll costs. For purposes of determining the percentage of use of proceeds for payroll costs, the amount of any EIDL refinanced will be included. For purposes of loan forgiveness, however, the borrower will have to document the proceeds used for payroll costs in order to determine the amount of forgiveness. While the Act provides that PPP loan proceeds may be used for the purposes listed above and for other allowable uses described in section 7(a) of the Small Business Act (15 U.S.C. 636(a)), the Administrator believes that finite appropriations and the structure of the Act warrant a requirement that borrowers use a substantial portion of the loan proceeds for payroll costs, consistent with Congress' overarching goal of keeping workers paid and employed. As with the similar limitation on the forgiveness amount explained earlier, the Administrator, in consultation with the Secretary, has determined that 75 percent is an appropriate percentage that will align this element of the program with the loan amount, 75 percent of which is equivalent to eight weeks of payroll. This limitation on use of the loan funds will help to ensure that the finite appropriations available for these loans are directed toward payroll protection, as each loan that is issued depletes the appropriation, regardless of whether portions of the loan are later forgiven.

s. What happens if PPP loan funds are misused?

If you use PPP funds for unauthorized purposes, SBA will direct you to repay those amounts. If you knowingly use the funds for unauthorized purposes, you will be subject to additional liability such as charges for fraud. If one of your shareholders, members, or partners uses PPP funds for unauthorized purposes, SBA will have recourse against the shareholder, member, or partner for the unauthorized use.

t. What certifications need to be made?

On the Paycheck Protection Program application, an authorized representative of the applicant must certify in good faith to all of the below:[1]
i. The applicant was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on a Form 1099–MISC.
ii. Current economic uncertainty makes this loan request necessary to support the ongoing operations of the applicant.
iii. The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments; I understand that if the funds are knowingly used for unauthorized purposes, the Federal Government may hold me legally liable such as for charges of fraud. As explained above, not more than 25 percent of loan proceeds may be used for non-payroll costs.
iv. Documentation verifying the number of full-time equivalent employees on payroll as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities for the eight week period following this loan will be provided to the lender.
v. Loan forgiveness will be provided for the sum of documented payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities. As explained above, not more than 25 percent of the forgiven amount may be for non-payroll costs.
vi. During the period beginning on February 15, 2020 and ending on December 31, 2020, the applicant has not and will not receive another loan under this program.
vii. I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 U.S.C. 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 U.S.C. 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 U.S.C. 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

---

[1] A representative of the applicant can certify for the business as a whole if the representative is legally authorized to do so.

viii. I acknowledge that the lender will confirm the eligible loan amount using tax documents I have submitted. I affirm that these tax documents are identical to those submitted to the Internal Revenue Service. I also understand, acknowledge, and agree that the Lender can share the tax information with SBA's authorized representatives, including authorized representatives of the SBA Office of Inspector General, for the purpose of compliance with SBA Loan Program Requirements and all SBA reviews.

3. What do lenders need to know and do?

a. Who is eligible to make PPP loans?

i. All SBA 7(a) lenders are automatically approved to make PPP loans on a delegated basis.

ii. The Act provides that the authority to make PPP loans can be extended to additional lenders determined by the Administrator and the Secretary to have the necessary qualifications to process, close, disburse, and service loans made with the SBA guarantee. Since SBA is authorized to make PPP loans up to $349 billion by June 30, 2020, the Adminstrator and the Secretary have jointly determined that authorizing additional lenders is necessary to achieve the purpose of allowing as many eligible borrowers as possible to receive loans by the June 30, 2020 deadline.

iii. The following types of lenders have been determined to meet the criteria and are eligible to make PPP loans unless they currently are designated in Troubled Condition by their primary Federal regulator or are subject to a formal enforcement action with their primary Federal regulator that addresses unsafe or unsound lending practices:

I. Any federally insured depository institution or any federally insured credit union;

II. Any Farm Credit System institution (other than the Federal Agricultural Mortgage Corporation) as defined in 12 U.S.C. 2002(a) that applies the requirements under the Bank Secrecy Act and its implementing regulations (collectively, BSA) as a federally regulated financial institution, or functionally equivalent requirements that are not altered by this rule; and

III. Any depository or non-depository financing provider that originates, maintains, and services business loans or other commercial financial receivables and participation interests; has a formalized compliance program; applies the requirements under the BSA as a federally regulated financial

institution, or the BSA requirements of an equivalent federally regulated financial institution; has been operating since at least February 15, 2019, and has originated, maintained, and serviced more than $50 million in business loans or other commercial financial receivables during a consecutive 12 month period in the past 36 months, or is a service provider to any insured depository institution that has a contract to support such institution's lending activities in accordance with 12 U.S.C. 1867(c) and is in good standing with the appropriate Federal banking agency.

iv. Qualified institutions described in 3.a.iii.I. and II. will be automatically qualified under delegated authority by the SBA upon transmission of CARES Act Section 1102 Lender Agreement (SBA Form 3506) unless they currently are designated in Troubled Condition by their primary Federal regulator or are subject to a formal enforcement action by their primary Federal regulator that addresses unsafe or unsound lending practices.

b. What do lenders have to do in terms of loan underwriting?

Each lender shall:

i. Confirm receipt of borrower certifications contained in Paycheck Protection Program Application form issued by the Administration;

ii. Confirm receipt of information demonstrating that a borrower had employees for whom the borrower paid salaries and payroll taxes on or around February 15, 2020;

iii. Confirm the dollar amount of average monthly payroll costs for the preceding calendar year by reviewing the payroll documentation submitted with the borrower's application; and

iv. Follow applicable BSA requirements:

I. Federally insured depository institutions and federally insured credit unions should continue to follow their existing BSA protocols when making PPP loans to either new or existing customers who are eligible borrowers under the PPP. PPP loans for existing customers will not require re-verification under applicable BSA requirements, unless otherwise indicated by the institution's risk-based approach to BSA compliance.

II. Entities that are not presently subject to the requirements of the BSA, should, prior to engaging in PPP lending activities, including making PPP loans to either new or existing customers who are eligible borrowers under the PPP, establish an anti-money laundering (AML) compliance program equivalent to that of a comparable federally regulated institution. Depending upon

the comparable federally regulated institution, such a program may include a customer identification program (CIP), which includes identifying and verifying their PPP borrowers' identities (including *e.g.*, date of birth, address, and taxpayer identification number), and, if that PPP borrower is a company, following any applicable beneficial ownership information collection requirements. Alternatively, if available, entities may rely on the CIP of a federally insured depository institution or federally insured credit union with an established CIP as part of its AML program. In either instance, entities should also understand the nature and purpose of their PPP customer relationships to develop customer risk profiles. Such entities will also generally have to identify and report certain suspicious activity to the U.S. Department of the Treasury's Financial Crimes Enforcement Network (FinCEN). If such entities have questions with regard to meeting these requirements, they should contact the FinCEN Regulatory Support Section at *FRC@fincen.gov*. In addition, FinCEN has created a COVID–19-specific contact channel, via a specific drop-down category, for entities to communicate to FinCEN COVID–19-related concerns while adhering to their BSA obligations. Entities that wish to communicate such COVID–19-related concerns to FinCEN should go to *www.FinCEN.gov*, click on "Need Assistance," and select "COVID19" in the subject drop-down list.

Each lender's underwriting obligation under the PPP is limited to the items above and reviewing the "Paycheck Protection Application Form." Borrowers must submit such documentation as is necessary to establish eligibility such as payroll processor records, payroll tax filings, or Form 1099–MISC, or income and expenses from a sole proprietorship. For borrowers that do not have any such documentation, the borrower must provide other supporting documentation, such as bank records, sufficient to demonstrate the qualifying payroll amount.

c. Can lenders rely on borrower documentation for loan forgiveness?

Yes. The lender does not need to conduct any verification if the borrower submits documentation supporting its request for loan forgiveness and attests that it has accurately verified the payments for eligible costs. The Administrator will hold harmless any lender that relies on such borrower documents and attestation from a borrower. The Administrator, in

consultation with the Secretary, has determined that lender reliance on a borrower's required documents and attestation is necessary and appropriate in light of section 1106(h) of the Act, which prohibits the Administrator from taking an enforcement action or imposing penalties if the lender has received a borrower attestation.

d. What fees will lenders be paid?

SBA will pay lenders fees for processing PPP loans in the following amounts:

i. Five (5) percent for loans of not more than $350,000;

ii. Three (3) percent for loans of more than $350,000 and less than $2,000,000; and

iii. One (1) percent for loans of at least $2,000,000.

e. Do lenders have to apply the "credit elsewhere test"?

No. When evaluating an applicant's eligibility lenders will not be required to apply the "credit elsewhere test" (as set forth in section 7(a)(1)(A) of the Small Business Act (15 U.S.C. 636) and SBA regulations at 13 CFR 120.101)).

4. What do both borrowers and lenders need to know and do?

a. What are the loan terms and conditions?

Loans will be guaranteed under the PPP under the same terms, conditions and processes as other 7(a) loans, with certain changes including but not limited to:

i. The guarantee percentage is 100 percent.

ii. No collateral will be required.

iii. No personal guarantees will be required.

iv. The interest rate will be 100 basis points or one percent.

v. All loans will be processed by all lenders under delegated authority and lenders will be permitted to rely on certifications of the borrower in order to determine eligibility of the borrower and the use of loan proceeds.

b. Are there any fee waivers?

i. There will be no up-front guarantee fee payable to SBA by the Borrower;

ii. There will be no lender's annual service fee ("on-going guaranty fee") payable to SBA;

iii. There will be no subsidy recoupment fee; and

iv. There will be no fee payable to SBA for any guarantee sold into the secondary market.

c. Who pays the fee to an agent who assists a borrower?

Agent fees will be paid by the lender out of the fees the lender receives from SBA. Agents may not collect fees from the borrower or be paid out of the PPP loan proceeds. The total amount that an agent may collect from the lender for assistance in preparing an application for a PPP loan (including referral to the lender) may not exceed:

i. One (1) percent for loans of not more than $350,000;

ii. 0.50 percent for loans of more than $350,000 and less than $2 million; and

iii. 0.25 percent for loans of at least $2 million.

The Act authorizes the Administrator to establish limits on agent fees. The Administrator, in consultation with the Secretary, determined that the agent fee limits set forth above are reasonable based upon the application req uirements and the fees that lenders receive for making PPP loans.

d. Can PPP loans be sold into the secondary market?

Yes. A PPP loan may be sold on the secondary market after the loan is fully disbursed. A PPP loan may be sold on the secondary market at a premium or a discount to par value. SBA will issue guidance regarding any advance purchase for loans sold in the secondary market.

e. Can SBA purchase some or all of the loan in advance?

Yes. A lender may request that the SBA purchase the expected forgiveness amount of a PPP loan or pool of PPP loans at the end of week seven of the covered period. The expected forgiveness amount is the amount of loan principal the lender reasonably expects the borrower to expend on payroll costs, covered mortgage interest, covered rent, and covered utility payments during the eight week period after loan disbursement. At least 75 percent of the expected forgiveness amount shall be for payroll costs, as provided in 2.o. To submit a PPP loan or pool of PPP loans for advance purchase, a lender shall submit a report requesting advance purchase with the expected forgiveness amount to the SBA. The report shall include: the Paycheck Protection Program Application Form (SBA Form 2483) and any supporting documentation submitted with such application; the Paycheck Protection Program Lender's Application for 7(a) Loan Guaranty (SBA Form 2484) and any supporting documentation; a detailed narrative explaining the assumptions used in determining the expected forgiveness amount, the basis for those assumptions, alternative assumptions considered, and why alternative assumptions were not used; any information obtained from the borrower since the loan was disbursed that the lender used to determine the expected forgiveness amount, which should include the same documentation required to apply for loan forgiveness such as payroll tax filings, cancelled checks, and other payment documentation; and any additional information the Administrator may require to determine whether the expected forgiveness amount is reasonable. The Administrator, in consultation with the Secretary, determined that seven weeks is the minimum period of time necessary for a lender to reasonably determine the expected forgiveness amount for a PPP loan or pool of PPP loans, since the PPP is a new program and the likelihood that many borrowers will be new clients of the lender. The expected forgiveness amount may not exceed the total amount of principal on the PPP loan or pool of loans. The Administrator will purchase the expected forgiveness amount of the PPP loan(s) within 15 days of the date on which the Administrator receives a complete report that demonstrates that the expected forgiveness amount is indeed reasonable.

5. Additional Information

All loans guaranteed by the SBA pursuant to the CARES Act will be made consistent with constitutional, statutory, and regulatory protections for religious liberty, including the First Amendment to the Constitution, the Religious Freedom Restoration Act, 42 U.S.C. 2000bb–1 and bb–3, and SBA regulation at 13 CFR 113.3–1h, which provides that nothing in SBA nondiscrimination regulations shall apply to a religious corporation, association, educational institution or society with respect to the membership or the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution or society of its religious activities. SBA intends to promptly issue additional guidance with regard to religious liberty protections under this program.

SBA may provide further guidance, if needed, through SBA notices and a program guide which will be posted on SBA's website at *www.sba.gov*.

Questions on the Paycheck Protection Program 7(a) Loans may be directed to the Lender Relations Specialist in the local SBA Field Office. The local SBA Field Office may be found at *https://www.sba.gov/tools/local-assistance/districtoffices*.

JA0040

**Compliance With Executive Orders 12866, 12988, 13132, and 13771, the Paperwork Reduction Act (44 U.S.C. Ch. 35), and the Regulatory Flexibility Act (5 U.S.C. 601–612)**

*E.O. 12866 and E.O. 13563*

This interim final rule is economically significant for the purposes of Executive Orders 12866 and 13563. SBA, however, is proceeding under the emergency provision at Executive Order 12866 Section 6(a)(3)(D) based on the need to move expeditiously to mitigate the current economic conditions arising from the COVID–19 emergency. This rule's designation under Executive Order 13771 will be informed by public comment.

This rule is necessary to implement Sections 1102 and 1106 of the CARES Act in order to provide economic relief to small businesses nationwide adversely impacted under the COVID–19 Emergency Declaration. We anticipate that this rule will result in substantial benefits to small businesses, their employees, and the communities they serve. However, we lack data to estimate the effects of this rule.

*Executive Order 12988*

SBA has drafted this rule, to the extent practicable, in accordance with the standards set forth in section 3(a) and 3(b)(2) of Executive Order 12988, to minimize litigation, eliminate ambiguity, and reduce burden. The rule has no preemptive or retroactive effect.

*Executive Order 13132*

SBA has determined that this rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various layers of government. Therefore, SBA has determined that this rule has no federalism implications warranting preparation of a federalism assessment.

*Paperwork Reduction Act, 44 U.S.C. Chapter 35*

SBA has determined that this rule will impose recordkeeping or reporting requirements under the Paperwork Reduction Act ("PRA"). SBA has obtained emergency approval under OMB Control Number 3245–0407 for the information collection (IC) required to implement the program described above. This IC consists of Form 2483 (Paycheck Protection Program Application Form), SBA Form 2484 (Paycheck Protection Program Lender's Application for 7(a) Loan Guaranty), and SBA Form 3506 (CARES Act

Section 1102 Lender Agreement), and SBA Form 3507 (CARES Act Section 1102 Lender Agreement—Non-Bank and Non-Insured Depository Institution Lender). The collection is approved for use until September 30, 2020.

*Regulatory Flexibility Act (RFA)*

The Regulatory Flexibility Act (RFA) generally requires that when an agency issues a proposed rule, or a final rule pursuant to section 553(b) of the APA or another law, the agency must prepare a regulatory flexibility analysis that meets the requirements of the RFA and publish such analysis in the **Federal Register**. 5 U.S.C. 603, 604. Specifically, the RFA normally requires agencies to describe the impact of a rulemaking on small entities by providing a regulatory impact analysis. Such analysis must address the consideration of regulatory options that would lessen the economic effect of the rule on small entities. The RFA defines a "small entity" as (1) a proprietary firm meeting the size standards of the Small Business Administration (SBA); (2) a nonprofit organization that is not dominant in its field; or (3) a small government jurisdiction with a population of less than 50,000. 5 U.S.C. 601(3)–(6). Except for such small government jurisdictions, neither State nor local governments are "small entities." Similarly, for purposes of the RFA, individual persons are not small entities.

The requirement to conduct a regulatory impact analysis does not apply if the head of the agency "certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." 5 U.S.C. 605(b). The agency must, however, publish the certification in the **Federal Register** at the time of publication of the rule, "along with a statement providing the factual basis for such certification." If the agency head has not waived the requirements for a regulatory flexibility analysis in accordance with the RFA's waiver provision, and no other RFA exception applies, the agency must prepare the regulatory flexibility analysis and publish it in the **Federal Register** at the time of promulgation or, if the rule is promulgated in response to an emergency that makes timely compliance impracticable, within 180 days of publication of the final rule. 5 U.S.C. 604(a), 608(b).

Rules that are exempt from notice and comment are also exempt from the RFA requirements, including conducting a regulatory flexibility analysis, when among other things the agency for good cause finds that notice and public procedure are impracticable,

unnecessary, or contrary to the public interest. Small Business Administration's Office of Advocacy guide: *How to Comply with the Regulatory Flexibility Ac. Ch.1. p.9.* Accordingly, SBA is not required to conduct a regulatory flexibility analysis.

*Authority:* 15 U.S.C. 636(a)(36); Coronavirus Aid, Relief, and Economic Security Act, Public Law 116–136, Section 1114.

**Jovita Carranza,**
*Administrator.*

[FR Doc. 2020–07672 Filed 4–10–20; 4:15 pm]

**BILLING CODE P**

---

## SMALL BUSINESS ADMINISTRATION

**13 CFR Part 121**

**[Docket No. SBA–2020–0019]**

**RIN 3245–AH35**

**Business Loan Program Temporary Changes; Paycheck Protection Program**

**AGENCY:** U.S. Small Business Administration.

**ACTION:** Interim final rule.

**SUMMARY:** Elsewhere in this issue of the **Federal Register**, the U.S. Small Business Administration (SBA) is publishing an interim final rule (the Initial Rule) announcing the implementation of sections 1102 and 1106 of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act or the Act). Section 1102 of the Act temporarily adds a new program, titled the "Paycheck Protection Program," to the SBA's 7(a) Loan Program. Section 1106 of the Act provides for forgiveness of up to the full principal amount of qualifying loans guaranteed under the Paycheck Protection Program. The Paycheck Protection Program and loan forgiveness are intended to provide economic relief to small businesses nationwide adversely impacted by the Coronavirus Disease 2019 (COVID–19). This interim final rule supplements the Initial Rule with additional guidance regarding the application of certain affiliate rules applicable to SBA's implementation of sections 1102 and 1106 of the Act and requests public comment.

**DATES:**

*Effective date:* This interim final rule is effective April 15, 2020.

*Applicability date:* This interim final rule applies to applications submitted under the Paycheck Protection Program through June 30, 2020, or until funds made available for this purpose are exhausted.

**SBA** | U.S. Small Business
Administration

**Faith-Based Organizations**
**FAQ**

## FREQUENTLY ASKED QUESTIONS
## REGARDING PARTICIPATION OF FAITH-BASED ORGANIZATIONS
## IN THE PAYCHECK PROTECTION PROGRAM (PPP)
## AND THE ECONOMIC INJURY DISASTER LOAN PROGRAM (EIDL)

1.  **Are faith-based organizations, including houses of worship, eligible to receive SBA loans under the PPP and EIDL programs?**

Yes, and we additionally clarify that faith-based organizations are eligible to receive SBA loans regardless of whether they provide secular social services.  That is, no otherwise eligible organization will be disqualified from receiving a loan because of the religious nature, religious identity, or religious speech of the organization.  The requirements in certain SBA regulations— 13 C.F.R. §§ 120.110(k) and 123.301(g)—impermissibly exclude some religious entities. Because those regulations bar the participation of a class of potential recipients based solely on their religious status, SBA will decline to enforce these subsections and will propose amendments to conform those regulations to the Constitution.  Although 13 C.F.R. § 120.110(a) states that nonprofit entities are ineligible for SBA business loans (which includes the PPP program), the CARES Act explicitly makes nonprofit entities eligible for the PPP program and it does so without regard to whether nonprofit entities provide secular social services.

2.  **Are there any limitations on how faith-based organizations can use the PPP and EIDL loan money they receive?**

Only the same limitations that apply to all other recipients of these loans (such as that loan forgiveness will cover non-payroll costs only to a maximum of 25% of the total loan to a recipient).  The PPP and EIDL loan programs are neutral, generally applicable loan programs that provide support for nonprofit organizations without regard to whether they are religious or secular.  The CARES Act has provided those program funds as part of the efforts to respond to the economic dislocation threatened by the COVID-19 public health emergency.  Under these circumstances, the Establishment Clause does not place any additional restrictions on how faith-based organizations may use the loan proceeds received through either the PPP or the EIDL loan program.  See, e.g., *Religious Restrictions on Capital Financing for Historically Black Colleges and Universities*, 43 Op. O.L.C. __, *7–15 (Aug. 15, 2019); *Authority of FEMA to Provide Disaster Assistance to Seattle Hebrew Academy*, 26 Op. O.L.C. 114, 122–32 (2002).  In addition, the CARES Act does not impose unique burdens or limitations on faith-based

JA0042

SBA U.S. Small Business Administration

**Faith-Based Organizations**
**FAQ**

organizations.  In particular, loans under the program can be used to pay the salaries of ministers and other staff engaged in the religious mission of institutions.

### 3. How will churches qualify if have not been informed of tax-exempt status by the IRS? Do organizations have to request and receive tax exempt status or just meet the requirements of 501(c)(3) status to be eligible?

Churches (including temples, mosques, synagogues, and other houses of worship), integrated auxiliaries of churches, and conventions or associations of churches qualify for PPP and EIDL loans as long as they meet the requirements of Section 501(c)(3) of the Internal Revenue Code, and all other PPP and EIDL requirements.  Such organizations are not required to apply to the IRS to receive tax-exempt status. See 26 U.S.C. § 508(c)(1)(A).

### 4. Will my organization be sacrificing its autonomy or its First Amendment or statutory rights if it requests and receives a loan?

No. Receipt of a loan through any SBA program does not (1) limit the authority of religious organizations to define the standards, responsibilities, and duties of membership; (2) limit the freedom of religious organizations to select individuals to perform work connected to that organization's religious exercise; nor (3) constitute waiver of any rights under federal law, including rights protecting religious autonomy and exercise under the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000b *et seq.*, Section 702 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1(a), or the First Amendment.

Simply put, a faith-based organization that receives a loan will retain its independence, autonomy, right of expression, religious character, and authority over its governance, and no faith-based organization will be excluded from receiving funding because leadership with, membership in, or employment by that organization is limited to persons who share its religious faith and practice.

### 5. What legal requirements will be imposed on my organization as a result of our receipt of this Federal financial assistance?  Will those requirements cease to apply when the loan is either repaid in full or forgiven?

Receipt of a loan through any SBA program constitutes Federal financial assistance and carries with it the application of certain nondiscrimination obligations.  Any legal obligations that you incur through your receipt of this loan are not permanent, and once the loan is paid or forgiven, those nondiscrimination obligations will no longer apply.

JA0043                                                              SBA_000043

Consistent with certain federal nondiscrimination laws, SBA regulations provide that the recipient may not discriminate on the basis of race, color, religion, sex, handicap, age, or national origin with regard to goods, services, or accommodations offered. 13 C.F.R. § 113.3(a). But SBA regulations also make clear that these nondiscrimination requirements do not limit a faith-based entity's autonomy with respect to membership or employment decisions connected to its religious exercise. 13 CFR § 113.3-1(h). And as discussed in Question 4, SBA recognizes the various protections for religious freedom enshrined in the Constitution and federal law that are not altered or waived by receipt of Federal financial assistance.

SBA therefore clarifies that its regulations apply with respect to goods, services, or accommodations offered generally to the public by recipients of these loans, but not to a faith-based organization's ministry activities within its own faith community. For example, SBA's regulations will require a faith-based organization that operates a restaurant or thrift store open to the public to serve the public without regard to the protected traits listed above. But SBA's regulations do not apply to limit a faith-based organization's ability to distribute food or clothing exclusively to its own members or co-religionists. Indeed, SBA will not apply its nondiscrimination regulations in a way that imposes substantial burdens on the religious exercise of faith-based loan recipients, such as by applying those regulations to the performance of church ordinances, sacraments, or religious practices, unless such application is the least restrictive means of furthering a compelling governmental interest. Congress enacted the CARES Act to afford swift and sweeping stopgap relief to Americans who might otherwise lose their jobs or businesses because of the economic hardships wrought by the response to the COVID-19 public health emergency, and SBA has a compelling interest in fulfilling that mandate to provide assistance broadly.

### 6. Is my faith-based organization disqualified from any SBA loan programs because it is affiliated with other faith-based organizations, such as a local diocese?

Not necessarily. Under SBA's regulations, an affiliation may arise among entities in various ways, including from common ownership, common management, or identity of interest. 13 C.F.R. §§ 121.103 and 121.301. These regulations are applicable to applicants for PPP loans. (They also apply to the EIDL program when determining certain loan terms, although aggregating the number of employees of affiliated organizations does not affect eligibility for EIDL loans.) Some faith-based organizations likely would qualify as "affiliated" with other entities under the applicable affiliation rules. Entities that are affiliated according to SBA's affiliation rules must add up their employee numbers in determining whether they have 500 or fewer employees.

But regulations must be applied consistent with constitutional and statutory religious freedom protections. If the connection between your organization and another entity that would constitute an affiliation is based on a religious teaching or belief or is otherwise a part of the



**Faith-Based Organizations**
**FAQ**

exercise of religion, your organization qualifies for an exemption from the affiliation rules. For example, if your faith-based organization affiliates with another organization because of your organization's religious beliefs about church authority or internal constitution, or because the legal, financial, or other structural relationships between your organization and other organizations reflect an expression of such beliefs, your organization would qualify for the exemption. If, however, your faith-based organization is affiliated with other organizations solely for non-religious reasons, such as administrative convenience, then your organization would be subject to the affiliation rules. SBA will not assess, and will not permit participating lenders to assess, the reasonableness of the faith-based organization's good-faith determination that this exception applies.

**7. Does my faith-based organization need to apply for this exemption or include any documentation of its religious beliefs or practices to fall within this affiliation exemption?**

No specific process or detailed filing is necessary to claim the benefit of this exemption. If you believe that your organization qualifies for this exemption to the affiliation rules, you should submit with your loan application a separate sheet stating as much. That sheet may be identified as addendum A, and no further listing of the other organizations with which your organization is affiliated, or description of the relationship to those organizations, is required. You are not required to describe your religious beliefs.

A sample "Addendum A" is attached to this document, but you may choose to write your own. Your statement can be very simple.

**8. How do I know where my organization fits in SBA's size standards table? Should I use the table to determine whether my organization is a small business that is eligible to participate in the PPP program?**

SBA's size standards can be found at 13 CFR § 121.201. Under the CARES Act, a non-profit organization qualifies as small, and is eligible for assistance, if (1) it has no more than 500 employees or (2) the NAICS code associated with its primary industry has a higher employee-based size standard. Some industries—including "religious organizations"—are currently listed in the size standards table with a monetary cap on annual receipts rather than an employee-based size standards cap. For nonprofit organizations whose primary industry is listed with a monetary cap on annual receipts, the size standards table therefore cannot be used to determine eligibility for the PPP program. Faith-based nonprofit organizations that do not fall under a primary industry that is listed with an employee-based size standard must have 500 employees or fewer to be considered small.

JA0045

SBA_000045



**U.S. Small Business Administration**

**Faith-Based Organizations**
**FAQ**

**[Sample]**

## ADDENDUM A

✓ The Applicant claims an exemption from all SBA affiliation rules applicable to Paycheck Protection Program loan eligibility because the Applicant has made a reasonable, good faith determination that the Applicant qualifies for a religious exemption under 13 C.F.R. 121.103(b)(10), which says that "[t]he relationship of a faith-based organization to another organization is not considered an affiliation with the other organization . . . if the relationship is based on a religious teaching or belief or otherwise constitutes a part of the exercise of religion."

JA0046

SBA_000046

As of April 23, 2020

## PAYCHECK PROTECTION PROGRAM LOANS
### Frequently Asked Questions (FAQs)

The Small Business Administration (SBA), in consultation with the Department of the Treasury, intends to provide timely additional guidance to address borrower and lender questions concerning the implementation of the Paycheck Protection Program (PPP), established by section 1102 of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act or the Act). This document will be updated on a regular basis.

Borrowers and lenders may rely on the guidance provided in this document as SBA's interpretation of the CARES Act and of the Paycheck Protection Program Interim Final Rule ("PPP Interim Final Rule") (link). The U.S. government will not challenge lender PPP actions that conform to this guidance,[1] and to the PPP Interim Final Rule and any subsequent rulemaking in effect at the time.

1. **Question:** Paragraph 3.b.iii of the PPP Interim Final Rule states that lenders must "[c]onfirm the dollar amount of average monthly payroll costs for the preceding calendar year by reviewing the payroll documentation submitted with the borrower's application." Does that require the lender to replicate every borrower's calculations?

   **Answer:** No. Providing an accurate calculation of payroll costs is the responsibility of the borrower, and the borrower attests to the accuracy of those calculations on the Borrower Application Form. Lenders are expected to perform a good faith review, in a reasonable time, of the borrower's calculations and supporting documents concerning average monthly payroll cost. For example, minimal review of calculations based on a payroll report by a recognized third-party payroll processor would be reasonable. In addition, as the PPP Interim Final Rule indicates, lenders may rely on borrower representations, including with respect to amounts required to be excluded from payroll costs.

   If the lender identifies errors in the borrower's calculation or material lack of substantiation in the borrower's supporting documents, the lender should work with the borrower to remedy the issue.[2]

2. **Question:** Are small business concerns (as defined in section 3 of the Small Business Act, 15 U.S.C. 632) required to have 500 or fewer employees to be eligible borrowers in the PPP?

   **Answer:** No. Small business concerns can be eligible borrowers even if they have more than 500 employees, as long as they satisfy the existing statutory and regulatory definition of a "small business concern" under section 3 of the Small Business Act, 15 U.S.C. 632. A business can qualify if it meets the SBA employee-based or revenue-

---

[1] This document does not carry the force and effect of law independent of the statute and regulations on which it is based.
[2] Question 1 published April 3, 2020.

JA0047

As of April 23, 2020

based size standard corresponding to its primary industry.  Go to www.sba.gov/size for the industry size standards.

Additionally, a business can qualify for the Paycheck Protection Program as a small business concern if it met both tests in SBA's "alternative size standard" as of March 27, 2020: (1) maximum tangible net worth of the business is not more than $15 million; and (2) the average net income after Federal income taxes (excluding any carry-over losses) of the business for the two full fiscal years before the date of the application is not more than $5 million.

A business that qualifies as a small business concern under section 3 of the Small Business Act, 15 U.S.C. 632, may truthfully attest to its eligibility for PPP loans on the Borrower Application Form, unless otherwise ineligible.

3. **Question:**  Does my business have to qualify as a small business concern (as defined in section 3 of the Small Business Act, 15 U.S.C. 632) in order to participate in the PPP?

   **Answer:**  No.  In addition to small business concerns, a business is eligible for a PPP loan if the business has 500 or fewer employees whose principal place of residence is in the United States, or the business meets the SBA employee-based size standards for the industry in which it operates (if applicable).  Similarly, PPP loans are also available for qualifying tax-exempt nonprofit organizations described in section 501(c)(3) of the Internal Revenue Code (IRC), tax-exempt veterans organization described in section 501(c)(19) of the IRC, and Tribal business concerns described in section 31(b)(2)(C) of the Small Business Act that have 500 or fewer employees whose principal place of residence is in the United States, or meet the SBA employee-based size standards for the industry in which they operate.

4. **Question:**  Are lenders required to make an independent determination regarding applicability of affiliation rules under 13 C.F.R. 121.301(f) to borrowers?

   **Answer:**  No.  It is the responsibility of the borrower to determine which entities (if any) are its affiliates and determine the employee headcount of the borrower and its affiliates. Lenders are permitted to rely on borrowers' certifications.

5. **Question:**  Are borrowers required to apply SBA's affiliation rules under 13 C.F.R. 121.301(f)?

   **Answer:**  Yes.  Borrowers must apply the affiliation rules set forth in SBA's Interim Final Rule on Affiliation.  A borrower must certify on the Borrower Application Form that the borrower is eligible to receive a PPP loan, and that certification means that the borrower is a small business concern as defined in section 3 of the Small Business Act (15 U.S.C. 632), meets the applicable SBA employee-based or revenue-based size standard, or meets the tests in SBA's alternative size standard, after applying the affiliation rules, if applicable.  SBA's existing affiliation exclusions apply to the PPP, including, for example the exclusions under 13 CFR 121.103(b)(2).

As of April 23, 2020

6. **Question:** The affiliation rule based on ownership (13 C.F.R. 121.301(f)(1)) states that SBA will deem a minority shareholder in a business to control the business if the shareholder has the right to prevent a quorum or otherwise block action by the board of directors or shareholders. If a minority shareholder irrevocably gives up those rights, is it still considered to be an affiliate of the business?

   **Answer:** No. If a minority shareholder in a business irrevocably waives or relinquishes any existing rights specified in 13 C.F.R. 121.301(f)(1), the minority shareholder would no longer be an affiliate of the business (assuming no other relationship that triggers the affiliation rules).

7. **Question:** The CARES Act excludes from the definition of payroll costs any employee compensation in excess of an annual salary of $100,000. Does that exclusion apply to all employee benefits of monetary value?

   **Answer:** No. The exclusion of compensation in excess of $100,000 annually applies only to cash compensation, not to non-cash benefits, including:
   - employer contributions to defined-benefit or defined-contribution retirement plans;
   - payment for the provision of employee benefits consisting of group health care coverage, including insurance premiums; and
   - payment of state and local taxes assessed on compensation of employees.

8. **Question:** Do PPP loans cover paid sick leave?

   **Answer:** Yes. PPP loans covers payroll costs, including costs for employee vacation, parental, family, medical, and sick leave. However, the CARES Act excludes qualified sick and family leave wages for which a credit is allowed under sections 7001 and 7003 of the Families First Coronavirus Response Act (Public Law 116–127). Learn more about the Paid Sick Leave Refundable Credit here.

9. **Question:** My small business is a seasonal business whose activity increases from April to June. Considering activity from that period would be a more accurate reflection of my business's operations. However, my small business was not fully ramped up on February 15, 2020. Am I still eligible?

   **Answer:** In evaluating a borrower's eligibility, a lender may consider whether a seasonal borrower was in operation on February 15, 2020 or for an 8-week period between February 15, 2019 and June 30, 2019.

10. **Question:** What if an eligible borrower contracts with a third-party payer such as a payroll provider or a Professional Employer Organization (PEO) to process payroll and report payroll taxes?

    **Answer:** SBA recognizes that eligible borrowers that use PEOs or similar payroll providers are required under some state registration laws to report wage and other data on

As of April 23, 2020

the Employer Identification Number (EIN) of the PEO or other payroll provider.  In these cases, payroll documentation provided by the payroll provider that indicates the amount of wages and payroll taxes reported to the IRS by the payroll provider for the borrower's employees will be considered acceptable PPP loan payroll documentation.  Relevant information from a Schedule R (Form 941), Allocation Schedule for Aggregate Form 941 Filers, attached to the PEO's or other payroll provider's Form 941, Employer's Quarterly Federal Tax Return, should be used if it is available; otherwise, the eligible borrower should obtain a statement from the payroll provider documenting the amount of wages and payroll taxes.  In addition, employees of the eligible borrower will not be considered employees of the eligible borrower's payroll provider or PEO.

11. **Question:**  May lenders accept signatures from a single individual who is authorized to sign on behalf of the borrower?

    **Answer:**  Yes.  However, the borrower should bear in mind that, as the Borrower Application Form indicates, only an authorized representative of the business seeking a loan may sign on behalf of the business.  An individual's signature as an "Authorized Representative of Applicant" is a representation to the lender and to the U.S. government that the signer is authorized to make the certifications, including with respect to the applicant and each owner of 20% or more of the applicant's equity, contained in the Borrower Application Form.  Lenders may rely on that representation and accept a single individual's signature on that basis.

12. **Question:**  I need to request a loan to support my small business operations in light of current economic uncertainty.  However, I pleaded guilty to a felony crime a very long time ago.  Am I still eligible for the PPP?

    **Answer:**  Yes. Businesses are only ineligible if an owner of 20 percent or more of the equity of the applicant is presently incarcerated, on probation, on parole; subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction; or, within the last five years, for any felony, has been convicted; pleaded guilty; pleaded nolo contendere; been placed on pretrial diversion; or been placed on any form of parole or probation (including probation before judgment).

13. **Question:**  Are lenders permitted to use their own online portals and an electronic form that they create to collect the same information and certifications as in the Borrower Application Form, in order to complete implementation of their online portals?

    **Answer:**  Yes.  Lenders may use their own online systems and a form they establish that asks for the same information (using the same language) as the Borrower Application Form.  Lenders are still required to send the data to SBA using SBA's interface.

14. **Question:**  What time period should borrowers use to determine their number of employees and payroll costs to calculate their maximum loan amounts?

As of April 23, 2020

**Answer:** In general, borrowers can calculate their aggregate payroll costs using data either from the previous 12 months or from calendar year 2019. For seasonal businesses, the applicant may use average monthly payroll for the period between February 15, 2019, or March 1, 2019, and June 30, 2019. An applicant that was not in business from February 15, 2019 to June 30, 2019 may use the average monthly payroll costs for the period January 1, 2020 through February 29, 2020.

Borrowers may use their average employment over the same time periods to determine their number of employees, for the purposes of applying an employee-based size standard. Alternatively, borrowers may elect to use SBA's usual calculation: the average number of employees per pay period in the 12 completed calendar months prior to the date of the loan application (or the average number of employees for each of the pay periods that the business has been operational, if it has not been operational for 12 months).

15. **Question:** Should payments that an eligible borrower made to an independent contractor or sole proprietor be included in calculations of the eligible borrower's payroll costs?

**Answer:** No. Any amounts that an eligible borrower has paid to an independent contractor or sole proprietor should be excluded from the eligible business's payroll costs. However, an independent contractor or sole proprietor will itself be eligible for a loan under the PPP, if it satisfies the applicable requirements.

16. **Question:** How should a borrower account for federal taxes when determining its payroll costs for purposes of the maximum loan amount, allowable uses of a PPP loan, and the amount of a loan that may be forgiven?

**Answer:** Under the Act, payroll costs are calculated on a gross basis without regard to (i.e., not including subtractions or additions based on) federal taxes imposed or withheld, such as the employee's and employer's share of Federal Insurance Contributions Act (FICA) and income taxes required to be withheld from employees. As a result, payroll costs are not reduced by taxes imposed on an employee and required to be withheld by the employer, but payroll costs do not include the employer's share of payroll tax. For example, an employee who earned $4,000 per month in gross wages, from which $500 in federal taxes was withheld, would count as $4,000 in payroll costs. The employee would receive $3,500, and $500 would be paid to the federal government. However, the employer-side federal payroll taxes imposed on the $4,000 in wages are excluded from payroll costs under the statute.[3]

---

[3] The definition of "payroll costs" in the CARES Act, 15 U.S.C. 636(a)(36)(A)(viii), excludes "taxes imposed or withheld under chapters 21, 22, or 24 of the Internal Revenue Code of 1986 during the covered period," defined as February 15, 2020, to June 30, 2020. As described above, the SBA interprets this statutory exclusion to mean that payroll costs are calculated on a gross basis, without subtracting federal taxes that are imposed on the employee or withheld from employee wages. Unlike employer-side payroll taxes, such employee-side taxes are ordinarily expressed as a reduction in employee take-home pay; their exclusion from the definition of payroll costs means payroll costs should not be reduced based on taxes imposed on the employee or withheld from employee wages. This interpretation is consistent with the text of the statute and advances the legislative purpose of ensuring workers

As of April 23, 2020

17. **Question:** I filed or approved a loan application based on the version of the PPP Interim Final Rule published on April 2, 2020. Do I need to take any action based on the updated guidance in these FAQs?

    **Answer:** No. Borrowers and lenders may rely on the laws, rules, and guidance available at the time of the relevant application. However, borrowers whose previously submitted loan applications have not yet been processed may revise their applications based on clarifications reflected in these FAQs.

18. **Question:** Are PPP loans for existing customers considered new accounts for FinCEN Rule CDD purposes? Are lenders required to collect, certify, or verify beneficial ownership information in accordance with the rule requirements for existing customers?

    **Answer:** If the PPP loan is being made to an existing customer and the necessary information was previously verified, you do not need to re-verify the information.

    Furthermore, if federally insured depository institutions and federally insured credit unions eligible to participate in the PPP program have not yet collected beneficial ownership information on existing customers, such institutions do not need to collect and verify beneficial ownership information for those customers applying for new PPP loans, unless otherwise indicated by the lender's risk-based approach to BSA compliance.[4]

19. **Question:** Do lenders have to use a promissory note provided by SBA or may they use their own?

    **Answer:** Lenders may use their own promissory note or an SBA form of promissory note.

20. **Question:** The amount of forgiveness of a PPP loan depends on the borrower's payroll costs over an eight-week period; when does that eight-week period begin?

    **Answer:** The eight-week period begins on the date the lender makes the first disbursement of the PPP loan to the borrower. The lender must make the first disbursement of the loan no later than ten calendar days from the date of loan approval.[5]

21. **Question:** Do lenders need a separate SBA Authorization document to issue PPP loans?

    **Answer:** No. A lender does not need a separate SBA Authorization for SBA to guarantee a PPP loan. However, lenders must have executed SBA Form 2484 (the

---

remain paid and employed. Further, because the reference period for determining a borrower's maximum loan amount will largely or entirely precede the period from February 15, 2020, to June 30, 2020, and the period during which borrowers will be subject to the restrictions on allowable uses of the loans may extend beyond that period, for purposes of the determination of allowable uses of loans and the amount of loan forgiveness, this statutory exclusion will apply with respect to such taxes imposed or withheld at any time, not only during such period.

[4] Questions 2 – 18 published April 6, 2020.

[5] Questions 19 – 20 published April 8, 2020.

JA0052

As of April 23, 2020

Lender Application Form for the Paycheck Protection Program)[6] to issue PPP loans and receive a loan number for each originated PPP loan. Lenders may include in their promissory notes for PPP loans any terms and conditions, including relating to amortization and disclosure, that are not inconsistent with Sections 1102 and 1106 of the CARES Act, the PPP Interim Final Rule and guidance, and SBA Form 2484.

22. **Question:** I am a non-bank lender that meets all applicable criteria of the PPP Interim Final Rule. Will I be automatically enrolled as a PPP lender? What criteria will SBA and the Treasury Department use to assess whether to approve my application to participate as a PPP lender?

**Answer:** We encourage lenders that are not currently 7(a) lenders to apply in order to increase the scope of PPP lending options and the speed with which PPP loans can be disbursed to help small businesses across America. We recognize that financial technology solutions can promote efficiency and financial inclusion in implementing the PPP. Applicants should submit SBA Form 3507 and the relevant attachments to NFRLApplicationForPPP@sba.gov. Submission of the SBA Form 3507 does not result in automatic enrollment in the PPP. SBA and the Treasury Department will evaluate each application from a non-bank or non-insured depository institution lender and determine whether the applicant has the necessary qualifications to process, close, disburse, and service PPP loans made with SBA's guarantee. SBA may request additional information from the applicant before making a determination.

23. **Question:** How do the $10 million cap and affiliation rules work for franchises?

**Answer:** If a franchise brand is listed on the SBA Franchise Directory, each of its franchisees that meets the applicable size standard can apply for a PPP loan. (The franchisor does not apply on behalf of its franchisees.) The $10 million cap on PPP loans is a limit per franchisee entity, and each franchisee is limited to one PPP loan.

Franchise brands that have been denied listing on the Directory because of affiliation between franchisor and franchisee may request listing to receive PPP loans. SBA will not apply affiliation rules to a franchise brand requesting listing on the Directory to participate in the PPP, but SBA will confirm that the brand is otherwise eligible for listing on the Directory.

24. **Question:** How do the $10 million cap and affiliation rules work for hotels and restaurants (and any business assigned a North American Industry Classification System (NAICS) code beginning with 72)?

**Answer:** Under the CARES Act, any single business entity that is assigned a NAICS code beginning with 72 (including hotels and restaurants) and that employs not more than 500 employees per physical location is eligible to receive a PPP loan.

---

[6] This requirement is satisfied by a lender when the lender completes the process of submitting a loan through the E-Tran system; no transmission or retention of a physical copy of Form 2484 is required.

As of April 23, 2020

In addition, SBA's affiliation rules (13 CFR 121.103 and 13 CFR 121.301) do not apply to any business entity that is assigned a NAICS code beginning with 72 and that employs not more than a total of 500 employees. As a result, if each hotel or restaurant location owned by a parent business is a separate legal business entity, each hotel or restaurant location that employs not more than 500 employees is permitted to apply for a separate PPP loan provided it uses its unique EIN.

The $10 million maximum loan amount limitation applies to each eligible business entity, because individual business entities cannot apply for more than one loan. The following examples illustrate how these principles apply.

Example 1. Company X directly owns multiple restaurants and has no affiliates.
- Company X may apply for a PPP loan if it employs 500 or fewer employees per location (including at its headquarters), even if the total number of employees employed across all locations is over 500.

Example 2. Company X wholly owns Company Y and Company Z (as a result, Companies X, Y, and Z are all affiliates of one another). Company Y and Company Z each own a single restaurant with 500 or fewer employees.
- Company Y and Company Z can each apply for a separate PPP loan, because each has 500 or fewer employees. The affiliation rules do not apply, because Company Y and Company Z each has 500 or fewer employees and is in the food services business (with a NAICS code beginning with 72).

Example 3. Company X wholly owns Company Y and Company Z (as a result, Companies X, Y, and Z are all affiliates of one another). Company Y owns a restaurant with 400 employees. Company Z is a construction company with 400 employees.
- Company Y is eligible for a PPP loan because it has 500 or fewer employees. The affiliation rules do not apply to Company Y, because it has 500 or fewer employees and is in the food services business (with a NAICS code beginning with 72).
- The waiver of the affiliation rules does not apply to Company Z, because Company Z is in the construction industry. Under SBA's affiliation rules, 13 CFR 121.301(f)(1) and (3), Company Y and Company Z are affiliates of one another because they are under the common control of Company X, which wholly owns both companies. This means that the size of Company Z is determined by adding its employees to those of Companies X and Y. Therefore, Company Z is deemed to have more than 500 employees, together with its affiliates. However, Company Z may be eligible to receive a PPP loan as a small business concern if it, together with Companies X and Y, meets SBA's other applicable size standards," as explained in FAQ #2.

25. **Question:** Does the information lenders are required to collect from PPP applicants regarding every owner who has a 20% or greater ownership stake in the applicant business (i.e., owner name, title, ownership %, TIN, and address) satisfy a lender's obligation to collect beneficial ownership information (which has a 25% ownership threshold) under the Bank Secrecy Act?

As of April 23, 2020

**Answer:**

For lenders with existing customers:  With respect to collecting beneficial ownership information for owners holding a 20% or greater ownership interest, if the PPP loan is being made to an existing customer and the lender previously verified the necessary information, the lender does not need to re-verify the information.  Furthermore, if federally insured depository institutions and federally insured credit unions eligible to participate in the PPP program have not yet collected such beneficial ownership information on existing customers, such institutions do not need to collect and verify beneficial ownership information for those customers applying for new PPP loans, unless otherwise indicated by the lender's risk-based approach to Bank Secrecy Act (BSA) compliance.

For lenders with new customers:  For new customers, the lender's collection of the following information from all natural persons with a 20% or greater ownership stake in the applicant business will be deemed to satisfy applicable BSA requirements and FinCEN regulations governing the collection of beneficial ownership information:  owner name, title, ownership %, TIN, address, and date of birth.  If any ownership interest of 20% or greater in the applicant business belongs to a business or other legal entity, lenders will need to collect appropriate beneficial ownership information for that entity. If you have questions about requirements related to beneficial ownership, go to https://www.fincen.gov/resources/statutes-and-regulations/cdd-final-rule.  Decisions regarding further verification of beneficial ownership information collected from new customers should be made pursuant to the lender's risk-based approach to BSA compliance.[7]

26. **Question:**  SBA regulations require approval by SBA's Standards of Conduct Committee (SCC) for SBA Assistance, other than disaster assistance, to an entity, if its sole proprietor, partner, officer, director, or stockholder with a 10 percent or more interest is: a current SBA employee; a Member of Congress; an appointed official or employee of the legislative or judicial branch; a member or employee of an SBA Advisory Council or SCORE volunteer; or a household member of any of the preceding individuals.  Do these entities need the approval of the SCC in order to be eligible for a PPP loan?

    **Answer:**  The SCC has authorized a blanket approval for PPP loans to such entities so that further action by the SCC is not necessary in the PPP program.

27. **Question:**  SBA regulations require a written statement of no objection by the pertinent Department or military service before it provides any SBA Assistance, other than disaster loans, to an entity, if its sole proprietor, partner, officer, director, or stockholder with a 10 percent or more interest, or if a household member of any of the preceding individuals, is an employee of another Government Department or Agency having a grade of at least GS-13 or its equivalent.  Does this requirement apply to PPP loans?

---

[7] Questions 21 – 25 published April 13, 2020.

As of April 23, 2020

**Answer:** No.  The SCC has determined that a written statement of no objection is not required from another Government Department or Agency for PPP loans.

28. **Question:**  Is a lender permitted to submit a PPP loan application to SBA through E-Tran before the lender has fulfilled its responsibility to review the required borrower documentation and calculation of payroll costs?

**Answer:**  No.  Before a lender submits a PPP loan through E-Tran, the lender must have collected the information and certifications contained in the Borrower Application Form and the lender must have fulfilled its obligations set forth in paragraphs 3.b.(i)-(iii) of the PPP Interim Final Rule.  Please refer to the Interim Final Rule and FAQ 1 for more information on the lender's responsibility regarding confirmation of payroll costs.

Lenders who did not understand that these steps are required before submission to E-Tran need not withdraw applications submitted to E-Tran before April 14, 2020, but must fulfill lender responsibilities with respect to those applications as soon as practicable and no later than loan closing.[8]

29. **Question:**  Can lenders use scanned copies of documents or E-signatures or E-consents permitted by the E-sign Act?

**Answer:**  Yes.  All PPP lenders may accept scanned copies of signed loan applications and documents containing the information and certifications required by SBA Form 2483 and the promissory note used for the PPP loan.  Additionally, lenders may also accept any form of E-consent or E-signature that complies with the requirements of the Electronic Signatures in Global and National Commerce Act (P.L. 106-229).

If electronic signatures are not feasible, when obtaining a wet ink signature without in-person contact, lenders should take appropriate steps to ensure the proper party has executed the document.

This guidance does not supersede signature requirements imposed by other applicable law, including by the lender's primary federal regulator.[9]

30. **Question:**  Can a lender sell a PPP loan into the secondary market?

**Answer:**  Yes.  A PPP loan may be sold into the secondary market at any time after the loan is fully disbursed.  A secondary market sale of a PPP loan does not require SBA approval.  A PPP loan sold into the secondary market is 100% SBA guaranteed.  A PPP loan may be sold on the secondary market at a premium or a discount to par value.[10]

---

[8] Questions 26 – 28 published April 14, 2020.
[9] Question 29 published April 15, 2020.
[10] Question 30 published April 17, 2020.

As of April 23, 2020

31. **Question:**  Do businesses owned by large companies with adequate sources of liquidity to support the business's ongoing operations qualify for a PPP loan?

**Answer:**  In addition to reviewing applicable affiliation rules to determine eligibility, all borrowers must assess their economic need for a PPP loan under the standard established by the CARES Act and the PPP regulations at the time of the loan application.  Although the CARES Act suspends the ordinary requirement that borrowers must be unable to obtain credit elsewhere (as defined in section 3(h) of the Small Business Act), borrowers still must certify in good faith that their PPP loan request is necessary.  Specifically, before submitting a PPP application, all borrowers should review carefully the required certification that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant."  Borrowers must make this certification in good faith, taking into account their current business activity and their ability to access other sources of liquidity sufficient to support their ongoing operations in a manner that is not significantly detrimental to the business.  For example, it is unlikely that a public company with substantial market value and access to capital markets will be able to make the required certification in good faith, and such a company should be prepared to demonstrate to SBA, upon request, the basis for its certification.

Lenders may rely on a borrower's certification regarding the necessity of the loan request.  Any borrower that applied for a PPP loan prior to the issuance of this guidance and repays the loan in full by May 7, 2020 will be deemed by SBA to have made the required certification in good faith.[11]

---

[11] Question 31 published April 23, 2020.

SBA_000057



# U. S. Small Business Administration

## Table of Small Business Size Standards
## Matched to
## North American Industry Classification System Codes

This table lists small business size standards matched to industries described in the North American Industry Classification System (NAICS), as modified by the Office of Management and Budget, effective January 1, 2017.

The size standards are for the most part expressed in either millions of dollars (those preceded by "$") or number of employees (those without the "$"). A size standard is the largest that a concern can be and still qualify as a small business for Federal Government programs. For the most part, size standards are the average annual receipts or the average employment of a firm. How to calculate average annual receipts and average employment of a firm can be found in 13 CFR § 121.104 and 13 CFR § 121.106, respectively.

SBA also includes the table of size standards in the Small Business Size Regulations, 13 CFR § 121.201. This table includes size standards that have changed since the last publication of 13 CFR § 121.

For more information on these size standards, please visit SBA's Size Standards webpage.

If you have any other questions concerning size standards, contact a Size Specialist at your nearest SBA Government Contracting Area Office (list at the end of the table), or contact the Office of Size Standards by email at *sizestandards@sba.gov* or by phone at (202) 205-6618.

Important Notices:
1. Businesses registered in the System for Award Management (SAM.gov) must update their SAM registration in order to have their small business status updated based on the new size standards effective May 2, 2022. Until the SAM registration is updated, the SAM profiles will continue to display the small business status under the old size standards.

2. In accordance with SBA's recently issued guidance, SBA advises all procurement professionals not to use NAICS 2022 codes when preparing solicitations and awarding contracts until SBA updates its small business size standards to NAICS 2022, which SBA anticipates implementing on October 1, 2022. Until SBA updates its size standards, the NAICS 2017 codes should be used.

*These size standards are effective*

*May 2, 2022*

SBA_000058

## Sector 11 – Agriculture, Forestry, Fishing and Hunting

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 111110 | Soybean Farming | $2.0 | |
| 111120 | Oilseed (except Soybean) Farming | $2.0 | |
| 111130 | Dry Pea and Bean Farming | $2.5 | |
| 111140 | Wheat Farming | $2.0 | |
| 111150 | Corn Farming | $2.25 | |
| 111160 | Rice Farming | $2.25 | |
| 111191 | Oilseed and Grain Combination Farming | $2.0 | |
| 111199 | All Other Grain Farming | $2.0 | |
| 111211 | Potato Farming | $3.75 | |
| 111219 | Other Vegetable (except Potato) and Melon Farming | $3.25 | |
| 111310 | Orange Groves | $3.5 | |
| 111320 | Citrus (except Orange) Groves | $3.75 | |
| 111331 | Apple Orchards | $4.0 | |
| 111332 | Grape Vineyards | $3.5 | |
| 111333 | Strawberry Farming | $4.75 | |
| 111334 | Berry (except Strawberry) Farming | $3.25 | |
| 111335 | Tree Nut Farming | $3.25 | |
| 111336 | Fruit and Tree Nut Combination Farming | $4.5 | |
| 111339 | Other Noncitrus Fruit Farming | $3.0 | |
| 111411 | Mushroom Production | $4.0 | |
| 111419 | Other Food Crops Grown Under Cover | $4.0 | |
| 111421 | Nursery and Tree Production | $2.75 | |
| 111422 | Floriculture Production | $3.25 | |
| 111910 | Tobacco Farming | $2.25 | |
| 111920 | Cotton Farming | $2.75 | |
| 111930 | Sugarcane Farming | $4.5 | |
| 111940 | Hay Farming | $2.25 | |
| 111991 | Sugar Beet Farming | $2.25 | |
| 111992 | Peanut Farming | $2.25 | |
| 111998 | All Other Miscellaneous Crop Farming | $2.25 | |
| 112111 | Beef Cattle Ranching and Farming | $2.25 | |
| 112112 | Cattle Feedlots | $19.5 | |
| 112120 | Dairy Cattle and Milk Production | $3.25 | |
| 112210 | Hog and Pig Farming | $3.5 | |

SBA_000052

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 112310 | Chicken Egg Production | $16.5 | |
| 112320 | Broilers and Other Meat Type Chicken Production | $3.0 | |
| 112330 | Turkey Production | $3.25 | |
| 112340 | Poultry Hatcheries | $3.5 | |
| 112390 | Other Poultry Production | $3.25 | |
| 112410 | Sheep Farming | $3.0 | |
| 112420 | Goat Farming | $2.25 | |
| 112511 | Finfish Farming and Fish Hatcheries | $3.25 | |
| 112512 | Shellfish Farming | $3.25 | |
| 112519 | Other Aquaculture | $3.25 | |
| 112910 | Apiculture | $2.75 | |
| 112920 | Horses and Other Equine Production | $2.5 | |
| 112930 | Fur-Bearing Animal and Rabbit Production | $3.25 | |
| 112990 | All Other Animal Production | $2.5 | |
| 113110 | Timber Tract Operations | $16.5 | |
| 113210 | Forest Nurseries and Gathering of Forest Products | $18.0 | |
| 113310 | Logging | | 500 |
| 114111 | Finfish Fishing | $22.0 | |
| 114112 | Shellfish Fishing | $12.5 | |
| 114119 | Other Marine Fishing | $10.0 | |
| 114210 | Hunting and Trapping | $7.5 | |
| 115111 | Cotton Ginning | $14.0 | |
| 115112 | Soil Preparation, Planting, and Cultivating | $8.5 | |
| 115113 | Crop Harvesting, Primarily by Machine | $12.0 | |
| 115114 | Postharvest Crop Activities (except Cotton Ginning) | $30.0 | |
| 115115 | Farm Labor Contractors and Crew Leaders | $16.5 | |
| 115116 | Farm Management Services | $13.5 | |
| 115210 | Support Activities for Animal Production | $9.5 | |
| 115310 | Support Activities for Forestry | $10.0 | |
| 115310 (Exception 1) | Forest Fire Suppression[1] | $30.0 | |
| 115310 (Exception 2) | Fuels Management Services[1] | $30.0 | |

JA0060

## Sector 21 – Mining, Quarrying, and Oil and Gas

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 211120 | Crude Petroleum Extraction | | 1,250 |
| 211130 | Natural Gas Extraction | | 1,250 |
| 212111 | Bituminous Coal and Lignite Surface Mining | | 1,250 |
| 212112 | Bituminous Coal Underground Mining | | 1,500 |
| 212113 | Anthracite Mining | | 250 |
| 212210 | Iron Ore Mining | | 750 |
| 212221 | Gold Ore Mining | | 1,500 |
| 212222 | Silver Ore Mining | | 250 |
| 212230 | Copper, Nickel, Lead, and Zinc Mining | | 750 |
| 212291 | Uranium-Radium-Vanadium Ore Mining | | 250 |
| 212299 | All Other Metal Ore Mining | | 750 |
| 212311 | Dimension Stone Mining and Quarrying | | 500 |
| 212312 | Crushed and Broken Limestone Mining and Quarrying | | 750 |
| 212313 | Crushed and Broken Granite Mining and Quarrying | | 750 |
| 212319 | Other Crushed and Broken Stone Mining and Quarrying | | 500 |
| 212321 | Construction Sand and Gravel Mining | | 500 |
| 212322 | Industrial Sand Mining | | 500 |
| 212324 | Kaolin and Ball Clay Mining | | 750 |
| 212325 | Clay and Ceramic and Refractory Minerals Mining | | 500 |
| 212391 | Potash, Soda, and Borate Mineral Mining | | 750 |
| 212392 | Phosphate Rock Mining | | 1,000 |
| 212393 | Other Chemical and Fertilizer Mineral Mining | | 500 |
| 212399 | All Other Nonmetallic Mineral Mining | | 500 |
| 213111 | Drilling Oil and Gas Wells | | 1,000 |
| 213112 | Support Activities for Oil and Gas Operations | $41.5 | |
| 213113 | Support Activities for Coal Mining | $24.0 | |
| 213114 | Support Activities for Metal Mining | $36.0 | |
| 213115 | Support Activities for Nonmetallic Minerals (except Fuels) | $18.0 | |

SBA_000064

## Sector 22 – Utilities

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 221111 | Hydroelectric Power Generation | | 500 |
| 221112 | Fossil Fuel Electric Power Generation | | 750 |
| 221113 | Nuclear Electric Power Generation | | 750 |
| 221114 | Solar Electric Power Generation | | 250 |
| 221115 | Wind Electric Power Generation | | 250 |
| 221116 | Geothermal Electric Power Generation | | 250 |
| 221117 | Biomass Electric Power Generation | | 250 |
| 221118 | Other Electric Power Generation | | 250 |
| 221121 | Electric Bulk Power Transmission and Control | | 500 |
| 221122 | Electric Power Distribution | | 1,000 |
| 221210 | Natural Gas Distribution | | 1,000 |
| 221310 | Water Supply and Irrigation Systems | $36.0 | |
| 221320 | Sewage Treatment Facilities | $31.0 | |
| 221330 | Steam and Air-Conditioning Supply | $26.5 | |

## Sector 23 – Construction

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 236115 | New Single-family Housing Construction (Except For-Sale Builders) | $39.5 | |
| 236116 | New Multifamily Housing Construction (except For-Sale Builders) | $39.5 | |
| 236117 | New Housing For-Sale Builders | $39.5 | |
| 236118 | Residential Remodelers | $39.5 | |
| 236210 | Industrial Building Construction | $39.5 | |
| 236220 | Commercial and Institutional Building Construction | $39.5 | |
| 237110 | Water and Sewer Line and Related Structures Construction | $39.5 | |
| 237120 | Oil and Gas Pipeline and Related Structures Construction | $39.5 | |

SBA_000062

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 237130 | Power and Communication Line and Related Structures Construction | $39.5 | |
| 237210 | Land Subdivision | $30.0 | |
| 237310 | Highway, Street, and Bridge Construction | $39.5 | |
| 237990 | Other Heavy and Civil Engineering Construction | $39.5 | |
| 237990 (Exception) | Dredging and Surface Cleanup Activities[2] | $32.5 | |
| 238110 | Poured Concrete Foundation and Structure Contractors | $16.5 | |
| 238120 | Structural Steel and Precast Concrete Contractors | $16.5 | |
| 238130 | Framing Contractors | $16.5 | |
| 238140 | Masonry Contractors | $16.5 | |
| 238150 | Glass and Glazing Contractors | $16.5 | |
| 238160 | Roofing Contractors | $16.5 | |
| 238170 | Siding Contractors | $16.5 | |
| 238190 | Other Foundation, Structure, and Building Exterior Contractors | $16.5 | |
| 238210 | Electrical Contractors and Other Wiring Installation Contractors | $16.5 | |
| 238220 | Plumbing, Heating, and Air-Conditioning Contractors | $16.5 | |
| 238290 | Other Building Equipment Contractors | $19.5 | |
| 238310 | Drywall and Insulation Contractors | $16.5 | |
| 238320 | Painting and Wall Covering Contractors | $16.5 | |
| 238330 | Flooring Contractors | $16.5 | |
| 238340 | Tile and Terrazzo Contractors | $16.5 | |
| 238350 | Finish Carpentry Contractors | $16.5 | |
| 238390 | Other Building Finishing Contractors | $16.5 | |
| 238910 | Site Preparation Contractors | $16.5 | |
| 238990 | All Other Specialty Trade Contractors | $16.5 | |
| 238990 (Exception) | Building and Property Specialty Trade Services [13] | $16.5 | |

SBA_000068

## Sector 31 – 33 – Manufacturing

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 311111 | Dog and Cat Food Manufacturing | | 1,000 |
| 311119 | Other Animal Food Manufacturing | | 500 |
| 311211 | Flour Milling | | 1,000 |
| 311212 | Rice Milling | | 500 |
| 311213 | Malt Manufacturing | | 500 |
| 311221 | Wet Corn Milling | | 1,250 |
| 311224 | Soybean and Other Oilseed Processing | | 1,000 |
| 311225 | Fats and Oils Refining and Blending | | 1,000 |
| 311230 | Breakfast Cereal Manufacturing | | 1,000 |
| 311313 | Beet Sugar Manufacturing | | 750 |
| 311314 | Cane Sugar Manufacturing | | 1,000 |
| 311340 | Nonchocolate Confectionery Manufacturing | | 1,000 |
| 311351 | Chocolate and Confectionery Manufacturing from Cacao Beans | | 1,250 |
| 311352 | Confectionery Manufacturing from Purchased Chocolate | | 1,000 |
| 311411 | Frozen Fruit, Juice and Vegetable Manufacturing | | 1,000 |
| 311412 | Frozen Specialty Food Manufacturing | | 1,250 |
| 311421 | Fruit and Vegetable Canning[3] | | 1,000 |
| 311422 | Specialty Canning | | 1,250 |
| 311423 | Dried and Dehydrated Food Manufacturing | | 750 |
| 311511 | Fluid Milk Manufacturing | | 1,000 |
| 311512 | Creamery Butter Manufacturing | | 750 |
| 311513 | Cheese Manufacturing | | 1,250 |
| 311514 | Dry, Condensed, and Evaporated Dairy Product Manufacturing | | 750 |
| 311520 | Ice Cream and Frozen Dessert Manufacturing | | 1,000 |
| 311611 | Animal (except Poultry) Slaughtering | | 1,000 |
| 311612 | Meat Processed from Carcasses | | 1,000 |
| 311613 | Rendering and Meat Byproduct Processing | | 750 |
| 311615 | Poultry Processing | | 1,250 |
| 311710 | Seafood Product Preparation and Packaging | | 750 |
| 311811 | Retail Bakeries | | 500 |
| 311812 | Commercial Bakeries | | 1,000 |

SBA_000067

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 311813 | Frozen Cakes, Pies, and Other Pastries Manufacturing | | 750 |
| 311821 | Cookie and Cracker Manufacturing | | 1,250 |
| 311824 | Dry Pasta, Dough, and Flour Mixes Manufacturing from Purchased Flour | | 750 |
| 311830 | Tortilla Manufacturing | | 1,250 |
| 311911 | Roasted Nuts and Peanut Butter Manufacturing | | 750 |
| 311919 | Other Snack Food Manufacturing | | 1,250 |
| 311920 | Coffee and Tea Manufacturing | | 750 |
| 311930 | Flavoring Syrup and Concentrate Manufacturing | | 1,000 |
| 311941 | Mayonnaise, Dressing and Other Prepared Sauce Manufacturing | | 750 |
| 311942 | Spice and Extract Manufacturing | | 500 |
| 311991 | Perishable Prepared Food Manufacturing | | 500 |
| 311999 | All Other Miscellaneous Food Manufacturing | | 500 |
| 312111 | Soft Drink Manufacturing | | 1,250 |
| 312112 | Bottled Water Manufacturing | | 1,000 |
| 312113 | Ice Manufacturing | | 750 |
| 312120 | Breweries | | 1,250 |
| 312130 | Wineries | | 1,000 |
| 312140 | Distilleries | | 1,000 |
| 312230 | Tobacco Manufacturing | | 1,500 |
| 313110 | Fiber, Yarn, and Thread Mills | | 1,250 |
| 313210 | Broadwoven Fabric Mills | | 1,000 |
| 313220 | Narrow Fabric Mills and Schiffli Machine Embroidery | | 500 |
| 313230 | Nonwoven Fabric Mills | | 750 |
| 313240 | Knit Fabric Mills | | 500 |
| 313310 | Textile and Fabric Finishing Mills | | 1,000 |
| 313320 | Fabric Coating Mills | | 1,000 |
| 314110 | Carpet and Rug Mills | | 1,500 |
| 314120 | Curtain and Linen Mills | | 750 |
| 314910 | Textile Bag and Canvas Mills | | 500 |
| 314994 | Rope, Cordage, Twine, Tire Cord, and Tire Fabric Mills | | 1,000 |
| 314999 | All Other Miscellaneous Textile Product Mills | | 500 |

JA0065

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 315110 | Hosiery and Sock Mills | | 750 |
| 315190 | Other Apparel Knitting Mills | | 750 |
| 315210 | Cut and Sew Apparel Contractors | | 750 |
| 315220 | Men's and Boys' Cut and Sew Apparel Manufacturing | | 750 |
| 315240 | Women's, Girls', and Infants' Cut and Sew Apparel Manufacturing | | 750 |
| 315280 | Other Cut and Sew Apparel Manufacturing | | 750 |
| 315990 | Apparel Accessories and Other Apparel Manufacturing | | 500 |
| 316110 | Leather and Hide Tanning and Finishing | | 500 |
| 316210 | Footwear Manufacturing | | 1,000 |
| 316992 | Women's Handbag and Purse Manufacturing | | 750 |
| 316998 | All Other Leather Good and Allied Product Manufacturing | | 500 |
| 321113 | Sawmills | | 500 |
| 321114 | Wood Preservation | | 500 |
| 321211 | Hardwood Veneer and Plywood Manufacturing | | 500 |
| 321212 | Softwood Veneer and Plywood Manufacturing | | 1,250 |
| 321213 | Engineered Wood Member (except Truss) Manufacturing | | 750 |
| 321214 | Truss Manufacturing | | 500 |
| 321219 | Reconstituted Wood Product Manufacturing | | 750 |
| 321911 | Wood Window and Door Manufacturing | | 1,000 |
| 321912 | Cut Stock, Resawing Lumber, and Planing | | 500 |
| 321918 | Other Millwork (including Flooring) | | 500 |
| 321920 | Wood Container and Pallet Manufacturing | | 500 |
| 321991 | Manufactured Home (Mobile Home) Manufacturing | | 1,250 |
| 321992 | Prefabricated Wood Building Manufacturing | | 500 |
| 321999 | All Other Miscellaneous Wood Product Manufacturing | | 500 |
| 322110 | Pulp Mills | | 750 |
| 322121 | Paper (except Newsprint) Mills | | 1,250 |
| 322122 | Newsprint Mills | | 750 |
| 322130 | Paperboard Mills | | 1,250 |

SBA_000060

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 322211 | Corrugated and Solid Fiber Box Manufacturing | | 1,250 |
| 322212 | Folding Paperboard Box Manufacturing | | 750 |
| 322219 | Other Paperboard Container Manufacturing | | 1,000 |
| 322220 | Paper Bag and Coated and Treated Paper Manufacturing | | 750 |
| 322230 | Stationery Product Manufacturing | | 750 |
| 322291 | Sanitary Paper Product Manufacturing | | 1,500 |
| 322299 | All Other Converted Paper Product Manufacturing | | 500 |
| 323111 | Commercial Printing (except Screen and Books) | | 500 |
| 323113 | Commercial Screen Printing | | 500 |
| 323117 | Books Printing | | 1,250 |
| 323120 | Support Activities for Printing | | 500 |
| 324110 | Petroleum Refineries[4] | | 1,500 |
| 324121 | Asphalt Paving Mixture and Block Manufacturing | | 500 |
| 324122 | Asphalt Shingle and Coating Materials Manufacturing | | 750 |
| 324191 | Petroleum Lubricating Oil and Grease Manufacturing | | 750 |
| 324199 | All Other Petroleum and Coal Products Manufacturing | | 500 |
| 325110 | Petrochemical Manufacturing | | 1,000 |
| 325120 | Industrial Gas Manufacturing | | 1,000 |
| 325130 | Synthetic Dye and Pigment Manufacturing | | 1,000 |
| 325180 | Other Basic Inorganic Chemical Manufacturing | | 1,000 |
| 325193 | Ethyl Alcohol Manufacturing | | 1,000 |
| 325194 | Cyclic Crude, Intermediate, and Gum and Wood Chemical Manufacturing | | 1,250 |
| 325199 | All Other Basic Organic Chemical Manufacturing | | 1,250 |
| 325211 | Plastics Material and Resin Manufacturing | | 1,250 |
| 325212 | Synthetic Rubber Manufacturing | | 1,000 |
| 325220 | Artificial and Synthetic Fibers and Filaments Manufacturing | | 1,000 |
| 325311 | Nitrogenous Fertilizer Manufacturing | | 1,000 |
| 325312 | Phosphatic Fertilizer Manufacturing | | 750 |
| 325314 | Fertilizer (Mixing Only) Manufacturing | | 500 |

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 325320 | Pesticide and Other Agricultural Chemical Manufacturing | | 1,000 |
| 325411 | Medicinal and Botanical Manufacturing | | 1,000 |
| 325412 | Pharmaceutical Preparation Manufacturing | | 1,250 |
| 325413 | In-Vitro Diagnostic Substance Manufacturing | | 1,250 |
| 325414 | Biological Product (except Diagnostic) Manufacturing | | 1,250 |
| 325510 | Paint and Coating Manufacturing | | 1,000 |
| 325520 | Adhesive Manufacturing | | 500 |
| 325611 | Soap and Other Detergent Manufacturing | | 1,000 |
| 325612 | Polish and Other Sanitation Good Manufacturing | | 750 |
| 325613 | Surface Active Agent Manufacturing | | 750 |
| 325620 | Toilet Preparation Manufacturing | | 1,250 |
| 325910 | Printing Ink Manufacturing | | 500 |
| 325920 | Explosives Manufacturing | | 750 |
| 325991 | Custom Compounding of Purchased Resins | | 500 |
| 325992 | Photographic Film, Paper, Plate and Chemical Manufacturing | | 1,500 |
| 325998 | All Other Miscellaneous Chemical Product and Preparation Manufacturing | | 500 |
| 326111 | Plastic Bag and Pouch Manufacturing | | 750 |
| 326112 | Plastics Packaging Film and Sheet (including Laminated) Manufacturing | | 1,000 |
| 326113 | Unlaminated Plastics Film and Sheet (except Packaging) Manufacturing | | 750 |
| 326121 | Unlaminated Plastics Profile Shape Manufacturing | | 500 |
| 326122 | Plastics Pipe and Pipe Fitting Manufacturing | | 750 |
| 326130 | Laminated Plastics Plate, Sheet (except Packaging), and Shape Manufacturing | | 500 |
| 326140 | Polystyrene Foam Product Manufacturing | | 1,000 |
| 326150 | Urethane and Other Foam Product (except Polystyrene) Manufacturing | | 750 |
| 326160 | Plastics Bottle Manufacturing | | 1,250 |
| 326191 | Plastics Plumbing Fixture Manufacturing | | 750 |
| 326199 | All Other Plastics Product Manufacturing | | 750 |

JA0068

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 326211 | Tire Manufacturing (except Retreading)[5] | | 1,500 |
| 326212 | Tire Retreading | | 500 |
| 326220 | Rubber and Plastics Hoses and Belting Manufacturing | | 750 |
| 326291 | Rubber Product Manufacturing for Mechanical Use | | 750 |
| 326299 | All Other Rubber Product Manufacturing | | 500 |
| 327110 | Pottery, Ceramics, and Plumbing Fixture Manufacturing | | 1,000 |
| 327120 | Clay Building Material and Refractories Manufacturing | | 750 |
| 327211 | Flat Glass Manufacturing | | 1,000 |
| 327212 | Other Pressed and Blown Glass and Glassware Manufacturing | | 1,250 |
| 327213 | Glass Container Manufacturing | | 1,250 |
| 327215 | Glass Product Manufacturing Made of Purchased Glass | | 1,000 |
| 327310 | Cement Manufacturing | | 1,000 |
| 327320 | Ready-Mix Concrete Manufacturing | | 500 |
| 327331 | Concrete Block and Brick Manufacturing | | 500 |
| 327332 | Concrete Pipe Manufacturing | | 750 |
| 327390 | Other Concrete Product Manufacturing | | 500 |
| 327410 | Lime Manufacturing | | 750 |
| 327420 | Gypsum Product Manufacturing | | 1,500 |
| 327910 | Abrasive Product Manufacturing | | 750 |
| 327991 | Cut Stone and Stone Product Manufacturing | | 500 |
| 327992 | Ground or Treated Mineral and Earth Manufacturing | | 500 |
| 327993 | Mineral Wool Manufacturing | | 1,500 |
| 327999 | All Other Miscellaneous Nonmetallic Mineral Product Manufacturing | | 500 |
| 331110 | Iron and Steel Mills and Ferroalloy Manufacturing | | 1,500 |
| 331210 | Iron and Steel Pipe and Tube Manufacturing from Purchased Steel | | 1,000 |
| 331221 | Rolled Steel Shape Manufacturing | | 1,000 |
| 331222 | Steel Wire Drawing | | 1,000 |

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 331313 | Alumina Refining and Primary Aluminum Production | | 1,000 |
| 331314 | Secondary Smelting and Alloying of Aluminum | | 750 |
| 331315 | Aluminum Sheet, Plate and Foil Manufacturing | | 1,250 |
| 331318 | Other Aluminum Rolling, Drawing, and Extruding | | 750 |
| 331410 | Nonferrous Metal (except Aluminum) Smelting and Refining | | 1,000 |
| 331420 | Copper Rolling, Drawing, Extruding, and Alloying | | 1,000 |
| 331491 | Nonferrous Metal (except Copper and Aluminum) Rolling, Drawing and Extruding | | 750 |
| 331492 | Secondary Smelting, Refining, and Alloying of Nonferrous Metal (except Copper and Aluminum) | | 750 |
| 331511 | Iron Foundries | | 1,000 |
| 331512 | Steel Investment Foundries | | 1,000 |
| 331513 | Steel Foundries (except Investment) | | 500 |
| 331523 | Nonferrous Metal Die-Casting Foundries | | 500 |
| 331524 | Aluminum Foundries (except Die-Casting) | | 500 |
| 331529 | Other Nonferrous Metal Foundries (except Die-Casting) | | 500 |
| 332111 | Iron and Steel Forging | | 750 |
| 332112 | Nonferrous Forging | | 750 |
| 332114 | Custom Roll Forming | | 500 |
| 332117 | Powder Metallurgy Part Manufacturing | | 500 |
| 332119 | Metal Crown, Closure, and Other Metal Stamping (except Automotive) | | 500 |
| 332215 | Metal Kitchen Cookware, Utensil, Cutlery, and Flatware (except Precious) Manufacturing | | 750 |
| 332216 | Saw Blade and Handtool Manufacturing | | 750 |
| 332311 | Prefabricated Metal Building and Component Manufacturing | | 750 |
| 332312 | Fabricated Structural Metal Manufacturing | | 500 |
| 332313 | Plate Work Manufacturing | | 750 |
| 332321 | Metal Window and Door Manufacturing | | 750 |
| 332322 | Sheet Metal Work Manufacturing | | 500 |
| 332323 | Ornamental and Architectural Metal Work Manufacturing | | 500 |

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 332410 | Power Boiler and Heat Exchanger Manufacturing | | 750 |
| 332420 | Metal Tank (Heavy Gauge) Manufacturing | | 750 |
| 332431 | Metal Can Manufacturing | | 1,500 |
| 332439 | Other Metal Container Manufacturing | | 500 |
| 332510 | Hardware Manufacturing | | 750 |
| 332613 | Spring Manufacturing | | 500 |
| 332618 | Other Fabricated Wire Product Manufacturing | | 500 |
| 332710 | Machine Shops | | 500 |
| 332721 | Precision Turned Product Manufacturing | | 500 |
| 332722 | Bolt, Nut, Screw, Rivet and Washer Manufacturing | | 500 |
| 332811 | Metal Heat Treating | | 750 |
| 332812 | Metal Coating, Engraving (except Jewelry and Silverware), and Allied Services to Manufacturers | | 500 |
| 332813 | Electroplating, Plating, Polishing, Anodizing and Coloring | | 500 |
| 332911 | Industrial Valve Manufacturing | | 750 |
| 332912 | Fluid Power Valve and Hose Fitting Manufacturing | | 1,000 |
| 332913 | Plumbing Fixture Fitting and Trim Manufacturing | | 1,000 |
| 332919 | Other Metal Valve and Pipe Fitting Manufacturing | | 750 |
| 332991 | Ball and Roller Bearing Manufacturing | | 1,250 |
| 332992 | Small Arms Ammunition Manufacturing | | 1,250 |
| 332993 | Ammunition (except Small Arms) Manufacturing | | 1,500 |
| 332994 | Small Arms, Ordnance, and Ordnance Accessories Manufacturing | | 1,000 |
| 332996 | Fabricated Pipe and Pipe Fitting Manufacturing | | 500 |
| 332999 | All Other Miscellaneous Fabricated Metal Product Manufacturing | | 750 |
| 333111 | Farm Machinery and Equipment Manufacturing[6] | | 1,250 |
| 333112 | Lawn and Garden Tractor and Home Lawn and Garden Equipment Manufacturing[6] | | 1,500 |
| 333120 | Construction Machinery Manufacturing[6] | | 1,250 |
| 333131 | Mining Machinery and Equipment Manufacturing[6] | | 500 |

JA0071

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 333132 | Oil and Gas Field Machinery and Equipment Manufacturing[6] | | 1,250 |
| 333241 | Food Product Machinery Manufacturing[6] | | 500 |
| 333242 | Semiconductor Machinery Manufacturing[6] | | 1,500 |
| 333243 | Sawmill, Woodworking, and Paper Machinery Manufacturing[6] | | 500 |
| 333244 | Printing Machinery and Equipment Manufacturing[6] | | 750 |
| 333249 | Other Industrial Machinery Manufacturing[6] | | 500 |
| 333314 | Optical Instrument and Lens Manufacturing[6] | | 500 |
| 333316 | Photographic and Photocopying Equipment Manufacturing[6] | | 1,000 |
| 333318 | Other Commercial and Service Industry Machinery Manufacturing[6] | | 1,000 |
| 333413 | Industrial and Commercial Fan and Blower and Air Purification Equipment Manufacturing[6] | | 500 |
| 333414 | Heating Equipment (except Warm Air Furnaces) Manufacturing[6] | | 500 |
| 333415 | Air-Conditioning and Warm Air Heating Equipment and Commercial and Industrial Refrigeration Equipment Manufacturing[6] | | 1,250 |
| 333511 | Industrial Mold Manufacturing[6] | | 500 |
| 333514 | Special Die and Tool, Die Set, Jig and Fixture Manufacturing[6] | | 500 |
| 333515 | Cutting Tool and Machine Tool Accessory Manufacturing[6] | | 500 |
| 333517 | Machine Tool Manufacturing[6] | | 500 |
| 333519 | Rolling Mill and Other Metalworking Machinery Manufacturing[6] | | 500 |
| 333611 | Turbine and Turbine Generator Set Unit Manufacturing[6] | | 1,500 |
| 333612 | Speed Changer, Industrial High-Speed Drive and Gear Manufacturing[6] | | 750 |

JA0072

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 333613 | Mechanical Power Transmission Equipment Manufacturing[6] | | 750 |
| 333618 | Other Engine Equipment Manufacturing[6] | | 1,500 |
| 333912 | Air and Gas Compressor Manufacturing[6] | | 1,000 |
| 333914 | Measuring, Dispensing, and Other Pumping Equipment Manufacturing[6] | | 750 |
| 333921 | Elevator and Moving Stairway Manufacturing[6] | | 1,000 |
| 333922 | Conveyor and Conveying Equipment Manufacturing[6] | | 500 |
| 333923 | Overhead Traveling Crane, Hoist and Monorail System Manufacturing[6] | | 1,250 |
| 333924 | Industrial Truck, Tractor, Trailer and Stacker Machinery Manufacturing[6] | | 750 |
| 333991 | Power-Driven Hand Tool Manufacturing[6] | | 500 |
| 333992 | Welding and Soldering Equipment Manufacturing[6] | | 1,250 |
| 333993 | Packaging Machinery Manufacturing[6] | | 500 |
| 333994 | Industrial Process Furnace and Oven Manufacturing[6] | | 500 |
| 333995 | Fluid Power Cylinder and Actuator Manufacturing[6] | | 750 |
| 333996 | Fluid Power Pump and Motor Manufacturing[6] | | 1,250 |
| 333997 | Scale and Balance Manufacturing[6] | | 500 |
| 333999 | All Other Miscellaneous General Purpose Machinery Manufacturing[6] | | 500 |
| 334111 | Electronic Computer Manufacturing[6] | | 1,250 |
| 334112 | Computer Storage Device Manufacturing[6] | | 1,250 |
| 334118 | Computer Terminal and Other Computer Peripheral Equipment Manufacturing[6] | | 1,000 |
| 334210 | Telephone Apparatus Manufacturing[6] | | 1,250 |
| 334220 | Radio and Television Broadcasting and Wireless Communications Equipment Manufacturing[6] | | 1,250 |
| 334290 | Other Communications Equipment Manufacturing[6] | | 750 |
| 334310 | Audio and Video Equipment Manufacturing[6] | | 750 |

JA0073

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 334412 | Bare Printed Circuit Board Manufacturing[6] | | 750 |
| 334413 | Semiconductor and Related Device Manufacturing[6] | | 1,250 |
| 334416 | Capacitor, Resistor, Coil, Transformer, and Other Inductor Manufacturing[6] | | 500 |
| 334417 | Electronic Connector Manufacturing[6] | | 1,000 |
| 334418 | Printed Circuit Assembly (Electronic Assembly) Manufacturing[6] | | 750 |
| 334419 | Other Electronic Component Manufacturing[6] | | 750 |
| 334510 | Electromedical and Electrotherapeutic Apparatus Manufacturing[6] | | 1,250 |
| 334511 | Search, Detection, Navigation, Guidance, Aeronautical, and Nautical System and Instrument Manufacturing[6] | | 1,250 |
| 334512 | Automatic Environmental Control Manufacturing for Residential, Commercial and Appliance Use[6] | | 500 |
| 334513 | Instruments and Related Products Manufacturing for Measuring, Displaying, and Controlling Industrial Process Variables[6] | | 750 |
| 334514 | Totalizing Fluid Meter and Counting Device Manufacturing[6] | | 750 |
| 334515 | Instrument Manufacturing for Measuring and Testing Electricity and Electrical Signals[6] | | 750 |
| 334516 | Analytical Laboratory Instrument Manufacturing[6] | | 1,000 |
| 334517 | Irradiation Apparatus Manufacturing[6] | | 1,000 |
| 334519 | Other Measuring and Controlling Device Manufacturing[6] | | 500 |
| 334613 | Blank Magnetic and Optical Recording Media Manufacturing[6] | | 1,000 |
| 334614 | Software and Other Prerecorded Compact Disc, Tape, and Record Reproducing[6] | | 1,250 |
| 335110 | Electric Lamp Bulb and Part Manufacturing[6] | | 1,250 |
| 335121 | Residential Electric Lighting Fixture Manufacturing[6] | | 750 |

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 335122 | Commercial, Industrial and Institutional Electric Lighting Fixture Manufacturing[6] | | 500 |
| 335129 | Other Lighting Equipment Manufacturing[6] | | 500 |
| 335210 | Small Electrical Appliance Manufacturing[6] | | 1,500 |
| 335220 | Major Household Appliance Manufacturing[6] | | 1,500 |
| 335311 | Power, Distribution and Specialty Transformer Manufacturing[6] | | 750 |
| 335312 | Motor and Generator Manufacturing[6] | | 1,250 |
| 335313 | Switchgear and Switchboard Apparatus Manufacturing[6] | | 1,250 |
| 335314 | Relay and Industrial Control Manufacturing[6] | | 750 |
| 335911 | Storage Battery Manufacturing[6] | | 1,250 |
| 335912 | Primary Battery Manufacturing[6] | | 1,000 |
| 335921 | Fiber Optic Cable Manufacturing[6] | | 1,000 |
| 335929 | Other Communication and Energy Wire Manufacturing[6] | | 1,000 |
| 335931 | Current-Carrying Wiring Device Manufacturing[6] | | 500 |
| 335932 | Noncurrent-Carrying Wiring Device Manufacturing[6] | | 1,000 |
| 335991 | Carbon and Graphite Product Manufacturing[6] | | 750 |
| 335999 | All Other Miscellaneous Electrical Equipment and Component Manufacturing[6] | | 500 |
| 336111 | Automobile Manufacturing[6] | | 1,500 |
| 336112 | Light Truck and Utility Vehicle Manufacturing[6] | | 1,500 |
| 336120 | Heavy Duty Truck Manufacturing[6] | | 1,500 |
| 336211 | Motor Vehicle Body Manufacturing[6] | | 1,000 |
| 336212 | Truck Trailer Manufacturing[6] | | 1,000 |
| 336213 | Motor Home Manufacturing[6] | | 1,250 |
| 336214 | Travel Trailer and Camper Manufacturing[6] | | 1,000 |
| 336310 | Motor Vehicle Gasoline Engine and Engine Parts Manufacturing[6] | | 1,000 |
| 336320 | Motor Vehicle Electrical and Electronic Equipment Manufacturing[6] | | 1,000 |

SBA_000078

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 336330 | Motor Vehicle Steering and Suspension Components (except Spring) Manufacturing[6] | | 1,000 |
| 336340 | Motor Vehicle Brake System Manufacturing[6] | | 1,250 |
| 336350 | Motor Vehicle Transmission and Power Train Parts Manufacturing[6] | | 1,500 |
| 336360 | Motor Vehicle Seating and Interior Trim Manufacturing[6] | | 1,500 |
| 336370 | Motor Vehicle Metal Stamping[6] | | 1,000 |
| 336390 | Other Motor Vehicle Parts Manufacturing[6] | | 1,000 |
| 336411 | Aircraft Manufacturing[6] | | 1,500 |
| 336412 | Aircraft Engine and Engine Parts Manufacturing[6] | | 1,500 |
| 336413 | Other Aircraft Part and Auxiliary Equipment Manufacturing[6,7] | | 1,250 |
| 336414 | Guided Missile and Space Vehicle Manufacturing[6] | | 1,250 |
| 336415 | Guided Missile and Space Vehicle Propulsion Unit and Propulsion Unit Parts Manufacturing[6] | | 1,250 |
| 336419 | Other Guided Missile and Space Vehicle Parts and Auxiliary Equipment Manufacturing[6] | | 1,000 |
| 336510 | Railroad Rolling Stock Manufacturing[6] | | 1,500 |
| 336611 | Ship Building and Repairing[6] | | 1,250 |
| 336612 | Boat Building[6] | | 1,000 |
| 336991 | Motorcycle, Bicycle and Parts Manufacturing[6] | | 1,000 |
| 336992 | Military Armored Vehicle, Tank and Tank Component Manufacturing[6] | | 1,500 |
| 336999 | All Other Transportation Equipment Manufacturing[6] | | 1,000 |
| 337110 | Wood Kitchen Cabinet and Counter Top Manufacturing | | 750 |
| 337121 | Upholstered Household Furniture Manufacturing | | 1,000 |
| 337122 | Nonupholstered Wood Household Furniture Manufacturing | | 750 |
| 337124 | Metal Household Furniture Manufacturing | | 750 |
| 337125 | Household Furniture (except Wood and Metal) Manufacturing | | 750 |
| 337127 | Institutional Furniture Manufacturing | | 500 |

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 337211 | Wood Office Furniture Manufacturing | | 1,000 |
| 337212 | Custom Architectural Woodwork and Millwork Manufacturing | | 500 |
| 337214 | Office Furniture (Except Wood) Manufacturing | | 1,000 |
| 337215 | Showcase, Partition, Shelving, and Locker Manufacturing | | 500 |
| 337910 | Mattress Manufacturing | | 1,000 |
| 337920 | Blind and Shade Manufacturing | | 1,000 |
| 339112 | Surgical and Medical Instrument Manufacturing | | 1,000 |
| 339113 | Surgical Appliance and Supplies Manufacturing | | 750 |
| 339114 | Dental Equipment and Supplies Manufacturing | | 750 |
| 339115 | Ophthalmic Goods Manufacturing | | 1,000 |
| 339116 | Dental Laboratories | | 500 |
| 339910 | Jewelry and Silverware Manufacturing | | 500 |
| 339920 | Sporting and Athletic Goods Manufacturing | | 750 |
| 339930 | Doll, Toy, and Game Manufacturing | | 500 |
| 339940 | Office Supplies (except Paper) Manufacturing | | 750 |
| 339950 | Sign Manufacturing | | 500 |
| 339991 | Gasket, Packing, and Sealing Device Manufacturing | | 500 |
| 339992 | Musical Instrument Manufacturing | | 1,000 |
| 339993 | Fastener, Button, Needle and Pin Manufacturing | | 750 |
| 339994 | Broom, Brush and Mop Manufacturing | | 500 |
| 339995 | Burial Casket Manufacturing | | 1,000 |
| 339999 | All Other Miscellaneous Manufacturing | | 500 |

## Sector 42 – Wholesale Trade

(These NAICS codes shall not be used to classify Government acquisitions for supplies.  They also shall not be used by Federal government contractors when subcontracting for the acquisition for supplies.  The applicable manufacturing NAICS code shall be used to classify acquisitions for supplies.  A Wholesale Trade or Retail Trade business concern submitting an offer or a quote on a supply acquisition is categorized as a nonmanufacturer and deemed small if it has 500 or fewer employees and meets the requirements of 13 CFR 121.406.)

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 423110 | Automobile and Other Motor Vehicle Merchant Wholesalers | | 250 |
| 423120 | Motor Vehicle Supplies and New Parts Merchant Wholesalers | | 200 |
| 423130 | Tire and Tube Merchant Wholesalers | | 200 |
| 423140 | Motor Vehicle Parts (Used) Merchant Wholesalers | | 100 |
| 423210 | Furniture Merchant Wholesalers | | 100 |
| 423220 | Home Furnishing Merchant Wholesalers | | 100 |
| 423310 | Lumber, Plywood, Millwork, and Wood Panel Merchant Wholesalers | | 150 |
| 423320 | Brick, Stone, and Related Construction Material Merchant Wholesalers | | 150 |
| 423330 | Roofing, Siding, and Insulation Material Merchant Wholesalers | | 200 |
| 423390 | Other Construction Material Merchant Wholesalers | | 100 |
| 423410 | Photographic Equipment and Supplies Merchant Wholesalers | | 200 |
| 423420 | Office Equipment Merchant Wholesalers | | 200 |
| 423430 | Computer and Computer Peripheral Equipment and Software Merchant Wholesalers | | 250 |
| 423440 | Other Commercial Equipment Merchant Wholesalers | | 100 |
| 423450 | Medical, Dental, and Hospital Equipment and Supplies Merchant Wholesalers | | 200 |
| 423460 | Ophthalmic Goods Merchant Wholesalers | | 150 |
| 423490 | Other Professional Equipment and Supplies Merchant Wholesalers | | 150 |
| 423510 | Metal Service Centers and Other Metal Merchant Wholesalers | | 200 |
| 423520 | Coal and Other Mineral and Ore Merchant Wholesalers | | 100 |
| 423610 | Electrical Apparatus and Equipment, Wiring Supplies, and Related Equipment Merchant Wholesalers | | 200 |
| 423620 | Household Appliances, Electric Housewares, and Consumer Electronics Merchant Wholesalers | | 200 |

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 423690 | Other Electronic Parts and Equipment Merchant Wholesalers | | 250 |
| 423710 | Hardware Merchant Wholesalers | | 150 |
| 423720 | Plumbing and Heating Equipment and Supplies (Hydronics) Merchant Wholesalers | | 200 |
| 423730 | Warm Air Heating and Air-Conditioning Equipment and Supplies Merchant Wholesalers | | 150 |
| 423740 | Refrigeration Equipment and Supplies Merchant Wholesalers | | 100 |
| 423810 | Construction and Mining (except Oil Well) Machinery and Equipment Merchant Wholesalers | | 250 |
| 423820 | Farm and Garden Machinery and Equipment Merchant Wholesalers | | 100 |
| 423830 | Industrial Machinery and Equipment Merchant Wholesalers | | 100 |
| 423840 | Industrial Supplies Merchant Wholesalers | | 100 |
| 423850 | Service Establishment Equipment and Supplies Merchant Wholesalers | | 100 |
| 423860 | Transportation Equipment and Supplies (except Motor Vehicle) Merchant Wholesalers | | 150 |
| 423910 | Sporting and Recreational Goods and Supplies Merchant Wholesalers | | 100 |
| 423920 | Toy and Hobby Goods and Supplies Merchant Wholesalers | | 150 |
| 423930 | Recyclable Material Merchant Wholesalers | | 100 |
| 423940 | Jewelry, Watch, Precious Stone, and Precious Metal Merchant Wholesalers | | 100 |
| 423990 | Other Miscellaneous Durable Goods Merchant Wholesalers | | 100 |
| 424110 | Printing and Writing Paper Merchant Wholesalers | | 200 |
| 424120 | Stationary and Office Supplies Merchant Wholesalers | | 150 |
| 424130 | Industrial and Personal Service Paper Merchant Wholesalers | | 150 |
| 424210 | Drugs and Druggists' Sundries Merchant Wholesalers | | 250 |

JA0079

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 424310 | Piece Goods, Notions, and Other Dry Goods Merchant Wholesalers | | 100 |
| 424320 | Men's and Boys' Clothing and Furnishings Merchant Wholesalers | | 150 |
| 424330 | Women's, Children's, and Infants' Clothing and Accessories Merchant Wholesalers | | 100 |
| 424340 | Footwear Merchant Wholesalers | | 200 |
| 424410 | General Line Grocery Merchant Wholesalers | | 250 |
| 424420 | Packaged Frozen Food Merchant Wholesalers | | 200 |
| 424430 | Dairy Product (except Dried or Canned) Merchant Wholesalers | | 200 |
| 424440 | Poultry and Poultry Product Merchant Wholesalers | | 150 |
| 424450 | Confectionery Merchant Wholesalers | | 200 |
| 424460 | Fish and Seafood Merchant Wholesalers | | 100 |
| 424470 | Meat and Meat Product Merchant Wholesalers | | 150 |
| 424480 | Fresh Fruit and Vegetable Merchant Wholesalers | | 100 |
| 424490 | Other Grocery and Related Products Merchant Wholesalers | | 250 |
| 424510 | Grain and Field Bean Merchant Wholesalers | | 200 |
| 424520 | Livestock Merchant Wholesalers | | 100 |
| 424590 | Other Farm Product Raw Material Merchant Wholesalers | | 100 |
| 424610 | Plastics Materials and Basic Forms and Shapes Merchant Wholesalers | | 150 |
| 424690 | Other Chemical and Allied Products Merchant Wholesalers | | 150 |
| 424710 | Petroleum Bulk Stations and Terminals | | 200 |
| 424720 | Petroleum and Petroleum Products Merchant Wholesalers (except Bulk Stations and Terminals) | | 200 |
| 424810 | Beer and Ale Merchant Wholesalers | | 200 |
| 424820 | Wine and Distilled Alcoholic Beverage Merchant Wholesalers | | 250 |
| 424910 | Farm Supplies Merchant Wholesalers | | 200 |

SBA_000080

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 424920 | Book, Periodical, and Newspaper Merchant Wholesalers | | 200 |
| 424930 | Flower, Nursery Stock, and Florists' Supplies Merchant Wholesalers | | 100 |
| 424940 | Tobacco and Tobacco Product Merchant Wholesalers | | 250 |
| 424950 | Paint, Varnish, and Supplies Merchant Wholesalers | | 150 |
| 424990 | Other Miscellaneous Nondurable Goods Merchant Wholesalers | | 100 |
| 425110 | Business to Business Electronic Markets | | 100 |
| 425120 | Wholesale Trade Agents and Brokers | | 100 |

## Sector 44 - 45 – Retail Trade

(These NAICS codes shall not be used to classify Government acquisitions for supplies.  They also shall not be used by Federal government contractors when subcontracting for the acquisition for supplies.  The applicable manufacturing NAICS code shall be used to classify acquisitions for supplies.  A Wholesale Trade or Retail Trade business concern submitting an offer or a quote on a supply acquisition is categorized as a nonmanufacturer and deemed small if it has 500 or fewer employees and meets the requirements of 13 CFR 121.406.)

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 441110 | New Car Dealers | | 200 |
| 441120 | Used Car Dealers | $27.0 | |
| 441210 | Recreational Vehicle Dealers | $35.0 | |
| 441222 | Boat Dealers | $35.0 | |
| 441228 | Motorcycle, ATV, and All Other Motor Vehicle Dealers | $35.0 | |
| 441310 | Automotive Parts and Accessories Stores | $16.5 | |
| 441320 | Tire Dealers | $16.5 | |
| 442110 | Furniture Stores | $22.0 | |
| 442210 | Floor Covering Stores | $8.0 | |

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 442291 | Window Treatment Stores | $8.0 | |
| 442299 | All Other Home Furnishings Stores | $22.0 | |
| 443141 | Household Appliance Stores | $12.0 | |
| 443142 | Electronics Stores | $35.0 | |
| 444110 | Home Centers | $41.5 | |
| 444120 | Paint and Wallpaper Stores | $30.0 | |
| 444130 | Hardware Stores | $8.0 | |
| 444190 | Other Building Material Dealers | $22.0 | |
| 444210 | Outdoor Power Equipment Stores | $8.0 | |
| 444220 | Nursery and Garden Centers | $12.0 | |
| 445110 | Supermarkets and Other Grocery (except Convenience) Stores | $35.0 | |
| 445120 | Convenience Stores | $32.0 | |
| 445210 | Meat Markets | $8.0 | |
| 445220 | Fish and Seafood Markets | $8.0 | |
| 445230 | Fruit and Vegetable Markets | $8.0 | |
| 445291 | Baked Goods Stores | $8.0 | |
| 445292 | Confectionery and Nut Stores | $8.0 | |
| 445299 | All Other Specialty Food Stores | $8.0 | |
| 445310 | Beer, Wine and Liquor Stores | $8.0 | |
| 446110 | Pharmacies and Drug Stores | $30.0 | |
| 446120 | Cosmetics, Beauty Supplies and Perfume Stores | $30.0 | |
| 446130 | Optical Goods Stores | $22.0 | |
| 446191 | Food (Health) Supplement Stores | $16.5 | |
| 446199 | All Other Health and Personal Care Stores | $8.0 | |
| 447110 | Gasoline Stations with Convenience Stores | $32.0 | |
| 447190 | Other Gasoline Stations | $16.5 | |
| 448110 | Men's Clothing Stores | $12.0 | |
| 448120 | Women's Clothing Stores | $30.0 | |
| 448130 | Children's and Infants' Clothing Stores | $35.0 | |
| 448140 | Family Clothing Stores | $41.5 | |
| 448150 | Clothing Accessories Stores | $16.5 | |
| 448190 | Other Clothing Stores | $22.0 | |
| 448210 | Shoe Stores | $30.0 | |
| 448310 | Jewelry Stores | $16.5 | |
| 448320 | Luggage and Leather Goods Stores | $30.0 | |

JA0082

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 451110 | Sporting Goods Stores | $16.5 | |
| 451120 | Hobby, Toy and Game Stores | $30.0 | |
| 451130 | Sewing, Needlework and Piece Goods Stores | $30.0 | |
| 451140 | Musical Instrument and Supplies Stores | $12.0 | |
| 451211 | Book Stores | $30.0 | |
| 451212 | News Dealers and Newsstands | $8.0 | |
| 452210 | Department Stores | $35.0 | |
| 452311 | Warehouse Clubs and Supercenters | $32.0 | |
| 452319 | All Other General Merchandise Stores | $35.0 | |
| 453110 | Florists | $8.0 | |
| 453210 | Office Supplies and Stationery Stores | $35.0 | |
| 453220 | Gift, Novelty and Souvenir Stores | $8.0 | |
| 453310 | Used Merchandise Stores | $8.0 | |
| 453910 | Pet and Pet Supplies Stores | $22.0 | |
| 453920 | Art Dealers | $8.0 | |
| 453930 | Manufactured (Mobile) Home Dealers | $16.5 | |
| 453991 | Tobacco Stores | $8.0 | |
| 453998 | All Other Miscellaneous Store Retailers (except Tobacco Stores) | $8.0 | |
| 454110 | Electronic Shopping and Mail-Order Houses | $41.5 | |
| 454210 | Vending Machine Operators | $12.0 | |
| 454310 | Fuel Dealers | | 100 |
| 454390 | Other Direct Selling Establishments | $8.0 | |

## Sector 48 - 49 – Transportation and Warehousing

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 481111 | Scheduled Passenger Air Transportation | | 1,500 |
| 481112 | Scheduled Freight Air Transportation | | 1,500 |
| 481211 | Nonscheduled Chartered Passenger Air Transportation | | 1,500 |
| 481212 | Nonscheduled Chartered Freight Air Transportation | | 1,500 |

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 481219 | Other Nonscheduled Air Transportation | $22.0 | |
| 482111 | Line-Haul Railroads | | 1,500 |
| 482112 | Short Line Railroads | | 1,500 |
| 483111 | Deep Sea Freight Transportation | | 500 |
| 483112 | Deep Sea Passenger Transportation | | 1,500 |
| 483113 | Coastal and Great Lakes Freight Transportation | | 750 |
| 483114 | Coastal and Great Lakes Passenger Transportation | | 500 |
| 483211 | Inland Water Freight Transportation | | 750 |
| 483212 | Inland Water Passenger Transportation | | 500 |
| 484110 | General Freight Trucking, Local | $30.0 | |
| 484121 | General Freight Trucking, Long-Distance, Truckload | $30.0 | |
| 484122 | General Freight Trucking, Long-Distance, Less Than Truckload | $38.0 | |
| 484210 | Used Household and Office Goods Moving | $30.0 | |
| 484220 | Specialized Freight (except Used Goods) Trucking, Local | $30.0 | |
| 484230 | Specialized Freight (except Used Goods) Trucking, Long-Distance | $30.0 | |
| 485111 | Mixed Mode Transit Systems | $25.5 | |
| 485112 | Commuter Rail Systems | $41.5 | |
| 485113 | Bus and Other Motor Vehicle Transit Systems | $28.5 | |
| 485119 | Other Urban Transit Systems | $33.0 | |
| 485210 | Interurban and Rural Bus Transportation | $28.0 | |
| 485310 | Taxi Service | $16.5 | |
| 485320 | Limousine Service | $16.5 | |
| 485410 | School and Employee Bus Transportation | $26.5 | |
| 485510 | Charter Bus Industry | $16.5 | |
| 485991 | Special Needs Transportation | $16.5 | |
| 485999 | All Other Transit and Ground Passenger Transportation | $16.5 | |
| 486110 | Pipeline Transportation of Crude Oil | | 1,500 |
| 486210 | Pipeline Transportation of Natural Gas | $36.5 | |
| 486910 | Pipeline Transportation of Refined Petroleum Products | | 1,500 |

JA0084

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 486990 | All Other Pipeline Transportation | $40.5 | |
| 487110 | Scenic and Sightseeing Transportation, Land | $18.0 | |
| 487210 | Scenic and Sightseeing Transportation, Water | $12.5 | |
| 487990 | Scenic and Sightseeing Transportation, Other | $22.0 | |
| 488111 | Air Traffic Control | $35.0 | |
| 488119 | Other Airport Operations | $35.0 | |
| 488190 | Other Support Activities for Air Transportation | $35.0 | |
| 488210 | Support Activities for Rail Transportation | $30.0 | |
| 488310 | Port and Harbor Operations | $41.5 | |
| 488320 | Marine Cargo Handling | $41.5 | |
| 488330 | Navigational Services to Shipping | $41.5 | |
| 488390 | Other Support Activities for Water Transportation | $41.5 | |
| 488410 | Motor Vehicle Towing | $8.0 | |
| 488490 | Other Support Activities for Road Transportation | $16.0 | |
| 488510 | Freight Transportation Arrangement[10] | $17.5 | |
| 488510 (Exception) | Non-Vessel Owning Common Carriers and Household Goods Forwarders | $30.0 | |
| 488991 | Packing and Crating | $30.0 | |
| 488999 | All Other Support Activities for Transportation | $22.0 | |
| 491110 | Postal Service | $8.0 | |
| 492110 | Couriers and Express Delivery Services | | 1,500 |
| 492210 | Local Messengers and Local Delivery | $30.0 | |
| 493110 | General Warehousing and Storage | $30.0 | |
| 493120 | Refrigerated Warehousing and Storage | $32.0 | |
| 493130 | Farm Product Warehousing and Storage | $30.0 | |
| 493190 | Other Warehousing and Storage | $32.0 | |

# Sector 51 – Information

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 511110 | Newspaper Publishers | | 1,000 |
| 511120 | Periodical Publishers | | 1,000 |

SBA_000085

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 511130 | Book Publishers | | 1,000 |
| 511140 | Directory and Mailing List Publishers | | 1,250 |
| 511191 | Greeting Card Publishers | | 1,500 |
| 511199 | All Other Publishers | | 500 |
| 511210 | Software Publishers[15] | $41.5 | |
| 512110 | Motion Picture and Video Production | $35.0 | |
| 512120 | Motion Picture and Video Distribution | $34.5 | |
| 512131 | Motion Picture Theaters (except Drive-Ins) | $41.5 | |
| 512132 | Drive-In Motion Picture Theaters | $11.0 | |
| 512191 | Teleproduction and Other Postproduction Services | $34.5 | |
| 512199 | Other Motion Picture and Video Industries | $25.0 | |
| 512230 | Music Publishers | | 750 |
| 512240 | Sound Recording Studios | $9.5 | |
| 512250 | Record Production and Distribution | | 250 |
| 512290 | Other Sound Recording Industries | $20.0 | |
| 515111 | Radio Networks | $41.5 | |
| 515112 | Radio Stations | $41.5 | |
| 515120 | Television Broadcasting | $41.5 | |
| 515210 | Cable and Other Subscription Programming | $41.5 | |
| 517311 | Wired Telecommunications Carriers | | 1,500 |
| 517312 | Wireless Telecommunications Carriers (except Satellite) | | 1,500 |
| 517410 | Satellite Telecommunications | $38.5 | |
| 517911 | Telecommunications Resellers | | 1,500 |
| 517919 | All Other Telecommunications | $35.0 | |
| 518210 | Data Processing, Hosting, and Related Services | $35.0 | |
| 519110 | News Syndicates | $32.0 | |
| 519120 | Libraries and Archives | $18.5 | |
| 519130 | Internet Publishing and Broadcasting and Web Search Portals | | 1,000 |
| 519190 | All Other Information Services | $30.0 | |

SBA_000080

## Sector 52 – Finance and Insurance

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 522110 | Commercial Banking[8] | $750 million in assets | |
| 522120 | Savings Institutions[8] | $750 million in assets | |
| 522130 | Credit Unions[8] | $750 million in assets | |
| 522190 | Other Depository Credit Intermediation[8] | $750 million in assets | |
| 522210 | Credit Card Issuing[8] | $750 million in assets | |
| 522220 | Sales Financing | $41.5 | |
| 522291 | Consumer Lending | $41.5 | |
| 522292 | Real Estate Credit | $41.5 | |
| 522293 | International Trade Financing | $41.5 | |
| 522294 | Secondary Market Financing | $41.5 | |
| 522298 | All Other Nondepository Credit Intermediation | $41.5 | |
| 522310 | Mortgage and Nonmortgage Loan Brokers | $13.0 | |
| 522320 | Financial Transactions Processing, Reserve, and Clearinghouse Activities | $41.5 | |
| 522390 | Other Activities Related to Credit Intermediation | $25.0 | |
| 523110 | Investment Banking and Securities Dealing | $41.5 | |
| 523120 | Securities Brokerage | $41.5 | |
| 523130 | Commodity Contracts Dealing | $41.5 | |
| 523140 | Commodity Contracts Brokerage | $41.5 | |
| 523210 | Securities and Commodity Exchanges | $41.5 | |
| 523910 | Miscellaneous Intermediation | $41.5 | |
| 523920 | Portfolio Management | $41.5 | |
| 523930 | Investment Advice | $41.5 | |
| 523991 | Trust, Fiduciary and Custody Activities | $41.5 | |
| 523999 | Miscellaneous Financial Investment Activities | $41.5 | |
| 524113 | Direct Life Insurance Carriers | $41.5 | |
| 524114 | Direct Health and Medical Insurance Carriers | $41.5 | |
| 524126 | Direct Property and Casualty Insurance Carriers | | 1,500 |
| 524127 | Direct Title Insurance Carriers | $41.5 | |

SBA_000080

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 524128 | Other Direct Insurance (except Life, Health and Medical) Carriers | $41.5 | |
| 524130 | Reinsurance Carriers | $41.5 | |
| 524210 | Insurance Agencies and Brokerages | $13.0 | |
| 524291 | Claims Adjusting | $22.0 | |
| 524292 | Third Party Administration of Insurance and Pension Funds | $40.0 | |
| 524298 | All Other Insurance Related Activities | $27.0 | |
| 525110 | Pension Funds | $35.0 | |
| 525120 | Health and Welfare Funds | $35.0 | |
| 525190 | Other Insurance Funds | $35.0 | |
| 525910 | Open-End Investment Funds | $35.0 | |
| 525920 | Trusts, Estates, and Agency Accounts | $35.0 | |
| 525990 | Other Financial Vehicles | $35.0 | |

## Sector 53 – Real Estate and Rental and Leasing

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 531110 | Lessors of Residential Buildings and Dwellings[9] | $30.0 | |
| 531120 | Lessors of Nonresidential Buildings (except Miniwarehouses)[9] | $30.0 | |
| 531130 | Lessors of Miniwarehouses and Self Storage Units[9] | $30.0 | |
| 531190 | Lessors of Other Real Estate Property[9] | $30.0 | |

SBA_000088

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 531210 | Offices of Real Estate Agents and Brokers[10] | $13.0 | |
| 531311 | Residential Property Managers | $11.0 | |
| 531312 | Nonresidential Property Managers | $17.0 | |
| 531320 | Offices of Real Estate Appraisers | $8.5 | |
| 531390 | Other Activities Related to Real Estate | $17.0 | |
| 532111 | Passenger Car Rental | $41.5 | |
| 532112 | Passenger Car Leasing | $41.5 | |
| 532120 | Truck, Utility Trailer, and RV (Recreational Vehicle) Rental and Leasing | $41.5 | |
| 532210 | Consumer Electronics and Appliances Rental | $41.5 | |
| 532281 | Formal Wear and Costume Rental | $22.0 | |
| 532282 | Video Tape and Disc Rental | $31.0 | |
| 532283 | Home Health Equipment Rental | $36.0 | |
| 532284 | Recreational Goods Rental | $8.0 | |
| 532289 | All Other Consumer Goods Rental | $11.0 | |
| 532310 | General Rental Centers | $8.0 | |
| 532411 | Commercial Air, Rail, and Water Transportation Equipment Rental and Leasing | $40.0 | |
| 532412 | Construction, Mining and Forestry Machinery and Equipment Rental and Leasing | $35.0 | |
| 532420 | Office Machinery and Equipment Rental and Leasing | $35.0 | |
| 532490 | Other Commercial and Industrial Machinery and Equipment Rental and Leasing | $35.0 | |
| 533110 | Lessors of Nonfinancial Intangible Assets (except Copyrighted Works) | $41.5 | |

## Sector 54 – Professional, Scientific and Technical Services

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 541110 | Offices of Lawyers | $13.5 | |
| 541191 | Title Abstract and Settlement Offices | $17.0 | |
| 541199 | All Other Legal Services | $18.0 | |

SBA_000082

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 541211 | Offices of Certified Public Accountants | $23.5 | |
| 541213 | Tax Preparation Services | $22.0 | |
| 541214 | Payroll Services | $34.5 | |
| 541219 | Other Accounting Services | $22.0 | |
| 541310 | Architectural Services | $11.0 | |
| 541320 | Landscape Architectural Services | $8.0 | |
| 541330 | Engineering Services | $22.5 | |
| 541330 (Exception 1) | Military and Aerospace Equipment and Military Weapons | $41.5 | |
| 541330 (Exception 2) | Contracts and Subcontracts for Engineering Services Awarded Under the National Energy Policy Act of 1992 | $41.5 | |
| 541330 (Exception 3) | Marine Engineering and Naval Architecture | $41.5 | |
| 541340 | Drafting Services | $8.0 | |
| 541350 | Building Inspection Services | $10.0 | |
| 541360 | Geophysical Surveying and Mapping Services | $25.0 | |
| 541370 | Surveying and Mapping (except Geophysical) Services | $16.5 | |
| 541380 | Testing Laboratories | $16.5 | |
| 541410 | Interior Design Services | $8.0 | |
| 541420 | Industrial Design Services | $15.0 | |
| 541430 | Graphic Design Services | $8.0 | |
| 541490 | Other Specialized Design Services | $12.0 | |
| 541511 | Custom Computer Programming Services | $30.0 | |
| 541512 | Computer Systems Design Services | $30.0 | |
| 541513 | Computer Facilities Management Services | $32.5 | |
| 541519 | Other Computer Related Services | $30.0 | |
| 541519 (Exception) | Information Technology Value Added Resellers[18] | | 150 |
| 541611 | Administrative Management and General Management Consulting Services | $21.5 | |
| 541612 | Human Resources Consulting Services | $25.5 | |
| 541613 | Marketing Consulting Services | $16.5 | |
| 541614 | Process, Physical Distribution and Logistics Consulting Services | $17.5 | |

SBA_000090

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 541618 | Other Management Consulting Services | $16.5 | |
| 541620 | Environmental Consulting Services | $16.5 | |
| 541690 | Other Scientific and Technical Consulting Services | $16.5 | |
| 541713 | Research and Technology in Nanotechnology[11] | | 1,000 |
| 541714 | Research and Technology in Biotechnology (except Nanobiotechnology)[11] | | 1,000 |
| 541715 | Research and Development in the Physical, Engineering, and Life Sciences (except Nanotechnology and Biotechnology)[11] | | 1,000 |
| 541715 (Exception 1) | Aircraft, Aircraft Engine and Engine Parts[11] | | 1,500 |
| 541715 (Exception 2) | Other Aircraft Parts and Auxiliary Equipment[11] | | 1,250 |
| 541715 (Exception 3) | Guided Missiles and Space Vehicles, Their Propulsion Units and Propulsion Parts[11] | | 1,250 |
| 541720 | Research and Development in the Social Sciences and Humanities | $24.5 | |
| 541810 | Advertising Agencies[10] | $22.5 | |
| 541820 | Public Relations Agencies | $16.5 | |
| 541830 | Media Buying Agencies | $28.5 | |
| 541840 | Media Representatives | $18.5 | |
| 541850 | Outdoor Advertising | $30.5 | |
| 541860 | Direct Mail Advertising | $19.5 | |
| 541870 | Advertising Material Distribution Services | $25.0 | |
| 541890 | Other Services Related to Advertising | $16.5 | |
| 541910 | Marketing Research and Public Opinion Polling | $20.0 | |
| 541921 | Photography Studios, Portrait | $14.0 | |
| 541922 | Commercial Photography | $8.0 | |
| 541930 | Translation and Interpretation Services | $20.0 | |
| 541940 | Veterinary Services | $9.0 | |
| 541990 | All Other Professional, Scientific and Technical Services | $17.0 | |

JA0091

## Sector 55 – Management of Companies and Enterprises

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 551111 | Offices of Bank Holding Companies | $34.0 | |
| 551112 | Offices of Other Holding Companies | $40.0 | |

## Sector 56 – Administrative and Support and Waste Management and Remediation Services

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 561110 | Office Administrative Services | $11.0 | |
| 561210 | Facilities Support Services[12] | $41.5 | |
| 561311 | Employment Placement Agencies | $30.0 | |
| 561312 | Executive Search Services | $30.0 | |
| 561320 | Temporary Help Services | $30.0 | |
| 561330 | Professional Employer Organizations | $36.5 | |
| 561410 | Document Preparation Services | $16.5 | |
| 561421 | Telephone Answering Services | $16.5 | |
| 561422 | Telemarketing Bureaus and Other contact Centers | $22.5 | |
| 561431 | Private Mail Centers | $16.5 | |
| 561439 | Other Business Service Centers (including Copy Shops) | $23.5 | |
| 561440 | Collection Agencies | $17.0 | |
| 561450 | Credit Bureaus | $36.0 | |
| 561491 | Repossession Services | $16.5 | |
| 561492 | Court Reporting and Stenotype Services | $16.5 | |
| 561499 | All Other Business Support Services | $19.0 | |
| 561510 | Travel Agencies[10] | $22.0 | |
| 561520 | Tour Operators[10] | $22.0 | |
| 561591 | Convention and Visitors Bureaus | $22.0 | |
| 561599 | All Other Travel Arrangement and Reservation Services | $28.5 | |
| 561611 | Investigation Services | $22.0 | |

SBA_000092

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 561612 | Security Guards and Patrol Services | $25.5 | |
| 561613 | Armored Car Services | $38.0 | |
| 561621 | Security Systems Services (except Locksmiths) | $22.0 | |
| 561622 | Locksmiths | $22.0 | |
| 561710 | Exterminating and Pest Control Services | $15.5 | |
| 561720 | Janitorial Services | $19.5 | |
| 561730 | Landscaping Services | $8.5 | |
| 561740 | Carpet and Upholstery Cleaning Services | $7.5 | |
| 561790 | Other Services to Buildings and Dwellings | $8.0 | |
| 561910 | Packaging and Labeling Services | $17.0 | |
| 561920 | Convention and Trade Show Organizers[10] | $17.5 | |
| 561990 | All Other Support Services | $14.5 | |
| 562111 | Solid Waste Collection | $41.5 | |
| 562112 | Hazardous Waste Collection | $41.5 | |
| 562119 | Other Waste Collection | $41.5 | |
| 562211 | Hazardous Waste Treatment and Disposal | $41.5 | |
| 562212 | Solid Waste Landfill | $41.5 | |
| 562213 | Solid Waste Combustors and Incinerators | $41.5 | |
| 562219 | Other Nonhazardous Waste Treatment and Disposal | $41.5 | |
| 562910 | Remediation Services | $22.0 | |
| 562910 (Exception) | Environmental Remediation Services[14] | | 750 |
| 562920 | Materials Recovery Facilities | $22.0 | |
| 562991 | Septic Tank and Related Services | $8.0 | |
| 562998 | All Other Miscellaneous Waste Management Services | $14.5 | |

## Sector 61 – Educational Services

| NAICS codes | NAICS U.S. industry titles | Size standards in millions of dollars | Size standards in number of employees |
|---|---|---|---|
| 611110 | Elementary and Secondary Schools | $17.5 | |
| 611210 | Junior Colleges | $28.5 | |

SBA_000096